IN THE UNITED STATES COURT OF APPEALS
ELEVENTH CIRCUIT

11th Cir. No. 20-14676-HH

AJ O'LAUGHLIN and
CRYSTAL LITTLE,

      Appellants,

vs.

PALM BEACH COUNTY, a political
subdivision of the State of Florida,

      Appellee.

_____/

## Appendix to Appellants' Initial Brief

(Volume 1)

KAREN COOLMAN AMLONG
Florida Bar Number 275565
KAmlong@TheAmlongFirm.com
THE AMLONG FIRM
500 NE Fourth St., Second Floor
Fort Lauderdale, FL  33301
Telephone (954) 462-1983
Facsimile (954) 523-3192
***Attorneys for the Appellants***,
    ***AJ O'Laughlin and Crystal Little***

**The Amlong Firm** • 500 Northeast Fourth Street • Fort Lauderdale, FL  33301 • 954.462.1983

## Index to Appendix

**Description**                                                                    **DE  No.**

Index  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I

**[Volume 1]**

Docket Sheet  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Docket

Notice of  Removal    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Defendant's Motion to Dismiss the Complaint  . . . . . . . . . . . . . . . . . . . . . . . 11

Plaintiffs' Response to Defendant's Motion to Dismiss the Complaint  . . . . . . . 14

Defendant's Reply in Support of Its Motion to Dismiss  . . . . . . . . . . . . . . . . . 30

Order Granting Motion to Dismiss  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

First Amended Complaint  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Defendant's Motion to Dismiss the Amended Complaint  . . . . . . . . . . . . . . . . 35

Plaintiff's Response to Defendant's Motion to Dismiss the Amended

    Complaint  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Defendant's Reply in Support of its Motion to Dismiss Plaintiffs' Amended

    Complaint  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Order Granting Motion to Dismiss  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

**[Volume 2]**

Palm Beach County's Answer and Affirmative Defenses  . . . . . . . . . . . . . . . . 46

Plaintiffs' Motion for Summary Judgment  . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Plaintiffs' Local 51.6(a) Statement of Material Facts  . . . . . . . . . . . . . . . . . . . 48

Defendant's Motion for Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Defendant's Statement of Material Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

**[Volume 3]**

Defendants' Response in Opposition to Plaintiffs' Motion

      for Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Defendant's Response Plaintiffs' Local 51.6(a) Statement of Material Facts . . . . 52

Plaintiffs' Local Rule 51.6(a)(2) Response to Defendant's Statement of Undisputed

      Material Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Plaintiffs' Response to Defendant's Motion for Summary Judgment . . . . . . . . . 54

Defendant's Reply in Support of its Motion for Summary Judgment . . . . . . . . . 55

Defendant's Reply to Plaintiffs' Local Rule 51.6(a)(2) Response to Defendant's

      Statement of Undisputed Material Facts . . . . . . . . . . . . . . . . . . . . . . . . . 56

Plaintiffs' Reply to Defendant's Response to Plaintiff's Motion for Summary

      Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Order Granting Defendant's Motion for Summary Judgment . . . . . . . . . . . . . . 76

Final Judgment and Order Closing Case . . . . . . . . . . . . . . . . . . . . . . . . . . 77

# DOCKET SHEET

APPEAL,CLOSED,MEDIATION,REF_DISCOV,WM

# U.S. District Court
## Southern District of Florida (West Palm Beach)
## CIVIL DOCKET FOR CASE #: 9:19-cv-80701-WPD

O'Laughlin et al v. Palm Beach County
Assigned to: Judge William P. Dimitrouleas
Referred to: Magistrate Judge William Matthewman
Case in other court: USCA, 20-14676-HH
                15th Judicial Circuit in and for Palm
                Beach County, 50-02019-CA-006350-
                XXXX-MB
Cause: 28:1331 Federal Question

Date Filed: 05/29/2019
Date Terminated: 11/12/2020
Jury Demand: Defendant
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**AJ O'Laughlin**                    represented by    **Karen Coolman Amlong**
Amlong & Amlong, PA
500 NE 4th Street
2nd Floor
Fort Lauderdale, FL 33301-1154
954-462-1983
Fax: 954-523-3192
Email: kamlong@theamlongfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Robert Amlong**
Amlong & Amlong
500 NE 4th Street
2nd Floor
Fort Lauderdale, FL 33301-1154
954-462-1983
Fax: 523-3192
Email: wramlong@theamlongfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*SUSPENDED 03/16/2021*

**Isha Kochhar**
1806 N. Flamingo Road #305
Pembroke Pines, FL 33028
(954) 292-5787
Email: isha@kochharlegal.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Crystal Little**                    represented by **Karen Coolman Amlong**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Robert Amlong**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*SUSPENDED 03/16/2021*

**Isha Kochhar**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Palm Beach County**              represented by **Anaili Medina Cure**
*a political Subdivision of the State of*        Palm Beacvh County Attorney's Office
*Florida*                                        300 N. Dixie Highway, Suite 359
West Palm Beach, FL 33401
561-355-6337
Email: acure@pbcgov.org
*ATTORNEY TO BE NOTICED*

**Andrew Marcus Pelino**
Palm Beach County Attorney's Office
Litigation Division
300 N Dixie Highway
Suite 359
West Palm Beach, FL 33401
561-355-2529
Fax: 355-4234
Email: apelino@pbcgov.com
*ATTORNEY TO BE NOTICED*

**Rachel Marie Fahey**
Palm Beach County Attorney's Office
300 N Dixie Hwy
Ste 359
West Palm Beach, FL 33401
(561) 355-6337
Email: rFahey@pbcgov.org
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|------------|---|-------------|
|            |   |             |

| 05/29/2019 | 1 | NOTICE OF REMOVAL (STATE COURT COMPLAINT - AJ O'Laughlin and Crystal Little vs. Palm Beach County) Filing fee $ 400.00 receipt number 113C-11682388, filed by Palm Beach County Board of County Commissioners. (Attachments: # 1 Ex 1, # 2 Ex 2, # 3 Ex 3)(Fahey, Rachel) (Entered: 05/29/2019) |
| --- | --- | --- |
| 05/29/2019 | 2 | Clerks Notice to Filer re: Electronic Case. Documents Improperly Arranged. The Filer did not properly attach the *documents*. Future filings must comply with the CM/ECF Civil Case Opening Guide. It is not necessary to re-file this document. (amb) (Entered: 05/29/2019) |
| 05/29/2019 | 3 | Clerks Notice of Judge Assignment to Judge William P. Dimitrouleas. Pursuant to 28 USC 636(c), the parties are hereby notified that the U.S. Magistrate Judge William Matthewman is available to handle any or all proceedings in this case. If agreed, parties should complete and file the Consent form found on our website. It is not necessary to file a document indicating lack of consent. Pro se (NON-PRISONER) litigants may receive Notices of Electronic Filings (NEFS) via email after filing a Consent by Pro Se Litigant (NON-PRISONER) to Receive Notices of Electronic Filing. The consent form is available under the forms section of our website. (amb) (Entered: 05/29/2019) |
| 05/30/2019 | 4 | Order Requiring Counsel To Meet, File Joint Scheduling Report And Joint Discovery Report. Signed by Judge William P. Dimitrouleas on 5/30/2019. *See attached document for full details.* (vmz) (Entered: 05/30/2019) |
| 05/31/2019 | 5 | ORDER REQUIRING COUNSEL TO MEET, FILE JOINT SCHEDULING REPORT AND JOINT DISCOVERY REPORT Signed by Judge William P. Dimitrouleas on 5/30/2019. *See attached document for full details.* (ail) (Entered: 05/31/2019) |
| 06/03/2019 | 6 | Unopposed MOTION for Extension of Time to File Response/Reply/Answer by Palm Beach County. (Fahey, Rachel) (Entered: 06/03/2019) |
| 06/04/2019 | 7 | PAPERLESS ORDER granting 6 Motion for Extension of Time to File Response/Answer to a Complaint or Other Case Initiating Document Palm Beach County. Answer due 6/25/2019. Re: 1 Notice of Removal (State Court Complaint), filed by Palm Beach County. Signed by Judge William P. Dimitrouleas on 6/4/2019. (vty) (Entered: 06/04/2019) |
| 06/18/2019 | 8 | NOTICE of Attorney Appearance by Andrew Marcus Pelino on behalf of Palm Beach County. Attorney Andrew Marcus Pelino added to party Palm Beach County(pty:dft). (Pelino, Andrew) (Entered: 06/18/2019) |
| 06/20/2019 | 9 | Second MOTION for Extension of Time to File Response/Reply/Answer *to respond to Plaintiffs' Complaint* by Palm Beach County. (Pelino, Andrew) (Entered: 06/20/2019) |
| 06/21/2019 | 10 | PAPERLESS ORDER granting 9 Motion for Extension of Time to File Response/Answer to a Complaint or Other Case Initiating Document Palm Beach County. Answer due 7/10/2019. Re: 1 Notice of Removal (State Court |

| | | |
|---|---|---|
| | | Complaint), filed by Palm Beach County. Signed by Judge William P. Dimitrouleas on 6/21/2019. (vty) (Entered: 06/21/2019) |
| 07/10/2019 | 11 | Defendant's MOTION to Dismiss with Prejudice 1 Notice of Removal (State Court Complaint), *Motion to Dismiss the Complaint and Incorporated Memorandum of Law* by Palm Beach County. Responses due by 7/24/2019 (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2)(Pelino, Andrew) (Entered: 07/10/2019) |
| 07/24/2019 | 12 | Unopposed MOTION for Extension of Time to File Response/Reply/Answer as to 11 Defendant's MOTION to Dismiss with Prejudice 1 Notice of Removal (State Court Complaint), *Motion to Dismiss the Complaint and Incorporated Memorandum of Law* by Crystal Little, AJ O'Laughlin. (Amlong, William) (Entered: 07/24/2019) |
| 07/25/2019 | 13 | PAPERLESS ORDER granting 12 Motion for Extension of Time to File Response/Reply to Motion. Re: 11 Defendant's MOTION to Dismiss with Prejudice 1 Notice of Removal (State Court Complaint), *Motion to Dismiss the Complaint and Incorporated Memorandum of Law* filed by Palm Beach County. Responses due by 8/5/2019 Signed by Judge William P. Dimitrouleas on 7/25/2019. (vty) (Entered: 07/25/2019) |
| 08/05/2019 | 14 | RESPONSE to Motion re 11 Defendant's MOTION to Dismiss with Prejudice 1 Notice of Removal (State Court Complaint), *Motion to Dismiss the Complaint and Incorporated Memorandum of Law* filed by Crystal Little, AJ O'Laughlin. Replies due by 8/12/2019. (Amlong, William) (Entered: 08/05/2019) |
| 08/12/2019 | 15 | Unopposed MOTION for Extension of Time to File Response/Reply/Answer as to 14 Response to Motion, by Palm Beach County. (Pelino, Andrew) (Entered: 08/12/2019) |
| 08/13/2019 | 16 | PAPERLESS ORDER TO SHOW CAUSE ( Show Cause Response due by 8/20/2019.) If a defendant fails to respond to a complaint, the plaintiff may move for a Clerks Entry of Default. See Fed. R. Civ. P. 55(a). In this case, although the Defendant has failed to timely respond to the Complaint, Plaintiff has not yet moved for a Clerks Entry of Default. Accordingly it is ORDERED and ADJUDGED that Plaintiff, on or before August 20, 2019, shall either move for Clerks Entry of Default against Defendant, or show cause why this action should not be dismissed for a lack of prosecution; and a failure to comply with this Order may result in immediate dismissal of this action without prejudice. Show Cause Response due by 8/20/2019. Signed by Judge William P. Dimitrouleas on 8/13/2019. (vty) (Entered: 08/13/2019) |
| 08/13/2019 | 17 | PAPERLESS ORDER granting 15 Motion for Extension of Time to File Response/Reply to Motion. Re: 11 Defendant's MOTION to Dismiss with Prejudice 1 Notice of Removal (State Court Complaint), *Motion to Dismiss the Complaint and Incorporated Memorandum of Law* filed by Palm Beach County. Replies due by 9/3/2019. Signed by Judge William P. Dimitrouleas on 8/13/2019. (vty) (Entered: 08/13/2019) |
| 08/13/2019 | 18 | The Paperless Order to Show Cause 16 is hereby STRICKEN. Signed by Judge William P. Dimitrouleas on 8/13/2019. (vty) (Entered: 08/13/2019) |
| | | |

| 08/14/2019 | 19 | Joint SCHEDULING REPORT - **Rule 16.1** by Crystal Little, AJ O'Laughlin (Amlong, William) (Entered: 08/14/2019) |
|---|---|---|
| 08/15/2019 | 20 | NOTICE of Attorney Appearance by Anaili Medina Cure on behalf of Palm Beach County. Attorney Anaili Medina Cure added to party Palm Beach County (pty:dft). (Medina Cure, Anaili) (Entered: 08/15/2019) |
| 08/15/2019 | 21 | ORDER SETTING TRIAL DATE & DISCOVERY DEADLINES, REFERRING CASE TO MEDIATION & REFERRING DISCOVERY MOTIONS TO UNITED STATES MAGISTRATE JUDGE. SCHEDULING ORDER: ( Jury Trial set for 8/17/2020 in Fort Lauderdale Division before Judge William P. Dimitrouleas., Calendar Call set for 8/14/2020 10:00 AM in Fort Lauderdale Division before Judge William P. Dimitrouleas.), ORDER REFERRING CASE to Mediation., ORDER REFERRING CASE to Magistrate Judge William Matthewman for Discovery Matters. Signed by Judge William P. Dimitrouleas on 8/15/2019. *See attached document for full details.* (amb)

**Pattern Jury Instruction Builder -** To access the latest, up to date changes to the 11th Circuit Pattern Jury Instructions go to https://pji.ca11.uscourts.gov or click here. (Entered: 08/15/2019) |
| 08/16/2019 | 22 | ORDER SETTING DISCOVERY PROCEDURE. Signed by Magistrate Judge William Matthewman on 8/16/2019. *See attached document for full details.* (kza) (Entered: 08/16/2019) |
| 08/27/2019 | 23 | NOTICE of Attorney Appearance by Isha Kochhar on behalf of Crystal Little, AJ O'Laughlin. Attorney Isha Kochhar added to party Crystal Little(pty:pla), Attorney Isha Kochhar added to party AJ O'Laughlin(pty:pla). (Kochhar, Isha) (Entered: 08/27/2019) |
| 08/29/2019 | 24 | Second MOTION for Extension of Time to File Response/Reply/Answer *Reply* by Palm Beach County. (Medina Cure, Anaili) (Entered: 08/29/2019) |
| 08/29/2019 | 25 | NOTICE by Crystal Little, AJ O'Laughlin *of Mediator Selection* (Kochhar, Isha) (Entered: 08/29/2019) |
| 08/29/2019 | 27 | NOTICE of Mediator Selection. Added Marlene Quintana. SEE DE 25 for Image (ail) (Entered: 08/30/2019) |
| 08/30/2019 | 26 | PAPERLESS ORDER granting 24 Motion for Extension of Time to File Response/Reply to Motion. Re: 11 Defendant's MOTION to Dismiss with Prejudice 1 Notice of Removal (State Court Complaint), *Motion to Dismiss the Complaint and Incorporated Memorandum of Law* filed by Palm Beach County. Replies due by 9/12/2019. Signed by Judge William P. Dimitrouleas on 8/30/2019. (vty) (Entered: 08/30/2019) |
| 08/30/2019 | 28 | Clerks Notice to Filer re 25 Notice (Other). **Wrong Event Selected**; ERROR - The Filer selected the wrong event. The document was re-docketed by the Clerk, see 27 Notice of Mediator Selection and/or Hearing. It is not necessary to refile this document. (ail) (Entered: 08/30/2019) |
| 09/12/2019 | 29 | Initial Disclosure(s) by Palm Beach County (Medina Cure, Anaili) (Entered: 09/12/2019) |

| 09/12/2019 | 30 | REPLY to 14 Response to Motion, by Palm Beach County. (Attachments: # 1 Exhibit Job Description of Captain)(Medina Cure, Anaili) (Entered: 09/12/2019) |
| 01/02/2020 | 31 | ORDER GRANTING MOTION TO DISMISS. ORDER granting 11 Motion to Dismiss. Plaintiffs are given leave to file an Amended Complaint by 1/23/2020. Signed by Judge William P. Dimitrouleas on 1/2/2020. *See attached document for full details.* (amb) (Entered: 01/03/2020) |
| 01/23/2020 | 32 | First AMENDED COMPLAINT against Palm Beach County, filed by Crystal Little, AJ O'Laughlin. (Attachments: # 1 Exhibit Attachment 1, # 2 Exhibit Attachment 2)(Amlong, William) Modified title text on 1/24/2020 (mc). (Entered: 01/23/2020) |
| 02/05/2020 | 33 | Unopposed MOTION for Extension of Time to File Response/Reply/Answer as to 32 MDL Amended Complaint by Palm Beach County. (Medina Cure, Anaili) (Entered: 02/05/2020) |
| 02/06/2020 | 34 | ORDER granting 33 Motion for Extension of Time to File Response/Answer to a Complaint or Other Case Initiating Document Palm Beach County. Answer due 2/26/2020. Re: 32 MDL Amended Complaint filed by Crystal Little, AJ O'Laughlin. Signed by Judge William P. Dimitrouleas on 2/5/2020. *See attached document for full details.* (ail) (Entered: 02/06/2020) |
| 02/26/2020 | 35 | MOTION TO DISMISS 32 MDL Amended Complaint FOR FAILURE TO STATE A CLAIM by Palm Beach County. Responses due by 3/11/2020 (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B, # 3 Exhibit Exhibit C)(Medina Cure, Anaili) (Entered: 02/26/2020) |
| 03/10/2020 | 36 | Unopposed MOTION for Extension of Time to File Response/Reply/Answer as to 35 MOTION TO DISMISS 32 MDL Amended Complaint FOR FAILURE TO STATE A CLAIM by Crystal Little, AJ O'Laughlin. (Kochhar, Isha) (Entered: 03/10/2020) |
| 03/10/2020 | 37 | ORDER granting 36 Motion for Extension of Time to Respond to Defendant's Motion. Re: 35 MOTION TO DISMISS 32 MDL Amended Complaint FOR FAILURE TO STATE A CLAIM filed by Palm Beach County. Responses due by 3/30/2020 Signed by Judge William P. Dimitrouleas on 3/10/2020. *See attached document for full details.* (jbs) (Entered: 03/11/2020) |
| 03/30/2020 | 38 | RESPONSE in Opposition re 35 MOTION TO DISMISS 32 MDL Amended Complaint FOR FAILURE TO STATE A CLAIM *and Incorporated Memorandum of Law* filed by AJ O'Laughlin. Replies due by 4/6/2020. (Amlong, William) (Entered: 03/30/2020) |
| 04/06/2020 | 39 | REPLY in Support re 35 MOTION TO DISMISS 32 MDL Amended Complaint FOR FAILURE TO STATE A CLAIM filed by Palm Beach County. (Medina Cure, Anaili) Modified text on 4/7/2020 (kpe). (Entered: 04/06/2020) |
| 05/14/2020 | 40 | Joint MOTION to Stay *Court Ordered Deadlines* by Palm Beach County. Responses due by 5/28/2020 (Attachments: # 1 Text of Proposed Order)(Medina Cure, Anaili) (Entered: 05/14/2020) |
| 05/20/2020 | 41 | |

| | | Joint MOTION to Expedite *Extension of Time to File Substantive Pretrial Motions* by Crystal Little, AJ O'Laughlin. (Attachments: # 1 Exhibit)(Amlong, William) (Entered: 05/20/2020) |
|---|---|---|
| 05/21/2020 | 42 | ORDER ON MOTION TO STAY. ORDER granting in part 40 Motion to Stay ( Calendar Call set for 11/13/2020 10:00 AM before Judge William P. Dimitrouleas., Jury Trial set for 11/16/2020 before Judge William P. Dimitrouleas. ); granting in part 41 Motion to Expedite. Signed by Judge William P. Dimitrouleas on 5/21/2020. *See attached document for full details.* (amb) (Entered: 05/22/2020) |
| 06/23/2020 | 43 | Unopposed MOTION for Extension of Time to Extend the Discovery Deadline re 42 Order on Motion to Stay,, Order on Motion to Expedite, by Crystal Little, AJ O'Laughlin. Responses due by 7/7/2020 (Amlong, William) (Entered: 06/23/2020) |
| 06/24/2020 | 44 | ORDER ON MOTION TO EXTEND DISCOVERY DEADLINE. ORDER granting 43 Motion for Extension of Time. Discovery due by 8/7/2020. Signed by Judge William P. Dimitrouleas on 6/24/2020. *See attached document for full details.* (amb) (Entered: 06/24/2020) |
| 07/06/2020 | 45 | ORDER GRANTING MOTION TO DISMISS. ORDER denying in part 35 Motion to Dismiss for Failure to State a Claim. Plaintiffs as-applied challenge to Defendants Social Media Policy is DISMISSED. Defendant shall file its Answer to Plaintiffs Amended Complaint within fourteen (14) days. Signed by Judge William P. Dimitrouleas on 7/6/2020. *See attached document for full details.* (amb) Modified Action Type re motion on 7/6/2020 (asl). (Entered: 07/06/2020) |
| 07/20/2020 | 46 | *Palm Beach County's* ANSWER and Affirmative Defenses to Complaint by Palm Beach County. (Medina Cure, Anaili) (Entered: 07/20/2020) |
| 08/20/2020 | 47 | Plaintiff's MOTION for Summary Judgment *on Facial Unconstitutionality of Palm Beach County Fire Rescue Departments Social Medica Policy and Incorporated Memorandum of Law* by Crystal Little, AJ O'Laughlin. Responses due by 9/3/2020 (Amlong, William) (Entered: 08/20/2020) |
| 08/20/2020 | 48 | Statement of: Statement of Material Facts In Support of Summary Judgment by Crystal Little, AJ O'Laughlin re 47 Plaintiff's MOTION for Summary Judgment *on Facial Unconstitutionality of Palm Beach County Fire Rescue Departments Social Medica Policy and Incorporated Memorandum of Law* (Attachments: # 1 Exhibit DE 32 - First Amended Complaint)(Amlong, William) (Entered: 08/20/2020) |
| 08/20/2020 | 49 | Defendant's MOTION for Summary Judgment *and Incorporated Memorandum of Law* by Palm Beach County. Responses due by 9/3/2020 (Medina Cure, Anaili) (Entered: 08/20/2020) |
| 08/20/2020 | 50 | Statement of: Of Material Facts In Support Of Its Motion For Summary Judgment by Palm Beach County re 49 Defendant's MOTION for Summary Judgment *and Incorporated Memorandum of Law* (Attachments: # 1 Exhibit Palm Beach County Ordinance 1983-023, # 2 Exhibit August 20, 2020, affidavit of Douglas McGlynns Affidavit with attachments to the affidavit, # 3 Exhibit Palm Beach County Fire Rescue Mission Statement, # 4 Exhibit Palm Beach |

| | | |
|---|---|---|
| | | County Fire Rescue Captain Job Description, # 5 Exhibit PPM# FR-A-404, # 6 Exhibit PPM# FR-A-405, # 7 Exhibit Voteolaughlin.com website, about me section, # 8 Exhibit Plaintiff OLaughlins responses to Palm Beach Countys first set of interrogatories dated June 12, 2020, # 9 Exhibit February 6, 2019 Facebook Post by Plaintiff OLaughlin and Plaintiff Little, # 10 Exhibit February 7, 2019 internal complaint regarding Plaintiff OLaughlins and Plaintiff Littles Facebook posts submitted by Captain Newsome, # 11 Exhibit May 21, 2020, affidavit of Tim McCabe with attachments to the affidavit, # 12 Exhibit February 25, 2019, Fire Rescue written warning issued to Plaintiff OLaughlin, # 13 Exhibit Plaintiff Littles responses to Palm Beach Countys first set of interrogatories dated June 12, 2020, # 14 Exhibit February 26, 2019, Fire Rescue written warning issued to Plaintiff Little)(Medina Cure, Anaili) (Entered: 08/20/2020) |
| 09/03/2020 | 51 | RESPONSE in Opposition re 47 Plaintiff's MOTION for Summary Judgment *on Facial Unconstitutionality of Palm Beach County Fire Rescue Departments Social Medica Policy and Incorporated Memorandum of Law* filed by Palm Beach County. Replies due by 9/10/2020. (Medina Cure, Anaili) (Entered: 09/03/2020) |
| 09/03/2020 | 52 | Defendant's RESPONSE to 48 Statement, *of Material Facts in Support of Plaintiffs' Summary Judgment* by Palm Beach County. (Medina Cure, Anaili) (Entered: 09/03/2020) |
| 09/03/2020 | 53 | RESPONSE to Motion re 49 Defendant's MOTION for Summary Judgment *and Incorporated Memorandum of Law* filed by Crystal Little, AJ O'Laughlin. Replies due by 9/10/2020. (Amlong, Karen) (Entered: 09/03/2020) |
| 09/03/2020 | 54 | RESPONSE to Motion re 49 Defendant's MOTION for Summary Judgment *and Incorporated Memorandum of Law* filed by Crystal Little, AJ O'Laughlin. Replies due by 9/10/2020. (Amlong, Karen) (Entered: 09/03/2020) |
| 09/10/2020 | 55 | REPLY to Response to Motion re 49 Defendant's MOTION for Summary Judgment *and Incorporated Memorandum of Law* filed by Palm Beach County. (Medina Cure, Anaili) (Entered: 09/10/2020) |
| 09/10/2020 | 56 | Defendant's REPLY to 53 Response to Motion *Statement of Material Facts in Support of Summary Judgment* by Palm Beach County. (Medina Cure, Anaili) (Entered: 09/10/2020) |
| 09/11/2020 | 57 | Plaintiff's MOTION for Extension of Time to File Plaintiff's Summary Judgment Reply and/or to Accept the Reply Out of Time re 52 Response/Reply (Other), 51 Response in Opposition to Motion, by Crystal Little, AJ O'Laughlin. Responses due by 9/25/2020 (Amlong, Karen) (Entered: 09/11/2020) |
| 09/15/2020 | 58 | ORDER ON MOTION FOR EXTENSION OF TIME. ORDER granting in part and denying in part 57 Motion for Extension of Time. Re: 47 Plaintiff's MOTION for Summary Judgment *on Facial Unconstitutionality of Palm Beach County Fire Rescue Departments Social Medica Policy and Incorporated Memorandum of Law* filed by Crystal Little, AJ O'Laughlin. Replies due by 9/17/2020. Signed by Judge William P. Dimitrouleas on 9/15/2020. *See attached document for full details.* (amb) (Entered: 09/15/2020) |

| 09/16/2020 | 59 | PAPERLESS ORDER THIS CAUSE is before the Court on Administrative Order 2020-53, dated August 11, 2020, whereby the Chief Judge continued all jury trials in the Southern District of Florida scheduled to begin on or after March 31, 2020 until January 4, 2021. All deadlines in the current Scheduling Order, with the exception of the two-week trial period, remain as scheduled. The mediation deadline remains set at 60 days before the start of the current two-week trial period. Counsel must file any motions to appear at the calendar call telephonically 72 hours in advance. The Court will discuss setting a new trial date at that time Signed by Judge William P. Dimitrouleas on 9/16/2020. (mp00) (Entered: 09/16/2020) |
|---|---|---|
| 09/17/2020 | 60 | REPLY to Response to Motion re 47 Plaintiff's MOTION for Summary Judgment *on Facial Unconstitutionality of Palm Beach County Fire Rescue Departments Social Medica Policy and Incorporated Memorandum of Law* filed by Crystal Little. (Amlong, Karen) (Entered: 09/17/2020) |
| 09/28/2020 | 61 | ORDER TO SHOW CAUSE- Mediation Report/Show Cause Response due by 10/5/2020. Signed by Judge William P. Dimitrouleas on 9/28/2020. *See attached document for full details.* (ail) (Entered: 09/28/2020) |
| 10/02/2020 | 62 | RESPONSE TO ORDER TO SHOW CAUSE re 61 Order to Show Cause by Crystal Little, AJ O'Laughlin. (Amlong, Karen) (Entered: 10/02/2020) |
| 10/05/2020 | 63 | RESPONSE TO ORDER TO SHOW CAUSE re 61 Order to Show Cause by Palm Beach County. (Attachments: # 1 Exhibit A, September 16, 2020 Email, # 2 Exhibit B, September 28, 2020 Email, # 3 Exhibit C, September 29, 2020 Email)(Medina Cure, Anaili) (Entered: 10/05/2020) |
| 10/07/2020 | 64 | ORDER EXTENDING DEADLINE TO MEDIATE. ( Mediation Deadline 10/30/2020.) Signed by Judge William P. Dimitrouleas on 10/7/2020. *See attached document for full details.* (amb) (Entered: 10/07/2020) |
| 10/21/2020 | 65 | NOTICE by Crystal Little, AJ O'Laughlin re 64 Order, Set/Reset Deadlines/Hearings *Scheduling Mediation Conference* (Amlong, Karen) (Entered: 10/21/2020) |
| 10/21/2020 | 66 | NOTICE of Mediator Selection and Hearing. Selected/Added Martin Soll as Mediator. Mediation Hearing set for 10/23/2020 at 10:30 a.m.. SEE DE 65 IMAGE(ail) (Entered: 10/22/2020) |
| 10/22/2020 | 67 | Clerks Notice to Filer re 65 Notice (Other). **Wrong Event Selected**; ERROR - The Filer selected the wrong event. The document was re-docketed by the Clerk, see 66 Notice of Mediator Selection and/or Hearing. It is not necessary to refile this document. (ail) (Entered: 10/22/2020) |
| 10/26/2020 | 68 | MEDIATION REPORT by Martin A. Soll. (Salmon, John) (Entered: 10/26/2020) |
| 10/29/2020 | 69 | Exhibit List by Palm Beach County.. (Medina Cure, Anaili) (Entered: 10/29/2020) |
| 10/30/2020 | 70 | Witness List by Crystal Little, AJ O'Laughlin.. (Amlong, William) (Entered: 10/30/2020) |

| 10/30/2020 | 71 | Exhibit List by Crystal Little, AJ O'Laughlin.. (Amlong, William) (Entered: 10/30/2020) |
| 10/30/2020 | 72 | Witness List by Palm Beach County.. (Medina Cure, Anaili) (Entered: 10/30/2020) |
| 10/30/2020 | 73 | PRETRIAL STIPULATION *Joint* by Crystal Little, AJ O'Laughlin (Attachments: # 1 Exhibit A - Plaintiff's exhibit list, # 2 Exhibit B - Defendant's exhibit list, # 3 Exhibit C - Plaintiff's witness list, # 4 Exhibit D - Defendant's witness list)(Amlong, Karen) (Entered: 10/30/2020) |
| 11/10/2020 | 74 | Joint MOTION for Leave to File *Appear Telephonically at Calendar Call* by Palm Beach County. (Medina Cure, Anaili) (Entered: 11/10/2020) |
| 11/12/2020 | 75 | ORDER GRANTING MOTION FOR COUNSEL TO APPEAR TELEPHONICALLY. ORDER granting 74 Motion for Leave to File. *Clerks Notice: Filer must separately re-file the amended pleading pursuant to Local Rule 15.1, unless otherwise ordered by the Judge.* Signed by Judge William P. Dimitrouleas on 11/12/2020. *See attached document for full details.* (amb) (Entered: 11/12/2020) |
| 11/12/2020 | 76 | ORDER GRANTING DEFENDANTS MOTION FOR SUMMARY JUDGEMENT. ORDER denying 47 Motion for Summary Judgment; granting 49 Motion for Summary Judgment. Signed by Judge William P. Dimitrouleas on 11/12/2020. *See attached document for full details.* (amb) (Entered: 11/12/2020) |
| 11/12/2020 | 77 | FINAL JUDGMENT AND ORDER CLOSING CASE. JUDGMENT in favor of Palm Beach County against AJ O'Laughlin, Crystal Little The Clerk is hereby directed to CLOSE this case and DENY any pending motions as moot. Signed by Judge William P. Dimitrouleas on 11/12/2020. *See attached document for full details.* (amb) (Entered: 11/12/2020) |
| 12/10/2020 | 78 | Notice of Appeal *by AJ O'Laughlin and Crystal Little* as to 76 Order on Motion for Summary Judgment,,, 45 Order on Motion to Dismiss for Failure to State a Claim, 77 Judgment, by Crystal Little, AJ O'Laughlin. Filing fee $ 505.00 receipt number AFLSDC-14014505. Within fourteen days of the filing date of a Notice of Appeal, the appellant must complete the Eleventh Circuit Transcript Order Form regardless of whether transcripts are being ordered [Pursuant to FRAP 10(b)]. For information go to our FLSD website under Transcript Information. (Amlong, William) (Entered: 12/10/2020) |
| 12/11/2020 | | Transmission of Notice of Appeal, Orders/Judgment under appeal and Docket Sheet to US Court of Appeals re 78 Notice of Appeal, Notice has been electronically mailed. (apz) (Entered: 12/11/2020) |
| 12/16/2020 | 79 | Acknowledgment of Receipt of noa from USCA re 78 Notice of Appeal, filed by Crystal Little, AJ O'Laughlin. Date received by USCA: 12/11/2020. USCA Case Number: 20-14676-HH. (apz) (Entered: 12/16/2020) |
| 12/18/2020 | 80 | Transcript Redaction Request re 78 Notice of Appeal,, by attorney William Robert Amlong (Amlong, William) (Entered: 12/18/2020) |
| 12/18/2020 | 82 | TRANSCRIPT INFORMATION FORM by Crystal Little, AJ O'Laughlin re 78 Notice of Appeal. No Transcript Requested. (apz) (Entered: 04/09/2021) |

| 12/18/2020 | 83 | Clerks Notice to Filer re 80 Transcript Redaction Request. **Wrong Event Selected**; ERROR - The Filer selected the wrong event. The document was re-docketed by the Clerk, see DE 82 . It is not necessary to refile this document. (apz) (Entered: 04/09/2021) |
| 12/31/2020 | 81 | NOTICE of Change of Address, Email or Law Firm Name by Anaili Medina Cure (Medina Cure, Anaili) (Entered: 12/31/2020) |
| 04/09/2021 | 84 | Pursuant to F.R.A.P. 11(c), the Clerk of the District Court for the Southern District of Florida certifies that the record is complete for purposes of this appeal re: 78 Notice of Appeal, Appeal No. 20-14676-HH. The entire record on appeal is available electronically. (apz) (Entered: 04/09/2021) |

| PACER Service Center | | |
| --- | --- | --- |
| **Transaction Receipt** | | |
| 04/09/2021 17:20:54 | | |
| **PACER Login:** | Kamlong2482 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 9:19-cv-80701-WPD |
| **Billable Pages:** | 9 | **Cost:** | 0.90 |

JS 44 (Rev. 06/17) FLSD Revised 06/01/2017

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)* **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

**I. (a) PLAINTIFFS** AJ O'Laughlin and Crystal Little

**DEFENDANTS** Palm Beach County Board of County Commissioners

**(b)** County of Residence of First Listed Plaintiff  Palm Beach
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  Palm Beach
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
William R. Amlong, Esquire of Amlong & Amlong; 500 Northeast Fourth Street, Fort Lauderdale, FL 33301; 954-462-1983

Attorneys *(If Known)*
Rachel Fahey, Esquire of Palm Beach County Attorney's Office; 300 North Dixie Highway, Third Floor, WPB, FL 33401; 561-355-6337

**(d)** Check County Where Action Arose:  ☐ MIAMI- DADE  ☐ MONROE  ☐ BROWARD  ☑ PALM BEACH  ☐ MARTIN  ☐ ST. LUCIE  ☐ INDIAN RIVER  ☐ OKEECHOBEE  ☐ HIGHLANDS

| II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)* | | III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff)* and One Box for Defendant) *(For Diversity Cases Only)* | | | |
|---|---|---|---|---|---|
| ☐ 1  U.S. Government Plaintiff | ☑ 3  Federal Question *(U.S. Government Not a Party)* | | PTF DEF | | PTF DEF |
| | | Citizen of This State | ☐ 1  ☐ 1  Incorporated *or* Principal Place of Business In This State | | ☐ 4  ☐ 4 |
| ☐ 2  U.S. Government Defendant | ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)* | Citizen of Another State | ☐ 2  ☐ 2  Incorporated *and* Principal Place of Business In Another State | | ☐ 5  ☐ 5 |
| | | Citizen or Subject of a Foreign Country | ☐ 3  ☐ 3  Foreign Nation | | ☐ 6  ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729 (a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & | ☐ 367 Health Care/ Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander | Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | ☐ 340 Marine | Injury Product | | ☐ 835 Patent – Abbreviated New Drug Application | ☐ 460 Deportation |
| Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | Liability | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 370 Other Fraud ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Med. Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| | | | ☐ 791 Empl. Ret. Inc. Security Act | | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☑ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | **Other:** | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 530 General ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 540 Mandamus & Other ☐ 550 Civil Rights | ☐ 462 Naturalization Application ☐ 465 Other Immigration Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition ☐ 560 Civil Detainee – Conditions of Confinement | | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

☐ 1 Original Proceeding  ☑ 2 Removed from State Court  ☐ 3 Re-filed (See VI below)  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district *(specify)*  ☐ 6 Multidistrict Litigation Transfer  ☐ 7 Appeal to District Judge from Magistrate Judgment  ☐ 8 Multidistrict Litigation – Direct File  ☐ 9 Remanded from Appellate Court

| VI. RELATED/ RE-FILED CASE(S) | (See instructions): a) Re-filed Case ☐YES ☐NO      b) Related Cases ☐YES ☐NO | |
|---|---|---|
| | JUDGE: | DOCKET NUMBER: |

**VII. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. 1983, U.S. Constitution, Federal question, free speech, declaratory relief
LENGTH OF TRIAL via _____ days estimated (for both sides to try entire case)

| VIII. REQUESTED IN COMPLAINT: | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $ | CHECK YES only if demanded in complaint: |
|---|---|---|---|
| | | | JURY DEMAND:  ☑ Yes  ☐ No |

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

DATE  May 29, 2019

SIGNATURE OF ATTORNEY OF RECORD  *Rachel Mave Fahey*

**FOR OFFICE USE ONLY**
RECEIPT #  _____  AMOUNT  _____  IFP  _____  JUDGE  _____  MAG JUDGE  _____

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 9:19-cv-80701

AJ O'LAUGHLIN and
CRYSTAL LITTLE,
     Plaintiffs,

vs.

PALM BEACH COUNTY, a political
Subdivision of the State of Florida,
     Defendant.

_____/

## NOTICE OF REMOVAL

Comes now the Defendant, PALM BEACH COUNTY BOARD OF COUNTY COMMISSIONERS ("the County"), by and through undersigned counsel, and pursuant to Title 28, United States Code, Sections 1331, 1441, and 1446, hereby files this Notice of Removal and states:

1.    This action was originally filed in the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida on or about May 14, 2019, where it was assigned Case No. 502019CA006350. The County was served with the Complaint on May 15, 2019. A true and accurate copy of the Complaint is attached hereto as Exhibit 1.

2.    Attached hereto as Exhibit 2 is a true and accurate copy of "Plaintiff's Notice of Filing Attachments 1 and 2 to Count I: AJ O'Laughlin and Crystal Little's 42 U.S.C. 1983 Claim for Declaratory and Other Relief Pursuant to the First Amendment's Free Speech Clause."

3.    A copy of the Fifteenth Judicial Circuit docket regarding the instant case is attached hereto as Exhibit 3.

4.      The face of the Complaint indicates that Count I arises out of an alleged violation of 42 U.S.C. 1983 and the Free Speech clause of the First Amendment to the Unites States Constitution.

5.      Accordingly, this Court has original jurisdiction over this action as provided in 28 U.S.C. § 1331, and is properly removable pursuant to 28 U.S.C. § 1441(a) and 28 U.S.C. § 1446(b). *See e.g. Incredible Invs., LLC v. Fernandez-Rundle*, 984 F. Supp. 2d 1318, 1323 (S.D. Fla. 2013) (action seeking declaratory relief, alleging violations of federal and Florida constitutions, was removed to this Court, pursuant to 28 U.S.C. §§ 1441(a) & 1446).

6.      Notice of this removal has been provided to Plaintiff and the Clerk of Court for the Fifteenth Judicial Circuit pursuant to 28 U.S.C. § 1446(d).

7.      This Notice of Removal has been filed within thirty (30) days after service of the Complaint in compliance with 28 U.S.C. § 1446(b).

Dated:  May *, 2019.

Respectfully submitted,

*/s/ Rachel M. Fahey            /*
Rachel Fahey, Esquire
Assistant County Attorney
Florida Bar No. 105734
300 North Dixie Highway, Third Floor
West Palm Beach, Florida 33401
Tel.: (561) 355-6337; Fax: (561) 355-4234
Primary Email: rfahey@pbcgov.org
Secondary Email: dfishel@pbcgov.org
swebber@pbcgov.org

## <u>CERTIFICATE OF SERVICE</u>

     I HEREBY CERTIFY that a true and correct copy of the Notice of Removal to Federal Court was served via Email and/or E-Filing Portal to: William Amlong, Esquire of Amlong & Amlong, P.A., 500 Northeast Fourth Street, Fort Lauderdale, FL 33301 at WRAmlong@theamlongfirm.com and KAmlong@theamlongfirm.com this _____ day of May, 2019.

                                      ***/s/ Rachel M. Fahey          /***
                                      Rachel Fahey, Esquire
                                      Assistant County Attorney
                                      Florida Bar No. 105734
                                      300 North Dixie Highway, Third Floor
                                      West Palm Beach, Florida 33401
                                      Tel.: (561) 355-6337; Fax: (561) 355-4234
                                      Primary Email: rfahey@pbcgov.org
                                      Secondary Email: dfishel@pbcgov.org
                                                     swebber@pbcgov.org

Filing # 89524562 E-Filed 05/14/2019 05:15:06 PM

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT,
IN AND FOR PALM BEACH COUNTY, FLORIDA

Case No.

AJ O'LAUGHLIN and CRYSTAL
LITTLE,

     Plaintiffs,

vs.

PALM BEACH COUNTY, a political
subdivision of the State of Florida,

     Defendant.

_____/

## **Complaint**

### **Count I:  AJ O'Laughlin and Crystal Little's 42 U.S.C. 1983 Claim for Declaratory and Other Relief Pursuant to the First Amendment's Free Speech Clause**

Plaintiffs, AJ O'Laughlin and Crystal Little, sue defendant, Palm Beach

County, a political subdivision of the State of Florida, and say:

### **Introduction and Summary**

1.    AJ O'Laughlin and Crystal Little, two captains within the Palm

Beach County Fire Rescue Department, sue Palm Beach County pursuant to

42 U.S.C. § 1983, the Free Speech clause of the First Amendment to the

United States Constitution, as extended to the states by the Fourteenth

Amendment, Chapter 86, FLA. STAT., and Article I, § 4 of the Florida

Constitution (1968, as amended) to enjoin the Palm Beach County Fire



**Exhibit "1"**


The Amlong Firm • 500 Northeast Fourth Street • Fort Lauderdale, FL 33301 • 954.462.1983

Rescue Department from enforcing its social media policy in relation to,

*One*, several February 6, 2019 Facebook posts by them, and, *Two*, any Fire

Rescue employee who wishes to post material on social media concerning

issues of public concern, but which posts might be interpreted by

management as "undermin[ing] the public trust and confidence required by

employees of Fire Rescue" or "reflect[ing] negatively upon [the] agency or

its mission."  The February 6 posts were made by Capt. O'Laughlin and Capt.

Little during Capt. O'Laughlin's recent candidacy for the presidency of Local

2928 of the International Association of Fire Fighters.  The theme of Capt.

O'Laughlin's campaign was that the incumbent union leadership was

management-friendly and corrupt.  The posts at issue concerned an attempt

by the union's first executive vice president, another captain, aided by Fire

Rescue Department management, to ensure that he had Thanksgiving and

Christmas Days off with pay—at the expense of union members.  The union

officer, with assistance by the department's Scheduling Officer, appropriated

to himself for those days hours contributed by members to a Union Time

Pool so that its officers can perform union duties during time when they

would otherwise be on duty.  Capt. O'Laughlin posted photographic evidence

of the scheme on an invitation-only FaceBook page he maintained during his

campaign for the presidency.  After the exposed IAFF vice president

complained the next day to Fire Rescue management, the department used

its social-media policy to issue discipline against Capt. O'Laughlin and Capt.

Little because of the contents of their posts.  The two captains seek

injunctive relief (i.e., the voiding of discipline issued to them, as well as the cessation of any future enforcement of the policy, particularly as it regards both private speech and comments on matters of public concern) and, pursuant to 42 U.S.C. § 1988(b), their attorney's fees and litigation expenses for that portion of the action brought pursuant to a federal statute and the United States Constitution.

### Jurisdiction and Venue

2.      This is an action for declaratory and other relief brought pursuant to Ch. 86, FLA. STAT. for a declaration of Capt. O'Laughlin and Capt. Little's rights under the free-speech clauses of both the United States and Florida constitutions.  This Court has jurisdiction pursuant to:

a.      § 86.011 to declare whether the First Amendment and Article I, § 4 protect:

i.      Capt. O'Laughlin and Capt. Little's Facebook posts made during a union campaign and in a private forum, or

ii.      any social media post by Fire Rescue Department employees about matters of public concern, regardless of whether it "undermine[s] public confidence" in the department, or "reflect[s] negatively" on it, and,

b.      § 86.061, if such speech were protected, to grant supplemental relief, e.g., ordering Palm Beach County to remove the discipline issued to each of the two captains, to cease enforcing its social-media policy to govern private speech and to delete those parts of its social

media policy that prohibit Fire Rescue Department personnel from criticizing management through social media about matters of public concern.

3.      Venue is proper in Palm Beach County, which is where the defendant does business and where the injuries to Capt. O'Laughlin and Capt. Little occurred.

### General Allegations

4.      The Palm Beach County Fire Rescue Department has issued a policy addressed to "Use of Social Media," which policy is appended to this complaint as Attachment 1 (in the form that it existed when the alleged violations of it occurred February 6, 2019) and Attachment 2 (as it was amended February 28).

5.      In its regulations on "personal use," the policy:

a.      warns against "discredit[ing] ... the agency," Procedure 1(a);

b.      "[w]hile ... off-duty ...disseminating content that is inconsistent with the duties, conduct, and responsibilities of a Fire Rescue employee, including content that could reasonably be interpreted as having an adverse effect upon ... [the] perception of the public...," Procedure 2(d), which lists as "examples,"

c.      material that might "tend to undermine the public trust and confidence required by employees of Fire Rescue," Procedure 2(d)(i), and

    d.    "any posting that may adversely reflect on Fire Rescue...."

Procedure 2(j).

    6.    The policy also prohibits "post[ing], transmit[ting], or otherwise disseminat[ing] any information (data, text, photographs, audio, video, or any other multimedia file to which they have access as a result of their employment without written permission from the Fire Rescue Administrator or designee." Procedure 2(k).

    7.    Capt. O'Laughlin maintained, as part of his campaign for the presidency of the IAFF local, an invitation-only FaceBook page branded "AJ O'Laughlin—Make our Union Strong again."

    8.    The Union Time Pool, or UTP, is a pool of hours donated by all of Local 2928's members to allow union officers to get paid their regular salaries for doing union business on days that they would otherwise be scheduled to work.

    9.    Capt. O'Laughlin on February 6, 2019 posted a screen shot of a computerized scheduling program that showed that Capt. Jeffrey L. Newsome, the IAFF local's First Executive Vice President and an associate of the incumbent President, had been scheduled in November 2018 to take UTP paid-leave for both Thanksgiving Day. Capt. O'Laughlin also learned, and posted, that Capt. Newsome had done the same thing for Christmas Day 2018—even though there was no union business to be done on either of those days.

10.    The scheduling of that time—which Capt. Newsome gave back after Jeff Rudd, a driver-engineer and a district vice president of the IAFF , noticed it and confronted Capt. Newsome about it—could only have been done by the Fire Rescue Staffing Officer, a management employee.

11.    Before the Thanksgiving/Christmas schedules were reversed, however, someone took a screen shot of the Thanksgiving entry, which found its way to Capt. O'Laughlin, who posted the photo February 6, 2019.

12.    Capt. O'Laughlin followed up the screen shot with several bursts:

a.    "This person is a theft (sic) just thinking about putting this into Telestaff.  This is your Union leadership.  Wtf.  When elected this will stop and who is Saying (sic) this is OK,"

b.    "Jeff you should be ashamed of yourself.  Thinking that union business is done on holidays.  I will make sure I keep my locker closed when I'm working with you,"

c.    "Is this unethical Wtf.  Make sure u call the [Inspector General] about this.  Transparency is everything," and

d.    "[Executive Vice President 1] took UTP for thanksgiving (sic) and also XMas (sic).  It was approved by the Union and by Admin.  Who does Union stuff on these days.  This is how Armand Nault got unelected.  You got to be kidding me.  Transparency is my campaign.  So you will see the truth."

13.    Capt. Little, an O'Laughlin partisan who prior to transferring back to the field had been in charge of the Fire Rescue Department's staffing

function, then chimed in:  "Nice to know the current retired president thinks

it's ok to use UTP for holidays!!  Thanks AJ for keeping them accountable.

And on that note our fucking stellar staffing officer just blindly approves it?

Wtf!"

14.    A smarting Capt. Newsome launched an immediate and clearly

content-based complaint to Deputy Fire Chief Joey Cooper, lodging a formal

charges against Capt. O'Laughlin of conduct-unbecoming and violation of the

social-media policy: he accused Capt. O'Laughlin of having "advised that I

was misusing Union Time Pool" and having said Capt. Newsome had

"committed theft."  Capt. Newsome also took issue with the fact that Capt.

O'Laughlin had "encouraged people contact (sic) the Office of the Inspector

General to make a complaint," and observed that "[t]his post, then was

replied to by Cpt. (sic) C. Little, who commented about 'our fucking stellar

staffing officer.'"

15.    Capt. Newsome continued:

By making this post, Cpt. (sic) O'Laughlin violated several provisions of
Policy FR-A-404.  Section 2(d) states:  Employees are prohibited from
disseminating content that is inconsistent with the duties, conduct,
and responsibilities of a Fire Rescue employee including content that
could be reasonably interpreted as having an adverse effect upon Fire
Rescue morale, discipline, operations, the safety of staff or perception
of the public.  Section 2(g) states Employees who chose (sic) to
maintain or participate in social media or social networking platforms
while off-duty shall conduct themselves with professionalism and in
such a manner that shall not reflect negatively upon this agency or its
mission.  Section 2(j) states Fire Rescue Personnel shall not post,
transmit, or otherwise disseminate any information (photographic or
text) to which they have access as a result of their employment
without written permission from the First Rescue Administrator.

> Cpt. (sic) O'Laughlin's posts have disparaged the reputation of Fire Rescue, the Fire Rescue Staffing Officer, "Admin" and me personally. His behavior could erode the faith the public has in Palm Beach County Fire Rescue.  His behavior is unprofessional, and certainly does not display the conduct that PBCFR and the public expect of a firefighter....

(Emphasis in original.)

16.    Notwithstanding that even Capt. Newsome acknowledged that it was not possible that the screen shots that Capt. O'Laughlin posted were materials "to which [he had] access as a result of [his] employment," Procedure 2(k), and stated that the posts had been made on "a hidden Facebook page," the Department began disciplinary proceedings against Capt. O'Laughlin and Capt. Little.

17.    Although the discipline issued to Capt. O'Laughlin and Capt. Little was a "written warning," under the Department's progressive discipline procedures, that sets each of them up for more serious discipline in the case of even a minimal offense—i.e., a one-to-three-shift suspension for Capt. Little, whose only discipline during her 14.5 years on the department has been for accidentally putting her pager into a washing machine 10 years ago, and termination for Capt. O'Laughlin, who got a five-shift suspension in July 2018 for an unrelated matter.

18.    The Department's Social Media Policy is constitutionally infirm—particularly as it applies to Capt. O'Laughlin and Capt. Little in this case because:

a.    It seeks to regulate private conversations, i.e., posts for the benefit of invitees to what Capt. Newsome described in his February 7

letter of complaint as "a hidden Facebook page," as opposed to statements
to the public at large—even though government is not permitted by either
the First Amendment or Article I, § 4 of Florida Constitution to regulate
private speech other than in such specific situations as, e.g., "falsely
shouting fire in a theatre and causing a panic,"[1] "fighting words"[2] and libels;[3]

  b.   Its criteria for determining what sort of social-media posts
are forbidden clearly appear—both from the plain language of the policy
itself, as well as from the letter from Capt. Newsome seeking discipline
against Capt. O'Laughlin and Capt. Little—to be clearly content-based, and

  c.   Its proscription of off-duty employees'

> disseminating content that is inconsistent with the duties, conduct,
> and responsibilities of a Fire Rescue employee, including content that
> could be reasonably interpreted as having an adverse effect upon [the]
> perception of the public[, f]or example, ... material [that could] tend
> to undermine the public trust and confidence required by employees of
> Fire Rescue[,]

Procedure 2(d), coupled with the instruction that any social-media postings
by off-duty employees "shall not reflect negatively upon this agency or its
mission," Procedure 2(g), constitutes a prior restraint of all speech critical of
the Fire Rescue Department.

---

[1]See Federal Communications Commission v. Pacifica Foundation, 438
U.S. 726, 743 (1978), quoting Schenck v. United States, 249 U.S. 47, 52
(1919).

[2]See id. at 745, citing Chaplinsky v. New Hampshire, 315 U.S. 568
(1942).

[3]See id., citing Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974).

19.     Even though Capt. O'Laughlin and Capt. Little spoke privately to the invitees to Capt. O'Laughlin's election-related Facebook page, documentation that Fire Rescue Department management was abetting the IAFF local's second-highest elected officer in his attempt to misuse the UTP to take Thanksgiving and Christmas days off at the expense of the union's membership:

a.     would be a matter of public concern, and

b.     would be in no way related to the duties of either Capt. O'Laughlin or Capt. Little or to either's personal grievances.

20.     There is no dispute—especially in light of Capt. Newsome's February 7 letter to Deputy Chief Cooper—that Capt. O'Laughlin and Capt. Little's posts about Capt. Newsome's attempted misuse of the UTP, and Fire Rescue Department management's involvement in that attempted misuse, is the sole cause of the discipline that the Department is attempting to impose.

21.     The Fire Rescue Department:

a.     can point to no disruption that has been caused since February 6 as a result of Capt. O'Laughlin and Capt. Little's posting their comments to a private audience,

b.     cannot reasonably predict that, were Capt. O'Laughlin and Capt. Little to use social media to disclose truthfully to the general public that Fire Rescue management was complicit with Capt. Newsome's attempt to misuse the UTP, the potential disruption that might result would justify the social-media policy's prior restraint of such disclosure, nor

     c.    can it point to any other compelling state interest that would outweigh Capt. O'Laughlin and Capt. Little's fundamental right to free speech about matters of public concern.

22.   Capt. O'Laughlin and Capt. Little are suffering irreparable harm, for which there is no adequate remedy at law, by:

     a.    being disciplined for having engaged in private speech, the content of which offended Capt. Newsome and Fire Rescue Department management, and

     b.    being precluded by the Fire Rescue Department's social-media policy from posting the expose of Capt. Newsome and Fire Rescue Department management's complicity in the attempted misuse of the UTP not merely to those persons who were invitees to Capt. O'Laughlin's Facebook page, but to a wider audience, lest such a broader posting "undermine the public trust and confidence required by employees of Fire Rescue" or "reflect negatively upon [the] agency."

23.   Capt. O'Laughlin and Capt. Little are entitled by 42 U.S.C. § 1988(b) to recover their attorney's fees and litigation expenses for suing pursuant to § 1983 to vindicate their First Amendment right to freedom of speech.

WHEREFORE, plaintiffs, Capt. AJ O'Laughlin and Capt. Crystal Little pray that this Court will:

**One**, determine and declare that that Palm Beach County is precluded by the First Amendment from regulating the private speech of Capt. AJ

O'Laughlin and Capt. Crystal Little within the non-public forum of Capt.
O'Laughlin's invitation-only Facebook page;

*Two*, determine and declare that the Fire Rescue Department's social-
media policy's prohibition against off-duty posts by its personnel that may
"undermine the public trust and confidence required by employees of Fire
Rescue" or "reflect negatively upon [the] agency or its mission" is an
unconstitutional prior restraint on Fire Rescue personnel's constitutional right
to publicly discuss issues of public concern about the Fire Rescue
Department;

*Three*, determine and declare that allegations that Fire Rescue
management was complicit with a high-ranking union officer's attempt to
use Union Time Pool hours to secure paid time-off for Thanksgiving and
Christmas Days in 2019, when there was no union work to be done those
two days, is an issue of public concern about which Capt. O'Laughlin and
Capt. Little have a constitutional right to comment publicly;

*Four*, enjoin Palm Beach County and its Fire Rescue Department to
void any disciplinary actions against Capt. O'Laughlin and Capt. Little in
connection with the February 6, 2019 post to Capt. O'Laughlin's "Make our
Union Strong again" page;

*Five*, enjoin Palm Beach County and its Fire Rescue Department from
any further attempts to regulate private speech in non-public fora through
its social media policy;

***Six***, enjoin Palm Beach County and its Fire Rescue Department to revoke those portions of its social media policy that are reasonably susceptible to interpretation as forbidding commentary critical of the Fire Rescue Department concerning matters of public concern—i.e., the ones forbidding off-duty posts that might "undermine public confidence" in the department, or "reflect negatively" on it;

***Seven***, award Capt. O'Laughlin and Capt. Little their reasonable attorney's fees and litigation expenses, and

***Eight***, grant such other and further relief as is just.

### Count II:  AJ O'Laughlin and Crystal Little's Ch. 86, FLA. STAT., Claim For Declaratory and Other Relief Pursuant to Article I, § 4, FLA. CONST. Free Speech Clause

24.   Plaintiffs adopt, as if fully set forth in Count II, the allegations of ¶¶ 1-22.

25.   The scope of the protection accorded to speech under Article I, § 4, of the Florida constitution is at least the same as that granted by the first amendment of the federal Constitution as interpreted by the United States Supreme Court.

WHEREFORE, plaintiffs, Capt. AJ O'Laughlin and Capt. Crystal Little pray that this Court will:

WHEREFORE, plaintiffs, Capt. AJ O'Laughlin and Capt. Crystal Little pray that this Court will:

***One***, determine and declare that that Palm Beach County is precluded by the Article I, § 4 of the Florida Constitution from regulating the private

speech of Capt. AJ O'Laughlin and Capt. Crystal Little within the non-public forum of Capt. O'Laughlin's invitation-only Facebook page;

*Two*, determine and declare that the Fire Rescue Department's social-media policy's prohibition against off-duty posts by its personnel that may "undermine the public trust and confidence required by employees of Fire Rescue" or "reflect negatively upon [the] agency or its mission" is an unconstitutional prior restraint on Fire Rescue personnel's constitutional right to publicly discuss issues of public concern about the Fire Rescue Department;

*Three*, determine and declare that allegations that Fire Rescue management was complicit with a high-ranking union officer's attempt to use Union Time Pool hours to secure paid time-off for Thanksgiving and Christmas Days in 2019, when there was no union work to be done those two days, is an issue of public concern about which Capt. O'Laughlin and Capt. Little have a constitutional right to comment publicly;

*Four*, enjoin Palm Beach County and its Fire Rescue Department to void any disciplinary actions against Capt. O'Laughlin and Capt. Little in connection with the February 6, 2019 post to Capt. O'Laughlin's "Make our Union Strong again" page;

*Five*, enjoin Palm Beach County and its Fire Rescue Department from any further attempts to regulate private speech in non-public fora through its social media policy;

*Six*, enjoin Palm Beach County and its Fire Rescue Department to revoke those portions of its social media policy that are reasonably susceptible to interpretation as forbidding commentary critical of the Fire Rescue Department concerning matters of public concern—i.e., the ones forbidding off-duty posts that might "undermine public confidence" in the department, or "reflect negatively" on it;

*Seven*, award Capt. O'Laughlin and Capt. Little the costs of this action, and

*Eight*, grant such other and further relief as is just.

### Demand for Jury Trial

Plaintiffs, Capt. AJ O'Laughlin and Crystal Little, demand trial by jury on all issues so triable.

Respectfully Submitted,

/s/   *William R. Amlong*
WILLIAM R. AMLONG
Florida Bar No.: 470228
WRAmlong@TheAmlongFirm.com
KAREN COOLMAN AMLONG
Florida Bar No.: 275565
KAmlong@TheAmlongFirm.com

AMLONG & AMLONG, P.A.
500 Northeast Fourth Street
Fort Lauderdale, Florida 33301-1154
(954) 462-1983
(954) 523-3192 (fax)

***Attorneys for Plaintiffs,***
***        AJ O'Laughlin and Crystal Little***

| TO: | **ALL PALM BEACH COUNTY FIRE RESCUE PERSONNEL** |
|---|---|
| FROM: | **MICHAEL C. MACKEY** <br> **FIRE RESCUE ADMINISTRATOR** |
| PREPARED BY: | **FIRE RESCUE PPM COMMITTEE** |
| SUBJECT: | **USE OF SOCIAL MEDIA** |
| PPM #: | **FR-A-404** |

| <u>ISSUE DATE</u> | <u>EFFECTIVE DATE</u> |
|---|---|
| April 17, 2016 | January 10, 2019 |

**PURPOSE:**   The purpose of this policy is to provide guidelines on the procedure and use of social media and social networking.

**UPDATES:**   Future updates to this PPM are the responsibility of the Deputy Chief of Administration, in conjunction with the PPM Committee, under the authority of the Fire Rescue Administrator.

**AUTHORITY:**
- Fire Rescue Administrator
- Florida Statues, Chapter 11
- CW-R-008: Internet Use Policy
- CW-R-113: Social Networking Policy
- PBCFR HIPAA Policies and Procedures Manual (PPM FR-A-401), as may be amended.

**SCOPE:**   This policy applies to all Palm Beach County Fire Rescue personnel and reservists.

**POLICY:**   This policy applies to the procedure and use of social media and social networking.

**DEFINITIONS:**

1. <u>Social Media</u> – A variety of online sources that allow people to communicate, share information, photos, videos, audio or exchange text and other multimedia files with others via online or cellular network platform. This includes but is not limited to social networking sites, micro-blogging sites, personal blogs/personal websites, and news sites.
2. <u>Social Networking</u> – Online platforms where users can network, socialize, communicate and exchange information with other users via text, live conferencing/chat rooms, photographs and/or video-tapes. Mobile Social Networking refers to social networking using a mobile phone or cellular based device.
3. <u>Blogs</u> – A personal online journal or commentary that allows visitors to post opinions, responses, reactions, or comments to a particular topic and may allow the use of graphics or video. Blogs may be private or accessible to the general public.

**FR-A-404/Page 1 of 4**

# ATTACHMENT 1

4. <u>Website/Webpage</u> – A webpage is any page a person sees when accessing the internet. A website is a collection of one or more web pages.
5. <u>Posting</u> – Typing a message, uploading graphics/videos or any electronic media to an online forum or newsgroup which may be accessible to specific viewers or the general public.
6. <u>Personal Website</u> – An online site created by an individual that may include personal information, commentary, photographs, videos and/or graphics for social, entertainment or business purposes. Personal websites may be private or accessible to general public.
7. <u>Profile</u> – A self-defined description of a person which can be displayed on a webpage or a social networking site, and may display any or all of the following biographical information: age, race, sex, employment, education, religion, political viewpoints, the user's likes and dislikes, current location, hometown, and contact information. Profiles may be private or accessible to the general public.
8. <u>Chat Rooms</u> – An online gathering where users can communicate with each other and exchange information via instant messaging and the information is visible to all people in the chat room. Chat Rooms may be private or accessible to the general public.

## **PROCEDURE:**

1. **Department-Sanctioned Use:**
   a. Fire Rescue reserves the right to not publish any posting and can remove unsuitable content from authorized social networking websites at any time without notice (CW-R-113). The Fire Rescue's Public Information Officer shall have final discretion as to the removal of any posting under question. The Fire Rescue's Public Information Officer and staff assigned by the Deputy Chief of Operations shall help promote authorized social media accounts.
   b. Misuse of social media websites may lead to disciplinary action under applicable provisions of the Palm Beach County Merit Rules or the Collective Bargaining Agreement (Disciplinary - Article 15).
   c. Fire Rescue personnel representing the Fire Rescue via social media outlets shall do the following:
      i. The use of Fire Rescue computers by Fire Rescue personnel to access social media is prohibited without authorization.
      ii. Conduct themselves at all times as representatives of the Fire Rescue and, accordingly, shall adhere to all Fire Rescue standards of conduct and observe conventionally accepted protocols and proper decorum.
      iii. Identify themselves as a member of the Fire Rescue.
      iv. Post, transmit, or otherwise disseminate confidential information, including photographs or videos, related to Fire Rescue training, activities, or work-related assignments without express written permission.
      v. Do not conduct political activities or private business.
      vi. Fire Rescue personnel use of personally owned devices to manage the Fire Rescue's social media activities or in the course of official duties is prohibited without express written permission.
      vii. Employees shall observe and abide by all copyright, trademark, and service mark restrictions in posting materials to electronic media.
      viii. Any postings to a Social Media site shall be assumed to be an official opinion/comment of Fire Rescue.

**FR-A-404/Page 2 of 4**

2. **Personal Use**:

   a. Fire Rescue recognizes the employee's right to participate in social networking/social media sites or maintain personal web pages, blogs or other types of online platforms while off-duty. However, it is strongly recommended employees use caution in their usage of social media/social networking platforms especially when displaying personal profiles so as not to discredit themselves or the agency.

   b. Development of an individual departmental networking site representing FIRE RESCUE or any Battalion/Division/Fire Station/Unit etc., is prohibited unless approved by the Fire Rescue Administrator or designee. No postings shall be permitted without the final approval of the Public Information Office or designee.

   c. Employees shall not use social media/social networking platforms in violation of PBC Merit Rules, the Collective Bargaining Agreement, (Disciplinary Article 15), either State or Federal law and the HIPAA Policies and Procedure Manual.

   d. While on duty or off duty Employees are prohibited from disseminating content that is inconsistent with the duties, conduct, and responsibilities of a Fire Rescue employee including content that could be reasonably interpreted as having an adverse effect upon Fire Rescue morale, discipline, operations, the safety of staff, or perception of the public. For example, unprofessional, unbecoming, illegal, unethical, sexual, violent, harassing, racist, sexist, or ethnically derogatory comments, pictures, artwork, videos, material or other such references all tend to undermine the public trust and confidence required by employees of the Fire Rescue.

   e. Unless authorized by the Fire Administrator or designee, employees are prohibited from posting any confidential, sensitive, or copyrighted information, data, text, photographs, audio, video, or any other multimedia file related to any on-going criminal or administrative investigation of this agency. This includes but is not limited to: photographing or video-taping of fire scenes, crime scenes, traffic crashes, medical/trauma patients, arrestees, evidence, restricted areas of Governmental facilities, vehicles, other employees, and statements or comments related to any pending prosecutions or investigations.

   f. Employees shall exercise good judgment in displaying logos, badges, seals, uniforms, vehicles, equipment, or any item or symbol that is associated with this agency.

   g. Employees who choose to maintain or participate in social media or social networking platforms while off-duty shall conduct themselves with professionalism and in such a manner that shall not reflect negatively upon this agency or its mission. While using social media off duty or in an unofficial capacity, employees are prohibited from speaking or writing in an official capacity, or from representing that they are acting on behalf of Fire Rescue or the PBC Board of County Commissioners. Employees are cautioned that speech on-or-off duty, made pursuant to their official duties, generally is not protected speech under the First Amendment and may be subject to disciplinary action if in violation of this policy.

   h. Employees should be aware that the content of social networking sites may be subpoenaed and used to undermine or impeach employee's testimony in a civil or criminal trial or other official proceeding.

   i. Failure to comply with the above guidelines may result in discipline up to and including termination. Authorized exceptions to the above guidelines may be permitted by the Fire Administrator or designee for the operational needs of the Fire Rescue. Employees are strongly encouraged to use caution and seek the guidance of

**FR-A-404/Page 3 of 4**

their supervisors regarding any posting that may adversely reflect upon either the agency or upon the professionalism and integrity of the employee.

j. Fire Rescue personnel shall not post, transmit, or otherwise disseminate any information (photographic or text) to which they have access as a result of their employment without written permission from the Fire Rescue Administrator or designee.

k. Fire Rescue personnel are cautioned against posting personal photographs or provide similar means of personal recognition that may cause you to be identified as a firefighter, fire officer or employee of this Fire Rescue.


*Michael C. Mackey*
**MICHAEL C. MACKEY**
**FIRE RESCUE ADMINISTRATOR**

<u>**Supersession History**</u>
1. PPM#FR I-71, issued 12/21/1991
2. PPM#FR I-71, issued 03/24/2011
3. PPM#FR I-71, issued 06/10/2016
4. PPM#FR A-404, clerical 03/01/2018
5. PPM#FR A-404, clerical 1/10/2019

**FR-A-404/Page 4 of 4**

| | |
|---|---|
| **TO:** | **ALL PALM BEACH COUNTY FIRE RESCUE PERSONNEL** |
| **FROM:** | **MICHAEL C. MACKEY**<br>**FIRE RESCUE ADMINISTRATOR** |
| **PREPARED BY:** | **FIRE RESCUE PPM COMMITTEE** |
| **SUBJECT:** | **USE OF SOCIAL MEDIA** |
| **PPM #:** | **FR-A-404** |

| **ISSUE DATE** | **EFFECTIVE DATE** |
|---|---|
| April February 28 17, 20 19 6 | January 10, 2019 February March 14 14, 2019 |

**PURPOSE:**   The purpose of this policy is to provide guidelines on the procedure and use of social media and social networking.

**UPDATES:**   Future updates to this PPM are the responsibility of the Deputy Chief of Administration, in conjunction with the PPM Committee, under the authority of the Fire Rescue Administrator.

**AUTHORITY:**
- Fire Rescue Administrator
- Florida Statues, Chapter 11
- CW-R-008: Internet Use Policy
- CW-R-113: Social Networking Policy
- PBCFR HIPAA Policies and Procedures Manual (PPM FR-A-401), as may be amended.

**SCOPE:**   This policy applies to all Palm Beach County Fire Rescue personnel and reservists.

**POLICY:**   This policy applies to the procedure and use of social media and social networking.

**DEFINITIONS:**

1. <u>Social Media</u> – A variety of online sources that allow people to communicate, share information, photos, videos, audio or exchange text and other multimedia files with others via online or cellular network platform. This includes but is not limited to social networking sites, micro-blogging sites, personal blogs/personal websites, and news sites.
2. <u>Social Networking</u> – Online platforms where users can network, socialize, communicate and exchange information with other users via text, live conferencing/chat rooms, photographs and/or video-tapes. Mobile Social Networking refers to social networking using a mobile phone or cellular based device.

**FR-A-404/Page 1 of 5**

# ATTACHMENT 2

3. <u>Blogs</u> – A personal online journal or commentary that allows visitors to post opinions, responses, reactions, or comments to a particular topic and may allow the use of graphics or video. Blogs may be private or accessible to the general public.

4. <u>Webpage</u> ~~Website/Webpage~~ – A webpage is any page a person sees when accessing the internet.

~~4.~~5. <u>Website</u> ~~A~~ – A website is a collection of one or more web pages.

~~5.~~6. <u>Posting</u> – Typing a message, uploading graphics/videos or any electronic media to an online forum or newsgroup which may be accessible to specific viewers or the general public.

~~6.~~7. <u>Personal Website</u> – An online site created by an individual that may include personal information, commentary, photographs, videos and/or graphics for social, entertainment or business purposes. Personal websites may be private or accessible to general public.

~~7.~~8. <u>Profile</u> – A self-defined description of a person which can be displayed on a webpage or a social networking site, and may display any or all of the following biographical information: age, race, sex, employment, education, religion, political viewpoints, the user's likes and dislikes, current location, hometown, and contact information. Profiles may be private or accessible to the general public.

~~8.~~9. <u>Chat Rooms</u> – An online gathering where users can communicate with each other and exchange information via instant messaging and the information is visible to all people in the chat room. Chat Rooms may be private or accessible to the general public.

**PROCEDURE:**

1. ~~Department~~<u>Fire Rescue</u>-Sanctioned Use:
   a. Fire Rescue reserves the right to not publish any posting and can remove unsuitable content from authorized social networking websites at any time without notice (CW-R-113).
   b. ~~The~~ Fire Rescue's Public Information Officer shall have final discretion as to the removal of any posting under question.　　　　　　　　　 [Commented [NN1]:]
   ~~a.~~c. ~~The~~ Fire Rescue's Public Information Officer and staff assigned by the Deputy Chief of Operations shall help promote authorized social media accounts.　　 [Commented [NN2]:]
   d. Misuse of social media ~~websites~~ may lead to disciplinary action under applicable provisions of the Palm Beach County Merit Rules or the Collective Bargaining Agreement (~~Disciplinary~~ Article 15 <u>Disciplinary Action and Discharge</u>).

   ~~b.~~e. ~~Fire Rescue personnel~~<u>Employees</u> representing ~~the~~ Fire Rescue via social media ~~outlets~~ shall ~~do the following~~:
      i. ~~The use of Fire Rescue computers by Fire Rescue personnel to access social media is prohibited without authorization.~~
      ~~ii.~~i. Conduct themselves at all times as representatives of ~~the~~ Fire Rescue and, accordingly, ~~shall~~ adhere to all Fire Rescue standards of conduct and observe conventionally accepted protocols and proper decorum.
      ~~iii.~~ii. Identify themselves as a member of ~~the~~ Fire Rescue.
      ~~Post, transmit, or otherwise disseminate confidential information, including photographs or videos, related to Fire Rescue training, activities, or work-related assignments without express written permission.~~
      ~~Do not conduct political activities or private business.~~

**FR-A-404/Page 2 of 5**

Fire Rescue personnel use of personally owned devices to manage the Fire Rescue's social media activities or in the course of official duties is prohibited without express written permission.

iv. ~~Employees shall~~ Oobserve and abide by all copyright, trademark, and service mark restrictions ~~in posting materials to electronic media~~.

iii.

iv. Obtain authorization prior to accessing social media from Fire Rescue computers.

v. Obtain express written permission to use personally owned devices to manage those Fire Rescue's social media activities or conduct official duties. Any postings to a Social Media site shall be assumed to be an official opinion/comment of Fire Rescue.

f. ~~Fire Rescue personnel~~Employees representing ~~the~~ Fire Rescue via social media ~~outlets~~ shall not conduct political activities or private business.~~:~~

~~Use the Fire Rescue computers to access social media without prior authorization.~~

~~Conduct political activities or private business.~~

Use personally owned devices to manage the Fire Rescue's social media activities or conduct official county duties without express written permission.

2. **Personal Use**:

a. Fire Rescue recognizes the employee's right to participate in social networking/social media sites or maintain personal web pages, blogs or other types of online platforms while off-duty. However, it is strongly recommended employees use caution in their usage of social networking~~media~~/social ~~networking~~ media ~~platforms~~ sites especially when displaying personal profiles so as not to discredit themselves or the agency.

b. Development of an individual departmental social networking/social media site representing Fire~~IRB~~ Rescue, or any ~~ESCUE or any~~ Battalion, /Division, /Fire Station, /Unit or other Fire Rescue affiliation ~~etc.~~, is prohibited unless prior approval is obtained~~ed~~ by the Fire Rescue Administrator or designee. No postings shall be permitted without the final approval of the Public Information Officer or designee.  <!-- Commented [NN3]: --> <!-- Commented [NN4]: -->

c. Employees shall not use social networking~~media~~/social media networking ~~platforms~~sites in violation of PBC Merit Rules, the Collective Bargaining Agreement , ~~(Disciplinary~~ Article 15 Disciplinary Action and Discharge), ~~either~~ State law, or Federal law ~~and~~ or the PBCFR HIPAA Policies and Procedure Manual (FR-A-401 Attachment A).  <!-- Commented [NN5]: --> <!-- Commented [NN6]: -->

d. While on _duty or off _duty eEmployees are prohibited from disseminating content that is inconsistent with the duties, conduct, and responsibilities of a Fire Rescue employee, including content that could be reasonably interpreted as having an adverse effect upon Fire Rescue morale, discipline, operations, the safety of staff, or perception of the public.

   i. For example, unprofessional, unbecoming, illegal, unethical, sexual, violent, harassing, racist, sexist, or ethnically derogatory comments, pictures, artwork, videos, material or other such references all tend to undermine the public trust and confidence required by employees of ~~the~~ Fire Rescue.

**FR-A-404/Page 3 of 5**

d.e. Unless authorized by the Fire Rescue Administrator or designee, employees are prohibited from posting any confidential, sensitive, or copyrighted information, data, text, photographs, audio, video, or any other multimedia file related to any on-going criminal or administrative investigation of this agency. This includes but is not limited to: photographing or video-taping of fire scenes, crime scenes, traffic crashes, medical/trauma patients, arrestees, evidence, restricted areas of gGovernmental facilities, vehicles, other employees, and statements or comments related to any pending prosecutions or investigations.

**Commented [NN7]:**

e.f. Employees shall exercise good judgment in displaying logos, badges, seals, uniforms, vehicles, equipment, or any item or symbol that is associated with this agencyFire Rescue.

g. Employees who choose to maintain or participate in social networking/social media or social networking platformssites while on-duty or off-duty shall conduct themselves with professionalism and in such a manner that shall not reflect negatively upon this agency or its mission.

f.h. While using social media off duty or in an unofficial capacity, employees are prohibited from speaking or writing in an official capacity, or from representing that they are acting on behalf of Fire Rescue or the PBC Board of County Commissioners. Employees are cautioned that speech on duty -or- off -duty, made pursuant to their official duties, generally is not protected speech under the First Amendment and may be subject to disciplinary action if in violation of this policy.

**Commented [NN8]:**

g.i. Employees should be aware that the content of social media/social networking sites may be subpoenaed and used to undermine or impeach employee's testimony in a civil or criminal trial or other official proceeding.

h.j. Failure to comply with the abovethis policy guidelines may result in discipline up to and including termination. Authorized exceptions to the above guidelinesthis policy may be permitted by the Fire Rescue Administrator or designee for the operational needs of the Fire Rescue. Employees are strongly encouraged to use caution and seek the guidance of their supervisors regarding any posting that may adversely reflect upon either the agency Fire Rescue or upon the professionalism and integrity of the employee.

i.k. Fire Rescue personnelEmployees shall not post, transmit, or otherwise disseminate any information (data, text, photographs, audio, video, or any other multimedia filephotographic or text) to which they have access as a result of their employment without written permission from the Fire Rescue Administrator or designee.

j.l. Fire Rescue personnelEmployees are cautioned against posting personal photographs or providinge similar means of personal recognition that may cause you them to be identified as a firefighter, fire officer or employee of this Fire Rescue.

*Michael C. Mackey*

**MICHAEL C. MACKEY**
**FIRE RESCUE ADMINISTRATOR**

**Supersession History**
1. PPM#FR I-71, issued 12/21/1991
2. PPM#FR I-71, issued 03/24/2011
3. PPM#FR I-71, issued 06/10/2016

4.   PPM#FR A-404, clerical 03/01/2018
5.   PPM#FR A-404, clerical 01/10/2019
5.6. PPM#FR A-404, clerical 02/2814/2019

FR-A-404/Page 5 of 5

DE 11

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 9:19-cv-80701 Dimitrouleas/Mattewman

AJ O'LAUGHLIN and
CRYSTAL LITTLE,
     Plaintiffs,

vs.

PALM BEACH COUNTY, a political
Subdivision of the State of Florida,
     Defendant.
_____/

## DEFENDANT'S MOTION TO DISMISS THE COMPLAINT AND INCORPORATED MEMORANDUM OF LAW

Comes now the Defendant, PALM BEACH COUNTY BOARD OF COUNTY COMMISSIONERS ("the County"), by and through undersigned counsel, and pursuant to Federal Rule of Civil Procedure 12(b)(6) moves to dismiss the complaint for failure to state a cause of action.

### I.    SUMMARY OF CLAIMS AND LEGAL ARGUMENTS

Plaintiffs, AJ O'Laughlin and Crystal Little, are employed by Palm Beach County and work in the Fire Rescue Department ("Fire Rescue"). They filed a two count complaint against the County. In count I they alleged various claims under the First Amendment free speech clause of the United States Constitution. In count II they alleged identical claims under Article I, section 4 of the Florida Constitution. The scope of the Florida Constitution's protection of freedom of speech is the same as required under the First Amendment. *Dep't of Educ. V. Lewis*, 416 So.2d 455, 461 (Fla. 1982). Therefore, First Amendment case law applies to the Article I, section 4 claims.

The County contends that neither of the Plaintiffs spoke as a citizen on matters of public concern and, therefore, have no claim under either the First Amendment or Article 1, section 4 of the Florida Constitution.   The County further contends that Fire Rescue's social media policy does not constitute a prior restraint on speech, and that Plaintiff O'Laughlin's invitation-only Facebook page is neither owned nor operated by the County and, therefore is not a non-public forum.   To the extent the court permits an amended pleading, the County requests that Plaintiffs set forth each separate, distinct cause of action in a separate count, rather than combining all alleged claims into a single count.

## II.   PLAINTIFFS DID NOT SPEAK AS CITIZENS ON A MATTER OF PUBLIC CONCERN

In a First Amendment claim brought by a governmental employee against his or her employer, the court must decide a threshold question of law: whether the employee's "speech was made as a citizen and whether it implicated a 'matter of public concern.'" *Moss v. City of Pembroke Pines*, 782 F.3d 613, 617–18 (11th Cir. 2015) (quoting Rankin v. McPherson, 483 U.S. 378, 384, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987)).   If the answer to this question is no, then the employee does not have a First Amendment free speech claim. *Id.*   "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147–48, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).   "Public concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication." *City of San Diego v. Roe*, 543 U.S. 77, 84, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004).   In making this determination courts ask "whether the 'main thrust' of the speech in question is essentially public in nature or private, whether the speech was communicated to the public at large or privately to an individual, and what the speaker's

motivation in speaking was." *Mitchell v. Hillsborough County*, 468 F.3d 1276, 1283-1284 (11th Cir. 2006) (citations omitted). *Alves v. Board of Regents of the University System of Georgia*, 804 F.3d 1149, 1162 (11th Cir. 2015) (same). By contrast, where speech primarily serves the personal interests of the speaker, it warrants no protection because it has little value to the public at large. *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 762, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985). Courts "carefully review the entire record to ensure that matters of internal policy, including mere allegations of favoritism, employment rumors, and other complaints of interpersonal discord, are not treated as matters of public policy." *Goldstein v. The Chestnut Ridge Volunteer Fire Company*, 218 F.3d 337, 352 (4th Cir. 2000). "The First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs." *Connick*, 461 U.S. at 149, 103 S.Ct. 1684. "Absent extraordinary circumstances ... First Amendment protection remains unavailable when 'a public employee speaks not as a citizen upon matters of public concern, but instead as an employee on matters only of personal interest." *Morgan v. Ford*, 6 F.3d 750, 754 (11th Cir. 1993) (quoting *Connick*, 461 U.S. at 147).

Though the well pleaded facts of the complaint must be accepted as true, the court need not accept Plaintiffs' legal conclusions in paragraph 19 that they spoke on matters of public concern. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (the court is not required to accept as true legal conclusions and "[t]hreadbare recitals of the elements of a cause of action.") The court may determine on a motion to dismiss that the speech at issue was not on a matter of public concern and thus not protected as a matter of law. *Butler v. Bd. of County Commissioners for San Miguel County*, 920 F.3d 651, 664 (10th Cir. 2019) (affirming district court's dismissal, concluding after considering the content, form and context of the

speech at issue that it was not a matter of public concern and thus not protected by the First Amendment); *Simons v. W. Virginia Univ.*, 85 F.3d 617 (4th Cir. 1996) (same).

The speech at issue in the instant case is contained within the February 6, 2019, Facebook posts made by Plaintiffs. These Facebook posts are attached hereto as Exhibit 1.[1]  The content of the protected speech "is undoubtedly the most important factor in assessing whether particular speech touches on a matter of public concern." *Mitchell v. Hillsborough County*, 468 F.3d 1276, 1284 (11th Cir. 2006) (citations omitted).  When looking at content, courts "look to whether the speech communicates a 'subject of legitimate news interest [,] a subject of general interest and of value and concern to the public at the time[.]'" *Id.* (quoting *City of San Diego v. Roe*, 543 U.S. 77, 84 (2004)).

Plaintiffs, O'Laughlin and Little, are captains with Fire Rescue and are both members of the Professional Firefighters/Paramedics of Palm Beach County, Local 2928, IAFF, Inc. ("Union").  Complaint 1, 7-13.  With respect to the content of their speech, the primary thrust of O'Laughlin's Facebook posts concern himself, his power struggle with the Union as well as his personal ambition to become the Union's president, and his personal grievance or difference of opinion with Union officers and Fire Rescue management regarding the internal process for using and cancelling Union Time Pool ("UTP").  According to the complaint, UTP "is a pool of hours donated by all of [the Union's] members to allow union officers to get paid their regular salaries for doing union business on days that they would otherwise be scheduled to work."  Complaint ¶ 8.  Article 4 of the relevant collective bargaining agreement ("CBA") between the County and the Union is attached hereto as Exhibit 2.  Article 4 is titled "Union Business" and

---

[1] The County is requesting the court to consider the actual Facebook posts in ruling on this motion because they were referred to in the complaint, are undisputed, and go to the heart or crux of the claims being made. *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005).

specifically relates to UTP.[2]  In his first post on February 6, 2019, O'Laughlin included a screen shot of an internal Fire Rescue Telestaff document, which indicated that on November 10, 2018, a UTP request concerning the Union's First Executive Vice President, Jeffrey Newsome, had been cancelled.  Complaint ¶¶ 10-11; Exhibit 1.  The screen shot O'Laughlin posted provides the viewer with no information regarding when the UTP requested was initiated, why it was initiated, and why it was cancelled.  *Id.*  According to Plaintiffs, "[t]he posts at issue concerned an attempt by the union's first executive vice president, another captain," Jeffrey Newsome, "aided by Fire Rescue Department management, to ensure that he had Thanksgiving and Christmas day off with pay – at the expense of union members." Complaint ¶ 1.

O'Laughlin launches into his by posts by focusing on himself:  "This was send (sic) to me can someone explain this to **me.  I'm** confused. ..."  Exhibit 1.  He then begins his personal grievance against Newsome by complaining that "[t]his person is a theft (sic) just thinking about putting this into Telestaff."  He then starts to denigrate the Union:   "This is your Union leadership.  Wtf.  **When elected** this will stop ..."  This is a clear reference to himself and a plea for Union members invited to his "invitation-only Facebook page" to vote for him and not the incumbent Union president.  He continues his personal grievance against Newsome by stating, "Jeff you should be ashamed of yourself.  Thinking that union business is done on holidays.  **I** will make sure **I** keep **my** locker closed when **I'm** working with you." *Brooks v. Arthur*, 685 F.3d 367, 372 (4th Cir. 2012) (explaining that the "content [of the employee] focuses on personal dissatisfactions that are not matters of public concern" and that "his complaint is replete with I's and me's.").  Another Union member, Robert Valentine, challenges him and says "[l]ooks like he cancelled the UTP???"  O'Laughlin responds, "EVP1 took UTP for thanksgiving and also Xmas.

---

[2] The County is requesting the court to consider Article 4 of the CBA in ruling on this motion because it defines what UTP is and sets forth the procedure for utilizing UTP.  It is not anticipated that the authenticity of Article 4 will be disputed.

It was approved by the Union and by Admin.  Who does Union stuff on these days.  This is how Armand Nault got unelected.  You got to be kidding me.  Transparency is **my** campaign.  Soon you will see the truth."  He made an earlier post regarding his "transparency" as well. O'Laughlin ignored Mr. Valentine's request to show the dates for the cancelled UTP.  During the middle of O'Laughlin's posts Little chimes in "[n]ice to know the current retired [Union] president thinks it's ok to use UTP for holidays!!  Thanks AJ for keeping them accountable.  And on that note our fucking stellar staffing officer just blindly approves it?  Wtf!" Exhibit 1.

The content of the posts made by O'Laughlin center primarily, if not exclusively, on his own personal interests, whether they be a power struggle with the current Union leadership, *see Desrochers v. City of San Bernadino*, 572 F.3d 703, 710 (9th Cir. 2009), and *Fotopolous v. Board of Fire Commissioners of the Hicksville Fire District*, 11 F.Supp.3d 348, 364 (E.D. N.Y. 2014) ("There is no reason to believe the public would be concerned about which firefighter holds what office in an internal Company or faction."); a personal grievance against Newsome, *Deremo v. Watkins*, 939 F.2d 908, 911-912 (11th Cir. 1991); politicking for votes for himself; or a personal difference of opinion with the Union and Fire Rescue management over the internal process of using and cancelling UTP.  Indeed, Plaintiffs concede that their posts were "made during a union campaign and in a private forum" and that they constitute "private speech." Complaint ¶¶ 2(a), 2(b), 7, 16, 18(a), 19, 21(a), 22(a).  What's more, the allegation regarding UTP is not an allegation about the misuse or waste of public money.  UTP is not public money or property.  Rather, it is vacation time already earned by Fire Rescue employees who then donate it to allow Union officers to use to conduct Union business.  Consequently, the content of the posts at issue weigh heavily in favor of them being of a personal nature rather than of a public interest or concern.

The same is true regarding the form of the posts. As Plaintiffs concede, their posts were made not only on an "invitation-only Facebook page;" they were made on a "'hidden Facebook page, as opposed to statements to the public at large." *Id.* Plaintiffs made no attempt whatsoever to communicate any alleged concern they had over the misuse of UTP to the general public or the print, television, or radio media to bring this issue to light for open and robust public debate, which is a primary interest the First Amendment seeks to protect. A statement is personal in nature where it does "nothing to inform the public about any aspect of the [government entity's] functioning or operation." *City of San Diego v. Roe,* 543 U.S. 77, 84, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004). *See also Kurtz v. Vickrey,* 855 F.2d 723, 729 (11th Cir. 1988) ("Kurtz's profession of public concern loses force when it is considered that he took no affirmative steps … to inform the public at large about, the problems which he was so gravely concerned."); and *Pearson v. Macon-Bibb County Hospital Authority,* 952 F.2d 1274, 1279 (11th Cir. 1992) ("[T]he private and self-interested character of Person's speech in no way draws the public at large or its concerns into the picture.").

The context and motivation of the speech also weigh heavily in favor of the speech being personal and private as opposed to being on a matter of legitimate public concern. O'Laughlin brought up the alleged UTP issue in his Facebook posts three months after it had been concededly cancelled. *Deremo v. Watkins*, 939 F.2d 908, 912 (11th Cir. 1991) (explaining that "the letters seeking compensation [were] written six months after the problem in the office had been completely resolved" and that "the immediate triggering event for writing the letters was appellants' learning via a newspaper article that personal compensation had been awarded in another sexual harassment case."). Why did he bring? The triggering event was undoubtedly his personal desire to oust the incumbent Union president and take over control of the Union. It

bears repeating that O'Laughlin did not provide any information in his posts on February 6, 2019, regarding when Newsome requested UTP, why he did, and why the UTP was cancelled on November 10, 2018. Thus, O'Laughlin was simply providing his personal speculation and hyperbole, as opposed to concrete facts, regarding these issues, which is of no value to the viewer.

Based upon the foregoing, the content, form, context, and motivation of the speech at issue is personal or private in nature rather than bearing on a legitimate public interest or concern. Desroachers, 572 F.3d at 710 ("In a close case, when the subject matter of a statement is only marginally related to issues of public concern, the fact that it was made because of a grudge or other private interest or to co-workers rather than to the press may lead the court to conclude that the statement does not substantially involve a matter of public concern.") (citation omitted). Counts I and II relating to both Plaintiffs should be dismissed with prejudice for failure to state a cause of action under either the First Amendment or Article I, section 4 of the Florida Constitution.

### III.   FIRE RESCUE'S SOCIAL MEDIA POLICY IS NOT A PRIOR RESTRAINT ON SPEECH

Plaintiffs allege that Fire Rescue's social media policy is a "prior restraint of all speech critical of the Fire Rescue Department." Complaint ¶ 18(c). It is not. "The term prior restraint is used to describe administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550 (1993) (emphasis and quotation marks omitted) (stating that temporary restraining orders and permanent injunctions that forbid speech activities are classic examples of prior restraints); *see also Barrett v. Walker Cty. Sch. Dist.*, 872 F.3d 1209, 1223 (11th Cir. 2017) (defining the phrase "prior restraint" as a situation where "the government can deny access to a

forum for expression before the expression occurs" and stating that a classic example of a prior restraint is a requirement that a would-be speaker obtain a permit or license before speaking). In addition, a prior restraint on speech is distinguishable from a penalization of past speech. *See Alexander*, 509 U.S. at 553-54 (stating that "our decisions have steadfastly preserved the distinction between prior restraints and subsequent punishments"); *Barrett*, 872 F.3d at 1223 ("Prior restraints contrast with subsequent punishments, which regulate a given type of speech by penalizing the speech only after it occurs.") (emphasis and quotation marks omitted). Fire Rescue's social media policy is not a prior restraint because it does not seek to regulate speech in advance. Rather, to the extent certain speech is determined to violate the policy, it penalizes only past speech. Counts I and II relating to both Plaintiffs should be dismissed with prejudice for failure to state a cause of action relating to a prior restraint on speech.

## IV. O'LAUGHLIN'S INVITATION-ONLY FACEBOOK PAGE IS NOT A NON-PUBLIC FORUM

In their wherefore clauses under both counts I and II Plaintiffs request the court to declare that the County "is precluded by the First Amendment from regulating the private speech of [Plaintiffs] within the non-public forum of Capt. O'Laughlin's invitation-only Facebook page." Both counts I and II of the complaint fail to state a cognizable cause of action with respect to the regulation of speech in a non-public forum. "A traditional public forum is a place, like a public park or street, 'that has traditionally been available for public expression.'" *Calvary Chapel Church v. Broward County, Florida*, 299 F.Supp.2d 1295, 1300 (S.D. Fla. 2003) (citation omitted). "Limited public fora are those public areas that the government 'has opened for use by the public as a place for expressive activity.'" *Id.* (citation omitted). "Finally, a non-public forum is one where public property is not by 'tradition or designation a forum for public

communication.'" *Id.* (citation omitted). "Such a forum exists where the Government acts in its position as proprietor to manage its own internal operations, as opposed to using its power as a regulator or lawmaker." O'Laughlin's invitation-only Facebook page is not government owned property. Consequently, counts I and II relating to any claim regarding a non-public forum should be dismissed with prejudice for failure to state a cause of action.

## V.     CONCLUSION

WHEREFORE, the County requests the court to dismiss the complaint against both Plaintiffs.

Dated:  July 10, 2019.

Respectfully submitted,

  /s/ Andrew M. Pelino                /
Andrew M. Pelino, Esquire
Senior Assistant County Attorney
Florida Bar No. 882410
300 North Dixie Highway, Third Floor
West Palm Beach, Florida 33401
Tel.: (561) 355-2529/Fax: (561) 355-4234
Primary Email:        apelino@pbcgov.org
Secondary Emails:     ldennis@pbcgov.org
                      swebber@pbcgov.org


### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 10, 2019, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send an electronic notice to the authorized CM/ECF filers.

  /s/ Andrew M. Pelino                /
Andrew M. Pelino, Esquire
Senior Assistant County Attorney
Florida Bar No. 882410
300 North Dixie Highway, Third Floor
West Palm Beach, Florida 33401

Tel.: (561) 355-2529/Fax: (561) 355-4234
Primary Email:           apelino@pbcgov.org
Secondary Emails:        ldennis@pbcgov.org
                         swebber@pbcgov.org

February 7, 2019

Chief Cooper,

Please accept this letter as my official internal complaint in reference to the conduct of Cpt. AJ O'Laughlin. I am accusing Cpt. O'Laughlin of C-6 Conduct Unbecoming, and F-1 Violation of Policy FR-A-404.

Cpt. O'Laughlin is the creator and moderator of a hidden Facebook page called "Make our Union Strong again". On February 6th, 2019, Cpt. O'Laughlin posted a screen shot of my Telestaff calendar to his Facebook page (twice). He then advised that I was misusing Union Time Pool, that I committed theft, and encouraged people contact the Office of the Inspector General to make a complaint. This post, then was replied to by Cpt. C. Little, who commented about "our fucking stellar staffing officer".

By making this post, Cpt. O'Laughlin violated several provisions of Policy FR-A-404. Section 2 (d) states: Employees are prohibited from disseminating content that is inconsistent with the duties, conduct, and responsibilities of a Fire Rescue employee <u>including content that could be reasonably interpreted as having an adverse effect upon Fire Rescue morale, discipline, operations, the safety of staff, or perception of the public</u>. Section 2 (g) states Employees who chose to maintain or participate in social media or social networking platforms <u>while off-duty shall conduct themselves with professionalism and in such a manner that shall not reflect negatively upon this agency or its mission</u>. Section 2 (j) states Fire Rescue personnel shall not post, transmit, or otherwise disseminate any information (photographic or text) to which they <u>have access as a result of their employment</u> without written permission from the Fire Rescue Administrator.

Cpt. O'Laughlin's posts have disparaged the reputation of Fire Rescue, the Fire Rescue Staffing Officer, "Admin", and me personally. His behavior could erode the faith the public has in Palm Beach County Fire Rescue. His behavior is unprofessional, and certainly does not display the conduct that PBCFR and the

*Exhibit 1*

public expect of a firefighter. By having a profile picture in his PBCFR Class A uniform, he cannot make the argument that his profession is not tied to his posts.

I have attached a copy of his Facebook page posts for your review. By looking at the pictures, the security permissions used are clearly that of someone higher than a Captain. I am requesting that PBCFR investigate who has accessed my Telestaff calendar. This misuse of official power must be addressed.

Thank you for your assistance in this matter.

Fraternally,

Jeffrey L. Newsome



👍 Like      💬 Comment

AJ O'Laughlin ▷ **Make our Union Strong again**
1 min · 🌐

This was send to me can someone explain this to me. I'm confused. Second copy coming!!!



👍 Like      💬 Comment

    

8:26 ⏻

<  **AJ O'Laughlin** ▷ **Make our Union Strong again**
🛡 Admin · 32 mins · 👥 ···

Be the first to like this

 **AJ O'Laughlin** 🛡
This person is a theft just thinking about putting this into Telestaff. This is your Union leadership. Wtf. When elected this will stop and who is Saying this is OK.

26m   Like   Reply                          1

 **AJ O'Laughlin** 🛡
Jeff you should be ashamed of yourself. Thinking that union business is done on holidays. I will make sure I keep my locker closed when I'm working with you.

18m   Like   Reply

Write a reply...

 **Robert Valentine**
I don't understand???

17m   Like   Reply

      

📷  Write a comment...                    GIF  ☺

        ≡

8:31 ◀

**‹**  **AJ O'Laughlin** ▶ **Make our Union Strong again**
🛡 Admin · 35 mins · 🖼



👍 Like          💬 Comment

🤍 1

 **Robert Valentine**
Looks like he canceled his UTP???
21m   Like   Reply

 **Crystal Little**
Nice to know the current retired president thinks it's ok to use UTP for holidays!! Thanks AJ for keeping them accountable. And on that note our fucking stellar staffing officer just blindly approves it? Wtf!
10m   Like   Reply                    1

      ✕

📷   Write a comment...                GIF 🙂



7:56

Q Search in Make our Union Stro...   ⓘ

**Discussion**   **Chats**   **Photos**   **Events**   **Files**

**From Notifications**

 **AJ O'Laughlin**   •••
🛡 Admin · Just now · 👤

Is this unethical Wtf. Make sure u call the IG about this. Transparency is everything.



< AJ's Post •••

 **Robert Valentine**
I don't understand???

11h   Like   Reply

 **AJ O'Laughlin** 🛡
**Robert Valentine** EVP1 took UTP for thanksgiving and also XMas. It was approved by the Union and by Admin. Who does Union stuff on these days. This is how Armand Nault got unelected.  You got to be kidding me. Transparency is my campaign. Soon you will see the truth.

11h   Like   Reply

 **Robert Valentine**
**AJ O'Laughlin** I don't see a date on there for Thanksgiving or Christmas.

11h   Like   Reply

 **AJ O'Laughlin** 🛡
Can't be erased.

11h   Like   Reply

 **Robert Valentine**
**AJ O'Laughlin** so where is it then?? The dates that is.

11h   Like   Reply

 Write a comment...    

     

| | |
|---|---|
| **TO:** | **ALL PALM BEACH COUNTY FIRE RESCUE PERSONNEL** |
| **FROM:** | **MICHAEL C. MACKEY**<br>**FIRE RESCUE ADMINISTRATOR** |
| **PREPARED BY:** | **FIRE RESCUE PPM COMMITTEE** |
| **SUBJECT:** | **USE OF SOCIAL MEDIA** |
| **PPM #:** | **FR-A-404** |

| **ISSUE DATE** | **EFFECTIVE DATE** |
|---|---|
| **April 17, 2016** | **June 10, 2016** |

**PURPOSE:**   The purpose of this policy is to provide guidelines on the procedure and use of social media and social networking.

**UPDATES:**   Future updates to this PPM are the responsibility of the Deputy Chief of Administration, in conjunction with the PPM Committee, under the authority of the Fire Rescue Administrator.

**AUTHORITY:**
- Fire Rescue Administrator
- Florida Statues, Chapter 11
- CW-R-008: Internet Use Policy
- CW-R-113: Social Networking Policy
- PBCFR HIPAA Policies and Procedures Manual (PPM FR-A-401), as may be amended.

**SCOPE:**   This policy applies to all Palm Beach County Fire Rescue personnel and reservists.

**POLICY:**   This policy applies to the procedure and use of social media and social networking.

**DEFINITIONS:**

1. <u>Social Media</u> – A variety of online sources that allow people to communicate, share information, photos, videos, audio or exchange text and other multimedia files with others via online or cellular network platform. This includes but is not limited to social networking sites, micro-blogging sites, personal blogs/personal websites, and news sites.
2. <u>Social Networking</u> – Online platforms where users can network, socialize, communicate and exchange information with other users via text, live conferencing/chat rooms, photographs and/or video-tapes. Mobile Social Networking refers to social networking using a mobile phone or cellular based device.
3. <u>Blogs</u> – A personal online journal or commentary that allows visitors to post opinions, responses, reactions, or comments to a particular topic and may allow the use of graphics or video. Blogs may be private or accessible to the general public.

**FR-A-404/Page 1 of 4**

4. <u>Website/Webpage</u> – A webpage is any page a person sees when accessing the internet. A website is a collection of one or more web pages.

5. <u>Posting</u> – Typing a message, uploading graphics/videos or any electronic media to an online forum or newsgroup which may be accessible to specific viewers or the general public.

6. <u>Personal Website</u> – An online site created by an individual that may include personal information, commentary, photographs, videos and/or graphics for social, entertainment or business purposes. Personal websites may be private or accessible to general public.

7. <u>Profile</u> – A self-defined description of a person which can be displayed on a webpage or a social networking site, and may display any or all of the following biographical information: age, race, sex, employment, education, religion, political viewpoints, the user's likes and dislikes, current location, hometown, and contact information. Profiles may be private or accessible to the general public.

8. <u>Chat Rooms</u> – An online gathering where users can communicate with each other and exchange information via instant messaging and the information is visible to all people in the chat room. Chat Rooms may be private or accessible to the general public.

**<u>PROCEDURE</u>:**

1. **<u>Department-Sanctioned Use</u>:**
   a. Fire Rescue reserves the right to not publish any posting and can remove unsuitable content from authorized social networking websites at any time without notice (CW-R-113). The Fire Rescue's Public Information Officer shall have final discretion as to the removal of any posting under question. The Fire Rescue's Public Information Officer and staff assigned by the Deputy Chief of Operations shall help promote authorized social media accounts.
   b. Misuse of social media websites may lead to disciplinary action under applicable provisions of the Palm Beach County Merit Rules or the Collective Bargaining Agreement (Disciplinary - Article 15).
   c. Fire Rescue personnel representing the Fire Rescue via social media outlets shall do the following:
      i. The use of Fire Rescue computers by Fire Rescue personnel to access social media is prohibited without authorization.
      ii. Conduct themselves at all times as representatives of the Fire Rescue and, accordingly, shall adhere to all Fire Rescue standards of conduct and observe conventionally accepted protocols and proper decorum.
      iii. Identify themselves as a member of the Fire Rescue.
      iv. Post, transmit, or otherwise disseminate confidential information, including photographs or videos, related to Fire Rescue training, activities, or work-related assignments without express written permission.
      v. Do not conduct political activities or private business.
      vi. Fire Rescue personnel use of personally owned devices to manage the Fire Rescue's social media activities or in the course of official duties is prohibited without express written permission.
      vii. Employees shall observe and abide by all copyright, trademark, and service mark restrictions in posting materials to electronic media.
      viii. Any postings to a Social Media site shall be assumed to be an official opinion/comment of Fire Rescue.

2. **Personal Use:**
   a. Fire Rescue recognizes the employee's right to participate in social networking/social media sites or maintain personal web pages, blogs or other types of online platforms while off-duty. However, it is strongly recommended employees use caution in their usage of social media/social networking platforms especially when displaying personal profiles so as not to discredit themselves or the agency.
   b. Development of an individual departmental networking site representing FIRE RESCUE or any Battalion/Division/Fire Station/Unit etc., is prohibited unless approved by the Fire Rescue Administrator or designee. No postings shall be permitted without the final approval of the Public Information Office or designee.
   c. Employees shall not use social media/social networking platforms in violation of PBC Merit Rules, the Collective Bargaining Agreement, (Disciplinary Article 15), either State or Federal law and the HIPAA Policies and Procedure Manual.
   d. Employees are prohibited from disseminating content that is inconsistent with the duties, conduct, and responsibilities of a Fire Rescue employee including content that could be reasonably interpreted as having an adverse effect upon Fire Rescue morale, discipline, operations, the safety of staff, or perception of the public. For example, unprofessional, unbecoming, illegal, unethical, sexual, violent, harassing, racist, sexist, or ethnically derogatory comments, pictures, artwork, videos, material or other such references all tend to undermine the public trust and confidence required by employees of the Fire Rescue.
   e. Unless authorized by the Fire Administrator or designee, employees are prohibited from posting any confidential, sensitive, or copyrighted information, data, text, photographs, audio, video, or any other multimedia file related to any on-going criminal or administrative investigation of this agency. This includes but is not limited to: photographing or video-taping of fire scenes, crime scenes, traffic crashes, medical/trauma patients, arrestees, evidence, restricted areas of Governmental facilities, vehicles, other employees, and statements or comments related to any pending prosecutions or investigations.
   f. Employees shall exercise good judgment in displaying logos, badges, seals, uniforms, vehicles, equipment, or any item or symbol that is associated with this agency.
   g. Employees who choose to maintain or participate in social media or social networking platforms while off-duty shall conduct themselve with professionalism and in such a manner that shall not reflect negatively upon this agency or its mission. While using social media off duty or in an unofficial capacity, employees are prohibited from speaking or writing in an official capacity, or from representing that they are acting on behalf of Fire Rescue or the PBC Board of County Commissioners. Employees are cautioned that speech on-or-off duty, made pursuant to their official duties, generally is not protected speech under the First Amendment and may be subject to disciplinary action if in violation of this policy.
   h. Employees should be aware that the content of social networking sites may be subpoenaed and used to undermine or impeach employee's testimony in a civil or criminal trial or other official proceeding.
   i. Failure to comply with the above guidelines may result in discipline up to and including termination. Authorized exceptions to the above guidelines may be permitted by the Fire Administrator or designee for the operational needs of the Fire Rescue. Employees are strongly encouraged to use caution and seek the guidance of

their supervisors regarding any posting that may adversely reflect upon either the agency or upon the professionalism and integrity of the employee.

j. Fire Rescue personnel shall not post, transmit, or otherwise disseminate any information (photographic or text) to which they have access as a result of their employment without written permission from the Fire Rescue Administrator or designee.

k. Fire Rescue personnel are cautioned against posting personal photographs or provide similar means of personal recognition that may cause you to be identified as a firefighter, fire officer or employee of this Fire Rescue.

*Michael C. Mackey*

**MICHAEL C. MACKEY**
**FIRE RESCUE ADMINISTRATOR**

**Supersession History**
1. PPM#FR I-71, issued 12/21/1991
2. PPM#FR I-71, issued 03/24/2011
3. PPM#FR I-71, issued 06/10/2016
4. PPM#FR A-404, clerical 03/01/2018

**FR-A-404/Page 4 of 4**

# Collective Bargaining Agreement

## between

## PALMBEACHCOUNTY

### AND

## PROFESSIONAL

## FIREFIGHTERS/PARAMEDICS OF

## PALMBEACHCOUNTY,

## LOCAL 2928, IAFF, INC.

October 1, 2018 through September 30, 2021

Exhibit 2

1

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................ 2

ARTICLE 1 – PREAMBLE ......................................................................................... 4

ARTICLE 2 – RECOGNITION ................................................................................... 5

ARTICLE 3 – DUES CHECKOFF .............................................................................. 7

ARTICLE 4 – UNION BUSINESS ............................................................................. 8

ARTICLE 5 – BULLETIN BOARDS ......................................................................... 10

ARTICLE 6 – MEETING ROOMS ........................................................................... 11

ARTICLE 7 – MANAGEMENT RIGHTS ................................................................. 12

ARTICLE 8 – MEETINGS WITH MANAGEMENT ................................................ 13

ARTICLE 9 – SAFETY COMMITTEE ..................................................................... 14

ARTICLE 10 – NON-DISCRIMINATION ............................................................... 15

ARTICLE 11 – PROHIBITION OF STRIKES .......................................................... 16

ARTICLE 12 – PERSONNEL REDUCTION ............................................................ 17

ARTICLE 13 – SENIORITY ...................................................................................... 19

ARTICLE 14 – PROBATIONARY EMPLOYEES .................................................... 21

ARTICLE 15 – DISCIPLINARY ACTION AND DISCHARGE ............................. 22

ARTICLE 16 – GRIEVANCE AND ARBITRATION PROCEDURE ...................... 23

ARTICLE 17 – PERFORMANCE REVIEW ............................................................. 26

ARTICLE 18 – PROMOTIONS ................................................................................. 27

ARTICLE 19 – PAY PLAN ........................................................................................ 45

ARTICLE 20 – WORK WEEK ................................................................................... 56

ARTICLE 21 – OVERTIME ....................................................................................... 61

ARTICLE 22 – EXCHANGE OF TIME .................................................................... 64

ARTICLE 23 – CALL BACK ...................................................................................... 66

ARTICLE 24 – INCENTIVE PAY ............................................................................. 67

ARTICLE 25 – EDUCATION .................................................................................... 69

ARTICLE 26 – CERTIFICATION ............................................................................. 70

ARTICLE 27 – UNIFORMS ...................................................................................... 72

ARTICLE 28 – VACATIONS ..................................................................................... 76

ARTICLE 29 – HOLIDAYS ........................................................................................... 84

ARTICLE 30 – FUNERAL LEAVE ................................................................................ 87

ARTICLE 31 – COURT TIME ...................................................................................... 88

ARTICLE 32 - JURY DUTY .......................................................................................... 89

ARTICLE 33 – INSURANCE........................................................................................ 90

ARTICLE 34 – PENSION ............................................................................................. 93

ARTICLE 35 – DOCUMENTS..................................................................................... 94

ARTICLE 36 – USE OF PERSONAL VEHICLES ........................................................ 95

ARTICLE 37 – VOTING .............................................................................................. 96

ARTICLE 38 – STATION CONDITIONS.................................................................... 97

ARTICLE 39 – LABOR RELATIONS COMMITTEE ................................................... 98

ARTICLE 40 – REPLACEMENT OF PERSONAL PROPERTY ................................... 99

ARTICLE 41 – EMPLOYEE BENEFITS...................................................................... 100

ARTICLE 42 – SAVINGS CLAUSE ............................................................................ 101

ARTICLE 43 – DURATION OF AGREEMENT.......................................................... 102

ARTICLE 44 – EMPLOYEE BILL OF RIGHTS.......................................................... 103

ARTICLE 45 – WELLNESS PROGRAM .................................................................... 104

ARTICLE 46 – RETIREE INSURANCE ...................................................................... 131

ARTICLE 47 – BENEVOLENT FUND ....................................................................... 133

ARTICLE 48 – MILITARY LEAVE............................................................................. 135

ARTICLE 49 - DRUG TESTING................................................................................. 136

SIGNATURE PAGE................................................................................................... 155

## ARTICLE 1 – PREAMBLE

**Section 1.**   This Agreement is entered into by and between PALM BEACH COUNTY, hereinafter referred to as the "County", and the PROFESSIONAL FIREFIGHTERS/PARAMEDICS OF PALM BEACH COUNTY, LOCAL 2928, IAFF, INC., hereinafter referred to as the "Union".

**Section 2.**   It is contemplated that the members of both Bargaining Units will, at all times, exhibit the high degree of professionalism and moral standards commensurate with the stature of the position of uniformed public servant being entrusted to them.

**Section 3.**   It is the purpose of this Agreement to achieve and maintain harmonious relations between the County and the Union to ensure an accurate line of communications, and clear transmission of facts relating to the workplace, to provide for equitable and peaceful adjustment of grievances which may arise, and to establish fair standards of wages, hours, and other terms and conditions of employment.

**Section 4.**   When the contract refers to an individual/position taking or approving an action, it shall also include designee.

## ARTICLE 2 – RECOGNITION

The County recognizes the Union as the exclusive bargaining representative for all employees of the Palm Beach County Fire Rescue Department in the main bargaining unit certified by the Public Employees Relations Commission (PERC cert. #RA-84-008), and a Supervisory Bargaining Unit certified by the Public Employees Relations Commission (PERC cert. #RA-93-004)as follows:

### COVERED BY THIS AGREEMENT:

Firefighters, Driver Operators, Lieutenants, Captains, ARFF Captains, Special Operations Captains, EMS Captains, Staff Captains, Battalion Chiefs, Communicator III, Communicator Supervisor, Communications Center Training Supervisor, Communications Center Quality Assurance Manager, Alarm Office Manager, Fire-Rescue Communications Coordinator, Integrated Health Paramedic*, Fire-Rescue Building Coordinator, Fire Apparatus Maintenance Superintendent, Fire Apparatus Tech II, Facility Technician, Electronics Technician, Fire Safety Specialist, Materials Manager, T.V. Producer/Director, Fire Rescue Broadcast Facility Coordinator, Fire Rescue Video Production Manager, Wellness Coordinator, Exercise Physiologist, Fire Rescue Support Services Driver, Fire Rescue Inventory Specialist,  Respiratory Protection Specialist, Fire Rescue Respiratory Protection Manager, Fire Rescue Training Facility Coordinator, and Medical Social Work Coordinator.

### NOT COVERED BY THIS AGREEMENT:

Fire Rescue Administrator, Deputy Chiefs, Division Chiefs, District Chiefs, Executive Assistants, Budget and Finance Employees, Information Technology Services Employees, Personnel and Payroll Records Employees, Planners and Clerical Employees, Inventory and Stores Manager, Capital Projects Coordinator, , Fire-Rescue Fleet Director.

Recognition status in the Bargaining Unit shall not change in the event of an assignment.

*Prior to implementing a program involving the classification of Integrated Health Paramedic or CAT Team Coordinator, the County and the Union agree to negotiate the program, the impacts of the program, and the wages, hours and terms and conditions of employment of the Integrated Health Paramedic or CAT Team Coordinator.

## ARTICLE 3 – DUES CHECKOFF

**Section 1.**    Employees who wish to join the Union and have their dues and assessments deducted through the payroll system may authorize the County to make such deductions by using the Union's "Dues Check off Authorization" form.  This authorization shall remain in effect until such time as the County has received written notice of revocation of this authorization.  Deductions shall be submitted to the Union each payroll period, and an itemized statement shall be provided to the Union on a monthly basis.

**Section 2.**    The Union agrees to indemnify and hold the County harmless against any and all claims, suits, orders or judgments brought or issued against the County as a result of any action taken or not taken by the County under the provisions of this Article.

## ARTICLE 4 – UNION BUSINESS

**Section 1.**    Each employee shall be allowed to voluntarily contribute any accrued leave, except sick leave, to the Union Time Pool.  The Union Time Pool may be used for Union business upon approval by the Union President.  Employees shall be released from duty on Union Time Pool only if the established needs of the service permit; with the approval of the non-bargaining unit supervisor, but such release shall not be unreasonably denied.

Any request for Union Time Pool, that is greater than twelve (12) hours and causes overtime must be authorized by the Deputy Chief.  Any time pool usage that causes overtime will be charged at a rate one and one-half (1½).  Requests for such time off shall be in writing or on the Department's computer system and shall be submitted to the Fire Rescue Administrator, forty-eight (48) hours prior to the time of such requested time off; provided that when it is impossible to submit written, forty-eight (48) hours' notice, then a request may be submitted orally together with the need for the short notices substantiated, and must be approved by the Division Chief in Operations, (or the appropriate non-bargaining unit supervisor in divisions not having Division Chiefs) and later confirmed in writing.  Such release shall not be unreasonably denied.  All 24-hour time pool requests from the Union President submitted at least thirty (30) days in advance will be approved or denied within two (2) business days of receipt of the request.

**Section 2.**    Union Time Pool hours will be used on an hour for hour basis.

**Section 3.**    The Union will be allowed up to four (4) designated employee representatives from the Main Bargaining Unit (one (1) of which is from non-shift personnel), and one (1) designated employee representative from the Supervisory Bargaining Unit who shall be permitted to participate in labor contract negotiation sessions while on duty with no loss of pay or emoluments.  It is contemplated that the designees will not change except for substantial reason not related to the question of pay or scheduling.

**Section 4.**    Two (2) grievance representatives, one (1) of whom is the Executive Vice President of the Union, shall be allowed to utilize time pool to attend grievance meetings. Two (2) Executive Board members shall be allowed to utilize time pool to attend Executive Board meetings (for up to four (4) hours).

**Section 5.**     The Union President or designee, if covered by this Agreement, shall be released from duty on a permanent basis to conduct Union business on the basis of a forty (40) hour employee and shall be paid the five (5%) percent adjustment in accordance with this Agreement.  One other Union Principal Officer, if covered by this Agreement, designated by the Union President, shall be released from duty on those shifts which fall on Mondays through Fridays to conduct Union business. They shall maintain their current pay, rank, bidded position, and time in grade.  They shall accrue all benefits available to other bargaining unit employees (except that they shall be exempt from overtime as to those duties as Union Officers) and shall also be eligible for any promotional examinations as applicable.  The President may perform regular Fire Rescue duties upon the approval of the appropriate Deputy Chief.  The President and designated other Union Officer, shall be available to conduct Union business during the same hours as the Fire Rescue Administrator.

The Union authorizes Payroll to automatically deduct, from the Union Time Pool, the number of regularly scheduled hours in each pay period, unless notified of an exception by the Union.

It is further agreed that the County shall provide a written accounting of the usage of the Union Time Pool on a monthly basis.

**Section 6.**     The first Executive Vice President of the Union shall be released from duty on Union time pool for all labor-management meetings, the IAFF convention, the FPF convention and other Union business approved by the Union President and the Fire Rescue Administrator.

**DE 14**

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT,
IN AND FOR PALM BEACH COUNTY, FLORIDA

Case No. 9:19-cv-80701 Dimitrouleas/Mattewman

AJ O'LAUGHLIN and CRYSTAL
LITTLE,

       Plaintiffs,

vs.

PALM BEACH COUNTY, a political
subdivision of the State of Florida,

       Defendant.

_____/

## Plaintiffs' Response to Defendant's Motion to Dismiss the Complaint And Incorporated Memorandum of Law

Plaintiffs, AJ O'Laughlin and Crystal Little, respond as follows to

defendant, Palm Beach County's motion to dismiss (DE 11):

### Introduction and Summary

Palm Beach County asks this Court to dismiss the First Amendment

complaint because:

**One**, the two fire captains were speaking as "public employees,"

rather than as "citizens" when they posted remarks about the rival side in a

union election on the private, invitation-only Facebook page of a candidate

for union president;

*Two*, allegations that Palm Beach Fire Rescue management was in cahoots with union leaders to permit the union's first executive vice president to use leave time donated by union fire fighters to take Thanksgiving and Christmas Days off at full pay—at the union's expense—would not be a matter of public concern;

*Three*, a Fire Rescue policy that states that the department will punish any fire fighter who uses social media to utter anything unflattering about Fire Rescue management is not prior restraint, but merely after-the-fact punishment for inappropriate speech, and

*Four*, a private, invitation-only Facebook page is not a non-public forum, within the plain meaning of that phrase, because it does not fit the term-of-art definition of that phrase used by some courts to describe government-owned real estate on which expression can be regulated.

**Point 1:** **O'Laughlin and Little were speaking as 'citizens,' not Fire Rescue employees, when they, as part of a union election campaign, characterized Captain Jeffrey Newsome's behavior as corrupt, and that of Fire Rescue management, as likewise being corrupt, for approving Captain Newsome's attempt to use time donated by rank-and-file fire fighters from their accrued leave to take Thanksgiving and Christmas off at full pay.**

"A public employee's speech is protected under the First Amendment where it meets two requirements:  the employee must have spoken both as a private citizen and on a matter of public concern."  <u>Weinstein v. City of N. Bay Vill.</u>, 977 F. Supp. 2d 1271, 1283 (S.D. Fla. 2013), citing <u>Garcetti v. Ceballos</u>,547 U.S. 410, 416 (2006).  "The First Amendment also protects

public employees' right to associate freely when they act as citizens."

Weinstein, citing D'Angelo v. Sch. Bd. of Polk Cnty., Fla., 497 F.3d 1203,

1212–13 (11th Cir.2007).

    "A freedom of association claim does not require that the associational

activity relate to a matter of public concern."  Id.  However, as far as Crystal

Little and AJ O'Laughlin's free-speech claims go, exposing corruption is a

matter of public concern.  See Bryson v. City of Waycross, 888 F.2d 1562,

1566 (11th Cir. 1990) ("a core concern of the first amendment is the

protection of the 'whistle-blower' attempting to expose government

corruption").  So is being a member of a union and running for office.  Scott

v. Goodman, 961 F. Supp. 424, 435 (E.D.N.Y. 1997), aff'd sub nom. Scott v.

Meyers, 191 F.3d 82 (2d Cir. 1999) (finding that union membership "and of

itself satisfies the public-concern requirement").

    Thus, when O'Laughlin and Little, two Palm Beach Fire Rescue

captains, criticized Captain Jeffrey Newsome for attempting to use accrued

leave donated by members of the International Association of Fire Fighters

("IAFF") local of which he was first executive vice president to take of both

Thanksgiving and Christmas Days last year at union expense, and criticized

the Fire Rescue Department for its going along with Newsome's scheme,

they were speaking as citizens, not as fire fighters, and were speaking about

a matter of public concern.

    Captain Newsome's attempt to take Thanksgiving and Christmas days

off during 2018, with his 24-hour-shift salary fully paid by time donated by

union members for him to take off to do union business, not only was arguably corrupt, but according to the Collective Bargaining Agreement that Palm Beach County appended to its motion to dismiss, it was also signed off on by the union president and Fire Rescue management.   See DE 11-2, at 8, "Article 4—Union Business," ¶ 1 ("The Union Time Pool may be used for Union business upon approval by the Union President. . . .  with the approval of the non-bargaining unit supervisor. . . .").

Nothing in their job descriptions required O'Laughlin to run as a reform candidate for the presidency of Local 2928, or Little to either support O'Laughlin's candidacy him or criticize both Newsome and Fire Rescue management for attempting to abuse the union time pool as he did.

Compare Garcetti, 547 U.S. at 423 (employee does not act as a citizen when speech or associations are made pursuant to his or her job duties).

**Point 2:**    **Even under Palm Beach County's case law, the Fire Rescue Department's Social Media Policy is a prior restraint.**

The Palm Beach Fire Rescue Department's Social Media Policy:

a.  warns against "discredit[ing] … the agency," Procedure 1(a);

b.  "[w]hile . . . off-duty . . . disseminating content that is inconsistent with the duties, conduct, and responsibilities of a Fire Rescue employee, including content that could reasonably be interpreted as having an adverse effect upon . . . [the] perception of the public…," Procedure 2(d), which lists as "examples,"

c.  material that might "tend to undermine the public trust and confidence required by employees of Fire Rescue," Procedure 2(d)(i), and

d.  "any posting that may adversely reflect on Fire Rescue…." Procedure 2(j).

Complaint, DE 1-1, at 4-5, ¶ 5.

Although Palm Beach County correctly cites Alexander v. United States, 509 U.S. 544, 550 (1993) (holding that a penalty imposed for a pornographer's violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") is not a prior restraint) for the proposition that "Temporary restraining orders and permanent injunctions—i.e., court orders that actually forbid speech activities—are classic examples of prior restraints," 509 U.S. at 550, it does so obliviously to the court's statement in the immediately previous sentence that "[t]he term 'prior restraint' is used 'to describe **administrative** and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur.'" Id., quoting M. Nimmer, Nimmer on Freedom of Speech § 4.03, p. 4-14 (1984) (underlined emphasis added by the court; bold italic emphasis supplied).

Palm Beach County's assertion that "Fire Rescue's social media policy is not a prior restraint because it does not seek to regulate speech in advance; [r]ather, to the extent certain speech is determined to violate the policy, it penalizes only past speech" is ludicrous. A simple reading of the policy makes clear that the policy sets out various rules that must be observed, including in off-duty postings on social media, and warns that "[f]ailure to comply with the above guidelines may result in discipline up to and including termination." See "Use of Social Media," 11-1, at 8-11, Procedure, ¶ 2(i).

The policy's exhortation that "[e]mployees are strongly encouraged to use caution and seek the guidance of their supervisors regarding any posting that may adversely reflect upon . . . the agency," DE 11-1, at 10-11, Social Media Policy, Personal Use, ¶ 1(i), sounds quite similar to how Palm Beach County characterized part of its takeaway from <u>Barrett v. Walker Cty. Sch. Dist.</u>, 872 F.3d 1209, 1223 (11th Cir. 2017), which it described as "defining the phrase 'prior restraint' as a situation where 'the government can deny access to a forum for expression before the expression occurs' and stating that a classic example of a prior restraint is a requirement that a would-be speaker obtain a permit or license before speaking." DE 11, at 8-9.

Captains O'Laughlin and Little have pleaded that they are being subjected to irreparable harm by

> being precluded by the Fire Rescue Department's social-media policy from posting the expose of Capt. Newsome and Fire Rescue Department management's complicity in the attempted misuse of the UTP not merely to those persons who were invitees to Capt. O'Laughlin's Facebook page, but to a wider audience, lest such a broader posting "undermine the public trust and confidence required by employees of Fire Rescue" or "reflect negatively upon [the] agency."

Complaint, DE 1-1, at 11, ¶ 23.

Although Palm Beach County does not elaborate on the point, its objection to Captains O'Laughlin and Little seeking injunctive relief against future enforcement of the social media policy would appear to be based standing.  However, they acquired that standing from their pleaded desire to more widely publish their concerns about Captain Newsome's abuse of the

union time pool, and Fire Rescue management's acquiescence in it—an attempted abuse that the Collective Bargaining Agreement that Palm Beach County appended to the motion to dismiss shows required the approval of the union president. See DE 11-2, supra. "'When an individual is subject to [the threatened enforcement of a law], an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law.'" Wollschlaeger v. Governor of Fla., 848 F.3d 1293, 1304 (11th Cir. 2017), quoting Susan B. Anthony List v. Driehaus, 573 U.S. 149, ___, 134 S.Ct. 2334, 2342 (establishing pro-life advocacy group's right to challenge Ohio statute criminalizing the "[making of] a false statement concerning the voting record of a candidate or public official."

**Point 3:**     **O'Laughlin and Little were speaking in a private forum when they posted on O'Laughlin's invitation-only Facebook page.**

O'Laughlin's invitation-only Facebook page was not a "non-public forum" as that phrase is used as a term of art of describing specified government property.  See, e.g., Calvary Chapel Church, Inc. v. Broward County, No. 03-61927-CIV-ZLOCH, at *10 (S.D. Fla. Dec. 23, 2003), citing Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45-46 (1983); Children of the Rosary v. City of Phoenix, 154 F.3d 972, 976 (9th Cir. 1993).

It is, however, a private forum.  "The Free Speech Clause restricts government regulation of private speech. . . ."  Pleasant Grove City v. Summum, 555 U.S. 460, 467 (2009).  Although the court in Connick v.

Myers, 461 U.S. 138 (1983) did hold that while the state generally is

prohibited from punishing the expression of private sentiments:

> when a public employee speaks not as a citizen upon matters of public
> concern, but instead as an employee upon matters only of personal
> interest, absent the most unusual circumstances, a federal court is not
> the appropriate forum in which to review the wisdom of a personnel
> decision taken by a public agency allegedly in reaction to the
> employee's behavior.

Id. at 147, this Court noted in Rice-Lamar v. City of Fort Lauderdale, 54 F.

Supp. 2d 1137 (S.D. Fla. 1998) that:

> [I]n weighing the State's interest in [disciplining] an employee based
> on any claim that the content of a statement made by the employee
> somehow undermines the mission of the public employer, some
> attention must be paid to the responsibilities of the employee within
> the agency. The burden of caution employees bear with respect to the
> words they speak will vary with the extent of authority and public
> accountability the employee's role entails. ***Where . . . an employee
> serves no confidential, policymaking, or public contact role, the
> danger to the agency's successful functioning from that
> employee's private speech is minimal.*** Id. at 390-91, 107 S.Ct. at
> 2900. Conversely, when the employee serves in a sensitive capacity
> that requires extensive public contact, the employee's private speech
> may pose a substantial danger to the agency's successful functioning.

Id. at 1143-44, quoting Sims v. Metropolitan Dade County, 972 F.2d 1230,

1237 (11th Cir. 1992) (quoting Rankin v. McPherson, 483 U.S. 378,

390-391 (1987)) (emphasis supplied).

Captains O'Laughlin and Little are not high-ranking policy makers. The

Facebook page was private and invitation only. It does not qualify for

punishment.

## Conclusion

Based on the authorities cited and the arguments presented, plaintiffs, AJ O'Laughlin and Crystal Little , respectfully requests this Court to deny defendant Palm Beach County's motion to dismiss.

Respectfully Submitted,

*/s/   William R. Amlong*
WILLIAM R. AMLONG
Florida Bar No.: 470228
WRAmlong@TheAmlongFirm.com
KAREN COOLMAN AMLONG
Florida Bar No.: 275565
KAmlong@TheAmlongFirm.com

AMLONG & AMLONG, P.A.
500 Northeast Fourth Street
Fort Lauderdale, Florida 33301-1154
(954) 462-1983
(954) 523-3192 (fax)

**Attorneys for Plaintiffs,
AJ O'Laughlin and Crystal Little**

## Certificate of Service

I HEREBY CERTIFY that the above and foregoing has been filed using the Southern District of Florida's ECF system and thereby distributed to all counsel of record.

*/s/   William R. Amlong*

**DE 30**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 9:19-cv-80701 Dimitrouleas/Matthewman

AJ O'LAUGHLIN and
CRYSTAL LITTLE,
      Plaintiffs,

vs.

PALM BEACH COUNTY, a political
Subdivision of the State of Florida,
      Defendant.

_____/

## DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' COMPLAINT AND INCORPORATED MEMORANDUM OF LAW

Defendant, PALM BEACH COUNTY BOARD OF COUNTY COMMISSIONERS ("the County"), by and through undersigned counsel, files this Reply in support of its Motion to Dismiss (the "Motion") [DE 11] and states as follows:

## I.    INTRODUCTION

Plaintiffs' Response in Opposition to the Motion (the "Response") [DE 14] addresses three main arguments.  First, Plaintiffs assert that they were speaking as "citizens" and not employees when they [mis]characterized as "arguably corrupt" Captain Jeffrey Newsome and Fire Rescue management.  As part of Plaintiffs' first argument, they also attempt to state that as "citizens" they have the right to associate freely.  Second, Plaintiffs state that the Fire Rescue Department's Social Media Policy is a prior restraint on speech.  Last, Plaintiffs emphasize that they were speaking in a private forum when they posted comments about the alleged "corruption."  As explained below, Plaintiffs' arguments fail to remedy the pleading defects delineated in the County's Motion to Dismiss; thus, the action should be dismissed in its entirety.

## II.    **MEMORANDUM OF LAW**

### A.  Plaintiffs Did Not Speak As Citizens On Matters of Public Concern

In the Response, Plaintiffs conclusively allege that their criticism of Captain Jeffery Newsome and the Fire Rescue Department was made "as citizens on a matter of public concern." [DE 14, p.3].  Plaintiffs are incorrect for the following reasons:

1.     Plaintiffs did not speak on a matter of public concern, which is evident by analyzing the speech's content, form, and context;

2.     To the extent that Plaintiffs contend they exposed ongoing corruption, investigating and disclosing corruption is required by Plaintiffs' positions as Captains; therefore, it is speech made as an employee, not a private citizen;

3.     Issues of union membership and union leadership are not the same and are not afforded the same protections under the First Amendment; and

4.     No freedom of association claim exists.

As analyzed fully in the Motion, a review of the speech's content (self-centered full of I's and me's regarding a matter that does not affect the public or tax-payers), form (made on a hidden Facebook campaign page entitled "Make our Union Strong again"), and context (solely for campaign reasons and self-promotion), leads to the conclusion that the speech at issue was personal in nature instead of relating to matters of public concern.  Notably, the Response failed to address the Motion's detailed analysis into these relevant factors.  Instead, Plaintiffs state in conclusory terms that their Facebook posts were made as citizens on a matter of public concern.  Markedly, the Complaint admits the union pool time referenced in the posts was canceled well before the posts occurred [DE 1-1, ¶ 10].  Yet, Plaintiffs waited until it was union campaigning and election time to "expose" the alleged misuse of time.  The timing of the disclosure rebuts the conclusory

allegations made in the Response.  *See Deremo v. Watkins*, 939 F.2d 908, 912 (11th Cir. 1991)
(considering the "immediate triggering event" leading to the protected speech in finding that the
"speech [was] made in appellants' own personal interest, rather than speech implicating a public
concern").

Plaintiffs argue that "exposing corruption" is a matter of public concern and thus protected
by the First amendment.  For this proposition Plaintiffs cite to *Bryson v. City of Waycross*, 888 F.
2d 1562, 1566 (11th Cir. 1990).  First, the method of using internal union pool time is not
corruption.  In fact, Plaintiffs did not state in the Complaint that the alleged "misuse" of union pool
time equated to corruption.  Even in the Response, Plaintiffs at best state that the alleged misuse
of union pool time was "*arguably* corrupt" without citing any proposition as to how that equates
to corruption. [DE 14, p. 4].  Consequently, the corruption argument must fail.

*Arguendo*, without conceding, that Plaintiffs somehow exposed "corrupt" conduct, which
was a matter of public concern, the speech remains unprotected by the First Amendment.  *Bryson*
was decided before *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).  In *Garcetti*, the Supreme
Court of the United States held that "when public employees make statements pursuant to their
official duties, the employees are not speaking as citizens for First Amendment purposes, and the
Constitution does not insulate their communications from employer discipline."

Plaintiffs are both Captains with the Fire Rescue Department; thus, their roles are
leadership roles which require disclosure of any perceived corruption.  *See* Captain Job
Description, attached as Exhibit A (a Captain's job description includes: "handl[ing] employee
complaints and grievances," "act[ing] as a shift officer [and] perform[ing] all supervisory duties
and responsibilities," "enforc[ing] rules, policies and procedures," and "maintain[ing] discipline

and morale of station personnel").[1]  Accordingly, disclosure of the "arguably corrupt" misuse of union pool time is part of Plaintiffs' official duties.  Consequently, Plaintiffs spoke as employees and not citizens when disclosing the alleged "arguably corrupt" conduct.

Next, Plaintiffs argue that union membership in and of itself is a matter of public concern. In so doing, Plaintiffs confuse an employee's right to union membership and opinions on voting matters within the union – covered in *Scott v. Goodman*, 961 F. Supp. 424, 435 (E.D.N.Y. 1997), aff'd sub nom. *Scott v. Meyers*, 191 F.3d 82 (2d Cir. 1999) cited in the Response – with a disagreement over union leadership.  The undersigned concedes that an employee's right to union *membership* is a matter of public-concern because it relates to the employee's right to participate in collective bargaining.  However, internal power struggles, such as who will be the next union president, are not a matter of public concern.  *See Desrochers v. City of San Bernardino*, 572 F.3d 703, 710 (9th Cir. 2009) (stating that speech is not of public concern when it "'relates to internal power struggles within the workplace'"); *Fotopolous v. Bd. of Fire Com'rs of Hicksville Fire Dist.*, 11 F. Supp. 3d 348, 363 (E.D.N.Y. 2014) ("There is no reason to believe the public would be concerned about which firefighter holds what office in an internal Company or faction.").

To the extent Plaintiffs seek to make a freedom of association claim in their Response, the one sentence dedicated to that argument is too little, too late.  Plaintiffs' Complaint does not include the phrase "freedom of association" even once and the Court should not consider this futile attempt to include such a claim.  Moreover, the case Plaintiffs cited for the freedom of association proposition*, Weinstein v. City of N. Bay Vill.*, 977 F. Supp. 2d 1271, 1283 (S.D. Fla. 2013), is not factually similar to the present case.  In *Weinstein*, the protected speech dealt with political

---

[1] The County is requesting this Court consider Plaintiffs' job description in ruling on this motion because it was referred to in the Response [DE 14, p. 4], is undisputed, and goes to a critical aspect of the case. *See Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005).

relationships and "rampant cronyism" affecting the way tax-dollars at large were spent.  Here, the [un]protected speech deals with self-promotion during a campaign and does not affect citizens at large, only union firefighters donating union pool time.  Further, *Weinstein*, like the Response, does not conduct any analysis into claims relating to freedom of association.

    B.  <u>The Social Media Policy Is Not a Prior Restraint on Speech</u>

    Plaintiffs cite the language in *Alexander v. United States*, 509 U.S. 544, 550 (1993) – "[t]he term prior restraint is used to describe administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications occur" – as if that statement was a revelation overlooked by the County [DE 14 p. 5].  In so doing, Plaintiffs ignore that the County itself cited that language [DE 11, p. 8] and that language does not bolster Plaintiffs' argument in any way.

    A more illustrative case is *Moore v. City of Kilgore, Tex.*, 877 F.2d 364, 391 (5th Cir. 1989).  In *Moore*, the Fifth Circuit held that a Fire Department's Rule and Regulation limiting statements made by members of the department was not a prior restraint because  "[t]he department does not pretend to have authority to gag its employees before they speak.  It claims the right to fire, demote, or suspend them after they speak.  That is not a prior restraint; it is an after-the-fact sanction."[2]  The social media policy at issue in the present case likewise does not gag employees before speaking, it merely cautions them to be thoughtful about their social media postings and the affect those postings have on the public's trust in the department.  *See also Harris v. Noxubee County, Miss.*, 350 F. Supp. 3d 592, 597 (S.D. Miss. 2018), aff'd sub nom. *Harris v. Noxube*

---

[2] Although *Moore* was distinguished by *Int'l Ass'n of Firefighters Local 3233 v. Frenchtown Charter Tp*., 246 F. Supp. 2d 734, 739 (E.D. Mich. 2003) in deciding which level of scrutiny to apply in a balancing test based on the Supreme Court's decision in *United States v. National Treasury Employees Union*, 513 U.S. 454, 468, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995), it is important to note that the opinion in *National Treasury Employees Union* did not address prior restraints at all.  *Frenchtown Charter Tp*. is also distinguishable because it was <u>not</u> brought by an employee who had been disciplined for failure to follow the rules, contrary to the present case and *Moore*. Instead, *Frenchtown Charter Tp*. dealt with a case seeking to invalidate a rule before the rule was violated.

*County, Miss., et. al.*, 18-60744, 2019 WL 4281949 (5th Cir. Sept. 10, 2019) (applying *Moore* in holding that an agreement to be signed by an employee, which prohibited discussing matters concerning the business of the County Tax Assessor/Collector's Office and stated that failure to adhere to the prohibition was grounds for immediate termination, was not a prior restraint).

C.  Plaintiffs Claimed the Comments Were Made in a Non-Public Forum

Last, Plaintiffs argue that the "invitation-only Facebook page was not a 'non-public forum' as that phrase is used as a term of art of describing specified government property." [DE 14 p. 7]. In making this argument, Plaintiffs ignore that it was they, and not the County, who referred to the Facebook page as a "non-public forum."  For example, in the Complaint Plaintiffs ask the Court to "determine and declare that Palm Beach County is precluded by the First Amendment from regulating the private speech of Capt. AJ O'Laughlin and Capt. Crystal Little *within the non-public forum of Capt. O'Laughlin's invitation-only Facebook page*." [DE 1-1, p. 12, 14] (emphasis added).

In essence, Plaintiffs' Response argues against its own Complaint and supports the County's position that "counts I and II relating to any claim regarding a non-public forum should be dismissed with prejudice for failure to state a cause of action." [DE 11 p. 10].

## III.   **CONCLUSION**

Based on the arguments made in the Motion to Dismiss [DE 11] combined with the arguments made above, the County respectfully requests that this Court dismiss the Complaint in its entirety and find that, as a matter of law, Plaintiffs' speech is not protected by the First Amendment because it was speech made as public employees on matters not of public concern. The County further request that the Court find that the County's Social Media Policy is not a prior restraint on speech.

Dated:  Sept. 12, 2019.

Respectfully submitted,

*/s/ Anaili Medina Cure                    /*
Anaili M. Cure, Esquire
Assistant County Attorney
Florida Bar No. 119558
300 North Dixie Highway, Third Floor
West Palm Beach, Florida 33401
Tel.: (561) 355-6021; Fax: (561) 233-2720
Primary Email: acure@pbcgov.org
Secondary Email: dfishel@pbcgov.org
swebber@pbcgov.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 12, 2019, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send an electronic notice to the authorized CM/ECF filers.

*/s/ Anaili Medina Cure                    /*
Anaili M. Cure, Esquire
Assistant County Attorney
Florida Bar No. 119558
300 North Dixie Highway, Third Floor
West Palm Beach, Florida 33401
Tel.: (561) 355-6021; Fax: (561) 233-2720
Primary Email: acure@pbcgov.org
Secondary Email: dfishel@pbcgov.org
swebber@pbcgov.org

07420

# CAPTAIN

## NATURE OF WORK

This is supervisory and skilled public safety work in the protection of life and property through the direction and coordination of fire prevention; suppression and EMS activities on an assigned shift.

An employee in a position allocated to this class, in addition to all of the requirements of a Firefighter, is responsible for the supervision of firefighting personnel and maintenance of the facilities, equipment and vehicles in a single fire station.  The Captain is responsible for effectively managing and combating a fire until relieved of command by a superior officer.  Employees in this class drill and instruct their subordinates in conjunction with the Training Division.  Considerable judgment is exercised in the daily operations of the fire station.

## EXAMPLES OF WORK

Writes performance evaluations; issues counseling forms/disciplinary actions; handles employee complaints and grievances.

Acts as a shift officer within a station, performs all supervisory duties and responsibilities accordingly and coordinates and assigns all duties on a shift.

Responds with a company to mitigate the scene of fires or other emergencies; evaluates, allocates and requests additional resources; supervises, directs and assists the company's activities while engaged in emergency operations.

Supervises the care and appropriate maintenance of assigned station facilities and grounds.

Enforces rules, policies and procedures to ensure employee health and safety.

Maintains station records and timely submission of Fire Department reports.

Conducts in-station training classes according to department training schedules.

Conducts in-service fire prevention surveys; to include five inspections to monitor target hazards with Quick Access Surveys (QAS's).

Maintains discipline and morale of station personnel.

Has authority to initiate the recommendation for transfer, reprimand, suspension and assignment of personnel to his/her superior.

Adjusts, or attempts to adjust, a grievance at his/her authoritative level.

May assist and make recommendations in all periodic evaluations of member's performance.

Performs related work as required.

EXHIBIT A

07420

## CAPTAIN – CONT'D

### REQUIRED KNOWLEDGE, SKILLS AND ABILITIES

Considerable knowledge of firefighting to include incident management, fire rescue, EMS, evacuation, exposures, confinement, extinguishments, radio communication, ventilation, salvage and overhaul.

Knowledge of fire prevention techniques.

Knowledge of the principles, practices and methods of emergency/rescue operations.

Thorough knowledge of the geography of the response areas with special emphasis on target hazards, water distribution.

Extensive knowledge of fire department equipment and material, policies and procedures.

Ability to detect and properly report the existence of common fire hazards.

Ability to react quickly and calmly in emergencies and to direct the work of subordinates in emergency situations.

Ability to effectively supervise a working shift.

Ability to independently act in the absence of a senior officer.

### MINIMUM ENTRANCE REQUIREMENTS

Graduation from high school or an equivalent recognized certification; a current Florida Certificate in fire fighting as approved by the State of Florida Bureau of Fire Standards; and currently meet all of the certification requirements under Florida Statute 633, as outlined in the Collective Bargaining Agreement.

**Rev. 12/2011**

# DE 31

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-80701-CIV-DIMITROULEAS

AJ O'LAUGHLIN and CRYSTAL
LITTLE,

       Plaintiffs,

v.

PALM BEACH COUNTY, a political
Subdivision of the State of Florida,

       Defendant.

_____/

## ORDER GRANTING MOTION TO DISMISS

THIS MATTER comes before the Court on Defendant's Motion to Dismiss the Complaint [DE 11] ("Motion"). The Court has carefully considered the Motion, Plaintiffs' Response, and the Reply and is otherwise fully advised in the premises.

### I.   BACKGROUND

Plaintiffs AJ O'Laughlin ("Plaintiff O'Lauglin") and Crystal Little ("Plaintiff" Little") (collectively "Plaintiffs") seek injunctive relief, enjoining the Palm Beach County Fire and Rescue Department ("Fire Department") from enforcing its social media policy. Plaintiffs bring claims under 42 U.S.C §1983, the First Amendment to the United States Constitution, Florida Statute Chapter 86, and Article I § 4 of the Florida Constitution.

On February 6, 2019, Plaintiff O'Laughlin made Facebook posts in an invite-only Facebook page he maintained while campaigning for the presidency of Local 2928 of the International Association of Fire Fighters. Compl. 2, DE 1. The posts concerned alleged misuse of a Union Time Pool by the union's First Executive Vice President, Captain Jeffrey L. Newsome ("Newsome"). Compl. ¶ 9.

Plaintiff O'Lauglin's Facebook posts alleged that Newsome was coordinating with Fire Department management to ensure he had Thanksgiving and Christmas Day off with pay. Compl. 2. To do so, Newsome tried to use Union Pool Time ("UTP"), which is a pool of hours of paid-time-off donated by union members for union officers to use when performing union duties. *Id*. The UTP allows officers to get paid their regular salaries for doing union business on days that they would otherwise be scheduled to work. Compl. ¶ 8. Plaintiff Little, a supporter of Plaintiff O'Laughlin's candidacy, commented on Plaintiff's post in support of its content. Compl. ¶ 13.

Plaintiffs were disciplined per the department's social media policy for the content of these posts. Compl. 2.

Defendant's social media policy prohibits or discourages it employees from displaying or disseminating a number of types of content, including "content that could reasonably be interpreted as having and adverse effect upon Fire Rescue morale, discipline, operations, the safety of staff, or the perception of the public." Compl. Ex. 1 at 3; Compl. ¶ 5. The social media policy also dictates that social media postings of off duty employees "shall not reflect negatively upon [the] agency or its mission." Compl. ¶ 18(c).

Plaintiffs allege that Defendant's social media policy is "constitutionally infirm" as it seeks to regulate "private conversations" in the form of Plaintiffs' posts and comment in a private Facebook group; as it is a content-based regulation, and as it constitutes a prior restraint of all speech critical of the Fire Department. Compl. ¶ 18. Plaintiffs allege that the content of O'Laughlin's Facebook post would be a matter of public concern and in no way related to the duties of either of the Plaintiffs or to their personal grievances. Compl. ¶ 19. Plaintiffs seek injunctive relief in the form of voiding of the discipline issued to them and cessation of future

enforcement of the policy as it regards both private speech and comments on matters of public concern. Compl. 11-15.

## II.   <u>LEGAL STANDARD</u>

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). Under Rule 12(b)(6), a motion to dismiss should be granted only if the plaintiff is unable to articulate "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (abrogating *Conley*, 355 U.S. at 41). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 556). The allegations of the claim must be taken as true and must be read to include any theory on which the plaintiff may recover. *See Linder v. Portocarrero*, 963 F. 2d 332, 334-36 (11th Cir. 1992) (citing *Robertson v. Johnston*, 376 F. 2d 43 (5th Cir. 1967)).

However, the court need not take allegations as true if they are merely "threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Iqbal*, 129 S. Ct. at 1949. In sum, "a district court weighing a motion to dismiss asks 'not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *Twombly*, 550 U.S. at n. 8 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds, Davis v. Scherer*, 468 U.S. 183 (1984)).

## III.   <u>ANALYSIS</u>

Defendant's arguments in favor of its Motion to Dismiss are three-fold. First, Defendant argues that Plaintiffs did not speak as citizens on a matter of public concern. Second, Defendant argues that the Fire Department's social media policy is not a prior restraint on speech. Finally, Defendant argues that O'laughlin's invitation-only Facebook page is not a non-public forum.

For the reasons set forth below, the Court agrees that Plaintiffs have not sufficiently alleged that the speech at issue related to a matter of public concern, rendering the Complaint due to be dismissed.[1]

With regard to whether Plaintffs' speech related to a matter of public concern, Defendant argues that the content of Plaintiffs' Facebook posts and comment were personal in nature. In addition, Defendant contends that the form of the speech, posting in a private Facebook group was private in nature. Further, Defendant argues that the context and motivation behind the speech, suggests that it was not a matter of legitimate public concern. Defendant contends that the facts in the complaint demonstrate that Plaintiff O'Lauglin's online statements were based on his personal grievances with Newsome or his interest in the union election. Defendant also notes that the Facebook post and comment were made during a union election campaign, months after Newsome's use of the UTP time on holidays had been canceled.

For a public employee to bring a claim under the First Amendment against an employer the employee must have spoken as a citizen on a matter of public concern. *See Garcetti v. Ceballos*, 547 U.S. 410 (2006); *Moss v. City of Pembroke Pines*, 782 F.3d 613, 618 (11th Cir. 2015) (noting that the "first threshold requirement" of such a claim is whether a plaintiff was

---

[1] The Court notes that scope of the Florida Constitution's protection of speech under Article 1 § 4 of the Florida Constitution is identical to the protection provided for under the First Amendment to the United States Constitution. *See Dep't of Educ. v. Lewis*, 416 So.2d 455, 461 (Fla. 1982).  Further, Defendant makes identical allegations in Count II as they do in their un-labeled Count I by incorporating every prior statement into Count II. Therefore, the Court addresses both Counts with an analysis of First Amendment doctrine.

speaking as a citizen on a matter of public concern). Whether a statement is a matter of public

concern is a determination made based on the content, form and context of the speech. *See Moss*,

782 F.3d at 621. In evaluating the content, form, and context, Court's look at 1) "whether the

'main thrust' of the speech in question is essentially public in nature or private," 2) "whether the

speech was communicated to the public at large or privately to an individual" and 3) "what the

speaker's motivation was." *See Mitchell v. Hillsborough County*, 468 F.3d 1276, 1283 (11ᵗʰ Cir.

2006) (citations omitted). Considering these factors, the Court finds that Plaintiffs fail to allege

facts sufficient to demonstrate that the speech at issue addressed a matter of public concern.

Here, the content of the speech addressed the potential misuse of a Union Time Pool, an

internal, union-specific, paid-time-off sharing mechanism. The speech did not address misuse of

public dollars or the Fire Department's budgeting priorities. *Cf Kurtz v. Vickrey*, 855 F.2d 723,

730 (11th Cir. 1988) (determining that memoranda that otherwise addressed personal personnel

matters, related to issues of public concern when they discussed the spending priorities of a

public university and the potential misuse of public dollars).

In addition, rather than being communicated to a public at large, Plaintiffs' statements

were made in the form of posts and a comment in a private Facebook group. Further, the

Facebook group was not built around a matter of public concern but rather Plaintiff O'Laughlin's

union election campaign. Plaintiffs' allegation that they are suffering irreparable harm by not

being able to more widely disseminate the information in the posts, is not alone sufficient to

demonstrate that Plaintiffs' speech should be considered a matter of public concern. *See Mitchell*,

468 F.3d at 1284 n. 18 (noting that "[n]ot all publicly communicated speech necessarily touches

on a matter of public concern.") (citing *Deremo v. Watkins,* 939 F.2d 908, 911 n. 3 (11th 1991)).

Lastly, the context of Plaintiffs' speech, based on the allegations in the complaint, suggest Plaintiffs were motivated to speak by personal interests in electing Plaintiff O'Lauglin to a union leadership position. Plaintiffs' statements were made months after the potentially misused application of UTP was canceled. *See* Comp. ¶¶ 10, 11. Such statements made months after the alleged issues had been resolved suggest that the statements were made to serve personal interests. *See Deremo,* 939 F.2d at 912 (finding that a time gap between the resolution of alleged sexual harassment and the statements at issue in the case helped establish a context that overcame the presumption that wrongful conduct of a public official is typically a matter of public concern). The statements were made during Plaintiff O'Laughlin's campaign, and the speech focused on differentiating O'Laughlin's promised behavior from the alleged indiscretion of Newsome. *See* Comp. ¶ 12 ("when elected this will stop…Transparency is my campaign. So you will see the truth").

The requirement that the speech at issue in the complaint be speech made by Plaintiffs as citizens on matters of public concern, does not change even though Plaintiffs challenge the social media policy as a prior restraint. *See Martin v. City Of Dothan,* No. 1:05-CV-1172-MEEF, 2006 WL 3063461, at *5 n. 6 (M.D. Ala. Oct. 27, 2006) (citing *Maldonado v. City of Altus,* 433 F.3d 1294, 1310 (10th Cir.2006) abrogated on other grounds by *Argo v. Blue Cross & Blue Shield of Kansas, Inc*., 452 F.3d 1193, 1202 (10th Cir. 2006)); *Baumann v. D.C*., 987 F. Supp. 2d 68, 76 (D.D.C. 2013), *aff'd,* 795 F.3d 209 (D.C. Cir. 2015).

## IV.   <u>CONCLUSION</u>

The Court, accepting all well-pleaded facts as true, determines that Plaintiffs fail to sufficiently allege that they were speaking as private citizens on matters of public concern. As this is a threshold requirement of any First Amendment claim by a public employee against their

employer, Plaintiffs' Complaint is due to be dismissed. The Court will grant leave to amend in accordance with this order. The Court also notes that any amended complaint should attempt to cure any others pleading inadequacies identified by Defendants' motion.[2]

       Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1.  Defendants Motion to Dismiss [DE 11] is here by **GRANTED**.

2.  Plaintiffs are given leave to file an amended complaint on or before **January 23, 2020**; failure to do so shall result in the Court closing this case.

       **DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida this 2nd day of January 2020.

WILLIAM P. DIMITROULEAS
United States District Judge

Copies furnished to:

All counsel of record

---

[2] The Court does not indicate by referencing or highlighting specific issues herein that there are not other issues that may need to be addressed, nor does it decide whether the other alleged deficiencies have merit.

**DE 32**

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT,
IN AND FOR PALM BEACH COUNTY, FLORIDA

Case No. 19-80701-CIV-DIMITROULEAS

AJ O'LAUGHLIN and CRYSTAL
LITTLE,

      Plaintiffs,

vs.

PALM BEACH COUNTY, a political
subdivision of the State of Florida,

      Defendant.

_____/

## First Amended Complaint

### Count I:  AJ O'Laughlin and Crystal Little's 42 U.S.C. 1983 Claim for Declaratory and Other Relief Pursuant to the First Amendment's Free Speech and Free Association Clauses

Plaintiffs, AJ O'Laughlin and Crystal Little, sue defendant, Palm Beach County, a political subdivision of the State of Florida, and say:

### Introduction and Summary

1.    AJ O'Laughlin and Crystal Little are two captains within the Palm Beach County Fire Rescue Department ("PBCFR").  They sue Palm Beach County pursuant to 42 U.S.C. § 1983 to enforce their rights under the Free Speech and Free Association clauses of the First Amendment to the United States Constitution, as extended to the states by the Fourteenth

Amendment.  They seek to enjoin PBCFR from enforcing its Social Media Policy because:

**One**, discipline was imposed on them in retaliation for the content of several February 6, 2019 Facebook posts that PBCFR deemed to violate the prior restraints contained in its Social Media Policy, and,

**Two**, the Social Media Policy was used to punish them for their participation in a union election in which Capt. O'Laughlin was running for president Local 2928 of the International Association of Fire Fighters and Capt. Little was supporting him, in violation of their right to freedom of association, and

**Three**, the Social Media Policy is unconstitutionally vague and overbroad, both:

•      as applied to them in connection with the proposed discipline, and

•      facially as to both them and any other PBCFR employee whose off-duty posts on social media concerning issues of public concern might be interpreted by management as, <u>inter alia</u>, "undermin[ing] the public trust and confidence required by employees of Fire Rescue" or "reflect[ing] negatively upon [the] agency or its mission."

The February 6 posts were made by Capt. O'Laughlin and Capt. Little during a public-employee union campaign that constituted a matter of public concern for purposes of the Free Speech clause and is separately protected by the Freedom of Association clause:  the theme of Capt. O'Laughlin's

campaign was that the incumbent union leadership was management-friendly and corrupt.  After an IAFF vice president complained the next day to PBCFR management, PBCFR disciplined the two captains for violating its Social Media Policybased on the contents of the posts.

## Jurisdiction and Venue

2.      This is an action for declaratory and other relief brought pursuant 42 U.S.C. 1983 concerning Capt. O'Laughlin and Capt. Little's rights under the free-speech clauses of both the United States and Florida constitutions and the freedom of association clause of the First Amendment. This Court has jurisdiction pursuant to 42 U.S.C. 1983 and 28 U.S.C. §§ 1331 and 1343(a)(4).

3.      This cause of action accrued in Palm Beach County in the Southern District of Florida.

## General Allegations

4.      Capt. O'Laughlin in 2018 ran for the presidency of Local 2928 of the International Association of Fire Fighters, a candidacy that Capt. Little supported, which union candidacy and support for it constituted as a matter of law both:

    a.      a matter of public concern,[1] and

---

[1]Plaintiff's counsel is mindful of this Court's Order Granting Motion to Dismiss [DE 31], but respectfully wishes to retain the matter-of-public-concern argument, in addition to the freedom-of-association argument, for appeal rather than abandoning it by omitting it from the amended complaint.

   b.      an exercise in the freedom of association.

   5.      PBCFR on or about April 17, 2016 had issued a policy addressed
to "Use of Social Media," which policy is appended to this complaint as
Attachment 1 (in the form that it existed when the alleged violations of it
occurred February 6, 2019) and Attachment 2 (as it was amended February
28).

   6.      In its regulations on "personal use," the policy:

   a.      warns against "discredit[ing] … the agency," Procedure
1(a);

   b.      "[w]hile … off-duty …disseminating content that is
inconsistent with the duties, conduct, and responsibilities of a Fire Rescue
employee, including content that could reasonably be interpreted as having
an adverse effect upon … [the] perception of the public…," Procedure 2(d),
which lists as "examples,"

   c.      material that might "tend to undermine the public trust
and confidence required by employees of Fire Rescue," Procedure 2(d)(i),
and

   d.      "any posting that may adversely reflect on Fire Rescue.…"
Procedure 2(j).

   7.      The policy also prohibits "post[ing], transmit[ting], or otherwise
disseminat[ing] any information (data, text, photographs, audio, video, or
any other multimedia file to which they have access as a result of their

employment without written permission from the Fire Rescue Administrator or designee."  Procedure 2(k).

8.      Capt. O'Laughlin maintained, as part of his campaign for the presidency of the IAFF local, an invitation-only FaceBook page branded "AJ O'Laughlin—Make our Union Strong again."

9.      The Union Time Pool, or UTP, is a pool of hours donated by all of Local 2928's members to allow union officers to get paid their regular salaries for doing union business on days that they would otherwise be scheduled to work.

10.     Capt. O'Laughlin on February 6, 2019 posted a screen shot of a computerized scheduling program that showed that Capt. Jeffrey L. Newsome, the IAFF local's First Executive Vice President and an associate of the incumbent President, had been scheduled two to three months earlier, i.e., in November 2018, to take UTP paid-leave for both Thanksgiving Day. Capt. O'Laughlin also learned, and posted, that Capt. Newsome had done the same thing for Christmas Day 2018—even though there was no union business to be done on either of those days.

11.     The scheduling of that time—which Capt. Newsome gave back after Jeff Rudd, a battalion chief, noticed it and confronted Capt. Newsome about it—could only have been done by the Fire Rescue Staffing Officer, a management employee.

12.     Before the Thanksgiving/Christmas schedules were reversed, however, someone took a screen shot of the Thanksgiving entry, which found its way to Capt. O'Laughlin, who posted the photo February 6, 2019.

13.     Capt. O'Laughlin followed up the screen shot with several bursts:

a.      "This person is a theft (sic) just thinking about putting this into Telestaff.  This is your Union leadership.  Wtf.  When elected this will stop and who is Saying (sic) this is OK,"

b.      "Jeff you should be ashamed of yourself.  Thinking that union business is done on holidays.  I will make sure I keep my locker closed when I'm working with you,"

c.      "Is this unethical Wtf.  Make sure u call the [Inspector General] about this.  Transparency is everything," and

d.      "[Executive Vice President 1] took UTP for thanksgiving (sic) and also XMas (sic).  It was approved by the Union and by Admin.  Who does Union stuff on these days.  This is how Armand Nault got unelected.  You got to be kidding me.  Transparency is my campaign.  So you will see the truth."

14.     Capt. Little, an O'Laughlin partisan who prior to transferring back to the field had been in charge of the Fire Rescue Department's staffing function, then chimed in:  "Nice to know the current retired president thinks it's ok to use UTP for holidays!!  Thanks AJ for keeping them accountable.  And on that note our fucking stellar staffing officer just blindly approves it?  Wtf!"

15.     Because neither Capt. O'Lauglin nor Capt. Little had at the time that they made their remarks about Capt. Newsome's attempted misuse of the UTP any job duties related to scheduling, their remarks about his behavior were:

      a.     made in their roles as citizens, rather than in their role as PBCFR captains, and

      b.     as part of a union election campaign.

16.     A smarting Capt. Newsome launched an immediate and clearly content-based complaint to Deputy Fire Chief Joey Cooper, lodging a formal charges against Capt. O'Laughlin of conduct-unbecoming and violation of the social-media policy: he accused Capt. O'Laughlin of having "advised that I was misusing Union Time Pool" and having said Capt. Newsome had "committed theft."

17.     Capt. Newsome also took issue with the fact that Capt. O'Laughlin had "encouraged people contact (sic) the Office of the Inspector General to make a complaint," and observed that "[t]his post, then was replied to by Cpt. (sic) C. Little, who commented about 'our fucking stellar staffing officer.'"

18.     Capt. Newsome continued:

> By making this post, Cpt. (sic) O'Laughlin violated several provisions of Policy FR-A-404.  ***Section 2(d) states:  Employees are prohibited from disseminating content that*** is inconsistent with the duties, conduct, and responsibilities of a Fire Rescue employee <u>including content that **_could be reasonably interpreted as having an adverse effect upon_**</u> Fire Rescue morale, discipline, operations, ***the*** <u>safety of staff or **perception of the public**</u>.  ***Section 2(g) states***

> ***Employees who chose (sic) to maintain or participate in social media or social networking platforms <u>while off-duty</u>*** <u>shall conduct themselves with professionalism and in such a manner that</u> ***<u>shall not reflect negatively upon this agency</u>*** <u>or its mission.</u> ***Section 2(j) states Fire Rescue Personnel shall not post, transmit, or otherwise disseminate any information*** (photographic or text) to which they <u>have access as a result of their employment</u> ***without written permission from the First Rescue Administrator.***
>
> Cpt. (sic) O'Laughlin's posts have disparaged the reputation of Fire Rescue, the Fire Rescue Staffing Officer, "Admin" and me personally. His behavior could erode the faith the public has in Palm Beach County Fire Rescue.  His behavior is unprofessional, and certainly does not display the conduct that PBCFR and the public expect of a firefighter....

(Underlining in original; bold italics supplied.)

19.    Those portions of the Social Media Policy cited in ¶¶ 6 and 18:

a.    Constitute prior restraints, i.e., a virtual blanket prohibition on all speech critical of the government employer, intended to chill potential protected speech before it happens;

b.    Are so overbroad as to discourage public (on even, as in the case at bar, private) discussions of constitutionally protected matters of public concerns, as well as matters that might not satisfy the public-concern test, and

c.    Are not supported, beyond conjecture, by pointing to the actual disruption to PBCFR's mission that it seeks to prevent.

20.    Additionally, by disciplining Capt. O'Laughlin and Capt. Little for their posts on Capt. O'Laughlin's "AJ O'Laughlin—Make our Union Strong again" Facebook page, PBCFR intruded on Capt. O'Laughlin and Capt. Little's

freedom-of-association rights by weaponizing the Social Media Policy in favor of Capt. Newsome and other Local 2928 incumbents.

21.     Notwithstanding that even Capt. Newsome acknowledged that it was not possible that the screen shots that Capt. O'Laughlin posted were materials "to which [he had] access as a result of [his] employment," Procedure 2(k), and stated that the posts had been made on "a hidden Facebook page," the Department began disciplinary proceedings against Capt. O'Laughlin and Capt. Little.

22.     Although the discipline issued to Capt. O'Laughlin and Capt. Little was a "written warning," under the Department's progressive discipline procedures, that sets each of them up for more serious discipline in the case of even a minimal offense—i.e., a one-to-three-shift suspension for Capt. Little, whose only discipline during her 14.5 years on the department has been for accidentally putting her pager into a washing machine 10 years ago, and termination for Capt. O'Laughlin, who got a five-shift suspension in July 2018 for an unrelated matter.

23.     The Department's Social Media Policy is constitutionally infirm and unenforceable because:

a.     as to all employees of PBCFR, it is facially unconstitutional as being vague and overbroad, and

b.     as applied to Capt. O'Laughlin and Capt. Little because either:

i.      PBCFR used the Social Media Policy to punish Capt. O'Lauglin and Capt. Little for the content of statements that each made in connection with a public-employee union election, which union-related activity is a matter of public concern, or, alternatively,

ii.      PBCFR intruded on Capt. O'Laughlin and Capt. Little's right to freedom of association because interfered with their participation in a public-employee union election.

24.   Capt. O'Laughlin and Capt. Little are suffering irreparable harm, for which there is no adequate remedy at law, by:

a.      being disciplined for having engaged in private speech, the content of which offended Capt. Newsome and Fire Rescue Department management;

b.      being disciplined for having exercised their rights to freedom of association by participating through their Facebook posts in a public-employee union election, and

c.      along with all of the other employees of PBCFR, being subjected to a Social Media Policy that:

i.      constitutes a prior restraint, and

ii.      is so vague and overbroad that it forbids PBCFR employees, speaking as citizens, to make unflattering comments about PBCFR issues that do, indeed, constitute mattes of public concern.

25.   Capt. O'Laughlin and Capt. Little are entitled by 42 U.S.C. § 1988(b) to recover their attorney's fees and litigation expenses for suing

pursuant to § 1983 to vindicate their First Amendment right to freedom of speech and freedom of association.

WHEREFORE, plaintiffs, Capt. AJ O'Laughlin and Capt. Crystal Little pray that this Court will:

**One**, determine and declare that Palm Beach County is precluded by the First Amendment from disciplining Capt. AJ O'Laughlin and Capt. Crystal Little for there speech that occurred within the context of a Local 2928 elections because to do so would violated their freedom of speech;

**Two**, determine and declare that Palm Beach County is precluded by the First Amendment from disciplining Capt. AJ O'Laughlin and Capt. Crystal Little for there speech that occurred within the context of a Local 2928 elections because to do so would violated their freedom of association;

**Three**, determine and declare that the Fire Rescue Department's Social Media Policy policy's prohibition against off-duty posts by its personnel that may "undermine the public trust and confidence required by employees of Fire Rescue" or "reflect negatively upon [the] agency or its mission" is:

- an unconstitutional prior restraint on Fire Rescue personnel's constitutional right to publicly discuss as citizenss issues of public concern about the Fire Rescue Department, and

- unconstitutionally vague and overbroad, and

**Four**, award Capt. O'Laughlin and Capt. Little their reasonable attorney's fees and litigation expenses, and

**Five**, grant such other and further relief as is just.

**Demand for Jury Trial**

Plaintiffs, Capt. AJ O'Laughlin and Crystal Little, demand trial by jury

on all issues so triable.

Respectfully Submitted,

/s/   William R. Amlong
WILLIAM R. AMLONG
Florida Bar No.: 470228
WRAmlong@TheAmlongFirm.com
KAREN COOLMAN AMLONG
Florida Bar No.: 275565
KAmlong@TheAmlongFirm.com

AMLONG & AMLONG, P.A.
500 Northeast Fourth Street
Fort Lauderdale, Florida 33301-1154
(954) 462-1983
(954) 523-3192 (fax)

**Certificate of Service**

I HEREBY certify that the above and foregoing was electronically filed
through the Southern District of Florida ECF system and thereby delivered to
all counsel of record.

/s/   William R. Amlong
WILLIAM R. AMLONG

TO:                    **ALL PALM BEACH COUNTY FIRE RESCUE PERSONNEL**

FROM:                  **MICHAEL C. MACKEY**
                       **FIRE RESCUE ADMINISTRATOR**

PREPARED BY:           **FIRE RESCUE PPM COMMITTEE**

SUBJECT:               **USE OF SOCIAL MEDIA**

PPM #:                 **FR-A-404**

**ISSUE DATE**                                    **EFFECTIVE DATE**
April 17, 2016                                    January 10, 2019

**PURPOSE**:   The purpose of this policy is to provide guidelines on the procedure and use of social media and social networking.

**UPDATES**:   Future updates to this PPM are the responsibility of the Deputy Chief of Administration, in conjunction with the PPM Committee, under the authority of the Fire Rescue Administrator.

**AUTHORITY**:
- Fire Rescue Administrator
- Florida Statues, Chapter 11
- CW-R-008: Internet Use Policy
- CW-R-113: Social Networking Policy
- PBCFR HIPAA Policies and Procedures Manual (PPM FR-A-401), as may be amended.

**SCOPE**:   This policy applies to all Palm Beach County Fire Rescue personnel and reservists.

**POLICY**:   This policy applies to the procedure and use of social media and social networking.

**DEFINITIONS**:

1. Social Media – A variety of online sources that allow people to communicate, share information, photos, videos, audio or exchange text and other multimedia files with others via online or cellular network platform. This includes but is not limited to social networking sites, micro-blogging sites, personal blogs/personal websites, and news sites.
2. Social Networking – Online platforms where users can network, socialize, communicate and exchange information with other users via text, live conferencing/chat rooms, photographs and/or video-tapes. Mobile Social Networking refers to social networking using a mobile phone or cellular based device.
3. Blogs – A personal online journal or commentary that allows visitors to post opinions, responses, reactions, or comments to a particular topic and may allow the use of graphics or video. Blogs may be private or accessible to the general public.

**FR-A-404/Page 1 of 4**

# ATTACHMENT 1

4.  <u>Website/Webpage</u> – A webpage is any page a person sees when accessing the internet. A website is a collection of one or more web pages.

5.  <u>Posting</u> – Typing a message, uploading graphics/videos or any electronic media to an online forum or newsgroup which may be accessible to specific viewers or the general public.

6.  <u>Personal Website</u> – An online site created by an individual that may include personal information, commentary, photographs, videos and/or graphics for social, entertainment or business purposes. Personal websites may be private or accessible to general public.

7.  <u>Profile</u> – A self-defined description of a person which can be displayed on a webpage or a social networking site, and may display any or all of the following biographical information: age, race, sex, employment, education, religion, political viewpoints, the user's likes and dislikes, current location, hometown, and contact information. Profiles may be private or accessible to the general public.

8.  <u>Chat Rooms</u> – An online gathering where users can communicate with each other and exchange information via instant messaging and the information is visible to all people in the chat room. Chat Rooms may be private or accessible to the general public.

**PROCEDURE**:

1.  **Department-Sanctioned Use**:

    a.  Fire Rescue reserves the right to not publish any posting and can remove unsuitable content from authorized social networking websites at any time without notice (CW-R-113). The Fire Rescue's Public Information Officer shall have final discretion as to the removal of any posting under question. The Fire Rescue's Public Information Officer and staff assigned by the Deputy Chief of Operations shall help promote authorized social media accounts.

    b.  Misuse of social media websites may lead to disciplinary action under applicable provisions of the Palm Beach County Merit Rules or the Collective Bargaining Agreement (Disciplinary - Article 15).

    c.  Fire Rescue personnel representing the Fire Rescue via social media outlets shall do the following:

        i.   The use of Fire Rescue computers by Fire Rescue personnel to access social media is prohibited without authorization.

        ii.  Conduct themselves at all times as representatives of the Fire Rescue and, accordingly, shall adhere to all Fire Rescue standards of conduct and observe conventionally accepted protocols and proper decorum.

        iii. Identify themselves as a member of the Fire Rescue.

        iv.  Post, transmit, or otherwise disseminate confidential information, including photographs or videos, related to Fire Rescue training, activities, or work-related assignments without express written permission.

        v.   Do not conduct political activities or private business.

        vi.  Fire Rescue personnel use of personally owned devices to manage the Fire Rescue's social media activities or in the course of official duties is prohibited without express written permission.

        vii. Employees shall observe and abide by all copyright, trademark, and service mark restrictions in posting materials to electronic media.

        viii. Any postings to a Social Media site shall be assumed to be an official opinion/comment of Fire Rescue.

**FR-A-404/Page 2 of 4**

2. **Personal Use**:

    a. Fire Rescue recognizes the employee's right to participate in social networking/social media sites or maintain personal web pages, blogs or other types of online platforms while off-duty. However, it is strongly recommended employees use caution in their usage of social media/social networking platforms especially when displaying personal profiles so as not to discredit themselves or the agency.

    b. Development of an individual departmental networking site representing FIRE RESCUE or any Battalion/Division/Fire Station/Unit etc., is prohibited unless approved by the Fire Rescue Administrator or designee. No postings shall be permitted without the final approval of the Public Information Office or designee.

    c. Employees shall not use social media/social networking platforms in violation of PBC Merit Rules, the Collective Bargaining Agreement, (Disciplinary Article 15), either State or Federal law and the HIPAA Policies and Procedure Manual.

    d. While on duty or off duty Employees are prohibited from disseminating content that is inconsistent with the duties, conduct, and responsibilities of a Fire Rescue employee including content that could be reasonably interpreted as having an adverse effect upon Fire Rescue morale, discipline, operations, the safety of staff, or perception of the public. For example, unprofessional, unbecoming, illegal, unethical, sexual, violent, harassing, racist, sexist, or ethnically derogatory comments, pictures, artwork, videos, material or other such references all tend to undermine the public trust and confidence required by employees of the Fire Rescue.

    e. Unless authorized by the Fire Administrator or designee, employees are prohibited from posting any confidential, sensitive, or copyrighted information, data, text, photographs, audio, video, or any other multimedia file related to any on-going criminal or administrative investigation of this agency. This includes but is not limited to: photographing or video-taping of fire scenes, crime scenes, traffic crashes, medical/trauma patients, arrestees, evidence, restricted areas of Governmental facilities, vehicles, other employees, and statements or comments related to any pending prosecutions or investigations.

    f. Employees shall exercise good judgment in displaying logos, badges, seals, uniforms, vehicles, equipment, or any item or symbol that is associated with this agency.

    g. Employees who choose to maintain or participate in social media or social networking platforms while off-duty shall conduct themselves with professionalism and in such a manner that shall not reflect negatively upon this agency or its mission. While using social media off duty or in an unofficial capacity, employees are prohibited from speaking or writing in an official capacity, or from representing that they are acting on behalf of Fire Rescue or the PBC Board of County Commissioners. Employees are cautioned that speech on-or-off duty, made pursuant to their official duties, generally is not protected speech under the First Amendment and may be subject to disciplinary action if in violation of this policy.

    h. Employees should be aware that the content of social networking sites may be subpoenaed and used to undermine or impeach employee's testimony in a civil or criminal trial or other official proceeding.

    i. Failure to comply with the above guidelines may result in discipline up to and including termination. Authorized exceptions to the above guidelines may be permitted by the Fire Administrator or designee for the operational needs of the Fire Rescue. Employees are strongly encouraged to use caution and seek the guidance of

Formatted: Highlight

their supervisors regarding any posting that may adversely reflect upon either the agency or upon the professionalism and integrity of the employee.

j.  Fire Rescue personnel shall not post, transmit, or otherwise disseminate any information (photographic or text) to which they have access as a result of their employment without written permission from the Fire Rescue Administrator or designee.

k.  Fire Rescue personnel are cautioned against posting personal photographs or provide similar means of personal recognition that may cause you to be identified as a firefighter, fire officer or employee of this Fire Rescue.


*Michael C. Mackey*

**MICHAEL C. MACKEY**
**FIRE RESCUE ADMINISTRATOR**

<u>**Supersession History**</u>
1.  PPM#FR I-71, issued 12/21/1991
2.  PPM#FR I-71, issued 03/24/2011
3.  PPM#FR I-71, issued 06/10/2016
4.  PPM#FR A-404, clerical 03/01/2018
5.  PPM#FR A-404, clerical 1/10/2019

| | |
|---|---|
| **TO:** | **ALL PALM BEACH COUNTY FIRE RESCUE PERSONNEL** |
| **FROM:** | **MICHAEL C. MACKEY**<br>**FIRE RESCUE ADMINISTRATOR** |
| **PREPARED BY:** | **FIRE RESCUE PPM COMMITTEE** |
| **SUBJECT:** | **USE OF SOCIAL MEDIA** |
| **PPM #:** | **FR-A-404** |

| **ISSUE DATE** | **EFFECTIVE DATE** |
|---|---|
| ~~April~~ February 28~~17~~, 201~~9~~6 | ~~January          10, 2019~~~~February~~March 14~~14~~, 2019 |

**PURPOSE**:   The purpose of this policy is to provide guidelines on the procedure and use of social media and social networking.

**UPDATES**:   Future updates to this PPM are the responsibility of the Deputy Chief of Administration, in conjunction with the PPM Committee, under the authority of the Fire Rescue Administrator.

**AUTHORITY**:
- Fire Rescue Administrator
- Florida Statues, Chapter 11
- CW-R-008: Internet Use Policy
- CW-R-113: Social Networking Policy
- PBCFR HIPAA Policies and Procedures Manual (PPM FR-A-401), as may be amended.

**SCOPE**:   This policy applies to all Palm Beach County Fire Rescue personnel and reservists.

**POLICY**:   This policy applies to the procedure and use of social media and social networking.

**DEFINITIONS**:

1. Social Media – A variety of online sources that allow people to communicate, share information, photos, videos, audio or exchange text and other multimedia files with others via online or cellular network platform. This includes but is not limited to social networking sites, micro-blogging sites, personal blogs/personal websites, and news sites.
2. Social Networking – Online platforms where users can network, socialize, communicate and exchange information with other users via text, live conferencing/chat rooms, photographs and/or video-tapes. Mobile Social Networking refers to social networking using a mobile phone or cellular based device.

**FR-A-404/Page 1 of 5**

# ATTACHMENT 2

3. <u>Blogs</u> – A personal online journal or commentary that allows visitors to post opinions, responses, reactions, or comments to a particular topic and may allow the use of graphics or video. Blogs may be private or accessible to the general public.

4. <u>Webpage Website/Webpage</u> – A webpage is any page a person sees when accessing the internet.

~~4.~~5. <u>Website</u> ~~A~~ – A website is a collection of one or more web-pages.

~~5.~~6. <u>Posting</u> – Typing a message, uploading graphics/videos or any electronic media to an online forum or newsgroup which may be accessible to specific viewers or the general public.

~~6.~~7. <u>Personal Website</u> – An online site created by an individual that may include personal information, commentary, photographs, videos and/or graphics for social, entertainment or business purposes. Personal websites may be private or accessible to general public.

~~7.~~8. <u>Profile</u> – A self-defined description of a person which can be displayed on a webpage or a social networking site, and may display any or all of the following biographical information: age, race, sex, employment, education, religion, political viewpoints, the user's likes and dislikes, current location, hometown, and contact information. Profiles may be private or accessible to the general public.

~~8.~~9. <u>Chat Rooms</u> – An online gathering where users can communicate with each other and exchange information via instant messaging and the information is visible to all people in the chat room. Chat Rooms may be private or accessible to the general public.

**<u>PROCEDURE</u>**:

1. ~~Department~~**Fire Rescue** **Sanctioned Use**:

    a. Fire Rescue reserves the right to not publish any posting and can remove unsuitable content from authorized social networking websites at any time without notice (CW-R-113).

    b. ~~The~~ Fire Rescue's Public Information Officer shall have final discretion as to the removal of any posting under question.                                    | Commented [NN1]: |

    ~~a.~~c. ~~The~~ Fire Rescue's Public Information Officer and staff assigned by the Deputy Chief of Operations shall help promote authorized social media accounts.      | Commented [NN2]: |

    d. Misuse of social media ~~websites~~ may lead to disciplinary action under applicable provisions of the Palm Beach County Merit Rules or the Collective Bargaining Agreement (~~Disciplinary~~ Article 15 <u>Disciplinary Action and Discharge</u>).

    ~~b.~~c. ~~Fire Rescue personnel~~**Employees** representing ~~the~~ Fire Rescue via social media ~~outlets~~ shall ~~do the following~~:

        ~~i.   The use of Fire Rescue computers by Fire Rescue personnel to access social media is prohibited without authorization.~~

        ~~ii.~~i. Conduct themselves at all times as representatives of ~~the~~ Fire Rescue and, accordingly, ~~shall~~ adhere to all Fire Rescue standards of conduct and observe conventionally accepted protocols and proper decorum.

        ~~iii.~~ii. Identify themselves as a member of ~~the~~ Fire Rescue.

        ~~Post, transmit, or otherwise disseminate confidential information, including photographs or videos, related to Fire Rescue training, activities, or work-related assignments without express written permission.~~

        ~~Do not conduct political activities or private business.~~

**FR-A-404/Page 2 of 5**

~~Fire Rescue personnel use of personally owned devices to manage the Fire Rescue's social media activities or in the course of official duties is prohibited without express written permission.~~

iv.   ~~Employees shall~~ Observe and abide by all copyright, trademark, and service mark restrictions ~~in posting materials to electronic media.~~

iii.

iv.   Obtain authorization prior to accessing social media from Fire Rescue computers.

v.    Obtain express written permission to use personally owned devices to manage those Fire Rescue's social media activities or conduct official duties. ~~Any postings to a Social Media site shall be assumed to be an official opinion/comment of Fire Rescue.~~

f.   ~~Fire Rescue personnel~~ Employees representing ~~the~~ Fire Rescue via social media ~~outlets~~ shall not conduct political activities or private business.~~:~~
~~Use the Fire Rescue computers to access social media without prior authorization.~~
~~Conduct political activities or private business.~~
~~Use personally owned devices to manage the Fire Rescue's social media activities or conduct official county duties without express written permission.~~

2.   **Personal Use**:

a.   Fire Rescue recognizes the employee's right to participate in social networking/social media sites or maintain personal web pages, blogs or other types of online platforms while off-duty. However, it is strongly recommended employees use caution in their usage of social networking~~media~~/social ~~networking~~ media ~~platforms~~ sites especially when displaying personal profiles so as not to discredit themselves or the agency. [Commented [NN3]:]

b.   Development of an individual departmental social networking/social media site representing Fire~~/RE~~ Rescue, or any ~~ESCUE or any~~ Battalion, /Division, /Fire Station, /Unit or other Fire Rescue affiliation ~~etc.~~, is prohibited unless prior approval is obtained~~ed~~ by the Fire Rescue Administrator or designee. No postings shall be permitted without the final approval of the Public Information Officer or designee. [Commented [NN4]:]

c.   Employees shall not use social networking~~media~~/social media ~~networking platforms~~ sites in violation of PBC Merit Rules, the Collective Bargaining Agreement ~~,~~ ~~(Disciplinary~~ Article 15 Disciplinary Action and Discharge), ~~either~~ State law, ~~or~~ Federal law ~~and~~ or the PBCFR ~~HIPAA~~ Policies and Procedure Manual (FR-A-401 Attachment A). [Commented [NN5]:]
[Commented [NN6]:]

d.   While on--**duty or off-duty** ~~e~~Employees are prohibited from disseminating content that is inconsistent with the duties, conduct, and responsibilities of a Fire Rescue employee, including content that could be reasonably interpreted as having an adverse effect upon Fire Rescue morale, discipline, operations, the safety of staff, or perception of the public.

i.    For example, unprofessional, unbecoming, illegal, unethical, sexual, violent, harassing, racist, sexist, or ethnically derogatory comments, pictures, artwork, videos, material or other such references all tend to undermine the public trust and confidence required by employees of ~~the~~ Fire Rescue.

**FR-A-404/Page 3 of 5**

d.e. Unless authorized by the Fire Rescue Administrator or designee, employees are prohibited from posting any confidential, sensitive, or copyrighted information, data, text, photographs, audio, video, or any other multimedia file related to any on-going criminal or administrative investigation of this agency. This includes but is not limited to: photographing or video-taping of fire scenes, crime scenes, traffic crashes, medical/trauma patients, arrestees, evidence, restricted areas of gGovernmental facilities, vehicles, other employees, and statements or comments related to any pending prosecutions or investigations.

Commented [NN7]:

e.f. Employees shall exercise good judgment in displaying logos, badges, seals, uniforms, vehicles, equipment, or any item or symbol that is associated with this agencyFire Rescue.

g. Employees who choose to maintain or participate in social networking/social media or social networking platformssites while on-duty or off-duty shall conduct themselves with professionalism and in such a manner that shall not reflect negatively upon this agency or its mission.

f.h. While using social media off duty or in an unofficial capacity, employees are prohibited from speaking or writing in an official capacity, or from representing that they are acting on behalf of Fire Rescue or the PBC Board of County Commissioners. Employees are cautioned that speech on-duty -or- off -duty, made pursuant to their official duties, generally is not protected speech under the First Amendment and may be subject to disciplinary action if in violation of this policy.

Commented [NN8]:

g.i. Employees should be aware that the content of social media/social networking sites may be subpoenaed and used to undermine or impeach employee's testimony in a civil or criminal trial or other official proceeding.

h.j. Failure to comply with the abovethis policy guidelines may result in discipline up to and including termination. Authorized exceptions to the above guidelinesthis policy may be permitted by the Fire Rescue Administrator or designee for the operational needs of the Fire Rescue. Employees are strongly encouraged to use caution and seek the guidance of their supervisors regarding any posting that may adversely reflect upon either the agency Fire Rescue or upon the professionalism and integrity of the employee.

i.k. Fire Rescue personnelEmployees shall not post, transmit, or otherwise disseminate any information (data, text, photographs, audio, video, or any other multimedia filephotographic or text) to which they have access as a result of their employment without written permission from the Fire Rescue Administrator or designee.

j.l. Fire Rescue personnelEmployees are cautioned against posting personal photographs or providinge similar means of personal recognition that may cause you them to be identified as a firefighter, fire officer or employee of thisFire Rescue.


*Michael C. Mackey*
**MICHAEL C. MACKEY**
**FIRE RESCUE ADMINISTRATOR**

Supersession History
1.   PPM#FR I-71, issued 12/21/1991
2.   PPM#FR I-71, issued 03/24/2011
3.   PPM#FR I-71, issued 06/10/2016

4.   PPM#FR A-404, clerical 03/01/2018
5.   PPM#FR A-404, ~~clerical 0~~1/10/2019
~~5.~~6. PPM#FR A-404, ~~clerical 0~~2/~~2814~~/2019

**FR-A-404/Page 5 of 5**

**DE 35**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 9:19-cv-80701 Dimitrouleas/Mattewman

AJ O'LAUGHLIN and
CRYSTAL LITTLE,
     Plaintiffs,

vs.

PALM BEACH COUNTY, a political
Subdivision of the State of Florida,
     Defendant.

_____/

## DEFENDANT'S MOTION TO DISMISS THE AMEDNDED COMPLAINT AND INCORPORATED MEMORANDUM OF LAW

Defendant, PALM BEACH COUNTY BOARD OF COUNTY COMMISSIONERS ("the County"), by and through undersigned counsel, and pursuant to Federal Rule of Civil Procedure 12(b)(6), moves to dismiss the Amended Complaint for failure to state a cause of action.

### I.    BACKGROUND

1.    On May 14, 2019, Plaintiffs filed a Complaint in state court seeking an injunction enjoining the County from enforcing its social media policy and ordering the County to rescind the "written warning" discipline received by Plaintiffs for violating Fire Rescue's Social Media Policy (the "Social Media Policy").  [DE 1-1].

2.    The County removed Plaintiffs' Complaint to Federal Court on May 29, 2019. [DE 1].

3.    Thereafter, the County filed a Motion to Dismiss the Complaint. [DE 11].  In the Motion to Dismiss, the County argued that (1) Plaintiffs did not speak as citizens on a matter of public concern; (2) the Social Media Policy is not a prior restraint on speech; and (3) O'Laughlin's invitation-only Facebook page is not a non-public forum.

4.      Plaintiffs filed a Response in Opposition to the County's Motion to Dismiss on August 5, 2019.  [DE 14].  The County filed a Reply to the Response on September 12, 2019. [DE 30].

5.      On January 3, 2020, this Court entered an Order granting the County's Motion to Dismiss and holding that "Plaintiffs fail[ed] to sufficiently allege that they were speaking as private citizens on matters of public concern."  [DE 31, pg. 6].

6.      Plaintiffs filed an Amended Complaint on January 23, 2020.   [DE 32].   The Amended Complaint again asks the Court to enjoin the County from enforcing the Social Media Policy and order the County to rescind the "written warning" discipline received by Plaintiffs for violating the Social Media Policy.   The Amended Complaint also attempts to add two new arguments: (1) the Social Media Policy is unconstitutionally vague and overbroad, both facially and as applied (although Plaintiffs previously made this argument without the exact use of those terms); and (2) the County violated Plaintiffs' freedom of association rights under the First Amendment.  [DE 32, *generally*].

## II.    SUMMARY OF CLAIMS AND LEGAL ARGUMENTS

Plaintiffs, AJ O'Laughlin and Crystal Little, are employed by Palm Beach County's Fire Rescue Department ("Fire Rescue").   The Amended Complaint filed by Plaintiffs contains various claims under the First Amendment of the United States Constitution, particularly as to Plaintiffs' free speech and freedom of association rights.

Plaintiffs provided no additional facts in the Amended Complaint, which could alter this Court's previous finding that the speech at issue did not address matters of public concern.  Thus, the County contends, and this Court has previously ruled, that neither of the Plaintiffs spoke as a citizen on matters of public concern and, therefore, have no claim under the freedom of speech

clause of the First Amendment.  As it did before, the County contends that the Social Media

Policy does not constitute a prior restraint on speech and is neither vague nor overbroad.

Additionally, the County contends that Plaintiffs' freedom of association claim fails because

Plaintiffs did not engage in activity protected by the First Amendment.  Moreover, even if

Plaintiffs had engaged in conduct protected by the First Amendment, which they did not, they

failed to properly allege a causal connection between the protected activity and the "adverse

employment action."

To the extent this Court permits an amended pleading, which it should not, the County

requests that Plaintiffs set forth each separate, distinct cause of action in a separate count, rather

than combining all alleged claims into a single count.

### III.   MEMORANDUM OF LAW

### A.   Plaintiffs Did Not Speak As Citizens On A Matter Of Public Concern[1]

The first threshold requirement of a First Amendment claim brought by a public

employee against an employer is establishing that the employee's "speech was made as a citizen

and [] implicated a 'matter of public concern.'" *Moss v. City of Pembroke Pines*, 782 F.3d 613,

617–18 (11th Cir. 2015) (quoting *Rankin v. McPherson*, 483 U.S. 378, 384, 107 S.Ct. 2891, 97

L.Ed.2d 315 (1987)).  If the answer to this question is no, then the employee does not have a

First Amendment free speech claim.  *Id.*

### i.   *Plaintiffs' Speech Did Not Implicate A Matter Of Public Concern*

"Public concern is something that is a subject of legitimate news interest; that is, a subject

of general interest and of value and concern to the public at the time of publication." *City of San*

---

[1] The County incorporates by reference the full argument and memorandum of law in its Motion to Dismiss the Complaint [DE 11] as it relates to Plaintiffs' not speaking as citizens on a matter of public concern.  Based on this Court's ruling on the County's Motion [DE 31] and the County's prior briefing of this issue, the County has shortened its legal memorandum as to this section in the current motion in the interest of not being repetitive.

*Diego v. Roe*, 543 U.S. 77, 84, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147–48, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). In evaluating the content, form and context, court's look at (1) "whether the 'main thrust' of the speech in question is essentially public in nature or private," (2) "whether the speech was communicated to the public at large or privately to an individual," and (3) "what the speaker's motivation in speaking was." *Mitchell v. Hillsborough County*, 468 F.3d 1276, 1283-1284 (11th Cir. 2006) (citations omitted); *Alves v. Board of Regents of the University System of Georgia*, 804 F.3d 1149, 1162 (11th Cir. 2015) (same).

Where speech primarily serves the personal interests of the speaker, it warrants no protection because it has little value to the public at large. *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 762, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985). Courts "carefully review the entire record to ensure that matters of internal policy, including mere allegations of favoritism, employment rumors, and other complaints of interpersonal discord, are not treated as matters of public policy." *Goldstein v. The Chestnut Ridge Volunteer Fire Company*, 218 F.3d 337, 352 (4th Cir. 2000). "The First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs." *Connick*, 461 U.S. at 149, 103 S.Ct. 1684. "Absent extraordinary circumstances … First Amendment protection remains unavailable when 'a public employee speaks not as a citizen upon matters of public concern, but instead as an employee on matters only of personal interest." *Morgan v. Ford*, 6 F.3d 750, 754 (11th Cir. 1993) (quoting *Connick*, 461 U.S. at 147).

The speech at issue in the instant case is contained within the February 6, 2019, Facebook posts made by Plaintiffs.  These Facebook posts are attached hereto as Exhibit A.[2]  In the January 3, 2020, Order Granting Motion to Dismiss, while evaluating the same Facebook posts, this Court found that Plaintiffs' speech did not address to a matter of public concern.  [DE 31, pgs. 4, 6].  In so finding, this Court thoroughly analyzed the following:

(1) The content of the speech: which addressed the potential misuse of Union Time Pool ("UTP")[3], an internal union-specific, paid-time-off sharing mechanism (as opposed to addressing the misuse of public dollars or the Fire Department's budgeting mechanism).  The Amended Complaint again alleges that the content of the speech related to misuse of UTP.  [DE 32, ¶¶ 8-14];

(2) The form of the speech: Plaintiffs posted the posts and comments on a private, "hidden," and "invitation-only" Facebook page as part of a personal campaign for "the presidency of the IAFF local," the local firefighter union.  [DE 32, ¶¶ 8, 21]. The Amended Complaint again alleges that the posts were made on a hidden and invitation-only Facebook page. *Id*.  In addition, as previously considered by this Court, the Facebook page was maintained "as part of [O'Laughlin's] campaign for the presidency of the IAFF local." *Id*. ; and

(3) The context of the speech: personal interests in electing O'Laughlin to a union leadership position motivated Plaintiffs to write on the "invitation-only" Facebook page.  As recognized in the Amended Complaint, the alleged misuse of UTP occurred

---

[2] The County is requesting the court to consider the actual Facebook posts in ruling on this motion because they were referred to in both the Complaint and Amended Complaint, are undisputed, and go to the heart or crux of the claims being made.  *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005).
[3] Article 4 of the relevant collective bargaining agreement ("CBA") between the County and the Union is attached hereto as Exhibit B.  Article 4 is titled "Union Business" and specifically relates to UTP.  The County is requesting the court to consider Article 4 of the CBA in ruling on this motion because it defines what UTP is and sets forth the procedure for utilizing UTP.  It is not anticipated that the authenticity of Article 4 will be disputed.

in November and December of 2018, yet is was not until February of 2019, when O'Laughlin was running for a union position, that the posts were made. [ DE 32, ¶10].

Ultimately, because this Court conducted a thorough analysis of the speech at issue in its Order Granting Motion to Dismiss and Plaintiffs have not raised any new or differing facts regarding the content, form, or context of the speech in question, this Court should find that Plaintiffs' speech was not as citizens on a matter of public concern. Consequently, this Court should dismiss Plaintiffs' free speech claims with prejudice.

*ii.*     *Plaintiffs Did Not Speak As Citizens*

*Arguendo*, for inclusivity's sake, that Plaintiffs had spoken on a matter of public concern, which they did not, the speech remains unprotected by the First Amendment. The Supreme Court of the United States held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *See Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). "Thus, a threshold question to ask in the government employee context is whether the speech was made by the employee in his capacity as an employee or as a private citizen." *Hubbard v. Clayton County Sch. Dist.*, 756 F.3d 1264, 1267 (11th Cir. 2014). "The central inquiry is whether the speech at issue 'owes its existence' to the employee's professional responsibilities." *Moss*, 782 F.3d at 618. "The proper inquiry is a practical one." *Garcetti*, 547 U.S. at 424.

Plaintiffs are both Captains with Fire Rescue; thus, their roles are leadership roles that require disclosure of any perceived wrongdoing. *See* Captain Job Description, attached as

Exhibit C[4] (a Captain's job description includes: "handl[ing] employee complaints and grievances," "act[ing] as a shift officer [and] perform[ing] all supervisory duties and responsibilities," "enforc[ing] rules, policies and procedures," and "maintain[ing] discipline and morale of station personnel"). (Emphasis added). Accordingly, disclosure of the misuse of UTP is part of Plaintiffs' official duties. Consequently, Plaintiffs spoke as employees and not citizens when disclosing the alleged misuse of UTP.

### B.    The Social Media Policy Is Not A Prior Restraint On Speech

Plaintiffs allege that the Social Media Policy is a "prior restraint[], i.e., a virtual blanket prohibition on all speech critical of the government employer, intended to chill potential speech before it happens." [DE 32, ¶19(a)]. It is not.

"The term prior restraint is used to describe administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550 (1993) (emphasis and quotation marks omitted) (stating that temporary restraining orders and permanent injunctions that forbid speech activities are classic examples of prior restraints). Notably, a prior restraint on speech is distinguishable from a penalization of past speech. *Id.* 553-54 (stating that "our decisions have steadfastly preserved the distinction between prior restraints and subsequent punishments"); *see also Barrett v. Walker Cty. Sch. Dist.*, 872 F.3d 1209, 1223 (11th Cir. 2017) ("Prior restraints contrast with subsequent punishments, which regulate a given type of speech by penalizing the speech only after it occurs.") (emphasis and quotation marks omitted).

In *Moore v. City of Kilgore, Tex.*, 877 F.2d 364, 391 (5th Cir. 1989), the Fifth Circuit held that a Fire Department's Rule and Regulation limiting statements made by members of the

---

[4] The County is requesting the court to consider the Captain's job description in ruling on this motion because it was referred to in the Complaint and Amended Complaint, is undisputed, and goes the heart or crux of the claims being made. *Day*, 400 F.3d at 1276.

department was not a prior restraint because "[t]he department does not pretend to have authority to gag its employees before they speak.  It claims the right to fire, demote, or suspend them after they speak.  That is not a prior restraint; it is an after-the-fact sanction."[5]  Likewise, the Social Media Policy at issue in this case does not gag employees before speaking, it merely cautions them to be thoughtful about their social media postings and the affect those postings have on the public's trust in the department.  *Id.*; *see also Harris v. Noxubee County, Miss*., 350 F. Supp. 3d 592, 597 (S.D. Miss. 2018), *aff'd sub nom. Harris v. Noxube County, Miss*., et. al., 18-60744, 2019 WL 4281949 (5th Cir. Sept. 10, 2019) (applying *Moore* in holding that an agreement to be signed by an employee, which prohibited discussing matters concerning the business of the County Tax Assessor/Collector's Office and stated that failure to adhere to the prohibition was grounds for immediate termination, was not a prior restraint).

Consequently, because the Social Media Policy at issue is an "after-the-fact sanction" as opposed to a "prior restraint" the Amended Complaint should be dismissed with prejudice for failure to state a cause of action relating to a prior restraint on speech.

The Amended Complaint should also be dismissed as to prior restraints because Plaintiffs' speech was not made as citizens on a matter of public concern.  As this Court held in its Order Granting Motion to Dismiss, "[t]he requirement that the speech at issue in the complaint be speech made by plaintiffs as citizens on matters of public concern, does not change even though Plaintiffs challenge the social media policy as a prior restraint."

---

[5] Although *Moore* was distinguished by *Int'l Ass'n of Firefighters Local 3233 v. Frenchtown Charter Tp*., 246 F. Supp. 2d 734, 739 (E.D. Mich. 2003) in deciding which level of scrutiny to apply in a balancing test based on the Supreme Court's decision in *United States v. National Treasury Employees Union*, 513 U.S. 454, 468, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995), it is important to note that the opinion in *National Treasury Employees Union* did not address prior restraints at all.  *Frenchtown Charter Tp*. is also distinguishable because it was not brought by an employee who had been disciplined for failure to follow the rules, contrary to the present case and *Moore*.  Instead, *Frenchtown Charter Tp*. dealt with a case seeking to invalidate a rule before the rule was violated.

### C.    The Social Media Policy Is Not Vague and Overbroad

Plaintiffs have alleged no instance in which Fir Rescue has used its Social Media Policy to violate the First Amendment rights of any County employee, apart from Plaintiffs' claims.  As such, it is the County's position that Plaintiffs' poor attempt to facially challenge the Social Media Policy at issue, which is comingled with all of their other claims, should fail.  In their Complaint, Plaintiffs also facially challenged the Social Media Policy, although they did not use the "vague and overbroad" term of art. [DE 1-1, pgs. 12-13].  For the reasons summarized in the above sections and the previous Order Granting Motion to Dismiss, the Court should dismiss this claim with prejudice.

In an effort to cover its bases, however, the County will nevertheless address Plaintiffs' deficient claims of vagueness and overbroadness in depth.  When analyzing whether a policy is overbroad, courts first "assess the policy's breadth by examining its text to determine whether the restriction reaches speech on a matter of public concern, and whether it reaches speech only within the scope of a public employee's official duties. Courts then look to the public employer's justification for the policy, weighing the impact of the ban as a whole—both on the employees whose speech may be curtailed and on the public interested in what they might say—against the restricted speech's 'necessary impact on the actual operation' of the Government."  *See Sabatini v. Las Vegas Metro. Police Dep't*, 369 F. Supp. 3d 1066, 1096 (D. Nev. 2019), reconsideration denied, 217CV01012JADNJK, 2019 WL 3307040 (D. Nev. July 23, 2019) (internal citations and quotations omitted).  When ruling on a policies' breadth, courts "must construe the provision [at issue] in the context of the broader social-media policy and consider whether the policy is readily susceptible to a limiting construction that would render it constitutional."  *Id*. at 1097.

In *Sabatini*, a police department had a social media policy that prohibited their officers from posting on social media speech that would, among other things:

(1) Damag[e] the reputation and trust the department has with the community; and

(2) Negatively impact or tend to negatively impact the department's ability to serve the public.

*Id*. at 1072.  The policy in *Sabatini* warned that "[e]ngaging in prohibited speech as stated in this policy, may negatively affect the department member's credibility and impair the member's ability to perform the essential job function."  *Id*. at 1073.  Additionally, the policy also warned that "[v]iolations of this policy or related policies (values, conduct, etc.) in the use of social media that bring the member or the department into discredit or would tend to bring the member or the department into discredit will result in the department taking appropriate action up to and including termination." *Id*.

In *Sabatini*, like here, the plaintiff argued that the social media policy was vague and overbroad.  *Id*.  In analyzing the policy at issue, the court in *Sabatini* found that the policy was neither overbroad or vague.  *Id*.  at 1099; 1100.  In so finding, the court focused on the entirety of the policy and its attempt to "prevent employees from posting content online that would impair its ability to function by, among other things, eroding the public's trust in the department."  *Id*. at 1099.  The court in *Sabatini* also focused on the police departments justification for the policy, which was to "maintain[] public trust by prohibiting speech that would cause the public to question its ability to 'enforce[] the law fairly, even-handedly, and without bias."  *Id*.  As to vagueness, the court in *Sabatini* reiterated that the "vagueness doctrine is based on fair notice that certain conduct puts persons at risk of discharge." *Id*.

Here, Plaintiffs ask the Court to determine that the "Social Media Policy policy's (*sic*) prohibition against off-duty posts by its personnel that may 'undermine the public trust and confidence required by employees of Fire Rescue' or 'reflect negatively upon [the] agency or its mission' is . . . unconstitutionally overbroad and vague."  In so doing, Plaintiffs leave out relevant excerpts of the policy, which narrow the intended scope of the policy and address any concerns regarding its breadth and vagueness.  Like in *Sabatini*, the Social Media Policy here exemplifies what type of conduct it intends to limit.  For example, Section 2(d) of the policy, which Plaintiffs repeatedly cite to as unconstitutional, states in its entirety as follows:

> While on duty or off duty Employees are prohibited from disseminating content that is inconsistent with the duties, conduct, and responsibilities of a Fire Rescue employee including content that could be reasonably interpreted as having an adverse effect upon Fire Rescue morale, discipline, operations, the safety of staff, or perception of the public. **For example, unprofessional, unbecoming, illegal, unethical, sexual, violent, harassing, racist, sexist, or ethnically derogatory comments, pictures, artwork, videos, material or other such references all tend to undermine the public trust and confidence required by employees of Fire Rescue**.

[DE 32, 1-1] (emphasis added).

Firefighters, like police officers, are first responders that members of the public entrust with their homes and lives.  It is evident from looking at the entirety of the policy, and not only the portions cherry picked by Plaintiffs, that the aim of the policy is to preserve the public's ability to trust that they, and their homes, will be taken care of by the County's firefighters.  Notably, the policy does not limit or enumerate criticism of internal policies, political speech, or limit employees from commenting on any particular topic.  Rather, the Social Media Policy at issue here is akin to the one at issue in *Sabatini*, which a federal court has already concluded was neither overbroad nor vague.  *Sabatini*, 369 F. Supp. 3d at 1099; *see also Hernandez v. City of*

*Phoenix*, CV-19-05365-PHX-MTL, 2020 WL 95438, at *13 (D. Ariz. Jan. 8, 2020) (finding that a social media policy, which prohibited officers from "using social media in a manner that would cause embarrassment to or discredit the Department in any way" was constitutional and neither overbroad or vague).

When viewing the entirety of the Social Media Policy in question, this Court should find that, as a matter of law, the Social Media Policy is neither overbroad nor vague. Moreover, as the court in *Sabatini* did, this Court should also find that here is a "close and rational relationship" between the County's interest in preserving the public's trust in its firefighters and the Social Media Policy. Consequently, Plaintiffs' claim that the Social Media Policy is unconstitutionally overbroad and vague should be dismissed with prejudice.

<div align="center">

**D.**     **Plaintiffs' Freedom of Association Claim Fails Because They Did Not Engage In Activity Protected By The First Amendment**

</div>

Plaintiffs' claim — that the County violated their freedom of association by disciplining them for the posts and comments made on O'Laughlin's invitation-only Facebook page — fails because Plaintiffs base their claim on speech that is not protected by the First Amendment. "To establish a First Amendment claim based on associational conduct, 'the plaintiff must demonstrate by a preponderance of the evidence <u>that the conduct at issue was protected</u>, that he suffered an adverse employment action, and that there was a causal connection between the protected conduct and the adverse employment action.'" *Fotopolous v. Bd. of Fire Com'rs of Hicksville Fire Dist*., 11 F. Supp. 3d 348, 360 (E.D.N.Y. 2014) (emphasis added) *citing Matusick v. Erie Cnty. Water Auth*., 757 F.3d 31, 46–47, 2014 WL 700718, at *10 (2d Cir. Feb. 25, 2014). Notably, "'[o]nly if an employee's speech or associational conduct 'touches on a matter of public concern' can a First Amendment claim proceed.'" *Id. citing to Wrobel v. County of Erie*, 692 F.3d 22, 28 (2d Cir. 2012). "When employee expression cannot be fairly considered as relating

<div align="center">

**Page 12 of 15**

</div>

to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Wrobel,* 692 F.3d at 28.

In *Fotopolous*, the plaintiff filed First Amendment claims alleging violations of his freedom of speech and freedom of association rights. *Fotopolous,* 11 F. Supp. 3d 348. In particular, the plaintiff in *Fotopolous* contended that he was fired in part because of his failure to support a particular parties' campaign for commissioner. There, the court found that the plaintiff's opposition did "not relate to a public matter, but to an employment-related, i.e., personal grievance"; thus, the plaintiff "did not engage in association conduct protected by the First Amendment." *Id*. at 363. The court in *Fotopolous* went on to state that "[w]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Id*.

Here, like in *Fotopolous*, the First Amendment does not protect Plaintiffs' speech because the speech at issue does not implicate a matter of public concern, as explained in Section III (a)(i) *supra* and in the County's first Motion to Dismiss.[6] Instead, Plaintiffs' speech concerned O'Laughlin's own campaign and was self-serving.

---

[6] The County is aware "that the Eleventh Circuit does not require Plaintiffs to demonstrate that their claimed freedom of association pertains to matters of public concern." *Cottrell v. Chickasaw City Sch. Bd. of Educ*., 307 F. Supp. 3d 1264, 1282 (S.D. Ala. 2018), appeal dismissed, 18-10893-AA, 2019 WL 1209637 (11th Cir. Jan. 28, 2019). However, because the claimed protected association activity relates back to the speech at issue, and for speech to be protected it must concern a matter of public importance, the County respectfully argues that whether the speech at issue related to a matter of public concern is a relevant and dispositive inquiry to the freedom of association claim. *See McCabe v. Sharrett*, 12 F.3d 1558, 1563 (11th Cir. 1994) (stating that a plaintiff can claim protection for an asserted association right if it can be demonstrated that "the purpose of the association is to engage in activities independently protected by the First Amendment") (emphasis added).

To the extent Plaintiffs' argue that union membership is itself a protected associational activity, the County agrees.  However, there is a difference between the right to associate with a union, which is protected, and the internal power struggle over who will be the next president, which is not protected.  *See Desrochers v. City of San Bernardino*, 572 F.3d 703, 710 (9th Cir. 2009) (stating that speech is not of public concern when it "'relates to internal power struggles within the workplace'"); *Fotopolous*, 11 F. Supp. 3d at 363 ("There is no reason to believe the public would be concerned about which firefighter holds what office in an internal Company or faction.").

Plaintiffs' claims of associational activity further fail because they have not properly alleged causation between their "associational activity" and the adverse employment action.  *See Lunow v. City of Oklahoma City*, 61 Fed. Appx. 598, 606 (10th Cir. 2003) ("Even assuming that Plaintiffs' union activity was a matter of public concern, to prevail under their free association claim, Plaintiffs must establish causation—that is, that their union activity was a 'motivating factor' behind the adverse employment actions that they allege.").

Plaintiffs have not and cannot argue that the issued discipline was due to their participation and/or association with the union, the union campaign, or O'Laughlin's page. Instead, Plaintiffs allege that the Social Medial Policy, which the County created in 2016, was upheld and used to issue a written warning, which is the lowest discipline available, because of specific comments made on the Facebook page that violated the Social Media Policy.  Notably, the County did not ask Plaintiffs to take down the page itself, stop campaigning, or cease participation in the union.  Moreover, none of the other supporters of O'Laughlin's campaign received discipline.  Instead, Plaintiffs' discipline was directly related to the specific comments made in violation of a neutral and necessary Social Media Policy.

IV.     **CONCLUSION**

WHEREFORE, the County requests the court to dismiss the Amended Complaint against

both Plaintiffs with prejudice.

Dated:  February 26, 2020.

Respectfully submitted,

 /s/ Anaili Medina Cure                 /
Anaili Medina Cure, Esquire
Assistant County Attorney
Florida Bar No. 119558
300 North Dixie Highway, Third Floor
West Palm Beach, Florida 33401
Tel.: (561) 355-6021/Fax: (561) 233-2270
Primary Email:          acure@pbcgov.org
Secondary Emails:       dfishel@pbcgov.org
                        swebber@pbcgov.org

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on February 26, 2020, I electronically filed the foregoing with

the Clerk of Court by using the CM/ECF system, which will send an electronic notice to the

authorized CM/ECF filers.

s/ Anaili Medina Cure                  /
Anaili Medina Cure, Esquire
Assistant County Attorney
Florida Bar No. 119558
300 North Dixie Highway, Third Floor
West Palm Beach, Florida 33401
Tel.: (561) 355-6021/Fax: (561) 233-2270
Primary Email:          acure@pbcgov.org
Secondary Emails:       dfishel@pbcgov.org
                        swebber@pbcgov.org

February 7, 2019

Chief Cooper,

Please accept this letter as my official internal complaint in reference to the conduct of Cpt. AJ O'Laughlin. I am accusing Cpt. O'Laughlin of C-6 Conduct Unbecoming, and F-1 Violation of Policy FR-A-404.

Cpt. O'Laughlin is the creator and moderator of a hidden Facebook page called "Make our Union Strong again". On February 6th, 2019, Cpt. O'Laughlin posted a screen shot of my Telestaff calendar to his Facebook page (twice). He then advised that I was misusing Union Time Pool, that I committed theft, and encouraged people contact the Office of the Inspector General to make a complaint. This post, then was replied to by Cpt. C. Little, who commented about "our fucking stellar staffing officer".

By making this post, Cpt. O'Laughlin violated several provisions of Policy FR-A-404. Section 2 (d) states: Employees are prohibited from disseminating content that is inconsistent with the duties, conduct, and responsibilities of a Fire Rescue employee <u>including content that could be reasonably interpreted as having an adverse effect upon Fire Rescue morale, discipline, operations, the safety of staff, or perception of the public</u>. Section 2 (g) states Employees who chose to maintain or participate in social media or social networking platforms <u>while off-duty shall conduct themselves with professionalism and in such a manner that shall not reflect negatively upon this agency or its mission</u>. Section 2 (j) states Fire Rescue personnel shall not post, transmit, or otherwise disseminate any information (photographic or text) to which they <u>have access as a result of their employment</u> without written permission from the Fire Rescue Administrator.

Cpt. O'Laughlin's posts have disparaged the reputation of Fire Rescue, the Fire Rescue Staffing Officer, "Admin", and me personally. His behavior could erode the faith the public has in Palm Beach County Fire Rescue. His behavior is unprofessional, and certainly does not display the conduct that PBCFR and the

public expect of a firefighter. By having a profile picture in his PBCFR Class A uniform, he cannot make the argument that his profession is not tied to his posts.

I have attached a copy of his Facebook page posts for your review. By looking at the pictures, the security permissions used are clearly that of someone higher than a Captain. I am requesting that PBCFR investigate who has accessed my Telestaff calendar. This misuse of official power must be addressed.

Thank you for your assistance in this matter.

Fraternally,

Jeffrey L. Newsome

7:54 ✈                                    ⦿ LTE ▭

👍 Like                          💬 Comment

 **AJ O'Laughlin** ▷ **Make our Union Strong again**                    •••
1 min · 🔯

This was send to me can someone explain this to me. I'm confused. Second copy coming!!!



👍 Like                          💬 Comment

     

8:26 

<  AJ O'Laughlin ▸ Make our Union Strong again   •••
⬡ Admin · 32 mins · 🔲

Be the first to like this

 AJ O'Laughlin ⬡
This person is a theft just thinking about putting this into Telestaff. This is your Union leadership. Wtf. When elected this will stop and who is Saying this is OK.

26m   Like   Reply          1

 AJ O'Laughlin ⬡
Jeff you should be ashamed of yourself. Thinking that union business is done on holidays. I will make sure I keep my locker closed when I'm working with you.

18m   Like   Reply

Write a reply...

 Robert Valentine
I don't understand???

17m   Like   Reply

      

 Write a comment...   

    

8:31

 **AJ O'Laughlin** ▸ **Make our Union Strong again**
🛡 Admin · 35 mins · 



👍 Like          💬 Comment

💗 1

 **Robert Valentine**
Looks like he canceled his UTP???
21m   Like   Reply

 **Crystal Little**
Nice to know the current retired president thinks it's ok to use UTP for holidays!! Thanks AJ for keeping them accountable. And on that note our fucking stellar staffing officer just blindly approves it? Wtf!
10m   Like   Reply          1

      

📷   Write a comment...           

    



**Discussion**   Chats   Photos   Events   Files

## From Notifications

 **AJ O'Laughlin**
🛡 Admin · Just now · 👥

Is this unethical Wtf. Make sure u call the IG about this. Transparency is everything.



AJ's Post

 **Robert Valentine**
I don't understand???

11h   Like   Reply

 **AJ O'Laughlin** ✪
**Robert Valentine** EVP1 took UTP for thanksgiving and also XMas. It was approved by the Union and by Admin. Who does Union stuff on these days. This is how Armand Nault got unelected.  You got to be kidding me. Transparency is my campaign. Soon you will see the truth.

11h   Like   Reply

 **Robert Valentine**
**AJ O'Laughlin** I don't see a date on there for Thanksgiving or Christmas.

11h   Like   Reply

 **AJ O'Laughlin** ✪
Can't be erased.

11h   Like   Reply

 **Robert Valentine**
**AJ O'Laughlin** so where is it then?? The dates that is.

11h   Like   Reply

 Write a comment...    

     

TO:                **ALL PALM BEACH COUNTY FIRE RESCUE PERSONNEL**

FROM:           **MICHAEL C. MACKEY**
                      **FIRE RESCUE ADMINISTRATOR**

PREPARED BY:    **FIRE RESCUE PPM COMMITTEE**

SUBJECT:       **USE OF SOCIAL MEDIA**

PPM #:          **FR-A-404**

| **ISSUE DATE** | **EFFECTIVE DATE** |
|---|---|
| April 17, 2016 | June 10, 2016 |

**PURPOSE**:   The purpose of this policy is to provide guidelines on the procedure and use of social media and social networking.

**UPDATES**:   Future updates to this PPM are the responsibility of the Deputy Chief of Administration, in conjunction with the PPM Committee, under the authority of the Fire Rescue Administrator.

**AUTHORITY**:
- Fire Rescue Administrator
- Florida Statues, Chapter 11
- CW-R-008: Internet Use Policy
- CW-R-113: Social Networking Policy
- PBCFR HIPAA Policies and Procedures Manual (PPM FR-A-401), as may be amended.

**SCOPE**:   This policy applies to all Palm Beach County Fire Rescue personnel and reservists.

**POLICY**:   This policy applies to the procedure and use of social media and social networking.

**DEFINITIONS**:

1. <u>Social Media</u> – A variety of online sources that allow people to communicate, share information, photos, videos, audio or exchange text and other multimedia files with others via online or cellular network platform. This includes but is not limited to social networking sites, micro-blogging sites, personal blogs/personal websites, and news sites.
2. <u>Social Networking</u> – Online platforms where users can network, socialize, communicate and exchange information with other users via text, live conferencing/chat rooms, photographs and/or video-tapes. Mobile Social Networking refers to social networking using a mobile phone or cellular based device.
3. <u>Blogs</u> – A personal online journal or commentary that allows visitors to post opinions, responses, reactions, or comments to a particular topic and may allow the use of graphics or video. Blogs may be private or accessible to the general public.

**FR-A-404/Page 1 of 4**

4. <u>Website/Webpage</u> – A webpage is any page a person sees when accessing the internet. A website is a collection of one or more web pages.
5. <u>Posting</u> – Typing a message, uploading graphics/videos or any electronic media to an online forum or newsgroup which may be accessible to specific viewers or the general public.
6. <u>Personal Website</u> – An online site created by an individual that may include personal information, commentary, photographs, videos and/or graphics for social, entertainment or business purposes. Personal websites may be private or accessible to specific viewers or the general public.
7. <u>Profile</u> – A self-defined description of a person which can be displayed on a webpage or a social networking site, and may display any or all of the following biographical information: age, race, sex, employment, education, religion, political viewpoints, the user's likes and dislikes, current location, hometown, and contact information. Profiles may be private or accessible to the general public.
8. <u>Chat Rooms</u> – An online gathering where users can communicate with each other and exchange information via instant messaging and the information is visible to all people in the chat room. Chat Rooms may be private or accessible to the general public.

**PROCEDURE:**

I. **Department-Sanctioned Use:**
   a. Fire Rescue reserves the right to not publish any posting and can remove unsuitable content from authorized social networking websites at any time without notice (CW-R-113). The Fire Rescue's Public Information Officer shall have final discretion as to the removal of any posting under question. The Fire Rescue's Public Information Officer and staff assigned by the Deputy Chief of Operations shall help promote authorized social media accounts.
   b. Misuse of social media websites may lead to disciplinary action under applicable provisions of the Palm Beach County Merit Rules or the Collective Bargaining Agreement (Disciplinary - Article 15).
   c. Fire Rescue personnel representing the Fire Rescue via social media outlets shall do the following:
      i. The use of Fire Rescue computers by Fire Rescue personnel to access social media is prohibited without authorization.
      ii. Conduct themselves at all times as representatives of the Fire Rescue and, accordingly, shall adhere to all Fire Rescue standards of conduct and observe conventionally accepted protocols and proper decorum.
      iii. Identify themselves as a member of the Fire Rescue.
      iv. Post, transmit, or otherwise disseminate confidential information, including photographs or videos, related to Fire Rescue training, activities, or work-related assignments without express written permission.
      v. Do not conduct political activities or private business.
      vi. Fire Rescue personnel use of personally owned devices to manage the Fire Rescue's social media activities or in the course of official duties is prohibited without express written permission.
      vii. Employees shall observe and abide by all copyright, trademark, and service mark restrictions in posting materials to electronic media.
      viii. Any postings to a Social Media site shall be assumed to be an official opinion/comment of Fire Rescue.

FR-A-404/Page 2 of 4

2. **Personal Use**:

    a. Fire Rescue recognizes the employee's right to participate in social networking/social media sites or maintain personal web pages, blogs or other types of online platforms while off-duty. However, it is strongly recommended employees use caution in their usage of social media/social networking platforms especially when displaying personal profiles so as not to discredit themselves or the agency.

    b. Development of an individual departmental networking site representing FIRE RESCUE or any Battalion/Division/Fire Station/Unit etc., is prohibited unless approved by the Fire Rescue Administrator or designee. No postings shall be permitted without the final approval of the Public Information Office or designee.

    c. Employees shall not use social media/social networking platforms in violation of PBC Merit Rules, the Collective Bargaining Agreement, (Disciplinary Article 15), either State or Federal law and the HIPAA Policies and Procedure Manual.

    d. Employees are prohibited from disseminating content that is inconsistent with the duties, conduct, and responsibilities of a Fire Rescue employee including content that could be reasonably interpreted as having an adverse effect upon Fire Rescue morale, discipline, operations, the safety of staff, or perception of the public. For example, unprofessional, unbecoming, illegal, unethical, sexual, violent, harassing, racist, sexist, or ethnically derogatory comments, pictures, artwork, videos, material or other such references all tend to undermine the public trust and confidence required by employees of the Fire Rescue.

    e. Unless authorized by the Fire Administrator or designee, employees are prohibited from posting any confidential, sensitive, or copyrighted information, data, text, photographs, audio, video, or any other multimedia file related to any on-going criminal or administrative investigation of this agency. This includes but is not limited to: photographing or video-taping of fire scenes, crime scenes, traffic crashes, medical/trauma patients, arrestees, evidence, restricted areas of Governmental facilities, vehicles, other employees, and statements or comments related to any pending prosecutions or investigations.

    f. Employees shall exercise good judgment in displaying logos, badges, seals, uniforms, vehicles, equipment, or any item or symbol that is associated with this agency.

    g. Employees who choose to maintain or participate in social media or social networking platforms while off-duty shall conduct themself with professionalism and in such a manner that shall not reflect negatively upon this agency or its mission. While using social media off duty or in an unofficial capacity, employees are prohibited from speaking or writing in an official capacity, or from representing that they are acting on behalf of Fire Rescue or the PBC Board of County Commissioners. Employees are cautioned that speech on-or-off duty, made pursuant to their official duties, generally is not protected speech under the First Amendment and may be subject to disciplinary action if in violation of this policy.

    h. Employees should be aware that the content of social networking sites may be subpoenaed and used to undermine or impeach employee's testimony in a civil or criminal trial or other official proceeding.

    i. Failure to comply with the above guidelines may result in discipline up to and including termination. Authorized exceptions to the above guidelines may be permitted by the Fire Administrator or designee for the operational needs of the Fire Rescue. Employees are strongly encouraged to use caution and seek the guidance of

their supervisors regarding any posting that may adversely reflect upon either the agency or, upon the professionalism and integrity of the employee.

j.  Fire Rescue personnel shall not post, transmit, or otherwise disseminate any information (photographic or text) to which they have access as a result of their employment without written permission from the Fire Rescue Administrator or designee.

k.  Fire Rescue personnel are cautioned against posting personal photographs or provide similar means of personal recognition that may cause you to be identified as a firefighter, fire officer or employee of this Fire Rescue.

*Michael C. Mackey*

**MICHAEL C. MACKEY**
**FIRE RESCUE ADMINISTRATOR**

**Supersession History**
1.  PPM#FR I-71, issued 12/21/1991
2.  PPM#FR I-71, issued 03/24/2011
3.  PPM#FR I-71, issued 06/10/2016
4.  PPM#FR A-404, clerical 03/01/2018

**FR-A-404/Page 4 of 4**

# Collective Bargaining Agreement

# between

# PALMBEACHCOUNTY

## AND

# PROFESSIONAL FIREFIGHTERS/PARAMEDICS OF PALMBEACHCOUNTY,

# LOCAL 2928, IAFF, INC.

October 1, 2018 through September 30, 2021

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................ 2

ARTICLE 1 – PREAMBLE ........................................................................... 4

ARTICLE 2 – RECOGNITION ...................................................................... 5

ARTICLE 3 – DUES CHECKOFF .................................................................. 7

ARTICLE 4 – UNION BUSINESS .................................................................. 8

ARTICLE 5 – BULLETIN BOARDS ............................................................. 10

ARTICLE 6 – MEETING ROOMS ............................................................... 11

ARTICLE 7 – MANAGEMENT RIGHTS ....................................................... 12

ARTICLE 8 – MEETINGS WITH MANAGEMENT ........................................ 13

ARTICLE 9 – SAFETY COMMITTEE .......................................................... 14

ARTICLE 10 – NON-DISCRIMINATION ...................................................... 15

ARTICLE 11 – PROHIBITION OF STRIKES ............................................... 16

ARTICLE 12 – PERSONNEL REDUCTION .................................................. 17

ARTICLE 13 – SENIORITY ........................................................................ 19

ARTICLE 14 – PROBATIONARY EMPLOYEES ........................................... 21

ARTICLE 15 – DISCIPLINARY ACTION AND DISCHARGE ......................... 22

ARTICLE 16 – GRIEVANCE AND ARBITRATION PROCEDURE .................. 23

ARTICLE 17 – PERFORMANCE REVIEW ................................................... 26

ARTICLE 18 – PROMOTIONS ................................................................... 27

ARTICLE 19 – PAY PLAN ......................................................................... 45

ARTICLE 20 – WORK WEEK .................................................................... 56

ARTICLE 21 – OVERTIME ........................................................................ 61

ARTICLE 22 – EXCHANGE OF TIME ......................................................... 64

ARTICLE 23 – CALL BACK ....................................................................... 66

ARTICLE 24 – INCENTIVE PAY ................................................................ 67

ARTICLE 25 – EDUCATION ...................................................................... 69

ARTICLE 26 – CERTIFICATION ................................................................ 70

ARTICLE 27 – UNIFORMS ........................................................................ 72

ARTICLE 28 – VACATIONS ...................................................................... 76

ARTICLE 29 – HOLIDAYS ................................................................................. 84

ARTICLE 30 – FUNERAL LEAVE ...................................................................... 87

ARTICLE 31 – COURT TIME ............................................................................ 88

ARTICLE 32 - JURY DUTY ............................................................................... 89

ARTICLE 33 – INSURANCE .............................................................................. 90

ARTICLE 34 – PENSION ................................................................................... 93

ARTICLE 35 – DOCUMENTS ............................................................................ 94

ARTICLE 36 – USE OF PERSONAL VEHICLES ............................................... 95

ARTICLE 37 – VOTING ..................................................................................... 96

ARTICLE 38 - STATION CONDITIONS ............................................................. 97

ARTICLE 39 – LABOR RELATIONS COMMITTEE ........................................... 98

ARTICLE 40 – REPLACEMENT OF PERSONAL PROPERTY ......................... 99

ARTICLE 41 – EMPLOYEE BENEFITS ........................................................... 100

ARTICLE 42 – SAVINGS CLAUSE .................................................................. 101

ARTICLE 43 – DURATION OF AGREEMENT ................................................. 102

ARTICLE 44 – EMPLOYEE BILL OF RIGHTS ................................................ 103

ARTICLE 45 – WELLNESS PROGRAM .......................................................... 104

ARTICLE 46 – RETIREE INSURANCE ............................................................ 131

ARTICLE 47 – BENEVOLENT FUND .............................................................. 133

ARTICLE 48 – MILITARY LEAVE .................................................................... 135

ARTICLE 49 - DRUG TESTING ...................................................................... 136

SIGNATURE PAGE ......................................................................................... 155

## ARTICLE 1 – PREAMBLE

**Section 1.**    This Agreement is entered into by and between PALM BEACH COUNTY, hereinafter referred to as the "County", and the PROFESSIONAL FIREFIGHTERS/PARAMEDICS OF PALM BEACH COUNTY, LOCAL 2928, IAFF, INC., hereinafter referred to as the "Union".

**Section 2.**    It is contemplated that the members of both Bargaining Units will, at all times, exhibit the high degree of professionalism and moral standards commensurate with the stature of the position of uniformed public servant being entrusted to them.

**Section 3.**    It is the purpose of this Agreement to achieve and maintain harmonious relations between the County and the Union to ensure an accurate line of communications, and clear transmission of facts relating to the workplace, to provide for equitable and peaceful adjustment of grievances which may arise, and to establish fair standards of wages, hours, and other terms and conditions of employment.

**Section 4.**    When the contract refers to an individual/position taking or approving an action, it shall also include designee.

## ARTICLE 2 – RECOGNITION

The County recognizes the Union as the exclusive bargaining representative for all employees of the Palm Beach County Fire Rescue Department in the main bargaining unit certified by the Public Employees Relations Commission (PERC cert. #RA-84-008), and a Supervisory Bargaining Unit certified by the Public Employees Relations Commission (PERC cert. #RA-93-004)as follows:

### COVERED BY THIS AGREEMENT:

Firefighters, Driver Operators, Lieutenants, Captains, ARFF Captains, Special Operations Captains, EMS Captains, Staff Captains, Battalion Chiefs, Communicator III, Communicator Supervisor, Communications Center Training Supervisor, Communications Center Quality Assurance Manager, Alarm Office Manager, Fire-Rescue Communications Coordinator, Integrated Health Paramedic*, Fire-Rescue Building Coordinator, Fire Apparatus Maintenance Superintendent, Fire Apparatus Tech II, Facility Technician, Electronics Technician, Fire Safety Specialist, Materials Manager, T.V. Producer/Director, Fire Rescue Broadcast Facility Coordinator, Fire Rescue Video Production Manager, Wellness Coordinator, Exercise Physiologist, Fire Rescue Support Services Driver, Fire Rescue Inventory Specialist, Respiratory Protection Specialist, Fire Rescue Respiratory Protection Manager, Fire Rescue Training Facility Coordinator, and Medical Social Work Coordinator.

### NOT COVERED BY THIS AGREEMENT:

Fire Rescue Administrator, Deputy Chiefs, Division Chiefs, District Chiefs, Executive Assistants, Budget and Finance Employees, Information Technology Services Employees, Personnel and Payroll Records Employees, Planners and Clerical Employees, Inventory and Stores Manager, Capital Projects Coordinator, , Fire-Rescue Fleet Director.

Recognition status in the Bargaining Unit shall not change in the event of an assignment.

*Prior to implementing a program involving the classification of Integrated Health Paramedic or CAT Team Coordinator, the County and the Union agree to negotiate the program, the impacts of the program, and the wages, hours and terms and conditions of employment of the Integrated Health Paramedic or CAT Team Coordinator.

## ARTICLE 3 – DUES CHECKOFF

**Section 1.**     Employees who wish to join the Union and have their dues and assessments deducted through the payroll system may authorize the County to make such deductions by using the Union's "Dues Check off Authorization" form.  This authorization shall remain in effect until such time as the County has received written notice of revocation of this authorization.  Deductions shall be submitted to the Union each payroll period, and an itemized statement shall be provided to the Union on a monthly basis.

**Section 2.**     The Union agrees to indemnify and hold the County harmless against any and all claims, suits, orders or judgments brought or issued against the County as a result of any action taken or not taken by the County under the provisions of this Article.

## ARTICLE 4 – UNION BUSINESS

**Section 1.**    Each employee shall be allowed to voluntarily contribute any accrued leave, except sick leave, to the Union Time Pool.  The Union Time Pool may be used for Union business upon approval by the Union President.  Employees shall be released from duty on Union Time Pool only if the established needs of the service permit; with the approval of the non-bargaining unit supervisor, but such release shall not be unreasonably denied.

Any request for Union Time Pool, that is greater than twelve (12) hours and causes overtime must be authorized by the Deputy Chief.  Any time pool usage that causes overtime will be charged at a rate one and one-half (1½).  Requests for such time off shall be in writing or on the Department's computer system and shall be submitted to the Fire Rescue Administrator, forty-eight (48) hours prior to the time of such requested time off; provided that when it is impossible to submit written, forty-eight (48) hours' notice, then a request may be submitted orally together with the need for the short notices substantiated, and must be approved by the Division Chief in Operations, (or the appropriate non-bargaining unit supervisor in divisions not having Division Chiefs) and later confirmed in writing.  Such release shall not be unreasonably denied.  All 24-hour time pool requests from the Union President submitted at least thirty (30) days in advance will be approved or denied within two (2) business days of receipt of the request.

**Section 2.**    Union Time Pool hours will be used on an hour for hour basis.

**Section 3.**    The Union will be allowed up to four (4) designated employee representatives from the Main Bargaining Unit (one (1) of which is from non-shift personnel), and one (1) designated employee representative from the Supervisory Bargaining Unit who shall be permitted to participate in labor contract negotiation sessions while on duty with no loss of pay or emoluments.  It is contemplated that the designees will not change except for substantial reason not related to the question of pay or scheduling.

**Section 4.**    Two (2) grievance representatives, one (1) of whom is the Executive Vice President of the Union, shall be allowed to utilize time pool to attend grievance meetings. Two (2) Executive Board members shall be allowed to utilize time pool to attend Executive Board meetings (for up to four (4) hours).

**Section 5.**    The Union President or designee, if covered by this Agreement, shall be released from duty on a permanent basis to conduct Union business on the basis of a forty (40) hour employee and shall be paid the five (5%) percent adjustment in accordance with this Agreement.  One other Union Principal Officer, if covered by this Agreement, designated by the Union President, shall be released from duty on those shifts which fall on Mondays through Fridays to conduct Union business. They shall maintain their current pay, rank, bidded position, and time in grade.  They shall accrue all benefits available to other bargaining unit employees (except that they shall be exempt from overtime as to those duties as Union Officers) and shall also be eligible for any promotional examinations as applicable.  The President may perform regular Fire Rescue duties upon the approval of the appropriate Deputy Chief.  The President and designated other Union Officer, shall be available to conduct Union business during the same hours as the Fire Rescue Administrator.

The Union authorizes Payroll to automatically deduct, from the Union Time Pool, the number of regularly scheduled hours in each pay period, unless notified of an exception by the Union.

It is further agreed that the County shall provide a written accounting of the usage of the Union Time Pool on a monthly basis.

**Section 6.**    The first Executive Vice President of the Union shall be released from duty on Union time pool for all labor-management meetings, the IAFF convention, the FPF convention and other Union business approved by the Union President and the Fire Rescue Administrator.

07420

## CAPTAIN

### NATURE OF WORK

This is supervisory and skilled public safety work in the protection of life and property through the direction and coordination of fire prevention; suppression and EMS activities on an assigned shift.

An employee in a position allocated to this class, in addition to all of the requirements of a Firefighter, is responsible for the supervision of firefighting personnel and maintenance of the facilities, equipment and vehicles in a single fire station. The Captain is responsible for effectively managing and combating a fire until relieved of command by a superior officer. Employees in this class drill and instruct their subordinates in conjunction with the Training Division. Considerable judgment is exercised in the daily operations of the fire station.

### EXAMPLES OF WORK

Writes performance evaluations; issues counseling forms/disciplinary actions; handles employee complaints and grievances.

Acts as a shift officer within a station, performs all supervisory duties and responsibilities accordingly and coordinates and assigns all duties on a shift.

Responds with a company to mitigate the scene of fires or other emergencies; evaluates, allocates and requests additional resources; supervises, directs and assists the company's activities while engaged in emergency operations.

Supervises the care and appropriate maintenance of assigned station facilities and grounds.

Enforces rules, policies and procedures to ensure employee health and safety.

Maintains station records and timely submission of Fire Department reports.

Conducts in-station training classes according to department training schedules.

Conducts in-service fire prevention surveys; to include five inspections to monitor target hazards with Quick Access Surveys (QAS's).

Maintains discipline and morale of station personnel.

Has authority to initiate the recommendation for transfer, reprimand, suspension and assignment of personnel to his/her superior.

Adjusts, or attempts to adjust, a grievance at his/her authoritative level.

May assist and make recommendations in all periodic evaluations of member's performance.

Performs related work as required.

EXHIBIT A

07420

### CAPTAIN – CONT'D

**REQUIRED KNOWLEDGE, SKILLS AND ABILITIES**

Considerable knowledge of firefighting to include incident management, fire rescue, EMS, evacuation, exposures, confinement, extinguishments, radio communication, ventilation, salvage and overhaul.

Knowledge of fire prevention techniques.

Knowledge of the principles, practices and methods of emergency/rescue operations.

Thorough knowledge of the geography of the response areas with special emphasis on target hazards, water distribution.

Extensive knowledge of fire department equipment and material, policies and procedures.

Ability to detect and properly report the existence of common fire hazards.

Ability to react quickly and calmly in emergencies and to direct the work of subordinates in emergency situations.

Ability to effectively supervise a working shift.

Ability to independently act in the absence of a senior officer.

**MINIMUM ENTRANCE REQUIREMENTS**

Graduation from high school or an equivalent recognized certification; a current Florida Certificate in fire fighting as approved by the State of Florida Bureau of Fire Standards; and currently meet all of the certification requirements under Florida Statute 633, as outlined in the Collective Bargaining Agreement.

**Rev. 12/2011**

**DE 38**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 19-80701-CIV-DIMITROULEAS

AJ O'LAUGHLIN and CRYSTAL LITTLE,

     Plaintiffs,

vs.

PALM BEACH COUNTY, a political
subdivision of the State of Florida,

     Defendant.

_____/

**Response to Defendant's Motion to Dismiss Amended Complaint and
Incorporated Memorandum of Law**

     Plaintiff responds as follows to the motion of Defendant Palm Beach County Board of

County Commissioners ("the County") to dismiss the Amended Complaint, pursuant to Federal

Rule of Civil Procedure 12(b)(6),  for failing to state a cause of action.

**Introduction and Summary**

     Plaintiffs, AJ O'Laughlin and Crystal Little, are captains in Palm Beach County's Fire

Rescue Department ("PBCFR").  They members of the Professional Firefighters/Paramedics of

Palm Beach County, Local 2928, International Association of Fire Fighters (IAFF).[1] Both have

been disciplined for statements made on Captain O'Laughlin's invitation-only Facebook page

(as part of Captain O'Laughlin's campaign to become president of Local 2928) that accused

_____

[1]The Court is requested to take judicial notice that Local 2928 consists of more than 3,000
members from more than 75 fire stations in seven fire-rescue departments throughout Palm Beach
County.

**The Amlong Firm** • 500 Northeast Fourth Street • Fort Lauderdale, FL  33301 • 954.462.1983

Local 2928's first executive vice president of attempting, with help from management, to misapply for his personal use time donated by union members to subsidize Local 2928's officers' taking time off to do union business.

In a one-count amended complaint, Capts. O'Laughlin and Little contend:

*One*, their speech was protected by the free-speech clause of the First Amendment because it involved both a campaign for office in a public-employee union and focused on attempted misbehavior by a vice president of a union, aided by personnel from a PBCFR management with whom Captains O'Laughlin and Little were characterizing Local 2928's incumbents as being too chummy;

*Two*, their comments on the invitation-only Facebook page that was part of a union election, were protected by the freedom-of-association clause of the First Amendment, and

*Three*, the wording of PBCFR's social-media guidelines is so vague and overbroad as to be facially unconstitutional for all PBCFR employees and as applied to Captains O'Laughlin and Little.

The County's motion to dismiss disputes each of those assertions. Caselaw, however, does not support the County's postions.

## Procedural History

Plaintiffs, both captains in the Palm Beach County Fire Rescue Department, filed a complaint in state court May 14, 2019, seeking to enjoin the County from enforcing its social media policy and ordering the County to rescind the "written warning" discipline received by Plaintiffs for violating PBCFR's Social Media Policy. [DE 1-1]. The County removed plaintiffs' complaint to this Court May 29, 2019. Id.

This Court granted the County's motion to dismiss January 3, 2020, holding that "Plaintiffs fail[ed] to sufficiently allege that they were speaking as private citizens on matters of public concern." [DE 31, at 6].

Plaintiffs filed an Amended Complaint on January 23, 2020. [DE 32]. While the Amended Complaint again asks the Court to enjoin the County from enforcing the social media policy and to order the County to rescind the "written warning" discipline received by Plaintiffs for violating the social media policy, the new complaint additionally seeks relief because:

*First*, Plaintiff's speech during the Local 2928 election was, by definition under circuit precedent, addressing a matter of public concern — the organization of a public employees' union, and

*Second*, by disciplining Plaintiff's because of what they said in connection with a union election, regardless of whether it were a matter of public concern, the County violated Plaintiffs' first-amendment freedom-of-association rights by punishing them for engaging in speech concerning the internal governance of Local 2928.

*Third*, the Social Media Policy is an unconstitutionally vague and overbroad prior restraint on protected speech, both facially and as applied.

### Statement of the Alleged Facts

Captain O'Laughlin in 2018 ran for the presidency of IAFF Local 2928, a candidacy that Captain Little supported.  DE 32, at ¶ 44.

PBCFR on or about April 17, 2016 had issued a policy addressed to "Use of Social Media," which policy, id. at ¶ 5 and Attachment 1, which in its "personal use" section:

*First*, warns against "discredit[ing] ... the agency," Procedure 1(a);

***Second***, states that "[w]hile ... off-duty ...disseminating content that is inconsistent with the duties, conduct, and responsibilities of a Fire Rescue employee, including content that could reasonably be interpreted as having an adverse effect upon ... [the] perception of the public...," Procedure 2(d), and lists as "examples,"

• material that might "tend to undermine the public trust and confidence required by employees of Fire Rescue," Procedure 2(d)(i), and

• "any posting that may adversely reflect on Fire Rescue...." Procedure 2(j). Id.. at ¶ 6.

Captain O'Laughlin maintained, as part of his campaign for the presidency of the IAFF local, an invitation-only FaceBook page branded "AJ O'Laughlin—Make our Union Strong again." Id. at ¶ 8.

The Union Time Pool, or UTP, is a pool of hours donated by all of Local 2928's members to allow union officers to get paid their regular salaries for doing union business on days that they would otherwise be scheduled to work. Id. at ¶ 9.

Captain O'Laughlin on February 6, 2019 posted a screen shot of a computerized scheduling program. The posting showed that Captain Jeffrey L. Newsome, the IAFF local's First Executive Vice President and an associate of the incumbent President, had been scheduled two to three months earlier, i.e., in November 2018, to take UTP paid-leave for Thanksgiving Day. Id. at ¶ 10.

Captain O'Laughlin also learned, and posted, that Captain Newsome had done the same thing for Christmas Day 2018—even though there was no union business to be done on either of those days. Id. at ¶ 10.

The scheduling of that time—which Captain Newsome gave back after Jeff Rudd, a battalion chief, noticed it and confronted Captain Newsome about it—could only have been done by the Fire Rescue Staffing Officer, a management employee.  Id. at ¶ 11.

Before the Thanksgiving/Christmas schedules were reversed, however, someone took a screen shot of the Thanksgiving entry, which found its way to Captain O'Laughlin, who posted the photo February 6, 2019.  Id. at ¶ 12.

Captain O'Laughlin followed up the screen shot with several bursts:

• "This person is a theft (sic) just thinking about putting this into Telestaff.  This is your Union leadership.  Wtf.  When elected this will stop and who is Saying (sic) this is OK,"

• "Jeff you should be ashamed of yourself.  Thinking that union business is done on holidays.  I will make sure I keep my locker closed when I'm working with you,"

• "Is this unethical Wtf.  Make sure u call the [Inspector General] about this. Transparency is everything," and

• "[Executive Vice President 1] took UTP for thanksgiving (sic) and also XMas (sic).  It was approved by the Union and by Admin.  Who does Union stuff on these days.  This is how Armand Nault got unelected.  You got to be kidding me.  Transparency is my campaign. So you will see the truth."  Id. at ¶ 13.

Captain Little, an O'Laughlin partisan who prior to transferring back to the field had been in charge of the Fire Rescue Department's staffing function, then chimed in:  "Nice to know the current retired president thinks it's ok to use UTP for holidays!!  Thanks AJ for keeping them accountable.  And on that note our fucking stellar staffing officer just blindly approves it?  Wtf!"  Id. at ¶ 14.

Neither Captain O'Lauglin nor Captain Little had at the time that they made their remarks about Captain Newsome's attempted misuse of the UTP any job duties related to scheduling  Id. at ¶ 15.

A smarting Captain Newsome launched an immediate and clearly content-based complaint to Deputy Fire Chief Joey Cooper, lodging a formal charges against Captain O'Laughlin of conduct-unbecoming and violation of the social-media policy: he accused Captain O'Laughlin of having "advised that I was misusing Union Time Pool" and having said Captain Newsome had "committed theft."  Id. at ¶ 16.

Captain Newsome also took issue with the fact that Captain O'Laughlin had "encouraged people contact (sic) the Office of the Inspector General to make a complaint," and observed that "[t]his post, then was replied to by Cpt. (sic) C. Little, who commented about 'our fucking stellar staffing officer.'"  Id. at ¶ 17

Captain Newsome continued:

By making this post, Cpt. (sic) O'Laughlin violated several provisions of Policy FR-A-404.  ***Section 2(d) states:  Employees are prohibited from disseminating content that*** is inconsistent with the duties, conduct, and responsibilities of a Fire Rescue employee including content that ***could be reasonably interpreted as having an adverse effect upon*** Fire Rescue morale, discipline, operations, ***the*** safety of staff or ***perception of the public.*** ***Section 2(g) states Employees who chose (sic) to maintain or participate in social media or social networking platforms while off-duty*** shall conduct themselves with professionalism and in such a manner that ***shall not reflect negatively upon this agency*** or its mission.  ***Section 2(j) states Fire Rescue Personnel shall not post, transmit, or otherwise disseminate any information*** (photographic or text) to which they have access as a result of their employment ***without written permission from the First Rescue Administrator.***

Cpt. (sic) O'Laughlin's posts have disparaged the reputation of Fire Rescue, the Fire Rescue Staffing Officer, "Admin" and me personally.  His behavior could erode the faith the public has in Palm Beach County Fire Rescue.  His behavior is unprofessional, and

certainly does not display the conduct that PBCFR and the public expect of a

firefighter....

(Underlining in original; bold italics supplied.)  Id. at ¶ 18.

Notwithstanding that even Captain Newsome acknowledged that it was not possible that

the screen shots that Captain O'Laughlin posted were materials "to which [he had] access as a

result of [his] employment," Procedure 2(k), and stated that the posts had been made on "a

hidden Facebook page," the Department began disciplinary proceedings against Captain

O'Laughlin and Captain Little.  Id. at ¶ 21.

Although the discipline issued to Captain O'Laughlin and Captain Little was a "written

warning," under the Department's progressive discipline procedures, that sets each of them up

for more serious discipline in the case of even a minimal offense—i.e., a one-to-three-shift

suspension for Captain Little, whose only discipline during her 14.5 years on the department has

been for accidentally putting her pager into a washing machine 10 years ago, and termination for

Captain O'Laughlin, who got a five-shift suspension in July 2018 for an unrelated matter.  Id. at

¶ 22.

## Applicable Legal Standards

**Concerning Rule 12(b)(6) motions**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), citing Bell Atlantic Corp. v Twombly, 550 U.S. 544, 570 (2007).  In considering a motion to dismiss pursuant to Rule 12(b)(6), all factual allegations must be taken as true and in the light most favorable to plaintiff.  See Erickson v. Pardus, 551 U.S. 89.  (2007).

**Concerning speech connected to public-employee union activity**

Public-employee free-speech claims are analyzed in this circuit based on a four-step test set out in Bryson v. City of Waycross, 888 F.2d 1562, 1565-66 (11th Cir. 1989) and summarized as follows in Beckwith v. City of Daytona Beach Shores, 58 F.3d 1554 (11th Cir. 1995):

> The Bryson test examines (1) whether the employee's speech involves a matter of public concern, (2) whether the employee's interest in speaking outweighs the government's legitimate interest in efficient public service, (3) whether the speech played a substantial part in the government's challenged employment decision, and (4) whether the government would have made the same employment decision in the absence of the protected conduct.

Id. at 1563-64.[2]

As to the first Bryson point, "[i]ssues regarding the operation of government, including issues of union organization, are often considered matters of public concern." Cook v. Gwinnett County School Dist, 414 F.3d 1313, 1319 (11th Cir. 2005),[3] citing Thornhill v. Alabama, 310 U.S. 88, 104 (1940) (striking down as unconstitutional Alabama's anti-picketing statute) and

---

[2]Only the first and third Bryson points are raised by the County's motion.  See DE 35, at

[3]None of the County's authorities have anything to do with union-related speech.

Porter v. Califano, 592 F.2d 770, 779 (5th Cir. 1979)[4] (reversing dismissal of, inter alia, first-amendment claim by Social Security employee who wrote letter seeking financial support for fired union president and accusing of corruption the two supervisors who had engineered his termination).[5]  See also Scott v. Goodman, 961 F. Supp. 424, 435 (E.D.N.Y. 1997), aff'd sub nom. Scott v. Meyers, 191 F.3d 82 (2d Cir. 1999) (finding that union membership "in and of itself satisfies the public-concern requirement").

 Further, while some aspects of an employee's communication may not be protected, other parts of the same communication can be, triggering the First Amendment.  See Anderson v. Burke County, 239 F.3d 1216, 1220 (11th Cir. 2001) (although questionnaire sent to political candidates by union president addressed a number of issues that were routine job-related issues rather than public concerns, the questionnaire constituted protected speech because it also "address[ed] concerns about alleged understaffing in the 911 system and of engine companies, physical fitness standards required for certain employees, and public tax consequences of high employee turnovers").

Further, a public employee who discusses matters of public concern while off-duty and in his role as a union member, and not as part of his or her duties as a public employee, is speaking as a citizen, not as an employee under Garcetti v. Ceballos, 547 U.S. 410 (2006).  See Hubbard v. Clayton Cnty. Sch. Dist., 756 F.3d 1264, 1267 (11th Cir. 2014) (vacating summary judgment

---

[4]In Bonner v. Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the United States Court of Appeals for the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to October 1, 1981.

[5]The plaintiff in Mitchell v. Hillsborough County, 468 F.3d 1276, 1280 (11th Cir. 2006), did not discuss matters of public concern, but was fired after launching into a lewd rant about "women's vaginas" at a county commission meeting.

because "[w]e agree with Hubbard that his speech was made in his capacity as president of [Georgia Association of Educators], and not as an employee of the School District.")[6]

As to the third <u>Bryson</u> point, i.e., "whether the speech played a substantial part in the government's challenged employment decision," the Eleventh Circuit has "considered several factors as relevant," "no one [of which] is outcome determinative, but all [of which] must be taken into account." <u>Stanley v. City of Dalton</u>, 219 F.3d 1280, 1291 n. 20 (11th Cir. 2000) (listing factors). "Where termination closely follows protected activity, it is usually reasonable to infer that the activity was the cause of the adverse employment decision." <u>Mize v. Jefferson City Board of Education</u>, 93 F.3d 739, 745 (11th Cir. 1996), citing <u>Bechtel Constr. Co. v. Secretary of Labor</u>, 50 F.3d 926, 934 (11th Cir. 1995) (inference permissible where employee questioned safety procedures in radiation control area of plant). Causation can be established by nothing more than temporal proximity between the protected activity and the adverse job action, so long as the proximity is less than three months. <u>See, e.g.</u>, <u>Thomas v. Cooper Lighting, Inc.</u>, 506 F.3d 1361, 1364 (11th Cir. 2007). Temporal proximity can be satisfied if the employer or its agent takes a "first step" in the adverse action within that period. <u>See, e.g.</u>, <u>Hamilton v. Geithner</u>, 666 F.3d 1344 (D.C. Cir. 2012) ("given Hamilton's claim that Burns 'ignored' him in December 2003 when he requested information regarding the detail, ... it appears that Burns actually took a first

---

[6]The County's reliance on <u>Moss v. City of Pembroke Pines</u>, 782 F.3d 613 (11th Cir. 2015) is inapposite, since the plaintiff in that case was not a union member, but rather an assistant fire chief who was not permitted to even be a member of the union. <u>Id.</u> at 616. <u>Alves v. Board of Regents of the University System of Georgia</u>, 804 F.3d 1149, 1162 (11th Cir. 2015) is likewise inapposite, involving a group of clinical psychologists complaining about working conditions and their supervisor, which put their memorandum for which they claimed to have been retaliated against clearly within the reach of <u>Garcetti</u> and <u>Connick v. Myers</u>, 461 U.S. 138 (1983). Captain O'Laughlin's running for union president, and Captain Little's supporting him politically, however, had nothing to do with their duties as PBCFR captains.

step toward the adverse action just two months after Hamilton filed his formal complaint");

Heaton v. Weitz Co., 534 F.3d 882, 888 (8th Cir. 2008) (affirming denial of defendant's Rule 50

motion in case where a reasonable jury could find that there was a pattern of adverse actions

against the plaintiff beginning shortly after the time he complained and lasting until he was laid

off).

**Concerning public-employee union activity as protected association**

"The right of association protects confidentiality in one's private, civic, and political

associations, particularly where government intrusion may result in a chilling effect on collective

action." Local 491, Police Officers v. Gwinnett County, Ga., 510 F. Supp. 2d 1271, 1289 (N.D.

Ga. 2007), citing Nat'l Assocc. for Advancement of Colored People v. Alabama, 357 U.S. 449,

462 (1958).  The Local 491 court stated that

> by asking questions about whether the leaders of Local 491, in the course of their
> organizational participation, had expressed opinions concerning the replacement of the
> current police chief, and by asking whether they had engaged in communications with
> members of the Gwinnett County Board of Commissioners, Internal Affairs investigators
> intruded into quintessentially protected associational activity.

510 F. Supp.2d at 1294.  Such an inquiry, the court found, "demonstrated a First Amendment

violation," id., because the investigators' "questions did not specifically, directly, and narrowly

relate to the legitimate inquiry initiated into [an individual police officer's] on-duty conduct,

Local 491's First Amendment interests in the confidentiality of their associational activities

outweighed the state interest in compelled disclosure."  Id.[7]

---

[7]The County's reliance on Desrochers v. City of San Bernardino, 572 F.3d 703, 710 (9th Cir.
2009) is misplaced.  Desrochers involved factions within the police department, not factions within
a police union.  Likewise, Fotopolous v. Bd. of Fire Comm'rs, 11 F. Supp. 3d 348, 354 (E.D.N.Y.
2014) involved the public election of a fire commissioner, not the internal election of a union
president.

"In analyzing free association claims in this context, [the Eleventh Circuit does] not apply the public concern portion of the <u>Pickering</u> analysis." <u>Cook</u>, 414 F.3d 1320, citing <u>Hatcher v. Board of Pub. Educ. Orphanage for Bibb County</u>, 809 F.2d 1546, 1558 (11th Cir. 1987).

"[T]he Eleventh Circuit has recognized that a police officer, like other public employees, 'has a legitimate interest in maintaining a zone of privacy where he can speak about work without fear of censure.'" <u>Local 491</u>, quoting <u>Waters v. Chaffin</u>, 684 F.2d 833, 837 (11th Cir. 1982). "Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." <u>N.A.A.C.P.</u>, 357 U.S. at 462 (1958) (reversing order of the Alabama Supreme Court that civil-rights organization disclose the identities of its rank-and-file members based on "an uncontroverted showing that on past occasions revelation of the identity of its rank-and-file members has exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility.")

<u>Waters</u> involved a police captain whom a female officer quoted in a memorandum as having disparaged the police chief over cocktails, which memorandum contributed some nine months later, following the police chief's resignation, to the chief's successor's terminating him. <u>Waters</u>, 684 F.2d at 834-835. After the district court rejected the plaintiff's case in a bench trial, holding "governmental regulation of the speech of public employees will generally be appropriate . . . [as to] speech which does not involve matters of public concern," <u>id.</u>, the court of appeals reversed, stating that

> In addition to Waters' fundamental interest in speaking as he chooses, he has an interest in being free from unnecessary work-related restrictions while off-duty. Waters

spoke the words at issue after he had left work, while he was out of uniform, while he was out of the department's jurisdiction, and to a person he considered a friend. We think it quite reasonable that he assumed he could vent a little steam over drinks, and we think that Waters, like everyone, has a legitimate interest in maintaining a zone of privacy where he can speak about work without fear of censure....

684 F.2d at 837.

**Concerning prior restraint of protected expression**

There is no published Eleventh Circuit opinion concerning a parallel prior restraint of public-employee speech other than Hallandale Prof'l Fire Fighters Local 2238 v. City of Hallandale, 922 F.2d 756 (11th Cir. 1991), in which the Eleventh Circuit reversed for lack of jurisdiction an injunction against recently enacted municipal rules similar to the ones involved in the case at bar.  The district court had entered the injunction based on the City of Hallandale's rules' constituting a prior restraint on protected speech and being void for vagueness, but the Eleventh Circuit reasoned that "[b]ecause the Union's facial attack on the City's policy is anticipatory, it raises serious questions of justiciability." 922 F.2d at 759.

The Eleventh Circuit, however, approved the an Alabama district court's application of the standards set forth in United States v. National Treasury Employees Union, 513 U.S. 454 (1995) ("NTEU") (striking as unconstitutionally overbroad a provision in the Ethics Reform Act of 1989 that forbade rank-and-file federal employees to accept "any honorarium while that individual is [an] employee" for any appearance, writing or presentation).  In Davis v. Phenix City, 513 F. Supp. 2d 1241, 1246 (M.D. Ala. 2007), the trial court sent to the jury a fire-fighter's union president's prior restraint and retaliation claims involving his statements to the press and members of the city's governing board.  In an appeal of a defense verdict, Davis v. Phenix City, Case No. 08-11498, *3 (11th Cir. Oct. 15, 2008), a panel of the Eleventh Circuit stated in an

unpublished opinion that it "[found] no error in the district court's application of the principles announced in [NTEU], in concluding that the regulations did not constitute a prior restraint based on the jury's determination that a firefighter who had noticed the chain of command could address elected officials directly without obtaining permission."

When it comes to prior restraints, NTEU has trumped even the deference historically shown to such paramilitary units as police and fire departments.  "In the 'quasi-military' context, which includes both fire departments and police stations, see [Anderson, 239 F.3d at 1222, the Eleventh Circuit has] afforded public employers greater latitude to burden an employee's rights, particularly when the exercise of that right impacts discipline, morale, harmony, uniformity, and trust in the ranks." Starling v. Board of County Com'rs, 602 F.3d 1257, 1261 (11th Cir. 2010),[8] citing  Oladeinde v. City of Birmingham, 230 F.3d 1275, 1293 (11th Cir. 2000).  NTEU nonetheless requires that before even uniformed government actors are allowed to "chill[] potential speech before it happens," they "must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government."  NTEU, 513 U.S. at 468, quoting Pickering v. Board of Education, 391 U.S. 563, 571 (1968).[9]  For example, a district court in Michigan, in relying on NTEU to declare

---

[8]Starling was not a prior restraint case, but one in which the Eleventh Circuit, relying on Rankin v. McPherson, 483 U.S. 378, 388 (1987), in affirmed a summary judgment against a fire department officer whose extramarital relationship with a subordinate it determined actually "(1) 'impair[ed] discipline by superiors or harmony among co-workers,' (2) 'ha[d] a detrimental impact on close working relationships for which personal loyalty and confidence [were] necessary,' or (3) 'impede[d] the performance of the [employee's] duties or interfere[d] with the regular operation of the enterprise. . . .'" 602 F.3d at 1261.

[9]The County cites the pre-NTEU case of Moore v. City of Kilgore, 877 F.2d 364 (5th Cir.
(continued...)

unconstitutional an ordinance similar to the County's social-media guidelines, quoted the

passage cited above and characterized the NTEU standard as "particularly onerous to the

government employer...." Inter. Ass'n of Firefighters v. Frenchtown Charter, 246 F. Supp. 2d

734, 740 (E.D. Mich. 2003). See also Moonin v. Tice, 868 F.3d 853, 868 (9th Cir. 2017)

(denying state-police major qualified immunity in prior-restraint case because, post-NTEU, he

was "clearly on notice that a policy precluding all sorts of speech by officers, to whomever

communicated, about the K9 program was subject to limits imposed by the First Amendment");

Milwaukee Police Ass'n v. Jones, 192 F.3d 742, 750 (7th Cir. 1999) ("This test recognizes the

government's interest when acting as an employer in the efficiency of its workplace, while also

acknowledging the greater risk posed to expression by a ban on speech"); Firenze v. Nat'l Labor

Relations Bd., 993 F. Supp. 2d 40, 54 (D. Mass. 2014) ("Prior restraints of speech bear a heavier

presumption of unconstitutionality because by chilling potential speech, they tend to be both

overinclusive and underinclusive and therefore are disfavored"); Kessler v. City of Providence,

167 F.Supp.2d 482, 485–86 (D.R.I. 2001) ("absent a showing by the Defendants that they have a

substantial interest in such a sweeping ban on their employees' speech, the Police Rules must be

struck down as violative of the First Amendment. See NTEU, 513 U.S. at 454-55.")

   Another court of appeals, meanwhile, addressing through the prism of NTEU a police

department's social networking policy similar to the one that PBCFR has in place, opened its

_____

[9](...continued)
1989), for the proposition that "a Fire Department's Rule and Regulation limiting statements made
by members of the department was not a prior restraint because '[t]he department does not pretend
to have authority to gag its employees before they speak. It claims the right to fire, demote, or
suspend them after they speak. That is not a prior restraint; it is an after-the-fact sanction." County's
Motion, at 7-8. It omits, however, that the Moore court held that disciplining the plaintiff because
of what he said about the department had violated the plaintiff's first-amendment rights.

opinion by stating "[w]hile we are sensitive to the Department's need for discipline throughout the chain of command, the policy here and the disciplinary actions taken pursuant to it would, if upheld, lead to an utter lack of transparency in law enforcement operations that the First Amendment cannot countenance." Liverman v. City of Petersburg, 844 F.3d 400 (4th Cir. 2016). The Liverman court held that "the Department's social networking policy was unconstitutional and that the disciplinary measures taken against plaintiffs pursuant to that policy were likewise impermissible," 844 F.3d at 414.

Although the County correctly cites Alexander v. United States, 509 U.S. 544, 550 (1993) (holding that a penalty imposed for a pornographer's violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") is not a prior restraint) for the proposition that "[t]emporary restraining orders and permanent injunctions — i.e., court orders that actually forbid speech activities — are classic examples of prior restraints," 509 U.S. at 550, it does so obliviously to the court's statement in the immediately previous sentence that "[t]he term 'prior restraint' is used 'to describe *administrative* and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur.'" Id., quoting M. Nimmer, Nimmer on Freedom of Speech § 4.03, p. 4-14 (1984) (underlined emphasis added by the court; bold italic emphasis supplied).

**Concerning the social-media policy's being vague and overbroad**

Although the County has not raised plaintiffs' standing to bring a vagueness or overbreadth challenge, plaintiff's address it here in recognition of the realities that:

*One*, "federal courts are courts of limited rather than general jurisdiction," Kelly v. Harris, 331 F.3d 817, 819 (11th Cir. 2003), citing Aldinger v. Howard, 427 U.S. 1, 15 (1976);

*Two*, "federal courts always have an obligation to examine <u>sua sponte</u> their jurisdiction before reaching the merits of any claim, <u>Kelly</u>, citing <u>Region 8 Forest Serv. Timber Purchasers Council v. Alcock</u>, 993 F.2d 800, 807 n. 9 (11th Cir. 1993);

*Three*, "[s]tanding is an irreducible minimum necessary under Article III's case-or-controversy requirement," <u>Kelly</u>, citing <u>Alabama Power</u>, 307 F.3d 1300, 1308 (11th Cir. 2002)," and

*Four*, "[t]o demonstrate his standing to bring a vagueness challenge (or any other challenge, for that matter), [a plaintiff] must show that: (1) he has suffered, or imminently will suffer, an injury-in-fact; (2) the injury is fairly traceable to the operation of the rules; and (3) a favorable judgment is likely to redress the injury." <u>Harrell v. Florida Bar</u>, 608 F.3d 1241, 1253 (11th Cir. 2010), citing <u>Kelly</u>, 331 F.3d 817, 819-20.

In the Eleventh Circuit,

> The injury requirement is most loosely applied — particularly in terms of how directly the injury must result from the challenged governmental action — where first amendment rights are involved, because of the fear that free speech will be chilled even before the law, regulation, or policy is enforced.

<u>Hallandale Prof'l Fire Fighters Local 2238</u>, 922 F.2d at 760, citing <u>Solomon v. City of Gainesville</u>, 763 F.2d 1212 (11th Cir. 1985) and <u>Intl. Soc. for Krishna Consciousness v. Eaves</u>, 601 F.2d 809 (5th Cir. 1979) (both allowing pre-enforcement challenges to local ordinances based on first amendment).  That is because a vagueness plaintiff can show the injury of self-censorhip if  "either (1) he was threatened with prosecution; (2) prosecution is likely; or (3) there is a credible threat of prosecution." <u>American Civil Liberties v. The Florida Bar</u>, 999 F.2d 1486, 1492 (11th Cir. 1993), citing <u>Babbitt v. Farm Workers</u>, 442 U.S. 289, 299 (1979).

"To overcome a vagueness challenge, statutes must 'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly,' and 'must provide explicit standards for those who apply them.'" Leib v. Hillsborough County Public Transportation Commission, 558 F.3d 1301, 1310 (11th Cir. 2009), quoting Grayned v. City of Rockford, 408 U.S. 104, 108 (1972).

"A statute is facially overbroad if it prohibits a substantial amount of protected speech 'relative to the statute's plainly legitimate sweep.'" United States v. Williams, 553 U.S. 285, 282 (2008).

### Applying the Law to the Facts in the Case at Bar

*First*, Captains O'Laughlin and Little were speaking as citizens about matters of public concern, not PBFR captains speaking about work, when they posted their respective messages on Captain O'Laughlin's private, invitation-only Facebook page.  See, e.g., Cook, Porter.

*Second*, PBCFR's disciplining them for their participation in a union presidential election invaded their right to privately associate with each other, as well as with other supporters of Captain O'Laughlin, in seeking to reorganize the leadership of Local 2928.  See NAACP, Waters and Local 491.

*Third*, the causal connection between Captains O'Laughlin and Little's protected activity and the discipline that the discipline that they received is demonstrated by both the temporal proximity between the two and Captain Newsome's next-day petitioning tp management to punish his two intra-union political rivals as soon as he found out about the posts accusing him of acting dishonorably as Local 2918's first executive vice president.  Thomas, Mize and Stanley.

*Fourth*, PBCFR's social media policy is a prior restraint that cannot survive the new standards set forth by the Supreme Court in <u>NTEU</u>.

*Fifth*, the social media policy — which forbids and penalizes such off-duty behavior as "discredit[ing] . . . the agency," "disseminating content . . . that could reasonably be interpreted as having an adverse effect upon ... [the] perception of the public...," posting material that might "tend to undermine the public trust and confidence required by employees of Fire Rescue," and "any posting that may adversely reflect on Fire Rescue...." — both:

- fails to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly" to "provide explicit standards for those who apply them," <u>Leib</u>, quoting <u>Grayned</u>, and

- is capable of being understood to "prohibit[] a substantial amount of protected speech 'relative to the statute's plainly legitimate sweep.'" <u>Williams</u>.

*Sixth*, plaintiffs can demonstrate standing to challenge the vagueness and overbreadth of the social networking policy because each has already been disciplined for assertion violations of it. <u>Harrell</u>, citing <u>Kelly</u>; <u>ACLU</u>, citing <u>Babbit</u>.

## Conclusion

Based on the facts alleged, the authorities cited and the arguments presented, plaintiffs, Captains AJ O'Laughlin and Crystal Little, respectfully request this Court to deny the County's Defendant's Motion to Dismiss the Amended Complaint.

Respectfully Submitted,

_/s/   William R. Amlong_____
WILLIAM R. AMLONG
Florida Bar No.: 470228
WRAmlong@TheAmlongFirm.com
KAREN COOLMAN AMLONG
Florida Bar No.: 275565
KAmlong@TheAmlongFirm.com

AMLONG & AMLONG, P.A.
500 Northeast Fourth Street
Fort Lauderdale, Florida 33301-1154
(954) 462-1983
(954) 523-3192 (fax)

**Certificate of Service**

I HEREBY certify that the above and foregoing was electronically filed through the Southern District of Florida ECF system and thereby delivered to all counsel of record.

_/s/   William R. Amlong_____
WILLIAM R. AMLONG

**DE 39**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 9:19-cv-80701 Dimitrouleas/Matthewman

AJ O'LAUGHLIN and
CRYSTAL LITTLE,
  Plaintiffs,

vs.

PALM BEACH COUNTY, a political
Subdivision of the State of Florida,
  Defendant.
_____/

**<u>DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS'
AMENDED COMPLAINT AND INCORPORATED MEMORANDUM OF LAW</u>**

  Defendant, PALM BEACH COUNTY BOARD OF COUNTY COMMISSIONERS (the "County"), by and through undersigned counsel, files this Reply in support of its Motion to Dismiss Plaintiffs' Amended Complaint (the "Motion") [DE 35] and states as follows:

**I. <u>INTRODUCTION</u>**

  Plaintiffs' Response in Opposition to the Motion (the "Response") [DE 38] jumbles various First Amendment cases in a patchwork devoid of analysis. Plaintiffs then follow the cited cases with a section full of conclusory statements lacking legal support. In fact, Plaintiffs' fail to provide as little as a parenthetical explanation of how the cited cases relate to the current litigation. The County thus can only reply to what it assumes Plaintiff is arguing in their citations.

  It appears that Plaintiffs attempt to make the following "arguments":

1. Plaintiffs spoke as private citizens on matters of public concern because "union-related speech" is a matter of public concern, regardless of the content, form, or context of the speech;

2. The "protected speech" played a substantial part in the County's "challenged employment decision" due to the allegedly temporal proximity of the "challenged employment decision" and the "protected speech";[1]

3. The County violated Plaintiffs' right to privately associate;

4. The Social Media Policy is a "prior restraint";

5. The Social Media Policy is vague and overbroad and Plaintiffs have standing to challenge the vagueness and overbreadth of the Social Media Policy.

As explained below, Plaintiffs' conclusions fail to remedy the pleading defects delineated in the County's Motion; thus, the action should be dismissed with prejudice in its entirety.

## II.   **MEMORANDUM OF LAW**

First, it is important to point out that Plaintiffs artificially attempt to narrow the case law applicable in this action to cases dealing with "union-related speech."  [DE 38, pg. 8, n.3; pg. 10, n.6; and pg 11. n.7].  Plaintiffs do this while themselves citing to a plethora of non-union cases.[2]  Defendant, however, was unable to find one single case that stands for the proposition that "speech connected to public-employee union activity" is treated differently for purposes of First Amendment claims or analysis.  Consequently, Plaintiffs' artificial limitation should be ignored.

### A.   Plaintiffs Did Not Speak As Citizens On Matters of Public Concern

As analyzed fully in the Motion, a review of the speech's content (self-centered full of I's and me's regarding a matter that does not affect the public or tax-payers), form (made on a hidden Facebook campaign page entitled "Make our Union Strong again"), and context (solely for

---

[1] Plaintiffs refer to this argument as the "third *Bryson* point." [DE 38, pgs. 10-11].  However, the "third *Bryson* point" is not at issue in the Motion as it relates to Plaintiffs' free speech claims.  The County admits Plaintiffs' Facebook posts were the reason Plaintiffs received written warnings. Thus, the County sees no reason to reply to this section of Plaintiffs' Response beyond this footnote.

[2] *See e.g. Bryson v. City of Waycross*, 888 F.2d 1562, 1565 (11th Cir. 1989); *Beckwith v. City of Daytona Beach Shores, Fla*., 58 F.3d 1554, 1556 (11th Cir. 1995); *Porter v. Califano*, 592 F.2d 770, 773 (5th Cir. 1979), etc.

campaign reasons and self-promotion), leads to the conclusion that the speech at issue was personal in nature instead of relating to matters of public concern.

Another key fact that contributed to this Court previously ruling that Plaintiffs were not speaking on matters of public concern is that Plaintiffs were not contemporaneously addressing an ongoing issue. In fact, the Amended Complaint admits the Union Time Pool ("UTP") referenced in the posts was canceled well before the posts occurred [DE 32, ¶¶ 11-12]. Yet, Plaintiffs waited until it was union campaigning and election time to "expose" the alleged misuse of time. The timing of the disclosure rebuts the conclusory allegations made in the Response. *See Deremo v. Watkins*, 939 F.2d 908, 912 (11th Cir. 1991) (considering the "immediate triggering event" leading to the protected speech in finding that the "speech [was] made in appellants' own personal interest, rather than speech implicating a public concern").

Instead of addressing the content, form, and context of the speech at issue in the Response, Plaintiffs argue that "union-related speech" in and of itself is a matter of public concern. In so doing, Plaintiffs confuse an employee's right to union membership and opinions on voting matters within the union –covered in *Scott v. Goodman*, 961 F. Supp. 424, 435 (E.D.N.Y. 1997), *aff'd sub nom. Scott v. Meyers*, 191 F.3d 82 (2d Cir. 1999) cited in the Response – with a disagreement over union leadership. An employee's right to union *membership* is a matter of public-concern because it relates to the employee's right to participate in collective bargaining. However, internal power struggles, such as who will be the next union president, are not a matter of public concern. *See Desrochers v. City of San Bernardino*, 572 F.3d 703, 710 (9th Cir. 2009) (stating that speech is not of public concern when it "'relates to internal power struggles within the workplace'"); *Fotopolous v. Bd. of Fire Com'rs of Hicksville Fire Dist.*, 11 F. Supp. 3d 348, 363 (E.D.N.Y. 2014)

("There is no reason to believe the public would be concerned about which firefighter holds what office in an internal Company or faction.").

The other cases cited by Plaintiffs for this same proposition, that union-related speech is *per se* a matter of public concern (*Cook v. Gwinnett County Sch. Dist.*, 414 F.3d 1313 (11th Cir. 2005) and *Porter v. Califano*, 592 F.2d 770 (5th Cir. 1979)), are likewise distinguishable.

In *Cook*, the plaintiff held the position of union president when she "expressed her concerns about the safety of children due to the overcrowding and lack of time allotted for pre-trip bus inspections." *Cook*, 414 F.3d at 1319.  It is clear that speech relating to the overall safety of the public, particularly of children being transported to and from school, is a matter of public concern. Further, Cook, as union president, recruited other members to join the union and went to the capitol to engage in lobbying on behalf of bus drivers.  *Id.*

Notably, the *Porter* case did not involve the plaintiff's union membership at all.[3]  *Porter*, 592 F.2d 770.  Moreover, the speech in *Porter* involved "a government "whistleblower" who exposes corruption among public officials."  *See Foster v. Ripley*, 645 F.2d 1142, 1148 (D.C. Cir. 1981) (upholding the district court's finding that the speech at issue, which "essentially involve[ed] a mere power struggle between an employee and his superior," was not protected speech and contrasting that to the "whistleblower" speech involved in *Porter*).  Last, the *Porter* court did not conduct an analysis as to whether the speech was a matter of public concern, which is the issue disputed in the present case.

Plaintiffs' speech here did not concern public safety and was not aimed at encouraging union membership.  Instead, the speech at issue here only served to advance the interest of

---

[3] *Porter* only involved unions to the extent that the letter authored by Porter referenced raising funds for Don Jolly, the former union president which had been allegedly terminated for expressing views similar to Porter and also had ongoing litigation regarding his termination.  *Porter*, 592 F.2d at 776.  Outside of the aforementioned context, the court in *Porter* made no mention of a union nor was it discussed whether Porter herself was part of the union.

Plaintiffs by disparaging Captain Newsome and airing personal grievances in a Facebook page created to promote O'Laughlin. Thus, the speech at issue here is not similar to that analyzed in *Cook*. Nor does the speech involve disinterested whistle-blowing like in *Porter*.[4] Instead, the speech at issue in the present case is more akin to the speech analyzed in *Foster*, involving a "'bureaucratic tangle' in which the plaintiff was attempting to protect his personal interests." *Foster*, 645 F.2d at 1148 (D.C. Cir. 1981). Consequently, this Court should again find that Plaintiffs' speech did not involve a matter of public concern and was therefore not protected.

B.  Plaintiffs' Freedom of Association Claim Fails Because It Is Little More Than A Disguised Freedom of Speech Claim

Plaintiffs conclude in the Response that the County "disciplining them for their participation in a union presidential election invaded their right to privately associate with each other, as well as with other supports of Captain O'Laughlin." [DE 38, pg. 18]. In the Amended Complaint, however, Plaintiffs' pled that they were disciplined "for their posts," which in turn violated their freedom of association. [DE 32, ¶ 20]. There is a difference between being disciplined for posts, which is speech, versus being disciplined for participation in a union election.

"To determine which line of cases—freedom of speech or freedom of association—is most instructive, courts look at the manner in which [Plaintiffs'] 'beliefs' became known to the outside world." *Boudreaux v. McArtor*, 681 Fed. Appx. 800, 803 (11th Cir. 2017). If a plaintiff is alleging he was retaliated against for "his beliefs due to his own speech or actions" freedom of speech cases are most instructive. *Id.* Plaintiffs unknowingly concede this point as they heavily rely on *Waters v. Chaffin*, 684 F.2d 833, 836 (11th Cir. 1982) in the legal section pertaining to their association claim, yet *Waters* was a freedom of speech and not a freedom of association case.

___

[4] "[T]he content of the speech addressed the potential misuse of UTP, an internal, union-specific, paid-time-off sharing mechanism," [DE 31, pg. 5] it did not address matters of public safety, misuse of public dollars or resources or other such matters that would be of public concern.

Plaintiffs fail to adequately plead that they were disciplined for their association with the union or with the campaign.  Instead, what they pled is that they were disciplined for the content of their Facebook posts. Notably, Plaintiffs admit that O'Laughlin began his union campaign for presidency in 2018 and as part of that campaign maintained the "AJ O'Laughlin- Make Our Union Strong Again" invitation-only Facebook page. [DE 32, ¶¶ 4, 8].  It was not until February of 2019, months after initiating both the union campaign and the Facebook page, but immediately after the inappropriate Facebook posts, that Plaintiffs were issued a written warning.

Further, and of considerable weight, is the fact that Plaintiffs did not and cannot allege that they were told to take down the Facebook page as a whole, discontinue running for union president, or in any way discouraged from participating in the union election.  Moreover, there is no allegation (nor could there be) that any of the other individuals who posted on the Facebook page at issue were disciplined.  Neither do Plaintiffs allege that they were requested, and disciplined for refusing, to supply a list of participants to the private Facebook Page/Group—as was the case in *Nat'l Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 461 (1958), cited by Plaintiffs in their Reply.

What Plaintiffs do allege, and what occurred, is that Plaintiffs were issued a written warning for the content of their posts, which violated the Social Media Policy by calling a fellow firefighter a "theft" *[sic*] and alluding to the need to keep doors locked around that firefighter. Disciplining employees for violations of established policies and procedures does not violate their freedom of association rights.  *See Douglas v. DeKalb County*, *GA*, 308 Fed. Appx. 396, 398 (11th Cir. 2009) (upholding the district court's finding that the officers were disciplined for their actions, which violated policies and procedures, and not for their union involvement).  It is undisputed that

firefighters hold offices of trust with the public; thus, that manner of speaking, particularly when it is self-serving, violates the neutral policies upheld by the County's Fire Rescue Department.[5]

Additionally, because Plaintiffs' purpose in posting the Facebook posts was to advance their personal interest of electing O'Laughlin and disparaging who they perceived as the competition, a person also associated with the union, the purpose of their "association" was not independently protected by the Frist Amendment and the claim must fail.  *See McCabe v. Sharrett,* 12 F.3d 1558, 1563 (11th Cir. 1994) (stating that a plaintiff can claim protection for an asserted association right if it can be demonstrated that "the purpose of the association is to engage in activities <u>independently protected</u> by the First Amendment") (emphasis added).

C.  <u>The Social Media Policy Is Not a Prior Restraint on Speech</u>

Plaintiffs cite to *United States v. Nat'l Treasury Employees Union*, 513 U.S. 454 (1995) ("*NTEU*") throughout the prior restraint section of their Response.  [DE 38, pgs. 13, 19].  In so doing, Plaintiffs omit that *NTEU* does not analyze prior restraints.  *Id.*  In fact, the term "prior restraints" does not appear in the *NTEU* opinion once.  Further, *NTEU* and *Int'l Ass'n of Firefighters Local 3233 v. Frenchtown Charter Tp*., 246 F. Supp. 2d 734, 739 (E.D. Mich. 2003), also cited by Plaintiffs, both deal with challenges to laws before the plaintiffs were disciplined.  In other words, those cases sought to invalidate the laws prior to violation of those laws.

Here, Plaintiffs challenge the Social Media Policy after having received discipline pursuant to the policy.  Thus, this case is much more analogous to *Moore v. City of Kilgore, Tex*., 877 F.2d 364, 391 (5th Cir. 1989).  In *Moore*, the Fifth Circuit held that a Fire Department's Rule and Regulation

---

[5] Moreover, even the cases cited in Plaintiffs' Response recognize a legitimate government interest in limiting first amendment protections in quasi-military organizations (such as police and firefighters*). See Local 491, Int'l Broth. of Police Officers v. Gwinnett County, GA*, 510 F. Supp. 2d 1271, 1290-91 (N.D. Ga. 2007) (internal citations omitted) ("The Eleventh Circuit has noted that comments concerning co-workers performance of their duties and superior officers' integrity can directly interfere with the confidentiality, esprit de corps and efficient operation of the police department.  Moreover, '[d]iscipline is a necessary component of a smoothly-operating police force ... [and] must be maintained among police officers during periods of active duty.'  Thus, 'courts should consider and give weight to the need for maintaining a close working relationship in quasi-military organizations like police departments.').

limiting statements made by members of the department was not a prior restraint because  "[t]he department does not pretend to have authority to gag its employees before they speak.  It claims the right to fire, demote, or suspend them after they speak.  That is not a prior restraint; it is an after-the-fact sanction."  The social media policy at issue in the present case likewise does not gag employees before speaking, it merely cautions them to be thoughtful about their social media postings and the affect those postings have on the public's trust in the department.  *See also Harris v. Noxubee County, Miss.*, 350 F. Supp. 3d 592, 597 (S.D. Miss. 2018), aff'd sub nom. *Harris v. Noxube County, Miss., et. al.*, 18-60744, 2019 WL 4281949 (5th Cir. Sept. 10, 2019) (applying *Moore* in holding that an agreement to be signed by an employee, which prohibited discussing matters concerning the business of the County Tax Assessor/Collector's Office and stated that failure to adhere to the prohibition was grounds for immediate termination, was not a prior restraint).

Plaintiffs cite the language in *Alexander v. United States*, 509 U.S. 544, 550 (1993) – "[t]he term prior restraint is used to describe ***administrative*** and judicial orders forbidding certain communications when issued in advance of the time that such communications occur" – as if that statement was a revelation overlooked by the County [DE 38 pg. 16].  In so doing, Plaintiffs ignore that the County itself cited that language [DE 35, p. 7] and that language does not bolster Plaintiffs' argument in any way. Particularly when the Eleventh Circuit has recognized the difference between prior restraints and subsequent punishments for speaking.  *See Barrett v. Walker Cty. Sch. Dist.*, 872 F.3d 1209, 1223 (11th Cir. 2017) ("Prior restraints contrast with subsequent punishments, which regulate a given type of speech by penalizing the speech only after it occurs.") (emphasis and quotation marks omitted).

Further, and as previously determined by the Court, "[t]he requirement that the speech at issue in the complaint be speech made by Plaintiffs as citizens on matters of public concern, does not change even though Plaintiffs challenge the social media policy as a prior restraint." [DE 31 pg. 6].  Thus, Plaintiffs prior restraint claims should be dismissed with prejudice.

D.  The Social Media Policy is Neither Vague Nor Overbroad And Plaintiffs' Standing Is Not At Issue

Plaintiffs raise a standing argument in the section dedicated to "the social-media policy's [*sic*] being vague and overbroad," instead of conducting a legal analysis as to the alleged vagueness and overbreadth of the policy.  [DE 38, pg. 16].  In other words, Plaintiffs evade the actual issue completely.  To be clear, the County does not contest Plaintiffs' standing.  What the County argues in its Motion (and here) is that when the Social Media Policy is looked at in its entirety, instead of reading only the sections cherry-picked by Plaintiffs, the Social Media Policy is neither vague nor overbroad.  *See Sabatini v. Las Vegas Metro. Police Dep't*, 369 F. Supp. 3d 1066, 1096 (D. Nev. 2019), reconsideration denied, 217CV01012JADNJK, 2019 WL 3307040 (D. Nev. July 23, 2019) (finding that a social media policy similar, if not almost identical, to the one at issue in this case was neither vague nor overbroad*); see also Hernandez v. City of Phoenix*, CV-19-05365-PHX-MTL, 2020 WL 95438, at *13 (D. Ariz. Jan. 8, 2020) (finding that a social media policy, which prohibited officers from "using social media in a manner that would cause embarrassment to or discredit the Department in any way" was constitutional and neither vague nor overbroad).

Plaintiffs do not respond to the County's argument or to the fact that two separate federal courts have analyzed social media policies, similar to the one Plaintiffs take issue with here, and held the policies were constitutional and neither vague nor overbroad.  *Id*.  Instead, Plaintiffs make conclusory statements about vagueness and overbreadth while citing to cases that do not address social media policies.

## III.   **CONCLUSION**

Based on the arguments made in the Motion(s) to Dismiss [DE 11, 35] combined with the arguments made above, the County respectfully requests that this Court dismiss the Amended Complaint in its entirety and find that, as a matter of law, Plaintiffs' speech is not protected by the First Amendment because it was speech made as public employees on matters not of public concern; the County did not violate Plaintiffs' Freedom of Association rights because Plaintiffs' pled that they were disciplined for their posts, not their union participation; and the County's Social Media Policy is not a prior restraint on speech, and the Social Media Policy is not constitutionally infirm.

Dated:  April 6, 2020.

Respectfully submitted,

*/s/ Anaili Medina Cure            /*
Anaili M. Cure, Esquire
Assistant County Attorney
Florida Bar No. 119558
300 North Dixie Highway, Third Floor
West Palm Beach, Florida 33401
Tel.: (561) 355-6021; Fax: (561) 233-2720
Primary Email: acure@pbcgov.org
Secondary Email: dfishel@pbcgov.org
swebber@pbcgov.org

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on April 6, 2019, I electronically filed the foregoing with the

Clerk of Court by using the CM/ECF system, which will send an electronic notice to the authorized

CM/ECF filers.

<div align="right">

*<u>/s/ Anaili Medina Cure</u>                /*
Anaili M. Cure, Esquire
Assistant County Attorney
Florida Bar No. 119558
300 North Dixie Highway, Third Floor
West Palm Beach, Florida 33401
Tel.: (561) 355-6021; Fax: (561) 233-2720
Primary Email: acure@pbcgov.org
Secondary Email: dfishel@pbcgov.org
swebber@pbcgov.org

</div>

**DE 45**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-80701-CIV-DIMITROULEAS

AJ O'LAUGHLIN and CRYSTAL
LITTLE,

      Plaintiffs,

v.

PALM BEACH COUNTY, a political
Subdivision of the State of Florida,

      Defendant.

_____/

## ORDER GRANTING MOTION TO DISMISS

THIS MATTER comes before the Court on Defendant's Motion to Dismiss the Complaint [DE 35] ("Motion"). The Court has carefully considered the Motion, Plaintiffs' Response, and the Reply and is otherwise fully advised in the premises.

### I.   BACKGROUND

On January 3, 2020, the Court granted Defendant Palm Beach County's ("Defendant" or "the County") Motion to Dismiss. [DE 31]. Plaintiffs AJ O'Laughlin ("O'Lauglin") and Crystal Little (" Little") (collectively "Plaintiffs") then filed an Amended Complaint on January 23, 2020. Am. Compl. [DE 32]. In their Amended Complaint Plaintiffs seek injunctive relief under 42 U.S.C §1983, the First Amendment to the United States Constitution, and the Florida Constitution. Am. Compl. ¶ 1. Plaintiffs' Amended Complaint states a single general count which attempts to present both a facial and an as-applied challenge to the Social Media Policy at issue and unconstitutional as applied to Plaintiffs as a restriction on their speech or as a restriction of their freedom of association. Am. Compl. ¶ 23. In addition, the Amended Complaint characterizes the Social Media Policy is a prior restraint on speech. Am. Compl. ¶ 24.

On February 6, 2019, Plaintiff O'Laughlin made Facebook posts in an invite-only

Facebook page he maintained while campaigning for the presidency of Local 2928 of the

International Association of Fire Fighters. Am. Compl. ¶ 4, 8, 10. The posts concerned alleged,

attempted misuse of a Union Time Pool in November and December of 2018 by the union's First

Executive Vice President, Captain Jeffrey L. Newsome ("Newsome"). Am. Compl. ¶ 10, 13, 15.

UTP is a pool of paid-time-off hours donated by union members for union officers to use to take

time off to perform union duties. Am. Compl. ¶ 9.

Plaintiff O'Laughlin's Facebook posts alleged that Newsome was coordinating with the

Palm Beach County Fire and Rescue Department ("Fire Department") management to ensure he

had Thanksgiving and Christmas Day off with pay by using Union Pool Time ("UTP") on those

holidays. Am. Compl. ¶ 13, 14. The UTP allows officers to get paid their regular salaries for

doing union business on days that they would otherwise be scheduled to work. Compl. ¶ 9.

Plaintiff Little, a supporter of Plaintiff O'Laughlin's candidacy, commented on O'Laughlin's

post in support of its content. Compl. ¶ 14.

Plaintiffs were disciplined per the department's Social Media Policy for the content of

these posts and comment. Am. Compl. ¶ 22.

Defendant's Social Media Policy, attached to the Amended Complaint as Exhibits 1 and

2, [1] prohibits or discourages it employees from displaying or disseminating a number of types of

content, including "content that could reasonably be interpreted as having an adverse effect upon

Fire Rescue morale, discipline, operations, the safety of staff, or the perception of the public."

Am. Compl. Ex. 1 § 2(d); Am. Compl. ¶ 6. The policy also prohibits the posting of any

---

[1] The Court notes that Plaintiff attaches two versions of the Social Media Policy, one from April 17, 2016 and one from February 28, 2019. *See* [DE 32-1, 32-2]. The Court here relies on the most recent version of the Policy which Plaintiff quotes from in its Amended Complaint.

information individuals have access to as a result of their employment. Am. Compl. Ex. 1 § 2(j). Am. Compl. ¶ 7. The social media policy also dictates that when making social media posts, employees "shall conduct themselves with professionalism and in such a manner that shall not reflect negatively upon [the] agency or its mission." Am. Compl. Ex. 1 § 2(g).

Plaintiffs seek a judgment from the Court declaring that Defendant Palm Beach County is precluded from disciplining Captain AJ O'Laughlin and Captain Little and declaring that the Social Media Policy is an unconstitutional prior restraint and unconstitutionally vague and overbroad. Am. Compl. 11.

## II.   <u>LEGAL STANDARD</u>

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). Under Rule 12(b)(6), a motion to dismiss should be granted only if the plaintiff is unable to articulate "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (abrogating *Conley*, 355 U.S. at 41). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 556). The allegations of the claim must be taken as true and must be read to include any theory on which the plaintiff may recover. *See Linder v. Portocarrero*, 963 F. 2d 332, 334-36 (11th Cir. 1992) (citing *Robertson v. Johnston*, 376 F. 2d 43 (5th Cir. 1967)).

However, the court need not take allegations as true if they are merely "threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Iqbal*, 129 S.

Ct. at 1949. In sum, "a district court weighing a motion to dismiss asks 'not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *Twombly*, 550 U.S. at n. 8 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds, Davis v. Scherer*, 468 U.S. 183 (1984)).

## III.   <u>ANALYSIS</u>

### A.  *Freedom of Speech Claim*

Defendant moves to Dismiss Plaintiffs' freedom of speech claim on the grounds that Plaintiffs did not speak as citizens on a matter of public concern and the disclosure of the misuse of UTP were part of Plaintiffs' official duties. In response, Plaintiffs reallege that Captain O'Laughlin and Captain Little speech involved a matter of public concern, even though the Court addressed this in its first Order on Defendants' Motion to Dismiss. As such, Plaintiffs argue that its First Amendment claim should be permitted to go forward. Specifically, Plaintiff argues that speech that relates to union activity is per se a matter of public concern. See 414 F.3d 1313 (11th Cir.); 592 F.2d 770. For the reasons set forth below, the Court agrees that Plaintiffs freedom of speech claim as applied to Plaintiffs O'Laughlin and Little is due to be dismissed as they have not sufficiently alleged that the speech at issue related to a matter of public concern.

For a public employee to bring a speech claim under the First Amendment against an employer the employee must have spoken as a citizen on a matter of public concern. *See Garcetti v.* Ceballos, 547 U.S. 410 (2006); *Moss v. City of Pembroke Pines*, 782 F.3d 613, 618 (11th Cir. 2015) (noting that the "first threshold requirement" of such a claim is whether a plaintiff was speaking as a citizen on a matter of public concern). Whether a statement is a matter of public concern is a determination made based on the content, form and context of the speech. *See Moss*, 782 F.3d at 621. In evaluating the content, form, and context, Court's look at 1) "whether the

'main thrust' of the speech in question is essentially public in nature or private," 2) "whether the speech was communicated to the public at large or privately to an individual" and 3) "what the speaker's motivation was." *See Mitchell v. Hillsborough County*, 468 F.3d 1276, 1283 (11th Cir. 2006) (citations omitted). Considering these factors, the Court again finds that Plaintiffs fail to allege facts sufficient to demonstrate that the speech at issue addressed a matter of public concern.

Here, the content of the speech addressed the potential misuse of a Union Time Pool, an internal, union-specific, paid-time-off sharing mechanism. The speech did not address misuse of public dollars or the Fire Department's budgeting priorities. *Cf Kurtz v. Vickrey*, 855 F.2d 723, 730 (11th Cir. 1988) (determining that memoranda that otherwise addressed personal personnel matters, related to issues of public concern when they discussed the spending priorities of a public university and the potential misuse of public dollars). Importantly, unlike the cases cited by Plaintiffs, Plaintiffs' speech did not regard union organizing, union membership, or retaliation against union members. *Cf Cook v. Gwinnett Cty. Sch. Dist.*, 414 F.3d 1313, 1319 (11th Cir. 2005) (stating the issue of "union organization" is often considered a matter of public concern when evaluating the speech of a union president who was recruiting co-workers to join a union to improve working conditions for herself and her co-workers); *Porter v. Califano*, 592 F.2d 770, 779 (5th Cir. 1979) (noting that statements regarding alleged corruption and termination of a union leader who had also spoken out about corruption would be matters of public concern). Rather the statements, made during Plaintiff O'Laughlin's campaign, focused on differentiating O'Laughlin's promised behavior from the alleged indiscretion of Newsome. *See* Am. Compl. ¶ 13 ("When elected this will stop…Transparency is my campaign. So you will see the truth").

The context of Plaintiffs' speech also supports a finding that Plaintiffs' were not speaking on a matter of public concern. The allegations in the complaint suggest Plaintiffs were motivated to speak by personal interests in electing Plaintiff O'Laughlin to a union leadership position. Plaintiffs' statements were made months after the potentially inappropriate use of UTP was canceled, as in Newsome never successfully used UTP to take Thanksgiving and Christmas off. *See* Am. Compl. ¶¶ 11, 12. Such statements, made months after the alleged issues had been resolved suggest that the statements were made to serve personal interests. *See Deremo,* 939 F.2d 908, 912 (11th Cir. 1991) (finding that a time gap between the resolution of alleged sexual harassment and the statements at issue in the case helped establish a context that overcame the presumption that wrongful conduct of a public official is typically a matter of public concern). In addition, rather than being communicated to a public at large, Plaintiffs' statements were made in the form of posts and a comment in a private Facebook group built to support Plaintiff O'Laughlin's union election campaign.

Based on the foregoing the Court, again, finds that speech at issue in the complaint was not in regard to a matter of public concern.

B.  *Freedom of Association Claim*

Plaintiffs allege in the alternative that Defendant's enforcement of the Social Media Policy against Plaintiffs O'Laughlin and Little, unconstitutionally infringed on their freedom of association under the First Amendment.

Defendant argues that Plaintiffs' freedom of association claim fails because the claim relates to speech that is not protected because it was not made as citizens on a matter of public concern. Defendant contends that this case is about an "internal power struggle" and Plaintiffs' speech, not protected associational conduct such as union membership or organizing. Further,

Defendant notes that Plaintiffs have not properly alleged causation between any associational activity and Defendant's disciplinary action.

The First Amendment's freedom of association protection covers two types of association: "association involving 'intimate human relationships' and association to engage 'in those activities protected by the First Amendment.'" *Cottrell v. Chickasaw City Sch. Bd. of Educ.*, 307 F. Supp. 3d 1264, 1281–82 (S.D. Ala. 2018), *appeal dismissed*, No. 18-10893-AA, 2019 WL 1209637 (11th Cir. Jan. 28, 2019) (citing *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984)). The right of intimate association concerns personal relationships, often those inherent to a family structure. *See McCabe v. Sharrett*, 12 F.3d 1558, 1563 (11th Cir. 1994) (stating that "[a]t a minimum, the right of intimate association encompasses the personal relationships that attend the creation and sustenance of a family"). The right of expressive association concerns associational conduct which related to other rights protected under the First Amendment such as "speech, assembly, petition for redress of grievances, and the exercise of religion." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984).

The First Amendment's protection of the freedom of association extends to public employees' freedom to engage in associational conduct, including union membership. *See Cook v. Gwinnett Cty. Sch. Dist.*, 414 F.3d 1313, 1320 (11th Cir. 2005). In the Eleventh Circuit, courts addressing freedom of association claims do not require that the associational conduct be related to a matter of public concern. *Cochran v. City of Atlanta*, 150 F. Supp. 3d 1305, 1319 (N.D. Ga. 2015) (citing *Cook v. Gwinnett Cty. Sch. Dist.*, 414 F.3d 1313, 1320 (11th Cir. 2005)); *Local 491, Int'l Bhd. of Police Officers v. Gwinnett Cty., GA*, 510 F. Supp. 2d 1271, 1288 (N.D. Ga. 2007).

However, Plaintiff has not sufficiently alleged associational conduct upon which the Defendant has infringed. Plaintiffs conclude Defendant infringed on their right to freedom of association by interfering with their participation in a union election. *See* Am. Compl. ¶ 23. Plaintiffs further allege that by disciplining Plaintiffs for their posts on Captain O'Laughlin's union campaign Facebook page Defendant "intruded on [Plaintiffs] freedom-of-association rights by weaponizing the Social Media Policy in favor of Capt. Newsome and other 2928 incumbents." The factual allegations in the Amended Complaint, however, do not support these conclusions. Plaintiffs allege they made Facebook posts in a private, union-election-campaign Facebook page; Captain Newsome filed a complaint stating that the posts violated the Social Media Policy; and finally, that Defendant disciplined them "for violating its Social Media Policy based on the contents of the [Facebook] posts." *See* Am. Compl. 3. From these scant allegations, the Court cannot draw a reasonable inference that Defendant is liable for intruding on Plaintiffs' right to freedom of association.

### C. Facial Challenge

#### i. *Plaintiffs' Claim that the Policy is Unconstitutionally Overbroad and Vague*

"It is well established that in the area of freedom of expression an overbroad regulation may be subject to facial review and invalidation, even though its application in the case under consideration may be constitutionally unobjectionable." *Forsyth Cty., Ga. v. Nationalist Movement*, 505 U.S. 123, 129 (1992). In addition to challenging the validity of the Social Media Policy as enforced against Plaintiffs O'Laughlin and Little, Plaintiffs bring a facial challenge seeking to invalidate the Social Media Policy as unconstitutionally overbroad and vague. *See* Am. Compl. 11. Specifically, Plaintiffs take issue with the policy's prohibition of speech that

may "undermine the public trust and confidence required by employees of Fire Rescue" or that may "reflect negatively upon [the] agency or its mission". *See* Am. Compl. 11.

Defendant argues that the Social Media Policy is not unconstitutionally overbroad or vague when taken as a whole. In particular, Defendants note that § 2(d) of the policy includes an enumeration of exemplar forms of prohibited content which Defendant claims narrow the scope of the Social Media Policy. Finally, Defendant asks that the Court find that there is a close, rational relationship between the Social Media Policy and the County's interest in preserving the public's trust in its firefighters.

"A facial challenge to a public-employer's policy that creates a prospective restriction on speech is similar to a retaliation claim, but it assesses the policy's impact on all prohibited employee speech rather than merely the plaintiff's interest in the specific speech that resulted in his discipline." *Sabatini v. Las Vegas Metro. Police Dep't*, 369 F. Supp. 3d 1066, 1095 (D. Nev. 2019), *reconsideration denied*, No. 217CV01012JADNJK, 2019 WL 3307040 (D. Nev. July 23, 2019). The threshold question in cases addressing policies that set forth parameters for public employee speech remains whether the Department's policy regulates employees' rights to speak on matters of public concern. *See Liverman v. City of Petersburg*, 844 F.3d 400, 407 (4th Cir. 2016) If the regulation covers speech that involves a matter of public concern, the government bears the burden of showing "that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *See Liverman v. City of Petersburg*, 844 F.3d 400, 407 (4th Cir. 2016) (citing *United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 466 (1995)).

Here, Plaintiffs have sufficiently alleged that the Social Media Policy regulates employees' rights to speak on matters of public concern. As Plaintiffs note, § 2(d) Social Media Policy prohibits employees "from disseminating content that is inconsistent with the duties, conduct, and responsibilities of a Fire Rescue employee including content that could be reasonably interpreted as having an adverse effect upon Fire Rescue morale, discipline, operations, the safety of staff, or perception of the public." *See* [DE 32-2] § 2(d). Section 2(g) states employees "shall conduct themselves with professionalism and in such a manner that shall not reflect negatively upon this agency and its mission." *See* [DE 32-2] § 2(g). Section 2(k) states employees "shall not post, transmit, or otherwise disseminate any information…to which they have access as a result of their employment without written permission from the Fire Rescue Administrator or designee." *See* [DE 32-2] § 2(k). These provisions taken together could be read to prohibit most speech critical of the government employer. Such a restraint would likely restrict an employee's right to speak on a matter of public concern. *See, e.g. Liverman v. City of Petersburg,* 844 F.3d 400, 407 (4th Cir. 2016). From these provisions the Court can reasonably infer that the Social Media Policy would restrict or chill potential speech that is a matter of public concern.

Section 2(d) does contain an explanatory phrase, stating "[f]or example, unprofessional, unbecoming, illegal, unethical, sexual, violent, harassing, racist, sexist, or ethnically derogatory comments, pictures, artwork, videos, material or other such references all tend to undermine the public trust and confidence required by employees of the Fire Rescue." However, even if read to limit the scope of § 2(d), this example of speech that tends to undermine the public trust may not limit the Social Media Policy's proscription of speech when considering the policy as a whole.

    ii.   *Plaintiffs' Claim that the Policy is a Prior Restraint*

Plaintiffs construe the Social Media Policy as a "prior restraint" on free speech and claim that they are challenging the policy and an unconstitutional prior restraint on free speech. The Social Media Policy at issue, however, is not a prior restraint on speech such that it would implicate precedent applicable to archetypical prior restraints like judicial orders and licensing schemas.

The phrase "prior restraint" is a term of art used "to describe administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur." *See Alexander v. United States*, 509 U.S. 544, 550 (1993). While policies that prohibit government employees from engaging in certain types of speech and prescribe post hoc punishment for specified speech are prospective restrictions on speech, these policies are distinct from archetypical "prior restraints" on speech. *See, e.g. United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 468 (1995) (analyzing a statute banning federal employees from accepting any honorarium as a ban that "chills potential speech before it happens" without ever describing it as a "prior restraint").

In *Moonin v. Tice*, the Ninth Circuit addressed the potential confusion between "prior restraints" and policies or regulations which serve as prospective restrictions on speech by prohibiting certain forms of speech. *See Moonin v. Tice*, 868 F.3d 853, 857 n. 1 (9th Cir. 2017). The Ninth Circuit noted that courts have often used the shorthand "prior restraint" to refer to prospective restrictions in order to differentiate such claims from retaliation claims brought after an employee has been punished for violating a speech-related policy, without intending to invoke precedent from cases addressing "archetypical prior restraints." The Moonin court acknowledged that the term "'prior restraint,'...conjures up a long line of cases in which we have held that such restraints are almost never permissible." *Id.* The Moonin court clarified that "claim[s]

concern[ing] a policy restricting employee speech, [are] analytically distinct from claims involving archetypical prior restraints, like government licensing requirements affecting only citizen speech or judicial orders forbidding certain speech by private parties." *Id.* (citing *Alexander v. United States*, 509 U.S. 544, 550 (1993); *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992); *Near v. Minnesota*, 283 U.S. 697, 713 (1931).

The Court is uncertain whether Plaintiffs intended to invoke precedent addressing "archetypical prior restraints." In its Response to Defendant's Motion to Dismiss, Plaintiff repeatedly invokes *United States v. National Treasury Employees Union*, which analyzed a statue that banned federal employees from accepting any honorarium. *See United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 469 (1995). *National Treasury Employees Union*, however, does not address a "prior restraint" as that term is used to identify restraints such as injunctions and licensing or pre-approval schemas. Notably, the United States Supreme Court never uses the phrase "prior restraint" in *National Treasury Employees Union*. *Id.* Instead the Supreme Court described the ban at issues as a statute that "chills potential speech before it happens." *See United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 468 (1995). However, Plaintiff also cites to *Alexander v. United States* in a way that implies it regards the Social Media Policy as and archetypical "prior restraint."

As the Parties spent significant portions of their briefs discussing whether the Social Media Policy at issue is a "prior restraint," the Court takes this time to clarify that the Social Media Policy is not a "prior restraint" as that term is used to describe "archetypical prior restraints" such as administrative and judicial ***orders*** forbidding specific communications. *See Moonin v. Tice*, 868 F.3d at 857 n. 1 (citing *Alexander v. United States*, 509 U.S. 544, 550 (1993)) (emphasis added).

IV.  <u>**CONCLUSION**</u>

The Court, accepting all well-pleaded facts as true, determines that Plaintiffs fail to challenge the constitutionality of the Social Media Policy as it was applied to and enforced against Plaintiffs O'Laughlin and Little. Plaintiffs also fail to state a freedom of association claim. As such, Plaintiffs' as-applied challenge to the Social Media Policy is due to be dismissed. Defendant's Motion to Dismiss as to Plaintiffs' facial challenge is denied for the reasons stated above.

Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1.  Defendant's Motion to Dismiss [DE 35] is hereby **DENIED in part.**

2.  Plaintiff's as-applied challenge to Defendant's Social Media Policy is **DISMISSED**.

3.  Defendant shall file its Answer to Plaintiff's Amended Complaint within fourteen (14) days.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida this 6th day of July, 2020.

WILLIAM P. DIMITROULEAS
United States District Judge

Copies furnished to:

All counsel of record

## Certificate of Service

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was filed and served electronically to Helene C. Hvizd and Anaili Cure, Attorneys for Appellee,  hhvizd@pbcgov.org;  acure@pbcgov.org; ldennis@pbcgov.org; webber@pbcgov.org; Palm Beach County Attorney's Office, 301 N. Olive Avenue, Suite 601, West Palm Beach, Florida 33401.

Respectfully Submitted,

*/s/ Karen Coolman Amlong*
KAREN COOLMAN AMLONG
Florida Bar Number 275565
KAmlong@TheAmlongFirm.com
THE AMLONG FIRM
500 NE Fourth St., Second Floor
Fort Lauderdale, FL  33301
Telephone (954) 462-1983
Facsimile (954) 523-3192
*Attorneys for the Appellants*,
    *AJ O'Laughlin and Crystal Little*

\\amlong3\cpshare\CPWin\HISTORY\210325_0001\1829.40

IN THE UNITED STATES COURT OF APPEALS
ELEVENTH CIRCUIT

11th Cir. No. 20-14676-HH

AJ O'LAUGHLIN and
CRYSTAL LITTLE,

     Appellants,

vs.

PALM BEACH COUNTY, a political
subdivision of the State of Florida,

     Appellee.

_____/

## Appendix to Appellants' Initial Brief

(Volume 2)

KAREN COOLMAN AMLONG
Florida Bar Number 275565
KAmlong@TheAmlongFirm.com
THE AMLONG FIRM
500 NE Fourth St., Second Floor
Fort Lauderdale, FL  33301
Telephone (954) 462-1983
Facsimile (954) 523-3192
***Attorneys for the Appellants***,
    ***AJ O'Laughlin and Crystal Little***

## Index to Appendix

**Description**                                                                **DE  No.**

Index  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I

**[Volume 1]**

Docket Sheet  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Docket

Notice of  Removal   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Defendant's Motion to Dismiss the Complaint  . . . . . . . . . . . . . . . . . . . . . . . . 11

Plaintiffs' Response to Defendant's Motion to Dismiss the Complaint  . . . . . . . 14

Defendant's Reply in Support of Its Motion to Dismiss  . . . . . . . . . . . . . . . . . . 30

Order Granting Motion to Dismiss  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

First Amended Complaint  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Defendant's Motion to Dismiss the Amended Complaint  . . . . . . . . . . . . . . . . . 35

Plaintiff's Response to Defendant's Motion to Dismiss the Amended

    Complaint  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Defendant's Reply in Support of its Motion to Dismiss Plaintiffs' Amended

    Complaint  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Order Granting Motion to Dismiss  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

**[Volume 2]**

Palm Beach County's Answer and Affirmative Defenses  . . . . . . . . . . . . . . . . . 46

Plaintiffs' Motion for Summary Judgment  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Plaintiffs' Local 51.6(a) Statement of Material Facts  . . . . . . . . . . . . . . . . . . . . 48

Defendant's Motion for Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Defendant's Statement of Material Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

**[Volume 3]**

Defendants' Response in Opposition to Plaintiffs' Motion

for Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Defendant's Response Plaintiffs' Local 51.6(a) Statement of Material Facts . . . . 52

Plaintiffs' Local Rule 51.6(a)(2) Response to Defendant's Statement of Undisputed

Material Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Plaintiffs' Response to Defendant's Motion for Summary Judgment . . . . . . . . . 54

Defendant's Reply in Support of its Motion for Summary Judgment . . . . . . . . 55

Defendant's Reply to Plaintiffs' Local Rule 51.6(a)(2) Response to Defendant's

Statement of Undisputed Material Facts . . . . . . . . . . . . . . . . . . . . . . . . 56

Plaintiffs' Reply to Defendant's Response to Plaintiff's Motion for Summary

Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Order Granting Defendant's Motion for Summary Judgment . . . . . . . . . . . . . 76

Final Judgment and Order Closing Case . . . . . . . . . . . . . . . . . . . . . . . . 77

DE 46

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 19-80701-CIV-DIMITROULEAS/MATTHEWMAN**

AJ O'LAUGHLIN and CRYSTAL LITTLE,
        Plaintiffs,
v.

PALM BEACH COUNTY, a political
Subdivision of the State of Florida,
        Defendant.
_____/

**PALM BEACH COUNTY'S ANSWER AND AFFIRMATIVE DEFENSES TO**
**PLAINTIFF'S FIRST AMENDED COMPLAINT**

Defendant, PALM BEACH COUNTY (the "County"), hereby Answers and asserts

Affirmative Defenses to Plaintiffs, AJ O'LAUGHLIN and CRYSTAL LITTLE'S (collectively

"Plaintiffs"), First Amended Complaint ("Amended Complaint").  The County Answers the

Amended Complaint in correspondingly numbered paragraphs and states:

1.        The County admits that (1) Plaintiffs are two Captains within the Palm Beach

County Fire Rescue Department ("Fire Rescue"); (2) the County disciplined Plaintiffs for violating

Fire Rescue's Social Media Policy based on the content of Plaintiffs' Facebook posts; and (3)

Plaintiffs purport to bring an action pursuant to 42 U.S.C. § 1983, but denies Plaintiffs are entitled

to the relief requested and denies the remaining allegations contained in Paragraph 1.

**JURISDICTION AND VENUE**

2.        The County admits Plaintiffs purport to bring an action for declaratory and other

relief pursuant to 42 U.S.C. § 1983, but denies Plaintiffs are entitled to the relief requested.  The

County admits this Court has jurisdiction over this case.

3.        Admitted.

1

## <u>GENERAL ALLEGATIONS</u>

4.      Denied in its entirety, including subparts (a)-(b) of Paragraph 4.

5.      Admitted that on April 17, 2016, Fire Rescue issued PPM # FR-A-404 titled Use of Social Media (the "Social Media Policy"), which was amended on February 28, 2019.

6.      The County asserts that the Social Media Policy speaks for itself and should be read in its entirety.

7.      The County asserts that the Social Media Policy speaks for itself and should be read in its entirety.

8.      The County is without sufficient knowledge to either affirm or deny the allegations in Paragraph 8, and therefore denies them.

9.      Admitted

10.     The County admits that O'Laughlin posted on Facebook a screen shot of a computerized scheduling program on February 6, 2019.  The County denies the remaining allegations in Paragraph 10.

11.     The County is without sufficient knowledge to either affirm or deny the allegations in Paragraph 11, and therefore denies them.

12.     The County is without sufficient knowledge to either affirm or deny the allegations in Paragraph 12, and therefore denies them.

13.     Admitted, but the County asserts that the postings speak for themselves.  The County filed the postings as Exhibit A to the County's Motion to Dismiss the Amended Complaint [DE 35-1].

14.     Admitted that Little was, at one time prior to February 2019, in charge of the Fire Rescue staffing function and that she posted on Facebook in response to O'Laughlin's postings,

but the County asserts that Little's posting speaks for itself.  The County filed the posting as Exhibit A to the County's Motion to Dismiss the Amended Complaint [DE 35-1].  The County is without sufficient knowledge to either affirm or deny the remaining allegations in Paragraph 14, and therefore denies them.

15.     Denied in its entirety, including subparts (a)-(b) of Paragraph 15.

16.     Admitted that Jeffrey Newsome made an internal complaint in reference to the Facebooks posts.  The County asserts Newsome's internal complaint speaks for itself.  The County filed Newsome's internal complaint as Exhibit A to the County's Motion to Dismiss the Amended Complaint [DE 35-1].

17.     The County asserts Newsome's internal complaint speaks for itself.  The County filed Newsome's internal complaint as Exhibit A to the County's Motion to Dismiss the Amended Complaint [DE 35-1].

18.     The County asserts Newsome's internal complaint speaks for itself.  The County filed Newsome's internal complaint as Exhibit A to the County's Motion to Dismiss the Amended Complaint [DE 35-1].

19.     Denied in its entirety, including subparts (a)-(c) of Paragraph 19.

20.     Denied.

21.     Admitted that Fire Rescue began disciplinary procedures against O'Laughlin and Little for the content of their Facebook postings.

22.     Admitted that Fire Rescue follows progressive discipline procedures.  The County is without sufficient knowledge to either affirm or deny the remaining allegations in Paragraph 22, and therefore denies them.

23.     Denied in its entirety, including subparts (a)-(b) and sub-subparts (b)(i)-(ii) of

Paragraph 23.

24.     Denied in its entirety, including subparts (a)-(c) and sub-subparts (c)(i)-(ii) of Paragraph 24.

25.     Denied.

The County denies that Plaintiffs are entitled to any of the relief sought in Plaintiffs' wherefore clause.

**WHEREFORE**, the COUNTY denies that the Social Media Policy is unconstitutionally vague and overbroad (the only issue remaining in this case per this Court's Order on the County's Motion to Dismiss [DE 45]), and denies that Plaintiffs are entitled to any relief in the Amended Complaint.  The County requests attorneys' fees, taxable costs, and any and all other relief the Court deems just and proper.

All allegations not expressly admitted above are hereby denied.

## <u>AFFIRMATIVE DEFENSES</u>

In light of this Court's Order on the County's Motion to Dismiss Plaintiffs' First Amended Complaint [DE 45], the County asserts affirmative defenses only as to Plaintiffs' facial challenge to the Social Media Policy, as that is the only issue remaining in this case.

## <u>FIRST AFFIRMATIVE DEFENSE</u>

The Complaint fails to state a claim upon which relief can be granted.

## <u>SECOND AFFIRMATIVE DEFENSE</u>

The Social Media Policy is neither vague nor overbroad as to infringe on constitutionally protected speech.

## THIRD AFFIRMATIVE DEFENSE

Even if the Social Media Policy is deemed to infringe on constitutionally protected speech, which it does not, the governmental interests of the County (and specifically Fire Rescue) outweigh any potential impact the Social Media Policy might have on Fire Rescue employees.

## FOURTH AFFIRMATIVE DEFENSE

Fire Rescue did not implement an unconstitutional custom, practice, or policy.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiffs' rights under the First Amendment are limited by the scope of their employment.

## SIXTH AFFIRMATIVE DEFENSE

At all times mentioned in Plaintiffs' Amended Complaint, the County acted on a good faith belief that its actions were legally justifiable.

The County reserves the right to amend these affirmative defenses.

WHEREFORE, the County demands judgment on its Affirmative Defenses; denies that Plaintiffs are entitled to any relief of any nature whatsoever as set forth in Plaintiffs' prayer for relief in the Amended Complaint, and demands strict proof thereof; demands reasonable attorney's fees and costs; demands prevailing party taxable costs; and reserves the right to amend this answer and affirmative defenses.

*This space intentionally left blank*

5

Dated:  July 20, 2020.

Respectfully submitted,

*/s/ Anaili Medina Cure                    /*
Anaili M. Cure, Esquire
Assistant County Attorney
Florida Bar No. 119558
300 North Dixie Highway, Third Floor
West Palm Beach, Florida 33401
Tel.: (561) 355-6021; Fax: (561) 233-2720
Primary Email: acure@pbcgov.org
Secondary Email: dfishel@pbcgov.org
swebber@pbcgov.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 20, 2020, I electronically filed the foregoing with the

Clerk of Court by using the CM/ECF system, which will send an electronic notice to the authorized

CM/ECF filers.

*/s/ Anaili Medina Cure                    /*
Anaili M. Cure, Esquire
Assistant County Attorney
Florida Bar No. 119558
300 North Dixie Highway, Third Floor
West Palm Beach, Florida 33401
Tel.: (561) 355-6021; Fax: (561) 233-2720
Primary Email: acure@pbcgov.org
Secondary Email: dfishel@pbcgov.org
swebber@pbcgov.org

6

**DE 47**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 19-80701-CIV-DIMITROULEAS

AJ O'LAUGHLIN and CRYSTAL LITTLE,

     Plaintiffs,

vs.

PALM BEACH COUNTY, a political
subdivision of the State of Florida,

     Defendant.

_____/

### Plaintiffs' Motion for Summary Judgment on Facial Unconstitutionality of Palm Beach County Fire Rescue Department's Social Medica Policy and Incorporated Memorandum of Law

Plaintiffs, AJ O'laughlin and Crystal Little move, pursuant to Federal Rule of Civil Procedure 56 for summary judgment against Palm Beach County on the issue that the social media policy promulgated by the County's Fire Rescue Department is facially unconstitutional.

### Introduction and Summary

Plaintiffs, AJ O'Laughlin and Crystal Little, are captains in Palm Beach County's Fire Rescue Department ("PBCFR").[1]  Both have been disciplined for

---

[1] See Plaintiffs' Local Rule 51.6(a) Statement of Material Facts in Support of Summary judgment.

**The Amlong Firm** • 500 Northeast Fourth Street • Fort Lauderdale, FL 33301 • 954.462.1983

statements made on Captain O'Laughlin's invitation-only Facebook page.[2]

Id.  The comments were posted as part of Captain O'Laughlin's campaign to become president of the Professional Firefighters/Paramedics of Palm Beach County, Local 2928, International Association of Fire Fighters (IAFF).  The comments accused Local 2928's first executive vice president of attempting, with help from management, to misapply for his personal use time donated by union members to subsidize Local 2928's officers' taking time off to do union business.

PBCFR had on or about February 6, 2019, re-issued a policy addressed to "Use of Social Media," which policy was appended (as it was amended February 28) to the First Amended Complaint as Attachment 2.[3]  In its regulations on "personal use," the policy:

**One**, warns against "discredit[ing] … the agency," Procedure 1(a),[4] and

**Two**, cautions against "[w]hile . . . off-duty . . .disseminating content that is inconsistent with the duties, conduct, and responsibilities of a Fire Rescue employee, including content that could reasonably be interpreted as

---

[2]Id. at ¶ 2.

[3]DE 32, at 4, ¶ 5, and DE 32-2.

[4]DE 32, at 4, ¶ 6(a), and DE 32-2, at 2.

having an adverse effect upon . . . [the] perception of the public. . . ."[5]

Procedure 2(d), which lists as "examples,"

- material that might "tend to undermine the public trust and

confidence required by employees of Fire Rescue," Procedure 2(d)(I),[6] and

- "any posting that may adversely reflect on Fire Rescue...."

Procedure 2(j).[7]

## Applicable Legal Standards

## Concerning summary judgment

As stated simply in <u>Reeves v. C.H. Robinson Worldwide, Inc.</u>, 594 F.3d

798 (11th Cir. 2010) (en banc):

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue of fact is material if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. It is genuine if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." <u>Allen v. Tyson Foods, Inc.</u>, 121 F.3d 642, 646 (11th Cir. 1997) (citations and quotation marks omitted). We construe the evidence in a light most favorable to the non-moving party.

<u>Id</u>. at 807.

---

[5]DE 32, at 4, ¶ 6(b), and DE 32-2, at 3.

[6]DE 32, at 4, ¶ 6(c), and DE 32-2, at 3.

[7]DE 32, at 4, ¶ 6(d), and DE 32-2, at 4-5.

**Concerning social-media policies**

"A facial challenge to a public-employer's policy that creates a prospective restriction on speech is similar to a retaliation claim, but it assesses the policy's impact on all prohibited employee speech rather than merely the plaintiff's interest in the specific speech that resulted in his discipline."  Sabatini v. Las Vegas Metro. Police Dep't, 369 F.Supp 3d 1066, 1095 (D. Nev. 2019).

The Eleventh Circuit historically has shown deference to such paramilitary units as police and fire departments when it comes to restrictions on employee's off-duty behavior. See, e.g., Starling v Board of County Com'rs, 602 F.3d 1257, 1261 (11th Cir 2010) ("In the 'quasi-military' context, which includes both fire departments and police stations, . . . we have afforded public employers greater latitude to burden an employee's rights, particularly when the exercise of that right impacts discipline, morale, harmony, uniformity, and trust in the ranks" (citations omitted)).

That has not necessarily held true, however, when the topics of the off-duty speech include matters of public concern — such as fire safety. See, e.g., Anderson v. Burke County, 239 F.3d 1216 (11th Cir. 2001) (although questionnaire sent to political candidates by union president addressed a number of issues that were routine job-related issues rather than public concerns, the questionnaire constituted protected speech

because it also "address[ed] concerns about alleged understaffing in the 911 system and of engine companies, physical fitness standards required for certain employees, and public tax consequences of high employee turnovers"); Beckwith v. City of Daytona Beach Shores, 58 F.3d 1554 (11th Cir. 1995) (remanding for entry of a judgment as a matter of law in favor of a fire chief who was terminated because he

> publicly opposed budget-cutting proposals advanced by Mayor Large at a city council meeting[; . . . expressed particular concern about a proposal to discontinue the City's paramedic program[, which h]e considered . . . dangerous to the City's citizens, visitors, and his own employees[; . . .] began mobilizing public opinion by discussing the proposed paramedic cut with citizens, most notably the ex-mayor[, and . . .] urged the people with whom he spoke to attend the next city council meeting in order to oppose or support the proposed cuts."

Id. at 1556-57).

As the Beckwith court observed,

> Few subjects are of more public concern to the average citizen than the provision of basic fire and rescue services. It is hard to imagine any combination of government interests sufficient to outweigh Appellant's strong interest in informing the public about policies he believed were dangerous to the City's citizens.

58 F.3d at 1564.

Additionally, when it comes to a government agency policing what its employees may say — but have not yet said — the First Amendment demands a stricter scrutiny because "unlike an adverse action taken in response to actual speech, this [sort of] ban chills potential speech before it happens." United States v. National Treasury Employees Union, 513 U.S.

454, 468 (1995) ("NTEU") (striking as unconstitutionally overbroad a provision in the Ethics Reform Act of 1989 that forbade rank-and-file federal employees to accept "any honorarium while that individual is [an] employee" for any appearance, writing or presentation).

> [T]he Government's burden is greater with respect to this statutory restriction on expression than with respect to an isolated disciplinary action. The Government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's "necessary impact on the actual operation" of the Government.

Id., quoting Pickering v. Board of Education, 391 U.S. 563, 571 (1968).

A district court in Michigan, in relying on NTEU to declare unconstitutional an ordinance similar to the PBCFR's social-media guidelines, quoted the passage cited above and characterized the NTEU standard as "particularly onerous to the government employer...." Inter. Ass'n of Firefighters v. Frenchtown Charter, 246 F. Supp. 2d 734, 740 (E.D. Mich. 2003); see also Kessler v. City of Providence, 167 F.Supp.2d 482, 485–86 (D.R.I. 2001) ("absent a showing by the Defendants that they have a substantial interest in such a sweeping ban on their employees' speech, the Police Rules must be struck down as violative of the First Amendment.[8]

---

[8]Although plaintiffs realize that this is not an archetypical prior-restraint case, various courts have applied the logic of NTEU to cases in which they have characterized behavior similar to that of PBCFR as prior-restraint. See, e.g., Moonin v. Tice, 868 F.3d 853, 868 (9th Cir. 2017) (denying state-police major qualified immunity in prior-restraint case

(continued...)

Another court of appeals, meanwhile, addressing through the prism of

NTEU a police department's social-networking policy similar to the one that

PBCFR has in place,[9] opened its opinion by stating "[w]hile we are sensitive

---

[8](...continued)

because, post-NTEU, he was "clearly on notice that a policy precluding all sorts of speech by officers, to whomever communicated, about the K9 program was subject to limits imposed by the First Amendment"); Milwaukee Police Ass'n v. Jones, 192 F.3d 742, 750 (7th Cir. 1999) ("This test recognizes the government's interest when acting as an employer in the efficiency of its workplace, while also acknowledging the greater risk posed to expression by a ban on speech"); Firenze v. Nat'l Labor Relations Bd., 993 F. Supp. 2d 40, 54 (D. Mass. 2014) ("Prior restraints of speech bear a heavier presumption of unconstitutionality because by chilling potential speech, they tend to be both overinclusive and underinclusive and therefore are disfavored").

[9]Two paragraphs from the Liverman social-media policy read as follows:

The central provision of the policy, which we will refer to as the Negative Comments Provision, states:

Negative comments on the internal operations of the Bureau, or specific conduct of supervisors or peers that impacts the public's perception of the department is not protected by the First Amendment free speech clause, in accordance with established case law.

J.A. 162. Another provision, which we label the Public Concern Provision, specifies:

Officers may comment on issues of general or public concern (as opposed to personal grievances) so long as the comments do not disrupt the workforce, interfere with important working relationships or efficient work flow, or undermine public confidence in the officer. The instances must be judged on a case-by-case basis.

(continued...)

to the Department's need for discipline throughout the chain of command, the policy here and the disciplinary actions taken pursuant to it would, if upheld, lead to an utter lack of transparency in law enforcement operations that the First Amendment cannot countenance." Liverman v. City of Petersburg, 844 F.3d 400 (4th Cir. 2016).  The Liverman court held that "the Department's social networking policy was unconstitutional and that the disciplinary measures taken against plaintiffs pursuant to that policy were likewise impermissible," 844 F.3d at 414.

**Concerning the social-media policy's being vague and overbroad**

"To overcome a vagueness challenge, statutes must 'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly,' and 'must provide explicit standards for those who apply them.'"  Leib v. Hillsborough County Public Transportation Commission, 558 F.3d 1301, 1310 (11th Cir. 2009), quoting Grayned v. City of Rockford, 408 U.S. 104, 108 (1972).

"A statute is facially overbroad if it prohibits a substantial amount of protected speech 'relative to the statute's plainly legitimate sweep.'" United States v. Williams, 553 U.S. 285, 282 (2008).

As the Court of Appeals for the Eleventh Circuit stated in Weaver v. Bonner, 309 F.3d 1312, 1318-19 (11th Cir 2002):

---

[9](...continued)
844 F.3d at 404.

The First Amendment provides that "Congress shall make no law
. . . abridging the freedom of speech. . . ." U.S. Const. amend. I. This
prohibition on laws abridging the freedom of speech has been
incorporated into the Fourteenth Amendment so that it also applies to
state governments. An overbreadth challenge is based on a statute's
"possible direct and indirect burdens on speech." <u>United States v.
Acheson</u>, 195 F.3d 645, 650 (11th Cir. 1999) (quoting <u>Am. Booksellers
v. Webb</u>, 919 F.2d 1493, 1499-1500 (11th Cir. 1990)). The
overbreadth doctrine "permits the facial invalidation of laws that inhibit
the exercise of First Amendment rights if the impermissible
applications of the law are substantial when `judged in relation to the
statute's plainly legitimate sweep.'" <u>City of Chicago v. Morales</u>, 527
U.S. 41, 52 (1999) (quoting <u>Broadrick v. Oklahoma</u>, 413 U.S. 601,
612-15 (1973)). ***The doctrine is designed to protect "the public
from the chilling effect such a statute has on protected speech;
the court will strike down the statute even though the
governmental entity enforced the statute against those
engaged in unprotected activities."*** <u>Acheson</u>, 195 F.3d at 650
(quoting <u>Nationalist Movement v. City of Cumming</u>, 934 F.2d 1482,
1485 (11th Cir. 1991) (Tjoflat, J., dissenting))")

(Emphasis supplied; parallel citations omitted).

### Applying the Law to the Facts in the Case at Bar

Fire fighters using social media can be expected to talk about fire

fighting, both in private conversations and those open to a broader

audience. Discussions about such matters as those that union president in

<u>Anderson</u> was including in a survey, i.e., "understaffing in the 911 system

and of engine companies, physical fitness standards required for certain

employees, and public tax consequences of high employee turnovers," would

be matters about which the public can legitimately be expected to be both

curious and anxious.  So would such cost-cutting measures as the "proposal

to discontinue the City's paramedic program[, which the fire chief in

Beckwith ] considered . . . dangerous to the City's citizens, visitors, and his own employees. . .″; the chief opposed the proposal both before the city counsel and to anyone else, including a former mayor, who would listen.

Such discussions clearly could be interpreted by PBCFR management as "discredit[ing] . . . the agency," "disseminating content . . . that could reasonably be interpreted as having an adverse effect upon … [the] perception of the public…," posting material that might "tend to undermine the public trust and confidence required by employees of Fire Rescue," and having a possibility to "adversely reflect on Fire Rescue…."   Such online conversations, however, feed the considerable hunger of what the Beckwith court characterized as "the average citizen" about "the provision of basic fire and rescue services."  58 F.3d at 1564.

What PBCFR management wants — and, unless this Court finds it unconstitutional, what it would continue to have — is a social media policy patterned along the lines of what the Fourth Circuit panel in Liverman characterized as "[a] policy . . . and the disciplinary actions taken pursuant to it [that] would, if upheld, lead to an utter lack of transparency in [PBCFR] operations that the First Amendment cannot countenance." 844 F.3d at 404.

PBCFR's social media policy cannot survive the standards set forth by the Supreme Court in NTEU since is proscribes speech without having "show[n] that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future

expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government."  513 U.S. at 468.

The social media policy additionally:

•       fails to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly" to "provide explicit standards for those who apply them," Leib, quoting Grayned, and

•       is capable of being understood to "prohibit[] a substantial amount of protected speech 'relative to the statute's plainly legitimate sweep.'" Williams.

Notwithstanding that this Court has found that neither Captain AJ O'Laughlin nor Captain Chrystal Little engaged in behavior protected by the First Amendment, the social-media regulation used to punish them for what they posted on Captain O'Lauglin's union-campaign presidential page is unconstitutional.

## Conclusion

Based on the facts alleged, the authorities cited and the arguments presented, plaintiffs, Captains AJ O'Laughlin and Crystal Little, respectfully request this Court to:

*One*, grant their motion for summary judgment;

*Two*, to enter final judgment in favor of them, declaring the PBCFR social-media policy facially unconstitutional and ordering their discipline

voided;

　　　*Three*, to reserve jurisdiction to resolve plaintiff's motions for

attorneys fees and litigation expenses, and

　　　*Four*, to grant such other and further relief as is just.

　　　　　　　　　Respectfully Submitted,

　　　　　　　　　*/s/   William R. Amlong*
　　　　　　　　　WILLIAM R. AMLONG
　　　　　　　　　Florida Bar No.: 470228
　　　　　　　　　WRAmlong@TheAmlongFirm.com
　　　　　　　　　KAREN COOLMAN AMLONG
　　　　　　　　　Florida Bar No.: 275565
　　　　　　　　　KAmlong@TheAmlongFirm.com

　　　　　　　　　AMLONG & AMLONG, P.A.
　　　　　　　　　500 Northeast Fourth Street
　　　　　　　　　Fort Lauderdale, Florida 33301-1154
　　　　　　　　　(954) 462-1983
　　　　　　　　　(954) 523-3192 (fax)

**Certificate of Service**

　　　I HEREBY certify that the above and foregoing was electronically filed through the Southern District of Florida ECF system and thereby delivered to all counsel of record.

　　　　　　　　　*/s/   William R. Amlong*
　　　　　　　　　WILLIAM R. AMLONG

# DE 48

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 19-80701-CIV-DIMITROULEAS

AJ O'LAUGHLIN and CRYSTAL LITTLE,

     Plaintiffs,

vs.

PALM BEACH COUNTY, a political
subdivision of the State of Florida,

     Defendant.

_____/

**Plaintiffs' Local Rule 51.6(a) Statement of Material Facts
In Supports of Summary Judgment**

Plaintiffs submit the following statement of undisputed material facts in support of their motion for summary judgment:

1.    Plaintiffs, AJ O'Laughlin and Crystal Little, are captains in Palm Beach County's Fire Rescue Department ("PBCFR").[1]

2.    Both have been disciplined for statements made on Captain O'Laughlin's invitation-only Facebook page.  Id.

3.    PBCFR had on or about February 6, 2019, re-issued a policy addressed to "Use of Social Media," which policy was appended (as it was

---

[1]See First Amended Complaint, DE 32, at 1-2, ¶ 1; Palm Beach County's Answer and Affirmative Defenses to Plaintiff's (sic) First Amended Complaint, DE 46, at 1, ¶ 1.

**The Amlong Firm** • 500 Northeast Fourth Street • Fort Lauderdale, FL  33301 • 954.462.1983

amended February 28) to the First Amended Complaint as Attachment 2.[2]

The policy, DE 32-2, is appended as Attachment 1.

Respectfully Submitted,

*/s/   William R. Amlong*
WILLIAM R. AMLONG
Florida Bar No.: 470228
WRAmlong@TheAmlongFirm.com
KAREN COOLMAN AMLONG
Florida Bar No.: 275565
KAmlong@TheAmlongFirm.com

AMLONG & AMLONG, P.A.
500 Northeast Fourth Street
Fort Lauderdale, Florida 33301-1154
(954) 462-1983
(954) 523-3192 (fax)

**Certificate of Service**

I HEREBY certify that the above and foregoing was electronically filed through the Southern District of Florida ECF system and thereby delivered to all counsel of record.

*/s/   William R. Amlong*
WILLIAM R. AMLONG

---

[2]DE 32, at 4, ¶ 5, and DE 32-2.

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT,
IN AND FOR PALM BEACH COUNTY, FLORIDA

Case No. 19-80701-CIV-DIMITROULEAS

AJ O'LAUGHLIN and CRYSTAL
LITTLE,

      Plaintiffs,

vs.

PALM BEACH COUNTY, a political
subdivision of the State of Florida,

      Defendant.

_____/

### First Amended Complaint

**Count I: AJ O'Laughlin and Crystal Little's 42 U.S.C. 1983 Claim for
Declaratory and Other Relief Pursuant to the
First Amendment's Free Speech and Free Association Clauses**

Plaintiffs, AJ O'Laughlin and Crystal Little, sue defendant, Palm Beach

County, a political subdivision of the State of Florida, and say:

### Introduction and Summary

1.      AJ O'Laughlin and Crystal Little are two captains within the Palm

Beach County Fire Rescue Department ("PBCFR"). They sue Palm Beach

County pursuant to 42 U.S.C. § 1983 to enforce their rights under the Free

Speech and Free Association clauses of the First Amendment to the United

States Constitution, as extended to the states by the Fourteenth

# ATTACHMENT 1



**The Amlong Firm** ● 500 Northeast Fourth Street ● Fort Lauderdale, FL 33301 ● 954.462.1983

Amendment.  They seek to enjoin PBCFR from enforcing its Social Media Policy because:

*One*, discipline was imposed on them in retaliation for the content of several February 6, 2019 Facebook posts that PBCFR deemed to violate the prior restraints contained in its Social Media Policy, and,

*Two*, the Social Media Policy was used to punish them for their participation in a union election in which Capt. O'Laughlin was running for president Local 2928 of the International Association of Fire Fighters and Capt. Little was supporting him, in violation of their right to freedom of association, and

*Three*, the Social Media Policy is unconstitutionally vague and overbroad, both:

•    as applied to them in connection with the proposed discipline, and

•    facially as to both them and any other PBCFR employee whose off-duty posts on social media concerning issues of public concern might be interpreted by management as, <u>inter alia</u>, "undermin[ing] the public trust and confidence required by employees of Fire Rescue" or "reflect[ing] negatively upon [the] agency or its mission."

The February 6 posts were made by Capt. O'Laughlin and Capt. Little during a public-employee union campaign that constituted a matter of public concern for purposes of the Free Speech clause and is separately protected by the Freedom of Association clause:  the theme of Capt. O'Laughlin's

campaign was that the incumbent union leadership was management-friendly and corrupt. After an IAFF vice president complained the next day to PBCFR management, PBCFR disciplined the two captains for violating its Social Media Policybased on the contents of the posts.

## Jurisdiction and Venue

2.    This is an action for declaratory and other relief brought pursuant 42 U.S.C. 1983 concerning Capt. O'Laughlin and Capt. Little's rights under the free-speech clauses of both the United States and Florida constitutions and the freedom of association clause of the First Amendment. This Court has jurisdiction pursuant to 42 U.S.C. 1983 and 28 U.S.C. §§ 1331 and 1343(a)(4).

3.    This cause of action accrued in Palm Beach County in the Southern District of Florida.

## General Allegations

4.    Capt. O'Laughlin in 2018 ran for the presidency of Local 2928 of the International Association of Fire Fighters, a candidacy that Capt. Little supported, which union candidacy and support for it constituted as a matter of law both:

a.    a matter of public concern,[1] and

---

[1] Plaintiff's counsel is mindful of this Court's Order Granting Motion to Dismiss [DE 31], but respectfully wishes to retain the matter-of-public-concern argument, in addition to the freedom-of-association argument, for appeal rather than abandoning it by omitting it from the amended complaint.

      b.    an exercise in the freedom of association.

    5.    PBCFR on or about April 17, 2016 had issued a policy addressed to "Use of Social Media," which policy is appended to this complaint as Attachment 1 (in the form that it existed when the alleged violations of it occurred February 6, 2019) and Attachment 2 (as it was amended February 28).

    6.    In its regulations on "personal use," the policy:

    a.    warns against "discredit[ing] … the agency," Procedure 1(a);

    b.    "[w]hile … off-duty …disseminating content that is inconsistent with the duties, conduct, and responsibilities of a Fire Rescue employee, including content that could reasonably be interpreted as having an adverse effect upon … [the] perception of the public…," Procedure 2(d), which lists as "examples,"

    c.    material that might "tend to undermine the public trust and confidence required by employees of Fire Rescue," Procedure 2(d)(i), and

    d.    "any posting that may adversely reflect on Fire Rescue…." Procedure 2(j).

    7.    The policy also prohibits "post[ing], transmit[ting], or otherwise disseminat[ing] any information (data, text, photographs, audio, video, or any other multimedia file to which they have access as a result of their

employment without written permission from the Fire Rescue Administrator or designee."  Procedure 2(k).

8.    Capt. O'Laughlin maintained, as part of his campaign for the presidency of the IAFF local, an invitation-only FaceBook page branded "AJ O'Laughlin—Make our Union Strong again."

9.    The Union Time Pool, or UTP, is a pool of hours donated by all of Local 2928's members to allow union officers to get paid their regular salaries for doing union business on days that they would otherwise be scheduled to work.

10.    Capt. O'Laughlin on February 6, 2019 posted a screen shot of a computerized scheduling program that showed that Capt. Jeffrey L. Newsome, the IAFF local's First Executive Vice President and an associate of the incumbent President, had been scheduled two to three months earlier, i.e., in November 2018, to take UTP paid-leave for both Thanksgiving Day. Capt. O'Laughlin also learned, and posted, that Capt. Newsome had done the same thing for Christmas Day 2018—even though there was no union business to be done on either of those days.

11.    The scheduling of that time—which Capt. Newsome gave back after Jeff Rudd, a battalion chief, noticed it and confronted Capt. Newsome about it—could only have been done by the Fire Rescue Staffing Officer, a management employee.

12.    Before the Thanksgiving/Christmas schedules were reversed, however, someone took a screen shot of the Thanksgiving entry, which found its way to Capt. O'Laughlin, who posted the photo February 6, 2019.

13.    Capt. O'Laughlin followed up the screen shot with several bursts:

a.    "This person is a theft (sic) just thinking about putting this into Telestaff.  This is your Union leadership.  Wtf.  When elected this will stop and who is Saying (sic) this is OK,"

b.    "Jeff you should be ashamed of yourself.  Thinking that union business is done on holidays.  I will make sure I keep my locker closed when I'm working with you,"

c.    "Is this unethical Wtf.  Make sure u call the [Inspector General] about this.  Transparency is everything," and

d.    "[Executive Vice President 1] took UTP for thanksgiving (sic) and also XMas (sic).  It was approved by the Union and by Admin.  Who does Union stuff on these days.  This is how Armand Nault got unelected.  You got to be kidding me.  Transparency is my campaign.  So you will see the truth."

14.    Capt. Little, an O'Laughlin partisan who prior to transferring back to the field had been in charge of the Fire Rescue Department's staffing function, then chimed in:  "Nice to know the current retired president thinks it's ok to use UTP for holidays!!  Thanks AJ for keeping them accountable.  And on that note our fucking stellar staffing officer just blindly approves it?  Wtf!"

15.     Because neither Capt. O'Lauglin nor Capt. Little had at the time
that they made their remarks about Capt. Newsome's attempted misuse of
the UTP any job duties related to scheduling, their remarks about his
behavior were:

   a.     made in their roles as citizens, rather than in their role as
PBCFR captains, and

   b.     as part of a union election campaign.

16.     A smarting Capt. Newsome launched an immediate and clearly
content-based complaint to Deputy Fire Chief Joey Cooper, lodging a formal
charges against Capt. O'Laughlin of conduct-unbecoming and violation of the
social-media policy: he accused Capt. O'Laughlin of having "advised that I
was misusing Union Time Pool" and having said Capt. Newsome had
"committed theft."

17.     Capt. Newsome also took issue with the fact that Capt.
O'Laughlin had "encouraged people contact (sic) the Office of the Inspector
General to make a complaint," and observed that "[t]his post, then was
replied to by Cpt. (sic) C. Little, who commented about 'our fucking stellar
staffing officer.'"

18.     Capt. Newsome continued:

By making this post, Cpt. (sic) O'Laughlin violated several provisions of
Policy FR-A-404.  **Section 2(d) states:  Employees are prohibited
from disseminating content that** is inconsistent with the duties,
conduct, and responsibilities of a Fire Rescue employee <u>including
content that **could be reasonably interpreted as having an
adverse effect upon** Fire Rescue morale, discipline, operations, **the**
safety of staff or **perception of the public.  Section 2(g) states**</u>

> ***Employees who chose (sic) to maintain or participate in social
> media or social networking platforms*** <u>***while off-duty***</u> shall
> <u>conduct themselves with professionalism and in such a manner that</u>
> <u>***shall not reflect negatively upon this agency***</u> <u>or its mission</u>.
> ***Section 2(j) states Fire Rescue Personnel shall not post,
> transmit, or otherwise disseminate any information***
> (photographic or text) to which they <u>have access as a result of their
> employment</u> ***without written permission from the First Rescue
> Administrator.***
>
> Cpt. (sic) O'Laughlin's posts have disparaged the reputation of Fire
> Rescue, the Fire Rescue Staffing Officer, "Admin" and me personally.
> His behavior could erode the faith the public has in Palm Beach County
> Fire Rescue.  His behavior is unprofessional, and certainly does not
> display the conduct that PBCFR and the public expect of a firefighter….

(Underlining in original; bold italics supplied.)

19.     Those portions of the Social Media Policy cited in ¶¶ 6 and 18:

        a.      Constitute prior restraints, i.e., a virtual blanket prohibition

on all speech critical of the government employer, intended to chill potential

protected speech before it happens;

        b.      Are so overbroad as to discourage public (on even, as in

the case at bar, private) discussions of constitutionally protected matters of

public concerns, as well as matters that might not satisfy the public-concern

test, and

        c.      Are not supported, beyond conjecture, by pointing to the

actual disruption to PBCFR's mission that it seeks to prevent.

20.     Additionally, by disciplining Capt. O'Laughlin and Capt. Little for

their posts on Capt. O'Laughlin's "AJ O'Laughlin—Make our Union Strong

again" Facebook page, PBCFR intruded on Capt. O'Laughlin and Capt. Little's

freedom-of-association rights by weaponizing the Social Media Policy in favor of Capt. Newsome and other Local 2928 incumbents.

21.    Notwithstanding that even Capt. Newsome acknowledged that it was not possible that the screen shots that Capt. O'Laughlin posted were materials "to which [he had] access as a result of [his] employment," Procedure 2(k), and stated that the posts had been made on "a hidden Facebook page," the Department began disciplinary proceedings against Capt. O'Laughlin and Capt. Little.

22.    Although the discipline issued to Capt. O'Laughlin and Capt. Little was a "written warning," under the Department's progressive discipline procedures, that sets each of them up for more serious discipline in the case of even a minimal offense—i.e., a one-to-three-shift suspension for Capt. Little, whose only discipline during her 14.5 years on the department has been for accidentally putting her pager into a washing machine 10 years ago, and termination for Capt. O'Laughlin, who got a five-shift suspension in July 2018 for an unrelated matter.

23.    The Department's Social Media Policy is constitutionally infirm and unenforceable because:

    a.    as to all employees of PBCFR, it is facially unconstitutional as being vague and overbroad, and

    b.    as applied to Capt. O'Laughlin and Capt. Little because either:

i.   PBCFR used the Social Media Policy to punish Capt. O'Lauglin and Capt. Little for the content of statements that each made in connection with a public-employee union election, which union-related activity is a matter of public concern, or, alternatively,

ii.   PBCFR intruded on Capt. O'Laughlin and Capt. Little's right to freedom of association because interfered with their participation in a public-employee union election.

24.   Capt. O'Laughlin and Capt. Little are suffering irreparable harm, for which there is no adequate remedy at law, by:

a.   being disciplined for having engaged in private speech, the content of which offended Capt. Newsome and Fire Rescue Department management;

b.   being disciplined for having exercised their rights to freedom of association by participating through their Facebook posts in a public-employee union election, and

c.   along with all of the other employees of PBCFR, being subjected to a Social Media Policy that:

i.   constitutes a prior restraint, and

ii.   is so vague and overbroad that it forbids PBCFR employees, speaking as citizens, to make unflattering comments about PBCFR issues that do, indeed, constitute mattes of public concern.

25.   Capt. O'Laughlin and Capt. Little are entitled by 42 U.S.C. § 1988(b) to recover their attorney's fees and litigation expenses for suing

pursuant to § 1983 to vindicate their First Amendment right to freedom of speech and freedom of association.

WHEREFORE, plaintiffs, Capt. AJ O'Laughlin and Capt. Crystal Little pray that this Court will:

*One*, determine and declare that Palm Beach County is precluded by the First Amendment from disciplining Capt. AJ O'Laughlin and Capt. Crystal Little for there speech that occurred within the context of a Local 2928 elections because to do so would violated their freedom of speech;

*Two*, determine and declare that Palm Beach County is precluded by the First Amendment from disciplining Capt. AJ O'Laughlin and Capt. Crystal Little for there speech that occurred within the context of a Local 2928 elections because to do so would violated their freedom of association;

*Three*, determine and declare that the Fire Rescue Department's Social Media Policy policy's prohibition against off-duty posts by its personnel that may "undermine the public trust and confidence required by employees of Fire Rescue" or "reflect negatively upon [the] agency or its mission" is:

• an unconstitutional prior restraint on Fire Rescue personnel's constitutional right to publicly discuss as citizenss issues of public concern about the Fire Rescue Department, and

• unconstitutionally vague and overbroad, and

*Four*, award Capt. O'Laughlin and Capt. Little their reasonable attorney's fees and litigation expenses, and

*Five*, grant such other and further relief as is just.

**Demand for Jury Trial**

Plaintiffs, Capt. AJ O'Laughlin and Crystal Little, demand trial by jury

on all issues so triable.

Respectfully Submitted,

*/s/   William R. Amlong*
WILLIAM R. AMLONG
Florida Bar No.: 470228
WRAmlong@TheAmlongFirm.com
KAREN COOLMAN AMLONG
Florida Bar No.: 275565
KAmlong@TheAmlongFirm.com

AMLONG & AMLONG, P.A.
500 Northeast Fourth Street
Fort Lauderdale, Florida 33301-1154
(954) 462-1983
(954) 523-3192 (fax)

**Certificate of Service**

I HEREBY certify that the above and foregoing was electronically filed
through the Southern District of Florida ECF system and thereby delivered to
all counsel of record.

*/s/   William R. Amlong*
WILLIAM R. AMLONG

| TO: | ALL PALM BEACH COUNTY FIRE RESCUE PERSONNEL |
|---|---|
| FROM: | MICHAEL C. MACKEY<br>FIRE RESCUE ADMINISTRATOR |
| PREPARED BY: | FIRE RESCUE PPM COMMITTEE |
| SUBJECT: | USE OF SOCIAL MEDIA |
| PPM #: | FR-A-404 |

| ISSUE DATE | EFFECTIVE DATE |
|---|---|
| April 17, 2016 | January 10, 2019 |

**PURPOSE**:   The purpose of this policy is to provide guidelines on the procedure and use of social media and social networking.

**UPDATES**:   Future updates to this PPM are the responsibility of the Deputy Chief of Administration, in conjunction with the PPM Committee, under the authority of the Fire Rescue Administrator.

**AUTHORITY**:
- Fire Rescue Administrator
- Florida Statues, Chapter 11
- CW-R-008: Internet Use Policy
- CW-R-113: Social Networking Policy
- PBCFR HIPAA Policies and Procedures Manual (PPM FR-A-401), as may be amended.

**SCOPE**:   This policy applies to all Palm Beach County Fire Rescue personnel and reservists.

**POLICY**:   This policy applies to the procedure and use of social media and social networking.

**DEFINITIONS**:

1. <u>Social Media</u> – A variety of online sources that allow people to communicate, share information, photos, videos, audio or exchange text and other multimedia files with others via online or cellular network platform. This includes but is not limited to social networking sites, micro-blogging sites, personal blogs/personal websites, and news sites.
2. <u>Social Networking</u> – Online platforms where users can network, socialize, communicate and exchange information with other users via text, live conferencing/chat rooms, photographs and/or video-tapes. Mobile Social Networking refers to social networking using a mobile phone or cellular based device.
3. <u>Blogs</u> – A personal online journal or commentary that allows visitors to post opinions, responses, reactions, or comments to a particular topic and may allow the use of graphics or video. Blogs may be private or accessible to the general public.

**FR-A-404/Page 1 of 4**

# ATTACHMENT 1

4. <u>Website/Webpage</u> – A webpage is any page a person sees when accessing the internet. A website is a collection of one or more web pages.

5. <u>Posting</u> – Typing a message, uploading graphics/videos or any electronic media to an online forum or newsgroup which may be accessible to specific viewers or the general public.

6. <u>Personal Website</u> – An online site created by an individual that may include personal information, commentary, photographs, videos and/or graphics for social, entertainment or business purposes. Personal websites may be private or accessible to general public.

7. <u>Profile</u> – A self-defined description of a person which can be displayed on a webpage or a social networking site, and may display any or all of the following biographical information: age, race, sex, employment, education, religion, political viewpoints, the user's likes and dislikes, current location, hometown, and contact information. Profiles may be private or accessible to the general public.

8. <u>Chat Rooms</u> – An online gathering where users can communicate with each other and exchange information via instant messaging and the information is visible to all people in the chat room. Chat Rooms may be private or accessible to the general public.

**PROCEDURE**:

1. **Department-Sanctioned Use**:

   a. Fire Rescue reserves the right to not publish any posting and can remove unsuitable content from authorized social networking websites at any time without notice (CW-R-113). The Fire Rescue's Public Information Officer shall have final discretion as to the removal of any posting under question. The Fire Rescue's Public Information Officer and staff assigned by the Deputy Chief of Operations shall help promote authorized social media accounts.

   b. Misuse of social media websites may lead to disciplinary action under applicable provisions of the Palm Beach County Merit Rules or the Collective Bargaining Agreement (Disciplinary - Article 15).

   c. Fire Rescue personnel representing the Fire Rescue via social media outlets shall do the following:

      i. The use of Fire Rescue computers by Fire Rescue personnel to access social media is prohibited without authorization.

      ii. Conduct themselves at all times as representatives of the Fire Rescue and, accordingly, shall adhere to all Fire Rescue standards of conduct and observe conventionally accepted protocols and proper decorum.

      iii. Identify themselves as a member of the Fire Rescue.

      iv. Post, transmit, or otherwise disseminate confidential information, including photographs or videos, related to Fire Rescue training, activities, or work-related assignments without express written permission.

      v. Do not conduct political activities or private business.

      vi. Fire Rescue personnel use of personally owned devices to manage the Fire Rescue's social media activities or in the course of official duties is prohibited without express written permission.

      vii. Employees shall observe and abide by all copyright, trademark, and service mark restrictions in posting materials to electronic media.

      viii. Any postings to a Social Media site shall be assumed to be an official opinion/comment of Fire Rescue.

**FR-A-404/Page 2 of 4**

2. <u>**Personal Use**</u>:

    a. Fire Rescue recognizes the employee's right to participate in social networking/social media sites or maintain personal web pages, blogs or other types of online platforms while off-duty. However, it is strongly recommended employees use caution in their usage of social media/social networking platforms especially when displaying personal profiles so as not to discredit themselves or the agency.

    b. Development of an individual departmental networking site representing FIRE RESCUE or any Battalion/Division/Fire Station/Unit etc., is prohibited unless approved by the Fire Rescue Administrator or designee. No postings shall be permitted without the final approval of the Public Information Office or designee.

    c. Employees shall not use social media/social networking platforms in violation of PBC Merit Rules, the Collective Bargaining Agreement, (Disciplinary Article 15), either State or Federal law and the HIPAA Policies and Procedure Manual.

    d. While on duty or off duty Employees are prohibited from disseminating content that is inconsistent with the duties, conduct, and responsibilities of a Fire Rescue employee including content that could be reasonably interpreted as having an adverse effect upon Fire Rescue morale, discipline, operations, the safety of staff, or perception of the public. For example, unprofessional, unbecoming, illegal, unethical, sexual, violent, harassing, racist, sexist, or ethnically derogatory comments, pictures, artwork, videos, material or other such references all tend to undermine the public trust and confidence required by employees of the Fire Rescue.

    e. Unless authorized by the Fire Administrator or designee, employees are prohibited from posting any confidential, sensitive, or copyrighted information, data, text, photographs, audio, video, or any other multimedia file related to any on-going criminal or administrative investigation of this agency. This includes but is not limited to: photographing or video-taping of fire scenes, crime scenes, traffic crashes, medical/trauma patients, arrestees, evidence, restricted areas of Governmental facilities, vehicles, other employees, and statements or comments related to any pending prosecutions or investigations.

    f. Employees shall exercise good judgment in displaying logos, badges, seals, uniforms, vehicles, equipment, or any item or symbol that is associated with this agency.

    g. Employees who choose to maintain or participate in social media or social networking platforms while off-duty shall conduct themselves with professionalism and in such a manner that shall not reflect negatively upon this agency or its mission. While using social media off duty or in an unofficial capacity, employees are prohibited from speaking or writing in an official capacity, or from representing that they are acting on behalf of Fire Rescue or the PBC Board of County Commissioners. Employees are cautioned that speech on-or-off duty, made pursuant to their official duties, generally is not protected speech under the First Amendment and may be subject to disciplinary action if in violation of this policy.

    h. Employees should be aware that the content of social networking sites may be subpoenaed and used to undermine or impeach employee's testimony in a civil or criminal trial or other official proceeding.

    i. Failure to comply with the above guidelines may result in discipline up to and including termination. Authorized exceptions to the above guidelines may be permitted by the Fire Administrator or designee for the operational needs of the Fire Rescue. Employees are strongly encouraged to use caution and seek the guidance of

**Formatted:** Highlight

**FR-A-404/Page 3 of 4**

their supervisors regarding any posting that may adversely reflect upon either the agency or upon the professionalism and integrity of the employee.

j.   Fire Rescue personnel shall not post, transmit, or otherwise disseminate any information (photographic or text) to which they have access as a result of their employment without written permission from the Fire Rescue Administrator or designee.

k.   Fire Rescue personnel are cautioned against posting personal photographs or provide similar means of personal recognition that may cause you to be identified as a firefighter, fire officer or employee of this Fire Rescue.


*Michael C. Mackey*

**MICHAEL C. MACKEY**
**FIRE RESCUE ADMINISTRATOR**

**Supersession History**

1.   PPM#FR I-71, issued 12/21/1991
2.   PPM#FR I-71, issued 03/24/2011
3.   PPM#FR I-71, issued 06/10/2016
4.   PPM#FR A-404, clerical 03/01/2018
5.   PPM#FR A-404, clerical 1/10/2019

| | |
|---|---|
| TO: | **ALL PALM BEACH COUNTY FIRE RESCUE PERSONNEL** |
| FROM: | **MICHAEL C. MACKEY**<br>**FIRE RESCUE ADMINISTRATOR** |
| PREPARED BY: | **FIRE RESCUE PPM COMMITTEE** |
| SUBJECT: | **USE OF SOCIAL MEDIA** |
| PPM #: | **FR-A-404** |

| ISSUE DATE | EFFECTIVE DATE |
|---|---|
| April February 28 17, 201 9 6 | January 10, 2019 February March 14 14, 2019 |

**PURPOSE**:   The purpose of this policy is to provide guidelines on the procedure and use of social media and social networking.

**UPDATES**:   Future updates to this PPM are the responsibility of the Deputy Chief of Administration, in conjunction with the PPM Committee, under the authority of the Fire Rescue Administrator.

**AUTHORITY**:
- Fire Rescue Administrator
- Florida Statues, Chapter 11
- CW-R-008: Internet Use Policy
- CW-R-113: Social Networking Policy
- PBCFR HIPAA Policies and Procedures Manual (PPM FR-A-401), as may be amended.

**SCOPE**:   This policy applies to all Palm Beach County Fire Rescue personnel and reservists.

**POLICY**:   This policy applies to the procedure and use of social media and social networking.

**DEFINITIONS**:

1. Social Media – A variety of online sources that allow people to communicate, share information, photos, videos, audio or exchange text and other multimedia files with others via online or cellular network platform. This includes but is not limited to social networking sites, micro-blogging sites, personal blogs/personal websites, and news sites.
2. Social Networking – Online platforms where users can network, socialize, communicate and exchange information with other users via text, live conferencing/chat rooms, photographs and/or video-tapes. Mobile Social Networking refers to social networking using a mobile phone or cellular based device.

**FR-A-404/Page 1 of 5**

# ATTACHMENT 2

3. Blogs – A personal online journal or commentary that allows visitors to post opinions, responses, reactions, or comments to a particular topic and may allow the use of graphics or video. Blogs may be private or accessible to the general public.

4. Webpage Website/Webpage – A webpage is any page a person sees when accessing the internet.

4.5. Website A – A website is a collection of one or more web-pages.

5.6. Posting – Typing a message, uploading graphics/videos or any electronic media to an online forum or newsgroup which may be accessible to specific viewers or the general public.

6.7. Personal Website – An online site created by an individual that may include personal information, commentary, photographs, videos and/or graphics for social, entertainment or business purposes. Personal websites may be private or accessible to general public.

7.8. Profile – A self-defined description of a person which can be displayed on a webpage or a social networking site, and may display any or all of the following biographical information: age, race, sex, employment, education, religion, political viewpoints, the user's likes and dislikes, current location, hometown, and contact information. Profiles may be private or accessible to the general public.

8.9. Chat Rooms – An online gathering where users can communicate with each other and exchange information via instant messaging and the information is visible to all people in the chat room. Chat Rooms may be private or accessible to the general public.

**PROCEDURE**:

1. ~~Department~~**Fire Rescue**-Sanctioned Use:

   a. Fire Rescue reserves the right to not publish any posting and can remove unsuitable content from authorized social networking websites at any time without notice (CW-R-113).

   b. ~~The~~ Fire Rescue's Public Information Officer shall have final discretion as to the removal of any posting under question. <span>`[Commented [NN1]:`</span>

   a.c. ~~The~~ Fire Rescue's Public Information Officer and staff assigned by the Deputy Chief of Operations shall help promote authorized social media accounts. <span>`[Commented [NN2]:`</span>

   d. Misuse of social media ~~websites~~ may lead to disciplinary action under applicable provisions of the Palm Beach County Merit Rules or the Collective Bargaining Agreement (~~Disciplinary~~ Article 15 Disciplinary Action and Discharge).

   b.e. ~~Fire Rescue personnel~~Employees representing ~~the~~ Fire Rescue via social media ~~outlets~~ shall ~~do the following~~:

      i. ~~The use of Fire Rescue computers by Fire Rescue personnel to access social media is prohibited without authorization.~~

      ii.i. Conduct themselves at all times as representatives of ~~the~~ Fire Rescue and, accordingly, ~~shall~~ adhere to all Fire Rescue standards of conduct and observe conventionally accepted protocols and proper decorum.

      iii.ii. Identify themselves as a member of ~~the~~ Fire Rescue.

      ~~Post, transmit, or otherwise disseminate confidential information, including photographs or videos, related to Fire Rescue training, activities, or work-related assignments without express written permission.~~

      ~~Do not conduct political activities or private business.~~

**FR-A-404/Page 2 of 5**

~~Fire Rescue personnel use of personally owned devices to manage the Fire Rescue's social media activities or in the course of official duties is prohibited without express written permission.~~

iv.  ~~Employees shall~~ Oo~~b~~serve and abide by all copyright, trademark, and service mark restrictions ~~in posting materials to electronic media.~~

iii.

iv.  Obtain authorization prior to accessing social media from Fire Rescue computers.

v.  Obtain express written permission to use personally owned devices to manage those Fire Rescue's social media activities or conduct official duties. ~~Any postings to a Social Media site shall be assumed to be an official opinion/comment of Fire Rescue.~~

f.  ~~Fire Rescue personnel~~Employees representing ~~the~~ Fire Rescue via social media ~~outlets~~ shall not conduct political activities or private business.~~:~~
~~Use the Fire Rescue computers to access social media without prior authorization.~~
~~Conduct political activities or private business.~~
~~Use personally owned devices to manage the Fire Rescue's social media activities or conduct official county duties without express written permission.~~

2.  **Personal Use**:
   a.  Fire Rescue recognizes the employee's right to participate in social networking/social media sites or maintain personal web pages, blogs or other types of online platforms while off-duty. However, it is strongly recommended employees use caution in their usage of ~~social~~ networking~~media~~/social ~~networking~~ media ~~platforms~~ sites especially when displaying personal profiles so as not to discredit themselves or the agency.

Commented [NN3]:

   b.  Development of an individual departmental ~~social~~ networking/social media site representing Fire~~IRE~~ R~~r~~escue, or any ~~ESCUE or any~~ Battalion, /Division, /Fire Station, /Unit or other Fire Rescue affiliation ~~etc.~~, is prohibited unless prior approval ~~is~~ obtaine~~d~~ed by the Fire Rescue Administrator or designee. No postings shall be permitted without the final approval of the Public Information Officer or designee.

Commented [NN4]:

   c.  Employees shall not use social networking~~media~~/social media ~~networking platforms~~sites in violation of PBC Merit Rules, the Collective Bargaining Agreement ~~,~~ ~~(Disciplinary~~ Article 15 Disciplinary Action and Discharge~~)~~, ~~either~~ State law, ~~or~~ Federal law ~~and~~ or the PBCFR HIPAA Policies and Procedure Manual (FR-A-401 Attachment A).

Commented [NN5]:
Commented [NN6]:

   d.  While on-~~-~~duty or off-~~-~~duty e~~E~~mployees are prohibited from disseminating content that is inconsistent with the duties, conduct, and responsibilities of a Fire Rescue employee, including content that could be reasonably interpreted as having an adverse effect upon Fire Rescue morale, discipline, operations, the safety of staff, or perception of the public.
      i.  For example, unprofessional, unbecoming, illegal, unethical, sexual, violent, harassing, racist, sexist, or ethnically derogatory comments, pictures, artwork, videos, material or other such references all tend to undermine the public trust and confidence required by employees of ~~the~~ Fire Rescue.

**FR-A-404/Page 3 of 5**

d.e. Unless authorized by the Fire Rescue Administrator or designee, employees are prohibited from posting any confidential, sensitive, or copyrighted information, data, text, photographs, audio, video, or any other multimedia file related to any on-going criminal or administrative investigation of this agency. This includes but is not limited to: photographing or video-taping of fire scenes, crime scenes, traffic crashes, medical/trauma patients, arrestees, evidence, restricted areas of gGovernmental facilities, vehicles, other employees, and statements or comments related to any pending prosecutions or investigations.

e.f. Employees shall exercise good judgment in displaying logos, badges, seals, uniforms, vehicles, equipment, or any item or symbol that is associated with this agencyFire Rescue.

g. Employees who choose to maintain or participate in social networking/social media or social networking platformssites while on-duty or off-duty shall conduct themselves with professionalism and in such a manner that shall not reflect negatively upon this agency or its mission.

f.h. While using social media off duty or in an unofficial capacity, employees are prohibited from speaking or writing in an official capacity, or from representing that they are acting on behalf of Fire Rescue or the PBC Board of County Commissioners. Employees are cautioned that speech on-duty -or- off -duty, made pursuant to their official duties, generally is not protected speech under the First Amendment and may be subject to disciplinary action if in violation of this policy.

g.i. Employees should be aware that the content of social media/social networking sites may be subpoenaed and used to undermine or impeach employee's testimony in a civil or criminal trial or other official proceeding.

h.j. Failure to comply with the abovethis policy guidelines may result in discipline up to and including termination. Authorized exceptions to the above guidelinesthis policy may be permitted by the Fire Rescue Administrator or designee for the operational needs of the Fire Rescue. Employees are strongly encouraged to use caution and seek the guidance of their supervisors regarding any posting that may adversely reflect upon either the agency Fire Rescue or upon the professionalism and integrity of the employee.

i.k. Fire Rescue personnelEmployees shall not post, transmit, or otherwise disseminate any information (data, text, photographs, audio, video, or any other multimedia filephotographic or text) to which they have access as a result of their employment without written permission from the Fire Rescue Administrator or designee.

j.l. Fire Rescue personnelEmployees are cautioned against posting personal photographs or providinge similar means of personal recognition that may cause you them to be identified as a firefighter, fire officer or employee of this Fire Rescue.


*Michael C. Mackey*

**MICHAEL C. MACKEY**
**FIRE RESCUE ADMINISTRATOR**

**Supersession History**
1. PPM#FR I-71, issued 12/21/1991
2. PPM#FR I-71, issued 03/24/2011
3. PPM#FR I-71, issued 06/10/2016

**FR-A-404/Page 4 of 5**

Commented [NN7]:

Commented [NN8]:

4.   PPM#FR A-404, clerical 03/01/2018
5.   PPM#FR A-404, clerical 01/10/2019
5.6. PPM#FR A-404, clerical 02/2814/2019

**FR-A-404/Page 5 of 5**

**DE 49**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 9:19-cv-80701 Dimitrouleas/Matthewman

AJ O'LAUGHLIN and
CRYSTAL LITTLE,
     Plaintiffs,

vs.

PALM BEACH COUNTY, a political
Subdivision of the State of Florida,
     Defendant.

_____/

### DEFENDANT MOTION FOR SUMMARY JUDGMENT
### AND INCORPORATED MEMORANDUM OF LAW

Defendant, PALM BEACH COUNTY (the "County"), by and through undersigned counsel, and pursuant to Federal Rule of Civil Procedure 56 and Rule 56.1 of the Local Rules of the United States District Court for the Southern District of Florida, moves for summary judgment on Plaintiffs' facial challenge to Palm Beach County Fire Rescue's ("Fire Rescue") Social Media Policy, PPM# FR-A-404.  In support thereof, the County states as follows:

**I.     PROCEDURAL POSTURE**

On May 14, 2019, Plaintiffs filed a Complaint in state court seeking an injunction enjoining the County from enforcing Palm Beach County Fire Rescue's ("Fire Rescue") Social Media Policy and ordering the County to rescind the "written warning" discipline received by Plaintiffs for violating Fire Rescue's Social Media Policy (the "Social Media Policy").  [DE 1-1]. The County removed Plaintiffs' Complaint to Federal Court on May 29, 2019, and filed a Motion to Dismiss the Complaint. [DE 1], [DE 11].

On January 3, 2020, this Court entered an Order granting the County's Motion to Dismiss the Complaint and holding that "Plaintiffs fail[ed] to sufficiently allege that they were speaking as private citizens on matters of public concern." [DE 31, pg. 6].

Plaintiffs filed an Amended Complaint on January 23, 2020, asserting both as-applied and facial challenges to the Social Media Policy and alleging that: (1) Fire Rescue violated their First Amendment rights by disciplining them as a result of their Facebook posts in violation of their freedom of speech rights; (2) Fire Rescue violated their First Amendment rights by disciplining them as a result of their associational conduct with the International Association of Fire Fighters Local 2928 Union (the "Union") in violation of their freedom of association rights; (3) the Social Media Policy is a prior restraint and (4) the Social Media Policy is facially unconstitutional because it is vague and overbroad.

On July 6, 2020, this court granted in part the County's Motion to Dismiss the Amended Complaint. [DE 45]. In that Order, the Court held that Plaintiffs' as-applied challenge alleging a violation of their freedom of speech was "due to be dismissed as [Plaintiffs had] not sufficiently alleged that the speech at issue related to a matter of public concern." [DE 45, pg. 4]. The Court also dismissed Plaintiffs' as-applied challenge alleging a violation of their freedom of association because the court found that Plaintiffs had "not sufficiently alleged associational conduct upon which the Defendant [had] infringed." [*Id*. at pg. 8]. Additionally, the Court held that the Social Media Policy "is not a prior restraint on speech." [*Id*. at pg. 11]

Based on the Court's July 6, 2020 Order, the only remaining issue in the instant lawsuit is the Plaintiffs' facial challenge to the Social Media Policy.

## II.  INTRODUCTION

Plaintiffs' facial challenge to Fire Rescue's Social Media Policy fails as a matter of law. It is undisputed that a government agency is afforded broader discretion to restrict speech when it acts in its role as an employer. This is necessary so that government employers have the ability to control the speech of their employees when such speech could undermine or diminish the operational goals of the government. The Social Media Policy comports with this concept. Furthermore, the Supreme Court has upheld statutory provisions of similar nature. As such, summary judgment in favor of Fire Rescue is appropriate.

## III.  MEMORANDUM OF LAW

### A.  <u>Legal Standard</u>

Summary judgment is "an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy, and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (*citations omitted*).  Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgement as a matter of law." Fed. R. Civ. P. 56; Celotex Corp., 477 U.S. at 322-23.  In response to a summary judgment motion, "'the non-moving party . . . bears the burden of coming forward with sufficient evidence of every element that he or she must prove." *Doe v. Cutter Biological*, 813 F. Supp. 1547, 1549 (M.D. Fla. 1993), *aff'd*, 16 F.3d 1231 (11th Cir. 1994), (quoting *Rollins v. TechSouth Inc.*, 833 F. 2d 1525, 1528 (11th Cir. 1987).

Notably, not every factual dispute will prevent summary judgment.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-249 (1986).  Unsupported, conclusory allegations are insufficient to preclude the granting of a summary judgment motion. *See Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("This court has consistently held that conclusory

allegations without specific supporting facts have no probative value.").  Where, as here, the only remaining question to be decided is a facial challenge to the constitutionality of a policy, summary judgment is proper.

### B.       The Social Media Policy Is Not Facially Unconstitutional

#### i.       The General Framework For Analyzing Facial Challenges To Government Employer Policies Affecting Speech

In assessing a facial challenge on a prospective restriction on speech, courts apply a modified version of the *Pickering*[1] framework.  *See Sabatini v. Las Vegas Metro. Police Dep't*, 369 F. Supp. 3d 1066, 1095 (D. Nev. 2019), *reconsideration denied*, 217CV01012JADNJK, 2019 WL 3307040 (D. Nev. July 23, 2019).  First, courts determine "whether the restriction reaches speech on a matter of public concern." *Id*.  If the regulation covers speech that involves a matter of public concern, "[c]ourts then look to the public employer's justification for the policy." *Id*.  It is the government's burden to show "that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's necessary impact on the actual operation of the Government."  *See United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 468 (1995) ("NTEU").

While conducting this balancing test, it is important to note that, "the efficient functioning of government offices is a paramount public interest."  *Grutzmacher v. Howard*

---

[1] The "Pickering framework" refers to the four-stage analysis used in cases where a public employee has been disciplined for speech.  *See Pickering v. Bd. of Ed. of Tp. High Sch. Dist. 205, Will County, Illinois*, 391 U.S. 563, 564 (1968); *Bryson v. City of Waycross*, 888 F.2d 1562, 1565 (11th Cir. 1989).  The four stages I nthe Pickering framework are as follows: (1) a determination regarding whether the employee spoke as a private citizen on matters of public concern; (2) a balancing test weighing the employee's first amendment interests against the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees; (3) if the public employee prevails on the balancing test, the fact-finder determines whether the employee's speech played a substantial part in the government's decision to demote or discharge the employee; and (4) if the employee prevails by showing that the speech was a substantial motivating factor in the state's employment decision, the state must prove by a preponderance of the evidence that "it would have reached the same decision ... even in the absence of the protected conduct.  *See id*.

*County*, 851 F.3d 332, 342 (4th Cir. 2017); *Nat'l Treasury Employees Union*, 513 U.S. at 473 ("operational efficiency is undoubtedly a vital government interest"); *Sabatini*, 369 F. Supp. 3d at 1099 (finding that a police department had "a strong interest in maintaining public trust by prohibiting speech that would cause the public to question its ability to 'enforce the law fairly, even-handedly, and without bias"). Consequently, "the First Amendment does not protect public employees when their speech interests are outweighed by the government's interest in providing efficient and effective services to the public." *Grutzmacher*, 851 F.3d at 342.

Further, in applying the *NTEU* balancing test, the Court must consider the challenged provision in the context of the broader policy, and, if possible apply a limited construction to avoid a finding of unconstitutionality. *See Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 397 (1988) ("It has long been a tenet of First Amendment law that in determining a facial challenge to a statute, if it be 'readily susceptible' to a narrowing construction that would make it constitutional, it will be upheld."); *Sabatini*, 369 F. Supp. 3d at 1097 (courts must construe a challenged provision in the context of the broader social-media policy and 'consider whether the policy is readily susceptible to a limiting construction that would render it constitutional'") (internal citations omitted).

### ii.  Fire Rescues Social Media Policy

*Arguendo*, without conceding, that the Social Media Policy reaches speech on a matter of public concern, the restrictions are justified based on the overwhelming and recognized need to promote operational efficiency within Fire Rescue and to enable Fire Rescue to effectively serve the community.

Plaintiffs ask the Court to determine that the "Social Media Policy policy's (*sic*) prohibition against off-duty posts by its personnel that may 'undermine the public trust and

confidence required by employees of Fire Rescue' or 'reflect negatively upon [the] agency or its mission' is . . . unconstitutionally overbroad and vague."   In so doing, Plaintiffs attempt to challenge certain parts of the Social Media Policy in a vacuum, while ignoring the overall context of the policy.

The relevant portions of the Social Media Policy read, in their entirety, as follows:

**PURPOSE**: The purpose of this policy is to provide guidelines on the procedure and use of social media and social networking.

**Personal Use**:

a. Fire Rescue recognizes the employee's right to participate in social networking/social media sites or maintain personal web pages, blogs or other types of online platforms while off-duty. However, it is strongly recommended employees use caution in their usage of social networking/ social media sites especially when displaying personal profiles so as not to discredit themselves or the agency.

d. While **on-duty or off-duty** employees are prohibited from disseminating content that is inconsistent with the duties, conduct, and responsibilities of a Fire Rescue employee, including content that could be reasonably interpreted as having an adverse effect on Fire Rescue morale, discipline, operations, the safety of the staff, or the perception of the public.
   i. For example, unprofessional, unbecoming, illegal, unethical, sexual, violent, harassing, racist, sexist, or ethnically derogatory comments, pictures, artwork, videos, material or other such references all tend to undermine the public trust and confidence required by employees of Fire Rescue.

g. Employees who choose to maintain or participate in social networking/social media sites while on-duty or off-duty shall conduct themselves with professionalism and in such a manner that shall not reflect negatively upon this agency or its mission.

j. Failure to comply with this policy may result in discipline up to and including termination. Authorized exceptions to this policy may be permitted by the Fire Rescue Administrator or designee for the operational needs of Fire Rescue. Employees are

strongly encouraged to use caution and seek guidance of their supervisors regarding any posting that may adversely reflect upon Fire Rescue or the professionalism and integrity of the employee.

k.  Employees shall not post, transmit, or otherwise disseminate any information (data, text, photographs, audio, video, or any other multimedia file) to which they have access to as a result of their employment without written permission from the Fire Rescue Administrator or designee.

Fire Rescue has articulated significant reasons for implementing and maintaining the Social Media Policy.  Chief amongst these reasons are:

(1) establishing a policy concerning personal web pages or internet sites when referencing Fire Rescue to ensure employees use appropriate discretion so as to not impede Fire Rescue's ability to serve the community and maintain the community's trust and respect;

(2) clearly identifying prohibited activities by Fire Rescue employees on social networking and other web sites;

 (3) providing guidelines for Fire Rescue employees in applying rules of conduct to their online content;

(4) protecting Fire Rescue and its employees from harm as a result of inappropriate postings or inadvertent harmful postings;

(5) and maintaining order and discipline within Fire Rescue to promote efficient operations, trust and camaraderie among our firefighters internally, and the safety of staff.

[DE 50-2, ¶ 17].

The interests articulated by Fire Rescue are legitimate interests that satisfy the higher burden articulated in *NTEU*. *See Sabatini*, 369 F. Supp. 3d 1099 (finding these same interests outweighed Plaintiffs' rights in a first amendment facial challenge to a police department's social media policy); *Grutzmacher*, 851 F.3d at 347-48 (recognizing that a in a paramilitary

organization the Fire Department's interests in (1) operational efficiency and preventing disruption; (2) fulfilling its public safety mission and maintaining community trust, which is "vitally important to it function"; and (3) preventing disruptive and insubordinate communications, outweighed employee's rights to post whatever they please).

As previously noted, the Court must consider the challenged provisions in the context of the broader policy, and must consider whether the policy is "readily susceptible" to a limiting construction that would render it constitutional. *Am. Booksellers Ass'n, Inc*., 484 U.S. at 397. When looked at in its totality, the Social Media Policy involves appropriate balancing of both side's interests and imposes restrictions only if the employees' speech impacts the operation of Fire Rescue or disrupts Fire Rescue's ability to serve the community. Consequently, this Court should find that the Social Media Policy is facially constitutional. *See Hallandale Prof'l Fire Fighters Local 2238 v. City of Hallandale*, 922 F.2d 756, 762, f.n. 5, (11th Cir. 1991) ("government employers can lawfully regulate their employees' speech to a significant degree").

It is also worth noting that Fire Rescue took steps to ensure the constitutionality of the Social Media Policy. In opting to maintain the Social Media Policy, Fire Rescue consulted with Curtis Varone, a veteran fire chief officer and licensed attorney that focuses on fire service legal matters, Battalion Chief Neil Niemcyzk, who's niche is the topic of policy renewal process and procedure, and also consulted with Lexipol, a provider of public safety policy and training solutions for law enforcement, fire and rescue, and corrections. [DE 50-2, ¶ 16].

### iii. <u>Significant Similar Cases:</u>

Two cases are of significance in guiding this Court's evaluation of the Social Media Policy's constitutionality: (1) *Liverman v. City of Petersburg*, 844 F.3d 400 (4th Cir. 2016) and *Sabatini*, 369 F. Supp. 3d 1066.

a. *Liverman v. City of Petersburg*, 844 F.3d 400, 404 (4th Cir. 2016):

In *Liverman*, the City of Petersburg police department had a social media policy, which the Ninth Circuit Court of Appeals found to be overbroad.  The *Liverman* social media policy had three contested sections:

1. A sweeping preface which prohibited the dissemination of any information "that would tend to discredit[2] or reflect unfavorably upon the [Department] or any other City of Petersburg Department or its employees." *Id.* at 404.

2. A "Negative Comment Provision" (which prohibited negative comments on the internal operations of the Bureau, or specific conduct of supervisors or peers that impacts the public's perception of the department). *Id.*

3. "Public Concern Provision" (which allowed comments on issues of general or public concern so long as they did not "disrupt the workforce, interfere with important working relationships or efficient work flow, or undermine public confidence in the officer"). *Id.*

Although the analysis used in *Liverman* is instructive, there are significant distinctions between *Liverman* and the current case. Here, unlike in *Liverman*, the Social Media Policy does not contain a sweeping prohibition in its preface.  Instead, the Social Media Policy in the instant case "recognizes the employee's right to participate in social networking/social media sites" and urges "caution" while doing so. [DE 50-6]. Notably, the social media policy in *Liverman* did not

---

[2] Use of the term "to discredit or reflect unfavorably on the agency" alone should not be a basis for finding a policy unconstitutional.  *See e.g. Dible v. City of Chandler*, 515 F.3d 918, 920 (9th Cir. 2008) (in which the termination of a police officer was upheld under the City and police Department's "rule against engaging 'in conduct which might **bring discredit** to the City service'") (emphasis added); *McCullars v. Maloy*, 369 F. Supp. 3d 1230, 1240 (M.D. Fla. 2019) (upholding the termination of a Clerk Office employee for violating the Clerk's code of ethics rule that employees "shall avoid any activities that **would impugn the dignity of the clerk's office**") (emphasis added); *Sabatini*, 369 F. Supp. 3d 1066 (finding that a social media policy, which included a provision stating that "Violations of this policy or related policies (values, conduct, etc.) in the use of social media **that bring the member or the department into discredit or would tend to bring the member or the department into discredit** will result in the department taking appropriate action up to and including termination," was facially constitutional).

contain any section exemplifying what type of speech the policy targeted. Here, Section (d)(i) of the Social Media Policy clearly enumerates the types of speech that rightfully concern Fire Rescue. *Id.*

Further, in conducting its balancing test, the court in *Liverman* stated that the police department had failed "to satisfy its burden of demonstrating actual disruption to its mission." However, that is not the correct standard. "It is well-settled that a 'government's legitimate interest in avoiding disruption does not require proof of actual disruption.' Rather, a '[r]easonable possibility of adverse harm is all that is required.'" *McCullars*, 369 F. Supp. 3d at 1240, *citing to Snipes v. Volusia County*, 704 Fed. Appx. 848, 852 (11th Cir. 2017); *see also Sabatini*, 369 F. Supp. 3d at 1090 (explaining that actual disruption is not always required and that the "government's interest in safeguarding the community's trust in its public institutions can, on its own, justify curtailing an employee's speech in certain circumstances").

  b. *Sabatini v. Las Vegas Metro. Police Dep't*, 369 F. Supp. 3d 1066 (D. Nev. 2019), reconsideration denied, 217CV01012JADNJK, 2019 WL 3307040 (D. Nev. July 23, 2019)

In *Sabatini*, like in *Liverman*, plaintiffs facially challenged a police department's social media policy. The court in *Sabatini*, however, found that the contested social media policy was constitutional and neither vague nor overbroad. In *Sabatini*, the social media policy read as follows:

1. Department members must give thoughtful consideration to their actions to avoid *damaging the reputation and trust the department has with the community*.

2. As public employees*, speech, on- or off-duty*, made pursuant to official duties is not protected speech under the First Amendment and may form the basis for

discipline *if deemed detrimental to the efficiency of operations of the department*;

3. Department members are free to express themselves as private citizens in matters of public concern *to the degree that their speech does not*:

   a. Impair working relationships of the department for which loyalty and confidentiality are important;

   b. Impede the performance of duties;

   c. Impair discipline and harmony among co-workers; or

   d. Negatively impact or tend to negatively impact the department's ability to serve the public

4. Department members will not post, transmit, or otherwise disseminate any information, documents, photos or videos, to which members have access as a result of employment, without written permission from the Sheriff, or designee;

5. Department members are prohibited from speech that ridicules, maligns, disparages, or otherwise promotes discrimination against race, ethnicity, religion, sex, national origin, sexual orientation, age, disability, political affiliation, gender identity and expression[,] or other explicit class of individuals;

6. Department members are prohibited from speech or other expression that suggests the person is engaged in behavior reasonably considered to be unlawful or reckless toward public safety;

7. Engaging in prohibited speech as stated in this policy, may negatively affect the department member's credibility and impair the member's ability to perform the essential job functions. A department member's speech is a reflection of character and values. Speech that fundamentally conflicts with the department's ICARE values negatively affects both the member's ability and the department's ability to serve the community. Violations of this policy or related policies (values, conduct, etc.) in the use of social media that bring the member or the department into discredit or would tend to bring the member or the department into discredit will result in the department taking appropriate action up to and including termination.

*Id.* at 1072-73 (emphasis added).

The Social Media Policy here is much more aligned with the policy upheld in *Sabatini,* than the one struck down in *Liverman.* For example, like in *Sabatini,* the Social Media Policy in this case urges employees to use caution instead of implementing a sweeping prohibition. [DE 50-6, §§ 2(a), 2(j)]. The only section in question in the Social Media Policy that uses the word "prohibited" is Section (d). However, like in *Sabatini,* Section (d) explicitly enumerates the types of speech it seeks to curtail. *Id.* at § (d)(i). Additionally, Section (k) of the Social Media Policy, stating that employees shall not post any information to which they have access to as a result of their employment, uses identical language as the *Sabatini* social media policy. Further, both policies express concerns about postings which will bring the member or the department into discredit. Overall, a complete and side-by-side review of the two social media policies, the one in *Sabatini* and the one at issue in this case, reveals many more similarities, which should cause the Court to grant summary judgment in the County's favor.

The court in *Sabatini* also focused on the police departments justification for the policy, which was to "maintain[] public trust by prohibiting speech that would cause the public to question its ability to 'enforce[] the law fairly, even-handedly, and without bias." Fire Rescue likewise has a similar justification for the necessity of maintaining the Social Media Policy. [DE 50-2, ¶¶ 17-23].

### iv.  The Social Media Policy Is Not Vague

"A law or policy is void for vagueness if it 'either forbids or requires the doing of an act in terms so vague that people of common intelligence must necessarily guess at its meaning and differ as to its application.'" *Ovadal v. City of Madison, Wisconsin*, 416 F.3d 531, 535–36 (7th Cir. 2005) *citing to Connally v. Gen. Const. Co.*, 269 U.S. 385, 391 (1926).  In civil cases, "the Supreme Court has reiterated that the vagueness doctrine is based on fair notice that certain conduct puts persons at risk of discharge. Such standards are not void for vagueness as long as ordinary persons using ordinary common sense would be notified that certain conduct will put them at risk of discharge." *Sabatini v. Las Vegas Metro. Police Dep't*, 369 F. Supp. 3d 1066, 1099 (D. Nev. 2019), *reconsideration denied*, 217CV01012JADNJK, 2019 WL 3307040 (D. Nev. July 23, 2019) *citing to Arnett v. Kennedy*, 416 U.S. 134, 159 (1974).

Notably, "[t]he fact that a statute fails to itemize with particularity every possible kind of conduct which would violate such statute does not make it constitutionally vague." *Ovadal*, 416 F.3d at 536; *Arnett*, 416 U.S. at 161 (finding that a provision of the Lloyd-La Follette Act that allows the government to discharge a federal employee "for such cause as will promote the efficiency of the service" was not unconstitutionally vague).

In the instant case, "ordinary persons using ordinary common sense" can read the Social Media Policy and be notified that certain conduct will put them at risk of discharge.  *See e.g.*

*Sabatini*, 369 F. Supp. 3d at 1100 (stating that a provision in a social media policy which prohibited posting material that would discredit the officer or the department provided sufficient notice to a person of ordinary common sense as to what speech is prohibited in the context of their job); *Arnett*, 416 U.S. at 161. Importantly, Section (d)(i) of the Social Media Policy delineates the types of speech it targets and provides specific examples as follows: "unprofessional, unbecoming, illegal, unethical, sexual, violent, harassing, racist, sexist, or ethnically derogatory comments, pictures, artwork, videos, material or other such references." [DE 50-6].

Further, "a plaintiff who engages in some conduct that is clearly proscribed by the policy at issue cannot challenge it as vague." *Sabatini*, 369 F. Supp. 3d at 1100 (D. Nev. 2019) *citing to Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc*., 455 U.S. 489, 495 (1982). Consequently, because Plaintiffs' speech clearly violated the Social Media Policy,[3] their vagueness claims must fail. *Id*.

## IV.    CONCLUSION

WHEREFORE, based upon the forgoing, the County respectfully requests that the Court enter an order granting a summary judgment on all remaining claims in this case and award attorney's fees, costs and any relief the Court deems just and proper.

Dated:  August 20, 2020.

Respectfully submitted,

_ /s/ Anaili Medina Cure              /

---

[3] [DE 50 - 2, ¶¶ 24, 26]

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on August 20, 2020, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send an electronic notice to the authorized CM/ECF filers.

<div align="right">

s/ Anaili Medina Cure             /
Anaili Medina Cure, Esquire
Assistant County Attorney
Florida Bar No. 119558
300 North Dixie Highway, Third Floor
West Palm Beach, Florida 33401
Tel.: (561) 355-6021/Fax: (561) 233-2270
Primary Email:        acure@pbcgov.org
Secondary Emails:     dfishel@pbcgov.org
                      swebber@pbcgov.org

</div>

# DE 50

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 9:19-cv-80701 Dimitrouleas/Matthewman

AJ O'LAUGHLIN and
CRYSTAL LITTLE,
     Plaintiffs,

vs.

PALM BEACH COUNTY, a political
Subdivision of the State of Florida,
     Defendant.

_____/

## DEFENDANT'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

     Defendant, PALM BEACH COUNTY (the "County"), pursuant to Rule 56.1 of the Local Rules of the United States District Court for the Southern District of Florida files this Statement of Material Facts in support of its Motion for Summary Judgment, ECF No. 49.

I.    **PALM BEACH COUNTY FIRE RESCUE DEPARTMENT ("FIRE RESCUE")**

     1.    Fire Rescue was created on October 1, 1984, after Palm Beach County Board of County Commissioners passed Ordinance 1983-023, consolidating the existing fire districts in Palm Beach County. *See* Ordinance 1983-023, Exhibit 1.

     2.    Fire Rescue is responsible for providing emergency response services in approximately 1,761 square miles. *See* McGlynn Affidavit., ¶ 4, Exhibit 2.

     3.    On average, Fire Rescue responds to around 140,000 911 calls for help each year. *Id*. That equates to roughly 383 emergency calls per day. *Id*.

     4.    It is Fire Rescue's mission to "strive to make a difference in [its] people by creating an atmosphere of teamwork and fellowship while recognizing the individual attributes and

responding to the needs of each other." *See* Palm Beach County Fire Rescue Mission Statement, *available a*t https://discover.pbcgov.org/pbcfr/Pages/Mission-Statement.aspx, *See* Exhibit 3.

5.      Due to the nature of the work done by Fire Rescue personnel, and to fulfill Fire Rescue's Mission Statement, Fire Rescue operates as a paramilitary organization, which follows a chain of command. *See* Ex. 2, McGlynn Aff., ¶ 3.

6.      Within that chain of command, Captains are in supervisory roles responsible for the supervision of firefighting personnel. *Id*. at 9. Additionally, Captains are responsible for enforcing rules, policies and procedures to ensure employee health and safety and for maintaining discipline and morale of station personnel. *Id*.; *see also*, Captain Job Description, *See* Exhibit 4.

7.      To successfully serve the community and reach Fire Rescue's operation goals of maintaining order and discipline to promote efficient operations, trust and camaraderie among firefighters internally, and the safety of Fire Rescue staff, it is imperative that the community, and Fire Rescue personnel, have trust in and respect for Fire Rescue.  Ex. 2, McGlynn Aff., ¶ 17-22.

8.       Trust and respect in Fire Rescue from the community is critical because the public calls upon Fire Rescue personnel, among other things, to (a) enter their private homes where they keep their personal valuables, (b) competently respond during a crisis, and (c) provide reliable paramedical care and recommendations to the sick and injured. Ex. 2, McGlynn Aff., ¶ 19.

9.      Additionally, trust among fire rescue personnel is essential because they (a) live with one another in close quarters while on duty and (b) respond to life-and-death situations where they must (c) depend upon each other performing their tasks and (d) follow the direction of their commanding officer.  The relationship between fire rescue personnel must be built on trust and respect for one another in order to succeed in the field during difficult and often times dangerous situations. *Id*. at ¶ 20.

II.   **FIRE RESCUE'S SOCIAL MEDIA POLICY**

10.    Fire Rescue recognizes that social media is an effective way to communicate with the community it serves and with firefighters in general, and that social media may have a positive impact on how the community views Fire Rescue.  *Id*. at ¶ 10.  For that reason, Fire Rescue itself has a Facebook page.  *Id*.  Fire Rescue's Facebook page is available at https://www.facebook.com/PBCFireRescue/.  It also has PPM# FR-A-405, to explain proper uses of the official Fire Rescue Facebook page.  *See* PPM# FR-A-405, *See* Exhibit 5.

11.    Fire Rescue also understands that social media, when used inappropriately, can erode the public's trust in the department. Ex. 2, McGlynn Aff., ¶ 11.

12.    Recognizing this, and in an effort to support and encourage proper use of social media, Fire Rescue established a "Social Media Policy" to maintain the public trust by prohibiting speech that could cause the public to question Fire Rescue's ability to assist, treat, and tend to citizens competently, even-handedly, and without bias.  *See id*. at ¶ ¶ 17-22. As part of its Policies and Procedures, Fire Rescue issued its first version of a Social Media Policy on December 21, 1991.  *Id*. at ¶ 12. Originally, Fire Rescue's Social Media Policy was PPM#FR I-71. *Id*.

13.    In April of 2016, Fire Rescue updated and amended its Social Media Policy, and renumbered it as PPM#FR A-404 (the "2016 Social Media Policy").  *Id*. at ¶ 13. On March 1, 2018, Fire Rescue made a clerical correction to the Social Media Policy, but mostly left the policy unchanged.  *Id*.

14.    On February 6, 2019, when O'Laughlin and Little authored the Facebook posts leading to disciplinary action against them, Fire Recue had the 2016 Social Media Policy in effect. *Id*. at ¶ 14.

15. On February 28, 2019, Fire Rescue again updated and amended its Social Media Policy. *Id.* at ¶ 14. The amended version became effective on March 14, 2019, (the "Social Media Policy"), and is in effect today. *Id.* The Social Media Policy, which is the basis of this lawsuit, *See* Exhibit 6.

16. The Social Media Policy states, in pertinent part:

**PURPOSE**: The purpose of this policy is to provide guidelines on the procedure and use of social media and social networking.

**Personal Use**:

a. Fire Rescue recognizes the employee's right to participate in social networking/social media sites or maintain personal web pages, blogs or other types of online platforms while off-duty. However, it is strongly recommended employees use caution in their usage of social networking/ social media sites especially when displaying personal profiles so as not to discredit themselves or the agency.

b. …

c. …

d. While **on-duty or off-duty** employees are prohibited from disseminating content that is inconsistent with the duties, conduct, and responsibilities of a Fire Rescue employee, including content that could be reasonably interpreted as having an adverse effect on Fire Rescue morale, discipline, operations, the safety of the staff, or the perception of the public.
    i. For example, unprofessional, unbecoming, illegal, unethical, sexual, violent, harassing, racist, sexist, or ethnically derogatory comments, pictures, artwork, videos, material or other such references all tend to undermine the public trust and confidence required by employees of Fire Rescue.

e. . . .

f. . . .

g. Employees who choose to maintain or participate in social networking/social media sites while on-duty or off-duty shall

conduct themselves with professionalism and in such a manner that shall not reflect negatively upon this agency or its mission.

h.   . . .

i.   . . .

j.   Failure to comply with this policy may result in discipline up to and including termination. Authorized exceptions to this policy may be permitted by the Fire Rescue Administrator or designee for the operational needs of Fire Rescue. Employees are strongly encouraged to use caution and seek guidance of their supervisors regarding any posting that may adversely reflect upon Fire Rescue or the professionalism and integrity of the employee.

k.   Employees shall not post, transmit, or otherwise disseminate any information (data, text, photographs, audio, video, or any other multimedia file) to which they have access to as a result of their employment without written permission from the Fire Rescue Administrator or designee.

Ex. 6, the Social Media Policy.

17.     The purposes of the Social Media Policy include (1) establishing a policy concerning personal web pages or internet sites when referencing Fire Rescue to ensure employees use appropriate discretion so as to not impede Fire Rescue's ability to serve the community and maintain the community's trust and respect; (2) clearly identifying prohibited activities by Fire Rescue employees on social networking and other web sites; (3) providing guidelines for Fire Rescue employees in applying rules of conduct to their online content; (4) protecting Fire Rescue and its employees from harm as a result of inappropriate postings or inadvertent harmful postings; (5) and maintaining order and discipline within Fire Rescue to promote efficient operations, trust and camaraderie among our firefighters internally, and the safety of staff. Exhibit 2, McGlynn Affidavit, ¶ 17.

18.     The Social Media Policy plays an important role in helping Fire Rescue, and its personnel, maintain professionalism, ethics, integrity, and the public's trust in Fire Rescue in order to best serve the community.  *Id*. at ¶¶ 18, 21.

19.     In opting to maintain the current Social Media Policy, Fire Rescue consulted with Curtis Varone, a veteran fire chief officer and licensed attorney that focuses on fire service legal matters, Battalion Chief Neil Niemcyzk, who's niche is the topic of policy renewal process and procedure, and also consulted with Lexipol, a provider of public safety policy and training solutions for law enforcement, fire and rescue, and corrections. *See* https://www.lexipol.com/.  *Id*. at ¶ 16. Additionally, Fire Rescue reviewed the social media policies of other fire departments.  *Id*.

III.   **THE PLAINTIFFS**

A.     **Plaintiff AJ O'Laughlin**

20.     Plaintiff AJ O'Laughlin ("O'Laughlin") has been employed by Palm Beach Fire rescue ("Fire Rescue") for eighteen (18) years, since 1992. *See* voteolaughlin.com website, about me section, *See* Exhibit 7; McGlynn Aff., ¶ 7, Ex. 2.

21.     He has been a member of the International Association of Fire Fighters Local 2928 Union (the "Union") for the duration of his employment with Fire Rescue. *See* O'Laughlin's Resp. to Interrogatory No. 3, (stating that he has been a member of the Union since 1992), attached as *See* Exhibit 8.

22.     O'Laughlin has held the rank of Captain since 2009. *See* [DE 32, ¶ 1]; Ex. 2, McGlynn Aff., ¶ 7.  Consequently, O'Laughlin has been responsible for understanding *and enforcing* the Social Media Policy for over ten years.  Ex. 4, Captain Job Description.

23.     In 2018, O'Laughlin ran for the position of Union President against opponent Scott Bielecky.   Ex. 8, O'Laughlin's Resp. to Interrogatory No. 4; [DE 32, ¶ 1].

24.     As part of his campaign for Union President, O'Laughlin created an invitation-only Facebook page named "AJ O'Laughlin – Make our Union Strong again" (the "Facebook page"). *Id*. at Resp. to Interrogatory No. 5; [DE 32, ¶ 8]; [DE 45, pg. 2].

25.     On February 6, 2019, O'Laughlin posted a screen shot of a Fire Rescue computerized scheduling program (the "Tele-staff photo"), purporting to demonstrate Captain Jeffrey Newsome's use of Union Time Pool ("UTP"), accompanied by various Facebook posts on the Facebook page.  [DE 32, ¶ 10]; [DE 45, pg. 2]. The Facebook posts accused Captain Newsome of misusing UTP. [DE 32, ¶¶10, 13]; *See* the Facebook Posts, Exhibit 9.  Additionally, the Facebook posts also criticized the Fire Rescue's staffing officer.  *Id*.

26.     UTP is a pool of hours donated by all Union members to allow union officers to be paid their regular salaries for doing union business on days they would otherwise be scheduled to work.  [DE 32, ¶ 9]; [DE 45, pg. 2].  UTP is, in essence, "an internal union-specific, paid-time-off sharing mechanism." [DE 45, pg. 5].

27.     It is undisputed that Captain Newsome never used UTP on holidays, as alleged by Plaintiffs in the Facebook posts.  [DE 45, pg. 6]; Ex. 2, McGlynn Aff., ¶ 25.

28.     After O'Laughlin posted the Facebook posts, Captain Newsome submitted an internal complaint regarding Plaintiffs' Facebook posts.  *See* February 7, 2019 Captain Newsome Letter, Exhibit 10; [DE 32, ¶ 16].

29.     Fire Rescue conducted an internal review regarding whether O'Laughlin and Little posted the Facebook posts and whether Captain Newsome misused UTP. Ex. 2, McGlynn Aff., ¶¶ 23-26; *See* McCabe Affidavit, ¶¶ 5-7, Exhibit 11.

30.     The internal review verified that O'Laughlin and Little did post the Facebook posts at issue in this case and that Captain Newsome did not misuse UTP. McGlynn Aff., ¶¶ 23-26.

31.     Fire Rescue then evaluated the propriety of the Facebook posts under the Fire Rescue Social Media Policy (the "Social Media Policy") and determined that the posts violated the Social Media Policy.  Ex. 11, McCabe Aff., ¶¶ 5-11; McGlynn Aff., ¶¶ 23-26.

32.     Based on the Facebook posts, Fire Rescue decided to issue O'Laughlin (and Crystal Little) the lowest form of discipline possible, a written warning. Ex. 2, McGlynn Aff., ¶ 26; [DE 32, ¶ 22].  *See* O'Laughlin's written warning Exhibit 12.

33.     Timothy McCabe, O'Laughlin's supervisor in February 2019, signed the Notification and Acknowledgement of Violation of Rules and Regulations Palm Beach Fire Rescue, memorializing the written warning, on February 25, 2019.  Ex.11, McCabe Aff., ¶ 5.

B.     **Plaintiff Crystal Little**

34.     Plaintiff Crystal Little ("Little") has been employed by Fire Rescue since 2005 and has held the rank of Captain since 2015.  [DE 32, ¶ 1]; Ex. 2, McGlynn Aff., ¶ 8.  Consequently, Little has been responsible for understanding *and enforcing* the Social Media Policy for five years. Ex. 4, Captain Job Description

35.     She has been a Union Member for the past fifteen (15) years. Little's Resp. to Interrogatory No. 3, *See* Exhibit 13.

36.     During O'Laughlin's campaign for Union President, Little was "an O'Laughlin partisan." [DE 32, ¶ 14].

37.     On February 6, 2019, Little responded to O'Laughlin's Facebook post with the following post: "Nice to know the current retired president thinks it's ok to use UTP for holidays!! Thanks AJ for keeping them accountable. And on that note our f**king stellar staffing officer just blindly approves it? Wtf!"  [DE 32, ¶ 14], Ex. 9, Facebook posts.

38.     Little was familiar with the duties of a Fire Rescue staffing officer because she held that position prior to authoring the Facebook posts. [DE 32, ¶ 14].  By the time Little authored the Facebook posts, she had already transferred back to the field. *Id.*

39.     Captain Newsome's internal complaint also brought Little's Facebook posts to Fire Rescue's attention.  Ex. 10, Newsome's Internal Complaint.

40.     Based on the content of the Facebook posts, and the language used therein, Fire Rescue determined that Little's posts violated the Social Media Policy.  Ex. 2, McGlynn Aff., ¶¶ 23-26.

41.     As was done with O'Laughlin, Fire Rescue decided to issue Little the lowest form of discipline possible, a written warning. Ex.2, McGlynn Aff., ¶ 26; [DE 32, ¶ 22].  *See* Little's written warning, Exhibit 14.

IV.    **THE INSTANT LAWSUIT**

42.     On May 14, 2019, Plaintiffs filed a Complaint in state court seeking an injunction enjoining the County from enforcing Fire Rescue's Social Media Policy and ordering the County to rescind the "written warning" discipline received by Plaintiffs for violating Fire Rescue's Social Media Policy (the "Social Media Policy").  [DE 1-1].

43.     The County removed Plaintiffs' Complaint to Federal Court on May 29, 2019 and filed a Motion to Dismiss the Complaint. [DE 1], [DE 11].

44.     On January 3, 2020, this Court entered an Order granting the County's Motion to Dismiss and holding that "Plaintiffs fail[ed] to sufficiently allege that they were speaking as private citizens on matters of public concern."  [DE 31, pg. 6].

45.     Plaintiffs filed an Amended Complaint on January 23, 2020, asserting both as-applied and facial challenges to the Social Media Policy and alleging that: (1) Fire Rescue violated

her First Amendment rights by disciplining her as a result of her Facebook posts in violation of her freedom of speech rights; (2) Fire Rescue violated her First Amendment rights by disciplining her as a result of her associational conduct with the Union in violation of her freedom of association rights; (3) the Social Media Policy is a prior restraint and (4) the Social Media Policy is facially unconstitutional because it is vague and overbroad.

46.     On July 6, 2020, this court granted in part the County's Motion to Dismiss the Amended Complaint.  [DE 45]. Consequently, for purposes of this Motion for Summary Judgment, the only remaining issue is Plaintiffs' facial challenge to the Social Media Policy.

Respectfully submitted,

_/s/ Anaili Medina Cure_____/

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 20, 2020, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send an electronic notice to the authorized CM/ECF filers.

/s/ Anaili Medina Cure_____/
Anaili Medina Cure, Esquire
Assistant County Attorney
Florida Bar No. 119558
300 North Dixie Highway, Third Floor
West Palm Beach, Florida 33401
Tel.: (561) 355-6021/Fax: (561) 233-2270
Primary Email:        acure@pbcgov.org
Secondary Emails:     dfishel@pbcgov.org
                      swebber@pbcgov.org

ORDINANCE NO. 83-23

AN ORDINANCE OF THE BOARD OF COUNTY COMMISSIONERS OF PALM BEACH COUNTY, FLORIDA, ADOPTED PURSUANT TO CHAPTER 83-495, LAWS OF FLORIDA, CHAPTER 125 FLORIDA STATUTES, PROVIDING FOR AN EFFECTIVE DATE OF THIS ORDINANCE AND A REPEAL OF CHAPTER 63-1747, LAWS OF FLORIDA, AS AMENDED; PROVIDING FOR THE CREATION AND PURPOSE OF FOUR FIRE/RESCUE MUNICIPAL SERVICE TAXING UNITS; PROVIDING THAT THE BOARD OF COUNTY COMMISSIONERS SHALL BE THE GOVERNING BODY; PROVIDING POWERS OF SAID MUNICIPAL SERVICE TAXING UNITS; PROVIDING FOR FUNDING POWERS AND LIMITATIONS; PROVIDING FOR THE CONTRACTING WITH LOCAL GOVERNMENT FOR THE PROVISION OF SERVICES, THE CONSIDERATION FOR SUCH, AND THE APPLICABILITY OF COUNTY ORDINANCES: PROVIDING FOR THE ADOPTION OF A BUDGET AND REIMBURSEMENT FOR USE OF EQUIPMENT OR PERSONNEL, PROVIDING FOR THE TRANSFER OF ASSETS AND LIABILITIES FROM FIRE CONTROL TAXING DISTRICTS: PROVIDING FOR NO IMPAIRMENT OF PENSION OR RETIREMENT RIGHTS; PROVIDING FOR A PRE TRANSFER ACCOUNTING; PROVIDING FOR THE ESTABLISHMENT OF ADMINISTRATIVE PROCEDURES AND STRUCTURES, PROVIDING FOR SEVERABILITY; PROVIDING CODIFICATION

*AMENDED See © 85-22*
*85-17*
*86-8*
*86-22*
*86-24*
*86-25*
*92-38*
*96-12*
*96-68*
*Repealed by 99-44*
*amended by 2004-046*

WHEREAS, after thorough study, public discussion, and consideration, it has been determined by the Board of County Commissioners of Palm Beach County that unification of the existing Palm Beach County Fire Control Taxing Districts created pursuant to Chapter 63-1747, Laws of Florida, as amended, is desirable, and

WHEREAS, the Legislature of the State of Florida has, by Chapter 83-495, Laws of Florida, provided for the repeal of Chapter 63-1747, Laws of Florida, as amended, and the dissolution of all fire control taxing districts created thereunder upon the adoption of an ordinance by the Palm Beach County Board of County Commissioners for the creation of Municipal Service Taxing Unit(s) to provide fire protection and advanced life support/fire rescue services to those portions of the unincorporated area of Palm Beach County presently served by fire control taxing districts created pursuant to Chapter 63-1747, Laws of Florida.

WHEREAS, Florida Statutes Chapter 125 provide for the formation of Municipal Service Taxing Units by county ordinance for the provision of municipal services;

# EXHIBIT 1

WHEREAS, Chapter 83-495, Laws of Florida, establishes certain powers and conditions of said Municipal Service Taxing Units supplementary to and superseding Florida Statutes Chapter 125,

NOW THEREFORE BE IT ORDAINED BY THE BOARD OF COUNTY COMMISSIONERS OF PALM BEACH COUNTY, FLORIDA (hereinafter called "BOARD") as follows:

Section 1.   EFFECTIVE DATE, REPEALER

This Ordinance shall become effective upon adoption by the Board of County Commissioners of Palm Beach County, Florida, and upon receipt of acknowledgement by the Department of State, provided, however, the Municipal Service Taxing Units created herein shall not be empowered to exercise any of the powers established by this ordinance or any special or general law, as may be amended, prior to September 30, 1984; and, provided further, Chapter 63-1747, Laws of Florida, as amended, shall be repealed, and the Fire Control Taxing Districts created thereby shall be dissolved, concurrent with the empowering of said municipal service taxing units pursuant to this section.

Section 2   CREATION, PURPOSE

There is hereby established four (4) Municipal Service Taxing Units, pursuant to, and in accordance with, the authority granted in Section 125.01(1)(q)(r), Florida Statutes.  Said Municipal Service Taxing Units shall be known as Fire/Rescue MSTU No. 1, No. 2, No. 3, and No. 4 respectively, each of which shall consist of a specific portion of the unincorporated area of the County of Palm Beach as described in the legal description for each of said four (4) Municipal Service Taxing Units, set forth in Exhibit "A" attached hereto and incorporated herein for all purposes.  Each of said Municipal Service Taxing Units shall consist of the specifically described portion of the unincorporated area of Palm Beach County, excepting all municipalities, as said municipalities now exist and as said municipalities may from time to time be changed in accordance with law.  The purpose of each of said Fire/Rescue MSTU shall be to provide fire protection, fire rescue, advance life support (or similar service), and any and all necessary and incidental powers to effect the purposes set forth herein within each of the respective Municipal Service Taxing Units pursuant to this ordinance and in compliance with law.

SECTION 3.   GOVERNING BODY

ORDINANCE NO. 83-23

The Board of County Commissioners of Palm Beach County shall be the Governing Body of each of the taxing units created by this ordinance.  All

2

references to either of said type of bodies herein shall be deemed to include both, as appropriate.

### SECTION 4.  POWERS

Each of said taxing units shall have the power to levy ad valorem taxes, to contract, borrow and expend funds, issue bonds, certificates of indebtedness, revenue certificates, and other obligations of indebtedness, and to exercise any other power as granted by general or special law.  Each taxing unit is authorized to enter into contracts with Municipalities, Counties and other units of government for the purpose of obtaining or providing any or all of the services the unit is established to provide.

### SECTION 5.  FUNDING

Each Municipal Service Taxing Unit created hereunder shall be funded through the levy of an ad valorem tax; which shall not exceed three (3) mills and which together with all other ad valorem taxes levied for municipal services within the unit shall not exceed ten (10) mills, against the assessed value of all lawfully taxable property situated within the boundaries of the respective taxing unit; service charges, if any, contractual charges, if any, special assessments, if any, and any other income or source of funds, attributable to the respective taxing units.  Any funds lawfully available from any source may be utilized to fund the service provided pursuant to this ordinance.

### SECTION 6.  CONTRACTING FOR SERVICES

(a)  Any municipality, special district, or other unit of local government contracting for the provision of services by any said taxing unit shall be required to pay as consideration for such services an amount equal to that amount which would be levied by the taxing unit if the area of said municipality, special district, or other unit of local government served was included in the taxing unit.  Adjustments shall be made to said consideration for annexation or deannexation in accordance with the standard set forth in this section.  Pro rata adjustments shall be made in accordance with the proportion of the fiscal year for which the area deannexed or annexed is within or without the municipality served.

(b)  Any Palm Beach County ordinance(s) pertaining to fire protection and/or advanced life support/fire rescue, applicable to the Municipal Service Taxing Unit(s) shall be applicable to, and effective within the area of, any

ORDINANCE NO. 83-23

municipality, special district, or other unit of local government which contracts for the provision of services by the taxing unit.

(c)  All other contractual terms, including but not limited to length of said contract, shall be set forth in an interlocal agreement between the municipality, special district, or other unit of local government and the Municipal Service Taxing Unit.

SECTION 7.  BUDGET ADOPTION:

Each year, the taxing unit shall adopt an annual budget according to the requirements of Chapter 129, Florida Statutes.  The Board of County Commissioners of Palm Beach County thereafter may cause such millage to be levied against all lawfully taxable property within said unit as is sufficient to raise the budget.  All funds so raised shall be used solely for the expenses of the taxing unit.  In the event that equipment or personnel are utilized outside of the Fire/Rescue MSTU, reimbursement to the Fire/Rescue MSTU for such utilization shall be effected.  Proper accounts and records shall be kept at all times.

SECTION 8.  TRANSFER OF ASSETS AND LIABILITIES

All assets and legal liabilities of the Fire Control Taxing Districts created pursuant to Chapter 63-1747, Laws of Florida, as amended, shall be transferred to or assumed by Palm Beach County to be used within, or paid from the coffers of, the Municipal Service Taxing Unit.  Said transfer and assumption shall be effective within the incorporated areas then previously served by the Fire Control Taxing District as though such incorporated area are included in the Municipal Service Taxing Unit.

SECTION 9.  RETIREMENT OR PENSION RIGHTS

Pursuant to Section 112.0515, Florida Statutes nothing herein shall diminish or impair the rights of any employee or officer of a Fire Control Taxing District in any retirement or pension fund.

SECTION 10. PRE-TRANSFER ACCOUNTING

Prior to October 1, 1984, an accounting shall be performed to determine the assets and liabilities, the form thereof, and any restrictions thereon, of the Fire Control Taxing Districts.

ORDINANCE NO. 83-23

SECTION 11.   ADMINISTRATION

The Governing body may establish such administrative structures and procedures as it deems appropriate or necessary to effect the purpose and intent of this ordinance.

SECTION 12.   SEVERABILITY

If any provision of this ordinance is held invalid by a Court of competent jurisdiction the remainder of this ordinance shall not be effected by such invalidity.

SECTION 13. CODIFICATION

The provision of this ordinance shall become and be made a part of the Code of Laws and Ordinances of Palm Beach County, Florida; and the Sections of this ordinance may be renumbered or relettered to accomplish the same and the word "Ordinance" may be changed to "Section", "Article" or other appropriate word.

Passed and adopted by the Board of County Commissioners of Palm Beach County, Florida on the ___20th___ day of ___December___, 1983.

PALM BEACH COUNTY, FLORIDA, BY ITS
BOARD OF COUNTY COMMISSIONERS

By √ _____
                        Vice-Chairman

Acknowledged by the Department of State, State of Florida, on the ___23rd___ day of ___December___, 1983.

EFFECTIVE DATE:  Acknowledgement from the Department of State, State of Florida, was received on ___December 28,___, 1983, at ___11:32__ A. M. and filed in the Office of the Clerk of the Board of County Commissioners of Palm Beach County, Florida.

APPROVED AS TO FORM AND
LEGAL SUFFICIENCY

By _____
     County Attorney

ORDINANCE NO. 83-23

Beginning at the water's edge of the Atlantic Ocean on the north boundary line of Palm Beach County, run westerly, southerly, then westerly along said north boundary line to the intersection with the easterly right-of-way line of S.R. 710 (Beeline Highway); thence run southeasterly along said right-of-way line to the intersection with the south line of Section 18, Township 41 South, Range 41 East; thence run easterly along the south line of said Section 18 and the south lines of Section 17, 16, 15, 14 and 13; and a portion of all in Township 41 South, Range 41 East, and the south line of Section 18, Township 41 South, Range 42 East to the intersection with the westerly line of that portion of the Canal C-18 which runs north and south; thence run northerly along the said westerly line of Canal C-18 to the extended centerline of Fred Small Road; thence run Easterly along said extended centerline to the west line of Section 18, Township 41 South, Range 43 East, said line being the corporate limits of the Town of Jupiter; thence run southerly and easterly along said corporate limits to the water's edge of the Atlantic Ocean; thence run northerly along said water's edge to the POINT OF BEGINNING.

Less, therefrom the incorporated areas contained therein.

Said area consisting of all unincorporated area formerly known as Jupiter Fire Control District Number One and Northeast Fire Control District Twelve.

Exhibit A
Page 1 of 5

ORDINANCE NO. 83-23

Beginning at a point where the water's edge of the Atlantic Ocean intersects the Easterly extension of S.R. 804 (N.E. 2nd Avenue), run thence along the following numbered courses.

1. Westerly along S.R. 804 and the Easterly extension thereof to the South Florida Water Management District Levee 40; thence

2. Northwesterly along S.F.W.M.D. Levee 40 to the West line of Section 30, Township 44 South, Range 41 East; thence

3. Northerly along the West line of Range 41 East to the Northwest corner of Section 19, Township 44 South, Range 41 East; thence

4. Westerly along the prolongation of the North line of Section 19, Township 44 South, Range 41 East, to the S.F.W.M.D. Levee 40; thence

5. Northwesterly along the S.F.W.M.D. Levee 40 to the centerline of State Road 80; thence

6. Westerly along the centerline of State Road 80 to the intersection of the centerline of U.S. Highway 98; thence

7. Northwesterly along the centerline of U.S. Highway 98 to the West line of Range 40 East; thence

8. North along the West line of Range 40 East to the Northeast corner of Section 1, Township 43 South, Range 39 East; thence

9. East along the South line of Section 36, Township 42 South, Range 39 East, to the Southeast corner of Section 36, Township 42 South, Range 39 East; thence

10. North along the East line of Range 39 to the Southwest corner of Section 18, Township 41 South, Range 40 East; thence

11. East along the South lines of Sections 18, 17, 16, 15, 14, 13 to the Southeast corner of Section 13, Township 41 South, Range 40 East; thence

12. Continue East along the South line of Section 18, 17, 16, 15, 13, Township 41 South, Range 41 East and Section 18, Township 41 South, Range 42 East to the West line of that portion of the C-18 Canal which runs North and South; thence

13. Northerly along the West line of the C-18 Canal to the extended centerline of Fred Small Road; thence

14. Easterly along the extended centerline of Fred Small Road to the West line of Section 18, Township 41 South, Range 43 East, said line being the corporate limits of the Town of Jupiter; thence

15. Southerly and Easterly along said corporate limits of the Town of Jupiter to the water's edge of the Atlantic Ocean; thence

16. Southerly along the water's edge of the Atlantic Ocean to the POINT OF BEGINNING.

LESS, therefrom, the areas of the incorporated communities contained therein.

Said area consisting of all unincorporated area of the area formerly known as Juno Fire Control District Number Three, Old Dixie Fire Control District Number Two, Military Park Fire Control District Number Four, Southwest Fire Control District Number Six, Trail Park Fire Control District Number Seven and Reservation Fire Control District Number Eight.

ORDINANCE NO. 83.23

Exhibit A
Page 2 of 5

Beginning at a point where the water's edge of the Atlantic Ocean intersects the Easterly extension of S.R. 804 (N.E. 2nd Avenue); thence Westerly along S.R. 804 and the Easterly extension thereof to the South Florida Water Management District Levee 40; thence run Southerly along the eastern right-of-way of the Levee 40 to the south line of Palm Beach County in Section 30, Township 47 South, Range 41 East; thence easterly along the south line of Palm Beach County to the water's edge of the Atlantic Ocean; thence northerly along the water's edge of the Atlantic Ocean to the POINT OF BEGINNING.

LESS, thereform, the incorporated areas contained therein.

Said area consisting of all unincorporated area of the area formerly known as Del-Trail Fire Control District Number Nine.

Exhibit A
Page 3 of 5

ORDINANCE NO. 83-23

Begin at the Northwest Corner of the Northeast Quarter of Section 35, Township 40 South, Range 37 East as the point of beginning; then go South along the West line of the East half of Section 35, Township 40 South, Range 37 East, and the West line of the East half of Sections 2, 11, 14 and 23 of Township 41 South, Range 37 East to a point; then go West along the North line of Section 26, Township 41 South, Range 37 East to the Northwest Corner of said Section 26 to a point; then go South along the West line of Sections 26 and 35, Township 41 South, Range 37 East to the Southwest Corner of said Section 35 to a point; then go West along the South line of said Section 34 and the South line of Section 33 to the East line of the U.S. Levee Lake Okeechobee right-of-way to a point; then meandering Northeasterly along the East line of the U.S. Levee Lake Okeechobee right-of-way go to the point of intersection with a line projected West represented by the North line of Section 35, Township 40 South, Range 37 East to a point; then go East along the said projected line and to North line of Section 35, Township 40 South, Range 37 East to the POINT OF BEGINNING.

LESS, therefrom the incorporated areas contained therein.

Said area consisting of the area formerly known as Canal Point Volunteer Fire Control District Number Eleven.

ORDINANCE NO. 83-23

119
Exhibit A
Page 5 of 5



STATE OF FLORIDA, COUNTY OF PALM BEACH
I, SHARON R. BOCK, Clerk and Comptroller
certify this to be a true and correct copy of the original
filed in my office on
dated at West Palm Beach, FL on
By:
Deputy Clerk

December 18th '83
8-20-20

ORDINANCE NO. 83-93

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 19-80701-CIV-DIMITROULEAS/MATTHEWMAN**

AJ O'LAUGHLIN and CRYSTAL LITTLE,
        Plaintiffs,
v.

PALM BEACH COUNTY, a political
Subdivision of the State of Florida,
        Defendant.
_____/

**<u>AFFIDAVIT OF DOUGLAS MCGLYNN</u>**

BEFORE ME, the undersigned authority, personally appeared DOUGLAS MCGLYNN,

who being first duly sworn, on oath, deposes and says:

1.      My name is Douglas McGlynn. I am over the age of 18 and have personal

knowledge of the facts testified to herein.

2.      I have served the Palm Beach County Fire Rescue Department ("Fire Rescue")

since 1999.

3.      Fire Rescue is a paramilitary organization, which follows a chain of command.

4.      Fire Rescue usually answers around 140,000 911 calls for help each year and covers

approximately 1761 square miles.  In responding to calls, Fire Rescue employees often times enter

people's homes and help people in emergency situations.

5.      Currently, I hold the position of Deputy Chief of Operations within Fire Rescue.  I

have held that position since 2018.

6.      As Deputy Chief of Operations, my duties and responsibilities include:

1

# EXHIBIT 2

Plans, directs and coordinates the work of all personnel assigned to the Fire Marshall's Division, the Operation Division or the Administrative Division. Provides for the response of appropriate personnel to emergency incidents for the division. Provides technical assistance and/or administrative support personnel for various Board relating to their assigned division's responsibilities. Responds to major incidents and assumes command of the incident upon deeming such action as necessary. Issues or approves the issuance of all official notices. Initiates, approves or denies the request for transfer between division, subject to the approval of the Fire Rescue Administrator. Prepares and submits an annual budget to the Fire-Rescue Administrator for the operation of the division. Prepares and/or reviews employee evaluation forms and recommends salary increases, demotions and promotions to the Fire Rescue Administrator. Prepares or is responsible for the preparing monthly and annual reports of the activities of the division for submission to the Fire Rescue Administrator. Prepares maps delineating all sources of water available for firefighting purposes. Recommends the purchase of all equipment to the Fire Rescue Administrator. Participates in the development of plans for negotiating with the bargaining unit. Resolves labor relations problems on a daily basis. Additionally, in my position, I have access to the personnel files of PBCFR employees. Said files are also public records.

7.      AJ O'Laughlin has been with PBCFR since 1992 and raised through the ranks until he became a Captain in 2009. He currently holds the position of Station Captain.

8.      Crystal Little has been with PBCFR since 2005 and raised through the ranks until she became a Captain in 2015. She currently holds the position of Station Captain.

2

9.      As Captains, O'Laughlin and Little are in supervisory roles and responsible for the supervision of firefighting personnel.  A Captain position requires the exercise of considerable judgment.  Captains are responsible for enforcing rules, policies and procedures to ensure employee health and safety and for maintaining discipline and morale of station personnel. *See* Captain Job description, a true and correct copy of which is attached as Exhibit 1.

10.     Fire Rescue recognizes that social media is an effective way to communicate with the community it serves and with firefighters in general.  Consequently, Fire Rescue issued PPM# FR-A-405, Use of Social Media to Publicize Departmental Services and runs an official Fire Rescue Facebook page, available at https://www.facebook.com/PBCFireRescue/.   A true and correct copy of PPM# FR-A-405 is attached as Exhibit 2.

11.     While Fire Rescue recognizes and understands the positive impact social media may have on the department and its employees, it also understands that social media, when used inappropriately, can erode the public's trust in the department.

12.     Consequently, as part of its Policies and Procedures, Fire Rescue issued its first version of a Social Media Policy on December 21, 1991.  Originally, Fire Rescue's Social Media Policy was PPM#FR I-71. A true and correct copy of the Original Social Media Policy, issued on December 21, 1991, is attached as Exhibit 3.

13.     In April of 2016, Fire Rescue updated and amended its Social Media Policy, and renumbered it as PPM#FR A-404 (the "2016 Social Media Policy").  On March 1, 2018, Fire

Rescue made a clerical correction to the Social Media Policy, but mostly left the policy unchanged.

A true and correct copy of the 2016 Social Media Policy is attached as Exhibit 4.

14.     On February 6, 2019, when O'Laughlin and Little made the Facebook posts leading

to disciplinary action against them, Fire Recue had the 2016 Social Media Policy in effect.  *See*

Ex. 4.

15.     On February 28, 2019, Fire Rescue again updated and amended its Social Media

Policy.  The amended version became effective on March 14, 2019, (the "Social Media Policy"),

and is in effect today.[1]  A true and correct copy of the Social Media Policy in effect since March

14, 2019, is attached at Exhibit 5.

16.     In opting to maintain the current Social Media Policy, Fire Rescue consulted with

Curtis Varone, a veteran fire chief officer and licensed attorney that focuses on fire service legal

matters, Battalion Chief Neil Niemcyzk, who's niche is the topic of policy renewal process and

procedure, and also consulted with Lexipol, a provider of public safety policy and training

solutions for law enforcement, fire and rescue, and corrections. *See* https://www.lexipol.com/.

Additionally, Fire Rescue reviewed the social media policies of other fire departments.  Based on

these efforts, Fire Rescue believes that its Social Media Policy is constitutional and narrowly

tailored to achieve the purposes for which it was enacted.

---

[1] It is my understanding that in ruling on the County's Motion to Dismiss, the Court in this case relied on the 2019 version of the Social Media Policy.

17.     The purposes of the Social Media Policy include (1) establishing a policy concerning personal web pages or internet sites when referencing Fire Rescue to ensure employees use appropriate discretion so as to not impede Fire Rescue's ability to serve the community and maintain the community's trust and respect; (2) clearly identifying prohibited activities by Fire Rescue employees on social networking and other web sites; (3) providing guidelines for Fire Rescue employees in applying rules of conduct to their online content; (4) protecting Fire Rescue and its employees from harm as a result of inappropriate postings or inadvertent harmful postings; (5) and maintaining order and discipline within Fire Rescue to promote efficient operations, trust and camaraderie among our firefighters internally, and the safety of staff.

18.     Fire Rescue's Social Media Policy is thus important in helping Fire Rescue maintain professionalism, ethics, integrity, and the public's trust in our fire department in order to best serve our community.

19.     Due to the nature of the work and service provided by Fire Rescue, professionalism, ethics, and integrity are of paramount importance within Fire Rescue and for the benefit of the community at large. Trust and respect in Fire Rescue from the community is critical because the public calls upon Fire Rescue personnel, among other things, to (a) enter their private homes where they keep their personal valuables, (b) competently respond during a crises, and (c) provide reliable paramedical care and recommendations to the sick and injured.

20.     Further, trust among fire rescue personnel is essential because they (a) live with

one another in close quarters while on duty and (b) respond to life-and-death situations where they must (c) depend upon each other performing their tasks and (d) follow the direction of their commanding officer. The relationship between fire rescue personnel must be built on trust and respect for one another in order to succeed in the field during difficult and often times dangerous situations.

21.    To achieve and maintain trust and respect, both internally and from the community, we, as firefighters, must place reasonable restrictions on our conduct and hold to these standards of conduct whether on or off duty. An employee's actions and/or conduct must not negatively interfere with Fire Rescue's ability to serve its community.

22.    It is detrimental to the operation of Fire Rescue for the community, and fire rescue personnel, to lose trust and respect for Fire Rescue. Fire Rescue anticipates that the community and its employees' trust and respect for Fire Rescue are eroded by comments suggesting that Fire Rescue employs liars, thieves, individuals whom are not "stellar" at their jobs, or individuals who rubber stamp/ "blindly approve" items.

23.    The Facebook posts, for which AJ O'Laughlin and Crystal Little were issued written warnings, refer to a Captain Newsome as a "thief," state that there is a need to keep one's locker closed around Captain Newsome, refer to a staffing officer as "fucking stellar," in a sarcastic method, and state that the "fucking stellar staffing officer blindly approves" whatever is before him.

24.     These comments directly violate the Social Media Policy.  Further, AJ O'Laughlin also posted a picture of an internal and private tele-staff calendar on social media.  That conduct is a direct violation of Section (2)(j) of the Social Media Policy.  As such, discipline was warranted.

25.     The Plaintiffs' comments are even more egregious due to their disregard for the truth.  Before a determination was made to issue a written warning, the department conducted an internal review regarding the veracity of the statements. The review concluded that "there was no wrongdoing by Captain Newsome."

26.     Based on these findings and the content of the postings, the department ultimately opted to proceed with a written warning for AJ O'Laughlin and Crystal Little. A written warning is the lowest form of discipline that the department can issue.

[*Space intentionally left blank*]

FURTHER AFFIANT SAYETH NAUGHT.

_____
DOUGLAS MCGLYNN

The foregoing affidavit was sworn to and subscribed before me by means of [ ] physical presence OR [ ] online notarization, this _20th_ day of _August_ 2020, by _Douglas McGlynn_ who is [ ] Personally known to me OR [ ] Produced Identification: _____

(type of identification)

ANGELA BROWN
Commission # GG 085693
Expires April 9, 2021
Bonded Thru Troy Fain Insurance 800-385-7019
(seal)

_____
Notary Public, State of Florida

07420

## CAPTAIN

### NATURE OF WORK

This is supervisory and skilled public safety work in the protection of life and property through the direction and coordination of fire prevention; suppression and EMS activities on an assigned shift.

An employee in a position allocated to this class, in addition to all of the requirements of a Firefighter, is responsible for the supervision of firefighting personnel and maintenance of the facilities, equipment and vehicles in a single fire station. The Captain is responsible for effectively managing and combating a fire until relieved of command by a superior officer. Employees in this class drill and instruct their subordinates in conjunction with the Training Division. Considerable judgment is exercised in the daily operations of the fire station.

### EXAMPLES OF WORK

Writes performance evaluations; issues counseling forms/disciplinary actions; handles employee complaints and grievances.

Acts as a shift officer within a station, performs all supervisory duties and responsibilities accordingly and coordinates and assigns all duties on a shift.

Responds with a company to mitigate the scene of fires or other emergencies; evaluates, allocates and requests additional resources; supervises, directs and assists the company's activities while engaged in emergency operations.

Supervises the care and appropriate maintenance of assigned station facilities and grounds.

Enforces rules, policies and procedures to ensure employee health and safety.

Maintains station records and timely submission of Fire Department reports.

Conducts in-station training classes according to department training schedules.

Conducts in-service fire prevention surveys; to include five inspections to monitor target hazards with Quick Access Surveys (QAS's).

Maintains discipline and morale of station personnel.

Has authority to initiate the recommendation for transfer, reprimand, suspension and assignment of personnel to his/her superior.

Adjusts, or attempts to adjust, a grievance at his/her authoritative level.

May assist and make recommendations in all periodic evaluations of member's performance.

Performs related work as required.

07420

## CAPTAIN – CONT'D

**REQUIRED KNOWLEDGE, SKILLS AND ABILITIES**

Considerable knowledge of firefighting to include incident management, fire rescue, EMS, evacuation, exposures, confinement, extinguishments, radio communication, ventilation, salvage and overhaul.

Knowledge of fire prevention techniques.

Knowledge of the principles, practices and methods of emergency/rescue operations.

Thorough knowledge of the geography of the response areas with special emphasis on target hazards, water distribution.

Extensive knowledge of fire department equipment and material, policies and procedures.

Ability to detect and properly report the existence of common fire hazards.

Ability to react quickly and calmly in emergencies and to direct the work of subordinates in emergency situations.

Ability to effectively supervise a working shift.

Ability to independently act in the absence of a senior officer.

**MINIMUM ENTRANCE REQUIREMENTS**

Graduation from high school or an equivalent recognized certification; a current Florida Certificate in fire fighting as approved by the State of Florida Bureau of Fire Standards; and currently meet all of the certification requirements under Florida Statute 633, as outlined in the Collective Bargaining Agreement.

**Rev. 12/2011**

Exhibit 2

| | |
|---|---|
| **TO:** | **ALL PALM BEACH COUNTY FIRE RESCUE PERSONNEL** |
| **FROM:** | **MICHAEL C. MACKEY**<br>**FIRE RESCUE ADMINISTRATOR** |
| **PREPARED BY:** | **FIRE RESCUE PPM COMMITTEE** |
| **SUBJECT:** | **USE OF SOCIAL MEDIA TO PUBLICIZE DEPARTMENTAL SERVICES** |
| **PPM #:** | **FR-A-405** |

| | |
|---|---|
| <u>**ISSUE DATE**</u> | <u>**EFFECTIVE DATE**</u> |
| **February 24, 2011** | **July 06, 2018** |

<u>**PURPOSE**</u>:   To define the procedure for using social media to publicize Fire Rescue facilities, programs, and services.

<u>**UPDATES**</u>:   Future updates to this PPM are the responsibility of the Deputy Chief of Administration, in conjunction with the PPM Committee, under the authority of the Fire Rescue Administrator.

<u>**AUTHORITY**</u>:
- Fire Rescue Administrator
- Florida Statues, Chapter 11
- CW-R-008: Internet Use Policy
- CW-R-113: Social Networking Policy
- DOR-004: E-mail, Internet, and Computer DOO-033: Preparation and Distribution of Online and Printed Promotional Documents, as may be amended.

<u>**SCOPE**</u>:       This policy applies to all Palm Beach County Fire Rescue personnel and reservists.

<u>**POLICY**</u>:     Fire Rescue shall use effective, cost-efficient methods to inform employees and citizens of information including available training events, classes and other Fire Rescue-associated interests.

<u>**PROCEDURE**</u>:

1. Social networking can be a powerful, low-cost, effective, and rapid method of communication in our community. Its use as a marketing tool for the Fire Rescue shall be applied in a responsible, efficient, ethical, and legal manner to support facilities, services, and programs. Use of social networking services for publicity shall be at the discretion of each Deputy Chief or designee.

2. The Deputy Chief or designee shall:
   a. Ensure that the social networking websites selected for use are part of an integrated public communication and marketing strategy;
   b. Ensure all necessary resources are available for current and on-going implementation;

**FR-A-405/Page 1 of 2**

    c. Follow established design standards for social networking accounts developed by the Fire Rescue of Public Affairs (CW-R-113);

    d. Ensure that the information provided through social networking accounts is regularly updated, accurate, consistent, and communicated in a professional manner;

    e. Ensure that the public record retention requirements established by the State of Florida are followed (General Records Schedule GS1-SL) for State and Local Government Agencies;

    f. Routinely monitor the use of all approved social media for compliance (CW-R-113); and take corrective action upon notice of violation (CW-R-113);

    g. Any postings to a Social Media site shall be assumed to be an official opinion/comment of Fire Rescue.

3. The Fire Rescues Public Information Officer and other assigned staff shall help promote authorized social media accounts.

4. Misuse of social media websites may lead to disciplinary action under applicable provisions of the Palm Beach County Merit Rules and DOR-004 or the collective bargaining agreement (Disciplinary Article 15).

5. All postings to social media sites must be forwarded to and processed by the following:
    a. Public Information Officer
    b. Operation's designee
    c. Analyst Programmer (IT)
    d. Web Specialist (Training)

6. They shall be responsible for the site's subject matter and shall be held accountable for content.

7. Fire Rescue reserves the right to not publish any posting and can remove unsuitable content from authorized social networking websites at any time without notice (CW-R-113). The Fire Rescue's Public Information Officer shall have final discretion as to the removal of any posting under question.

*Michael C. Mackey*

**MICHAEL C. MACKEY**
**FIRE RESCUE ADMINISTRATOR**

**Supersession History**
1. PPM#FR I-72, issued 03/02/2011
2. PPM#FR A-405, clerical 03/01/2018
3. PPM#FR A-405, reviewed 07/06/2018

TO:      **ALL OPERATIONAL PERSONNEL AND RESERVISTS OF PALM BEACH COUNTY FIRE RESCUE**

FROM:    **JEFFREY P. COLLINS, FIRE RESCUE ADMINISTRATOR**

**SUBJECT: USE OF SOCIAL MEDIA**

**POLICY#: I-71**

---

| **ISSUE DATE** | **EFFECTIVE DATE** |
|---|---|
| **DECEMBER 21, 1991** | **t/b/d** |

**PURPOSE:**   The purpose of this policy is to provide guidelines on the procedure and use of social media and social networking.

UPDATES:   Any future updates for this policy are the responsibility of the Public Information Officer

**AUTHORITY:**   Fire Rescue Administrator
                Florida Statues, Chapter 11
                CW-R-008: Internet Use Policy
                CW-R-113: Social Networking Policy

**DEFINITIONS:**

A.    **Social Media:** A variety of online sources that allow people to communicate, share information, photos, videos, audio or exchange text and other multimedia files with others via online or cellular network platform. This includes but is not limited to social networking sites, micro-blogging sites, personal blogs/personal websites, and news sites.

B.    **Social Networking:** Online platforms where users can network, socialize, communicate and exchange information with other users via text, live conferencing/chat rooms, photographs and/or video-tapes. Mobile Social Networking refers to social networking using a mobile phone or cellular based device.

C.    **Blogs:** A personal online journal or commentary that allows visitors to post opinions, responses, reactions, or comments to a particular topic and may allow the use of graphics or video. Blogs may be private or accessible to the general public.

D.   **Website/Webpage:**   A webpage is any page you see when accessing the internet.  A website is a collection of one or more web pages.

E.   **Posting:** Typing a message, uploading graphics/videos or any electronic media to an online forum or newsgroup which may be accessible to specific viewers or the general public.

F.   **Personal Website:** An online site created by an individual that may include personal information, commentary, photographs, videos and/or graphics for social, entertainment or business purposes. Personal websites may be private or accessible to general public.

G.   **Profile:** A self-defined description of a person which can be displayed on a webpage or a social networking site, and may display any or all of the following biographical information: age, race, sex, employment, education, religion, political viewpoints, the user's likes and dislikes, current location, hometown, and contact information. Profiles may be private or accessible to the general public.

H.   **Chat Rooms:** An online gathering where users can communicate with each other and exchange information via instant messaging and the information is visible to all people in the chat room. Chat Rooms may be private or accessible to the general public.

**POLICY:**
**Department-Sanctioned Use:**

Palm Beach County Fire Rescue reserves the right to not publish any posting and can remove unsuitable content from authorized social networking websites at any time without notice (CW-R-113). The Department's Public Information Officer shall have final discretion as to the removal of any posting under question. The Department's Public Information Officer & staff assigned by the Deputy Chief of Operations shall help promote authorized social media accounts.

Misuse of social media websites may lead to disciplinary action under applicable provisions of the Palm Beach County Merit Rules or the Collective Bargaining Agreement (Disciplinary - Article 15).

Department personnel representing the department via social media outlets shall do the following:

A.   The use of department computers by department personnel to access social media is prohibited without authorization.

B.      Conduct themselves at all times as representatives of the department and, accordingly, shall adhere to all department standards of conduct and observe conventionally accepted protocols and proper decorum.

C.      Identify themselves as a member of the department.

D.      Post, transmit, or otherwise disseminate confidential information, including photographs or videos, related to department training, activities, or work-related assignments without express written permission.

E.      Do not conduct political activities or private business.

F.      Department personnel use of personally owned devices to manage the department's social media activities or in the course of official duties is prohibited without express written permission.

G.      Employees shall observe and abide by all copyright, trademark, and service mark restrictions in posting materials to electronic media.

H.      Any postings to a Social Media site will be assumed to be an official   opinion/comment of Palm Beach Fire Rescue

**Personal Use**

A.      Palm Beach County Fire Rescue recognizes the employee's right to participate in social networking/social media sites or maintain personal web pages, blogs or other types of online platforms while off-duty. However, it is strongly recommended employees use caution in their usage of social media/social networking platforms especially when displaying personal profiles so as not to discredit themselves or the agency.

B.      Development of an individual departmental networking site representing PBCFR or any battalion/division/station/unit, etc. is prohibited unless approved by the Fire Administrator or designee. **No postings will be permitted without the final approval of the Public Information Office or designee.**

C.      Employees will not use social media/social networking platforms in violation of PBC Merit Rule, the Collective Bargaining Agreement, (Disciplinary Article 15) and either State or Federal law.

D.  Employees are prohibited from using any social media or social networking platform while on duty unless supervisory permission is granted for investigative or public information purposes.

E.  Employees are prohibited from disseminating content that is inconsistent with the duties, conduct and responsibilities of a Palm Beach County Fire Rescue employee including content that could be reasonably interpreted as having an adverse affect upon department morale, discipline, operations, safety of staff, or perception of the public. For example, unprofessional, unbecoming, illegal, unethical, sexual, violent, harassing, racist, sexist, or ethnically derogatory comments, pictures, artwork, videos, material or other such references all tend to undermine the public trust and confidence required by employees of the PBCFR.

F.  Unless authorized by the Fire Administrator or designee, employees are prohibited from posting any confidential, sensitive, or copyrighted information, data, text, photographs, audio, video, or any other multimedia file related to any on-going criminal or administrative investigation of this agency. This includes but is not limited to: photographing or video-taping of fire scenes, crime scenes, traffic crashes, medical/trauma patients, arrestees, evidence, restricted areas of
Governmental facilities, vehicles, other employees, and statements or comments related to any pending prosecutions or investigations.

G.  Employees shall exercise good judgment in displaying logos, badges, seals, uniforms, vehicles, equipment, or any item or symbol that is associated with this agency.

H.  Employees who choose to maintain or participate in social media or social networking platforms while off-duty shall conduct themselves with professionalism and in such a manner that will not reflect negatively upon this agency or its mission. While using social media off duty or in an unofficial capacity, employees are prohibited from speaking or writing in an official capacity, or from representing that they are acting on behalf of Palm Beach County Fire Rescue or the PBC BOCC. Employees are cautioned that speech on-or-off duty, made pursuant to their official duties, generally is not protected speech under the First Amendment and may be subject to disciplinary action if in violation of this policy.

I.  Employees should be aware that the content of social networking sites may be subpoenaed and used to undermine or impeach employee's testimony in a civil or criminal trial or other official proceeding.

J.      Failure to comply with the above guidelines may result in discipline up to and including termination. Authorized exceptions to the above guidelines may be permitted by the Fire Administrator or designee for the operational needs of the department. Employees are strongly encouraged to use caution and seek the guidance of their supervisors regarding any posting that may adversely reflect upon either the agency or upon the professionalism and integrity of the employee.

K.      Department personnel shall not post, transmit, or otherwise disseminate any information (photographic or text) to which they have access as a result of their employment without written permission from the Fire Chief or designee.

L.      Department personnel are cautioned against posting personal photographs or provide similar means of personal recognition that may cause you to be identified as a firefighter, fire officer or employee of this department.

Supersession History
F-R OP#I-72 issued 2/24/2011
F-R OP#I-72 issued 3/24/2011
F-R OP#I-71 issued 4/17/2016

| TO: | **ALL PALM BEACH COUNTY FIRE RESCUE PERSONNEL** |
|---|---|
| FROM: | **MICHAEL C. MACKEY**<br>**FIRE RESCUE ADMINISTRATOR** |
| PREPARED BY: | **FIRE RESCUE PPM COMMITTEE** |
| SUBJECT: | **USE OF SOCIAL MEDIA** |
| PPM #: | **FR-A-404** |

| **ISSUE DATE** | **EFFECTIVE DATE** |
|---|---|
| April 17, 2016 | January 10, 2019 |

**PURPOSE**:   The purpose of this policy is to provide guidelines on the procedure and use of social media and social networking.

**UPDATES**:   Future updates to this PPM are the responsibility of the Deputy Chief of Administration, in conjunction with the PPM Committee, under the authority of the Fire Rescue Administrator.

**AUTHORITY**:
- Fire Rescue Administrator
- Florida Statues, Chapter 11
- CW-R-008: Internet Use Policy
- CW-R-113: Social Networking Policy
- PBCFR HIPAA Policies and Procedures Manual (PPM FR-A-401), as may be amended.

**SCOPE**:   This policy applies to all Palm Beach County Fire Rescue personnel and reservists.

**POLICY**:   This policy applies to the procedure and use of social media and social networking.

**DEFINITIONS**:

1. Social Media – A variety of online sources that allow people to communicate, share information, photos, videos, audio or exchange text and other multimedia files with others via online or cellular network platform. This includes but is not limited to social networking sites, micro-blogging sites, personal blogs/personal websites, and news sites.
2. Social Networking – Online platforms where users can network, socialize, communicate and exchange information with other users via text, live conferencing/chat rooms, photographs and/or video-tapes. Mobile Social Networking refers to social networking using a mobile phone or cellular based device.
3. Blogs – A personal online journal or commentary that allows visitors to post opinions, responses, reactions, or comments to a particular topic and may allow the use of graphics or video. Blogs may be private or accessible to the general public.

4. <u>Website/Webpage</u> – A webpage is any page a person sees when accessing the internet. A website is a collection of one or more web pages.
5. <u>Posting</u> – Typing a message, uploading graphics/videos or any electronic media to an online forum or newsgroup which may be accessible to specific viewers or the general public.
6. <u>Personal Website</u> – An online site created by an individual that may include personal information, commentary, photographs, videos and/or graphics for social, entertainment or business purposes. Personal websites may be private or accessible to general public.
7. <u>Profile</u> – A self-defined description of a person which can be displayed on a webpage or a social networking site, and may display any or all of the following biographical information: age, race, sex, employment, education, religion, political viewpoints, the user's likes and dislikes, current location, hometown, and contact information. Profiles may be private or accessible to the general public.
8. <u>Chat Rooms</u> – An online gathering where users can communicate with each other and exchange information via instant messaging and the information is visible to all people in the chat room. Chat Rooms may be private or accessible to the general public.

**<u>PROCEDURE</u>**:

1. **<u>Department-Sanctioned Use</u>**:
   a. Fire Rescue reserves the right to not publish any posting and can remove unsuitable content from authorized social networking websites at any time without notice (CW-R-113). The Fire Rescue's Public Information Officer shall have final discretion as to the removal of any posting under question. The Fire Rescue's Public Information Officer and staff assigned by the Deputy Chief of Operations shall help promote authorized social media accounts.
   b. Misuse of social media websites may lead to disciplinary action under applicable provisions of the Palm Beach County Merit Rules or the Collective Bargaining Agreement (Disciplinary - Article 15).
   c. Fire Rescue personnel representing the Fire Rescue via social media outlets shall do the following:
      i. The use of Fire Rescue computers by Fire Rescue personnel to access social media is prohibited without authorization.
      ii. Conduct themselves at all times as representatives of the Fire Rescue and, accordingly, shall adhere to all Fire Rescue standards of conduct and observe conventionally accepted protocols and proper decorum.
      iii. Identify themselves as a member of the Fire Rescue.
      iv. Post, transmit, or otherwise disseminate confidential information, including photographs or videos, related to Fire Rescue training, activities, or work-related assignments without express written permission.
      v. Do not conduct political activities or private business.
      vi. Fire Rescue personnel use of personally owned devices to manage the Fire Rescue's social media activities or in the course of official duties is prohibited without express written permission.
      vii. Employees shall observe and abide by all copyright, trademark, and service mark restrictions in posting materials to electronic media.
      viii. Any postings to a Social Media site shall be assumed to be an official opinion/comment of Fire Rescue.

2. **Personal Use**:
   a. Fire Rescue recognizes the employee's right to participate in social networking/social media sites or maintain personal web pages, blogs or other types of online platforms while off-duty. However, it is strongly recommended employees use caution in their usage of social media/social networking platforms especially when displaying personal profiles so as not to discredit themselves or the agency.
   b. Development of an individual departmental networking site representing FIRE RESCUE or any Battalion/Division/Fire Station/Unit etc., is prohibited unless approved by the Fire Rescue Administrator or designee. No postings shall be permitted without the final approval of the Public Information Office or designee.
   c. Employees shall not use social media/social networking platforms in violation of PBC Merit Rules, the Collective Bargaining Agreement, (Disciplinary Article 15), either State or Federal law and the HIPAA Policies and Procedure Manual.
   d. While on duty or off duty Employees are prohibited from disseminating content that is inconsistent with the duties, conduct, and responsibilities of a Fire Rescue employee including content that could be reasonably interpreted as having an adverse effect upon Fire Rescue morale, discipline, operations, the safety of staff, or perception of the public. For example, unprofessional, unbecoming, illegal, unethical, sexual, violent, harassing, racist, sexist, or ethnically derogatory comments, pictures, artwork, videos, material or other such references all tend to undermine the public trust and confidence required by employees of the Fire Rescue.
   e. Unless authorized by the Fire Administrator or designee, employees are prohibited from posting any confidential, sensitive, or copyrighted information, data, text, photographs, audio, video, or any other multimedia file related to any on-going criminal or administrative investigation of this agency. This includes but is not limited to: photographing or video-taping of fire scenes, crime scenes, traffic crashes, medical/trauma patients, arrestees, evidence, restricted areas of Governmental facilities, vehicles, other employees, and statements or comments related to any pending prosecutions or investigations.
   f. Employees shall exercise good judgment in displaying logos, badges, seals, uniforms, vehicles, equipment, or any item or symbol that is associated with this agency.
   g. Employees who choose to maintain or participate in social media or social networking platforms while off-duty shall conduct themselves with professionalism and in such a manner that shall not reflect negatively upon this agency or its mission. While using social media off duty or in an unofficial capacity, employees are prohibited from speaking or writing in an official capacity, or from representing that they are acting on behalf of Fire Rescue or the PBC Board of County Commissioners. Employees are cautioned that speech on-or-off duty, made pursuant to their official duties, generally is not protected speech under the First Amendment and may be subject to disciplinary action if in violation of this policy.
   h. Employees should be aware that the content of social networking sites may be subpoenaed and used to undermine or impeach employee's testimony in a civil or criminal trial or other official proceeding.
   i. Failure to comply with the above guidelines may result in discipline up to and including termination. Authorized exceptions to the above guidelines may be permitted by the Fire Administrator or designee for the operational needs of the Fire Rescue. Employees are strongly encouraged to use caution and seek the guidance of

their supervisors regarding any posting that may adversely reflect upon either the agency or upon the professionalism and integrity of the employee.

j.  Fire Rescue personnel shall not post, transmit, or otherwise disseminate any information (photographic or text) to which they have access as a result of their employment without written permission from the Fire Rescue Administrator or designee.

k.  Fire Rescue personnel are cautioned against posting personal photographs or provide similar means of personal recognition that may cause you to be identified as a firefighter, fire officer or employee of this Fire Rescue.

*Michael C. Mackey*

**MICHAEL C. MACKEY**
**FIRE RESCUE ADMINISTRATOR**

**Supersession History**
1. PPM#FR I-71, issued 12/21/1991
2. PPM#FR I-71, issued 03/24/2011
3. PPM#FR I-71, issued 06/10/2016
4. PPM#FR A-404, clerical 03/01/2018
5. PPM#FR A-404, clerical 1/10/2019

# Exhibit 5

| | |
|---|---|
| **TO:** | **ALL PALM BEACH COUNTY FIRE RESCUE PERSONNEL** |
| **FROM:** | **MICHAEL C. MACKEY**<br>**FIRE RESCUE ADMINISTRATOR** |
| **PREPARED BY:** | **FIRE RESCUE PPM COMMITTEE** |
| **SUBJECT:** | **USE OF SOCIAL MEDIA** |
| **PPM #:** | **FR-A-404** |

| | |
|---|---|
| **ISSUE DATE** | **EFFECTIVE DATE** |
| **February 28, 2019** | **March 14, 2019** |

**PURPOSE**:   The purpose of this policy is to provide guidelines on the procedure and use of social media and social networking.

**UPDATES**:   Future updates to this PPM are the responsibility of the Deputy Chief of Administration, in conjunction with the PPM Committee, under the authority of the Fire Rescue Administrator.

**AUTHORITY**:

- Fire Rescue Administrator
- Florida Statues, Chapter 11
- CW-R-008: Internet Use Policy
- CW-R-113: Social Networking Policy
- PBCFR HIPAA Policies and Procedures Manual (PPM FR-A-401), as may be amended.

**SCOPE**:   This policy applies to all Palm Beach County Fire Rescue personnel and reservists.

**POLICY**:   This policy applies to the procedure and use of social media and social networking.

**DEFINITIONS**:

1. Social Media – A variety of online sources that allow people to communicate, share information, photos, videos, audio or exchange text and other multimedia files with others via online or cellular network platform. This includes but is not limited to social networking sites, micro-blogging sites, personal blogs/personal websites, and news sites.
2. Social Networking – Online platforms where users can network, socialize, communicate and exchange information with other users via text, live conferencing/chat rooms, photographs and/or video-tapes. Mobile Social Networking refers to social networking using a mobile phone or cellular based device.
3. Blogs – A personal online journal or commentary that allows visitors to post opinions, responses, reactions, or comments to a particular topic and may allow the use of graphics or video. Blogs may be private or accessible to the general public.
4. Webpage – A webpage is any page a person sees when accessing the internet.

**FR-A-404/Page 1 of 4**

5. <u>Website</u> – A website is a collection of one or more webpages.
6. <u>Posting</u> – Typing a message, uploading graphics/videos or any electronic media to an online forum or newsgroup which may be accessible to specific viewers or the general public.
7. <u>Personal Website</u> – An online site created by an individual that may include personal information, commentary, photographs, videos and/or graphics for social, entertainment or business purposes. Personal websites may be private or accessible to general public.
8. <u>Profile</u> – A self-defined description of a person which can be displayed on a webpage or a social networking site, and may display any or all of the following biographical information: age, race, sex, employment, education, religion, political viewpoints, the user's likes and dislikes, current location, hometown, and contact information. Profiles may be private or accessible to the general public.
9. <u>Chat Rooms</u> – An online gathering where users can communicate with each other and exchange information via instant messaging and the information is visible to all people in the chat room. Chat Rooms may be private or accessible to the general public.

**<u>PROCEDURE</u>:**

1. **<u>Fire Rescue-Sanctioned Use</u>:**
   a. Fire Rescue reserves the right to not publish any posting and can remove unsuitable content from authorized social networking websites at any time without notice (CW-R-113).
   b. Fire Rescue's Public Information Officer shall have final discretion as to the removal of any posting under question.
   c. Fire Rescue's Public Information Officer and staff assigned by the Deputy Chief of Operations shall help promote authorized social media accounts.
   d. Misuse of social media may lead to disciplinary action under applicable provisions of the Palm Beach County Merit Rules or the Collective Bargaining Agreement (Article 15 Disciplinary Action and Discharge).
   e. Employees representing Fire Rescue via social media shall:
      i. Conduct themselves at all times as representatives of Fire Rescue and, accordingly, adhere to all Fire Rescue standards of conduct and observe conventionally accepted protocols and proper decorum.
      ii. Identify themselves as a member of Fire Rescue.
      iii. Observe and abide by all copyright, trademark, and service mark restrictions.
      iv. Obtain authorization prior to accessing social media from Fire Rescue computers.
      v. Obtain express written permission to use personally owned devices to manage those Fire Rescue's social media activities or conduct official duties.
   f. Employees representing Fire Rescue via social media shall <u>not</u> conduct political activities or private business.

2. **<u>Personal Use</u>:**
   a. Fire Rescue recognizes the employee's right to participate in social networking/social media sites or maintain personal web pages, blogs or other types of online platforms while off-duty. However, it is strongly recommended employees use caution in their usage of social networking/social media sites especially when displaying personal profiles so as not to discredit themselves or the agency.

**FR-A-404/Page 2 of 4**

b. Development of an individual departmental social networking/social media site representing Fire Rescue, or any Battalion, Division, Fire Station, Unit or other Fire Rescue affiliation, is prohibited unless prior approval is obtained by the Fire Rescue Administrator or designee. No postings shall be permitted without the final approval of the Public Information Officer or designee.

c. Employees shall not use social networking/social media sites in violation of PBC Merit Rules, the Collective Bargaining Agreement (Article 15 Disciplinary Action and Discharge), State law, Federal law or the PBCFR HIPAA Policies and Procedure Manual (FR-A-401 Attachment A).

d. While **on-duty or off-duty** employees are prohibited from disseminating content that is inconsistent with the duties, conduct, and responsibilities of a Fire Rescue employee, including content that could be reasonably interpreted as having an adverse effect upon Fire Rescue morale, discipline, operations, the safety of staff, or perception of the public.

   i. For example, unprofessional, unbecoming, illegal, unethical, sexual, violent, harassing, racist, sexist, or ethnically derogatory comments, pictures, artwork, videos, material or other such references all tend to undermine the public trust and confidence required by employees of Fire Rescue.

e. Unless authorized by the Fire Rescue Administrator or designee, employees are prohibited from posting any confidential, sensitive, or copyrighted information, data, text, photographs, audio, video, or any other multimedia file related to any on-going criminal or administrative investigation of this agency. This includes but is not limited to: photographing or video-taping of fire scenes, crime scenes, traffic crashes, medical/trauma patients, arrestees, evidence, restricted areas of governmental facilities, vehicles, other employees, and statements or comments related to any pending prosecutions or investigations.

f. Employees shall exercise good judgment in displaying logos, badges, seals, uniforms, vehicles, equipment, or any item or symbol that is associated with Fire Rescue.

g. Employees who choose to maintain or participate in social networking/social media sites while **on-duty or off-duty** shall conduct themselves with professionalism and in such a manner that shall not reflect negatively upon this agency or its mission.

h. While using social media off duty or in an unofficial capacity, employees are prohibited from speaking or writing in an official capacity, or from representing that they are acting on behalf of Fire Rescue or the PBC Board of County Commissioners. Employees are cautioned that speech **on-duty or off-duty**, made pursuant to their official duties, generally is not protected speech under the First Amendment and may be subject to disciplinary action if in violation of this policy.

i. Employees should be aware that the content of social media/social networking sites may be subpoenaed and used to undermine or impeach employee's testimony in a civil or criminal trial or other official proceeding.

j. Failure to comply with this policy may result in discipline up to and including termination. Authorized exceptions to this policy may be permitted by the Fire Rescue Administrator or designee for the operational needs of Fire Rescue. Employees are strongly encouraged to use caution and seek the guidance of their supervisors regarding any posting that may adversely reflect upon Fire Rescue or the professionalism and integrity of the employee.

k. Employees shall not post, transmit, or otherwise disseminate any information (data, text, photographs, audio, video, or any other multimedia file) to which they have

access as a result of their employment without written permission from the Fire Rescue Administrator or designee.

l.  Employees are cautioned against posting personal photographs or providing similar means of personal recognition that may cause them to be identified as a firefighter, fire officer or employee of Fire Rescue.

*Michael C. Mackey*
_____
**MICHAEL C. MACKEY**
**FIRE RESCUE ADMINISTRATOR**

**Supersession History**
1.  PPM#FR I-71, issued 12/21/1991
2.  PPM#FR I-71, issued 03/24/2011
3.  PPM#FR I-71, issued 06/10/2016
4.  PPM#FR A-404, clerical 03/01/2018
5.  PPM#FR A-404, 01/10/2019
6.  PPM#FR A-404, 02/28/2019
7.  PPM#FR A-404, 3/14/2019

# Mission Statement

WE, THE PERSONNEL, of Palm Beach County Fire Rescue, are committed to assuring the residents, guests, and visitors in our community a secure and superior quality of life. We accomplish this by maintaining the highest state of readiness, dedication, and compassion in order to minimize emotional, physical, and economic loss.

We acknowledge that empathy toward human suffering requires special individuals who realize the importance of their unselfish contribution and personal commitment to the welfare of the team and community.

In our organization, we strive to make a difference in our people by creating an atmosphere of teamwork and fellowship while recognizing the individual attributes and responding to the needs of each other.

## History

Palm Beach County Fire Rescue was created on October 1, 1984, when the Palm Beach County Board of County Commissioners passed a resolution consolidating the existing fire districts in Palm Beach County.

Prior to 1984 the following fire districts were in existence, covering mostly unincorporated Palm Beach County:

- Jupiter-Tequesta
- Juno Beach
- Old Dixie
- Military Park
- Southwest
- Trail Park
- Reservation
- Del Trail
- Canal Point
- Palm Beach International Airport

**EXHIBIT 3**

Case 9:19-cv-80701-WPD   Document 50-3   Entered on FLSD Docket 08/20/2020   Page 2 of 2
USCA11 Case: 20-14676      Document: 26      Date Filed: 04/12/2021      Page: 322 of 457

These departments consolidated, under the leadership of Chief Herman Brice, into Palm Beach County Fire Rescue. Most of the incorporated cities, unless they were under a contract with a fire district, retained their own departments.

07420

## CAPTAIN

### NATURE OF WORK

This is supervisory and skilled public safety work in the protection of life and property through the direction and coordination of fire prevention; suppression and EMS activities on an assigned shift.

An employee in a position allocated to this class, in addition to all of the requirements of a Firefighter, is responsible for the supervision of firefighting personnel and maintenance of the facilities, equipment and vehicles in a single fire station. The Captain is responsible for effectively managing and combating a fire until relieved of command by a superior officer. Employees in this class drill and instruct their subordinates in conjunction with the Training Division. Considerable judgment is exercised in the daily operations of the fire station.

### EXAMPLES OF WORK

Writes performance evaluations; issues counseling forms/disciplinary actions; handles employee complaints and grievances.

Acts as a shift officer within a station, performs all supervisory duties and responsibilities accordingly and coordinates and assigns all duties on a shift.

Responds with a company to mitigate the scene of fires or other emergencies; evaluates, allocates and requests additional resources; supervises, directs and assists the company's activities while engaged in emergency operations.

Supervises the care and appropriate maintenance of assigned station facilities and grounds.

Enforces rules, policies and procedures to ensure employee health and safety.

Maintains station records and timely submission of Fire Department reports.

Conducts in-station training classes according to department training schedules.

Conducts in-service fire prevention surveys; to include five inspections to monitor target hazards with Quick Access Surveys (QAS's).

Maintains discipline and morale of station personnel.

Has authority to initiate the recommendation for transfer, reprimand, suspension and assignment of personnel to his/her superior.

Adjusts, or attempts to adjust, a grievance at his/her authoritative level.

May assist and make recommendations in all periodic evaluations of member's performance.

Performs related work as required.

# EXHIBIT 4

07420

## CAPTAIN – CONT'D

### REQUIRED KNOWLEDGE, SKILLS AND ABILITIES

Considerable knowledge of firefighting to include incident management, fire rescue, EMS, evacuation, exposures, confinement, extinguishments, radio communication, ventilation, salvage and overhaul.

Knowledge of fire prevention techniques.

Knowledge of the principles, practices and methods of emergency/rescue operations.

Thorough knowledge of the geography of the response areas with special emphasis on target hazards, water distribution.

Extensive knowledge of fire department equipment and material, policies and procedures.

Ability to detect and properly report the existence of common fire hazards.

Ability to react quickly and calmly in emergencies and to direct the work of subordinates in emergency situations.

Ability to effectively supervise a working shift.

Ability to independently act in the absence of a senior officer.

### MINIMUM ENTRANCE REQUIREMENTS

Graduation from high school or an equivalent recognized certification; a current Florida Certificate in fire fighting as approved by the State of Florida Bureau of Fire Standards; and currently meet all of the certification requirements under Florida Statute 633, as outlined in the Collective Bargaining Agreement.

**Rev. 12/2011**

| | |
|---|---|
| **TO:** | **ALL PALM BEACH COUNTY FIRE RESCUE PERSONNEL** |
| **FROM:** | **MICHAEL C. MACKEY**<br>**FIRE RESCUE ADMINISTRATOR** |
| **PREPARED BY:** | **FIRE RESCUE PPM COMMITTEE** |
| **SUBJECT:** | **USE OF SOCIAL MEDIA TO PUBLICIZE DEPARTMENTAL SERVICES** |
| **PPM #:** | **FR-A-405** |

| | |
|---|---|
| **ISSUE DATE** | **EFFECTIVE DATE** |
| February 24, 2011 | July 06, 2018 |

**PURPOSE**:   To define the procedure for using social media to publicize Fire Rescue facilities, programs, and services.

**UPDATES**:   Future updates to this PPM are the responsibility of the Deputy Chief of Administration, in conjunction with the PPM Committee, under the authority of the Fire Rescue Administrator.

**AUTHORITY**:
- Fire Rescue Administrator
- Florida Statues, Chapter 11
- CW-R-008: Internet Use Policy
- CW-R-113: Social Networking Policy
- DOR-004: E-mail, Internet, and Computer DOO-033: Preparation and Distribution of Online and Printed Promotional Documents, as may be amended.

**SCOPE**:   This policy applies to all Palm Beach County Fire Rescue personnel and reservists.

**POLICY**:   Fire Rescue shall use effective, cost-efficient methods to inform employees and citizens of information including available training events, classes and other Fire Rescue-associated interests.

**PROCEDURE**:

1. Social networking can be a powerful, low-cost, effective, and rapid method of communication in our community. Its use as a marketing tool for the Fire Rescue shall be applied in a responsible, efficient, ethical, and legal manner to support facilities, services, and programs. Use of social networking services for publicity shall be at the discretion of each Deputy Chief or designee.

2. The Deputy Chief or designee shall:
   a. Ensure that the social networking websites selected for use are part of an integrated public communication and marketing strategy;
   b. Ensure all necessary resources are available for current and on-going implementation;

**EXHIBIT 5**

    c. Follow established design standards for social networking accounts developed by the Fire Rescue of Public Affairs (CW-R-113);

    d. Ensure that the information provided through social networking accounts is regularly updated, accurate, consistent, and communicated in a professional manner;

    e. Ensure that the public record retention requirements established by the State of Florida are followed (General Records Schedule GS1-SL) for State and Local Government Agencies;

    f. Routinely monitor the use of all approved social media for compliance (CW-R-113); and take corrective action upon notice of violation (CW-R-113);

    g. Any postings to a Social Media site shall be assumed to be an official opinion/comment of Fire Rescue.

3. The Fire Rescues Public Information Officer and other assigned staff shall help promote authorized social media accounts.

4. Misuse of social media websites may lead to disciplinary action under applicable provisions of the Palm Beach County Merit Rules and DOR-004 or the collective bargaining agreement (Disciplinary Article 15).

5. All postings to social media sites must be forwarded to and processed by the following:
    a. Public Information Officer
    b. Operation's designee
    c. Analyst Programmer (IT)
    d. Web Specialist (Training)

6. They shall be responsible for the site's subject matter and shall be held accountable for content.

7. Fire Rescue reserves the right to not publish any posting and can remove unsuitable content from authorized social networking websites at any time without notice (CW-R-113).  The Fire Rescue's Public Information Officer shall have final discretion as to the removal of any posting under question.

*Michael C. Mackey*

**MICHAEL C. MACKEY**
**FIRE RESCUE ADMINISTRATOR**

**Supersession History**
1. PPM#FR I-72, issued 03/02/2011
2. PPM#FR A-405, clerical 03/01/2018
3. PPM#FR A-405, reviewed 07/06/2018

| | |
|---|---|
| **TO:** | **ALL PALM BEACH COUNTY FIRE RESCUE PERSONNEL** |
| **FROM:** | **MICHAEL C. MACKEY**<br>**FIRE RESCUE ADMINISTRATOR** |
| **PREPARED BY:** | **FIRE RESCUE PPM COMMITTEE** |
| **SUBJECT:** | **USE OF SOCIAL MEDIA** |
| **PPM #:** | **FR-A-404** |

| **ISSUE DATE** | **EFFECTIVE DATE** |
|---|---|
| **February 28, 2019** | **March 14, 2019** |

**PURPOSE**:   The purpose of this policy is to provide guidelines on the procedure and use of social media and social networking.

**UPDATES**:   Future updates to this PPM are the responsibility of the Deputy Chief of Administration, in conjunction with the PPM Committee, under the authority of the Fire Rescue Administrator.

**AUTHORITY**:
- Fire Rescue Administrator
- Florida Statues, Chapter 11
- CW-R-008: Internet Use Policy
- CW-R-113: Social Networking Policy
- PBCFR HIPAA Policies and Procedures Manual (PPM FR-A-401), as may be amended.

**SCOPE**:   This policy applies to all Palm Beach County Fire Rescue personnel and reservists.

**POLICY**:   This policy applies to the procedure and use of social media and social networking.

**DEFINITIONS**:

1. Social Media – A variety of online sources that allow people to communicate, share information, photos, videos, audio or exchange text and other multimedia files with others via online or cellular network platform. This includes but is not limited to social networking sites, micro-blogging sites, personal blogs/personal websites, and news sites.
2. Social Networking – Online platforms where users can network, socialize, communicate and exchange information with other users via text, live conferencing/chat rooms, photographs and/or video-tapes. Mobile Social Networking refers to social networking using a mobile phone or cellular based device.
3. Blogs – A personal online journal or commentary that allows visitors to post opinions, responses, reactions, or comments to a particular topic and may allow the use of graphics or video. Blogs may be private or accessible to the general public.
4. Webpage – A webpage is any page a person sees when accessing the internet.

# EXHIBIT 6

5. <u>Website</u> – A website is a collection of one or more webpages.
6. <u>Posting</u> – Typing a message, uploading graphics/videos or any electronic media to an online forum or newsgroup which may be accessible to specific viewers or the general public.
7. <u>Personal Website</u> – An online site created by an individual that may include personal information, commentary, photographs, videos and/or graphics for social, entertainment or business purposes. Personal websites may be private or accessible to general public.
8. <u>Profile</u> – A self-defined description of a person which can be displayed on a webpage or a social networking site, and may display any or all of the following biographical information: age, race, sex, employment, education, religion, political viewpoints, the user's likes and dislikes, current location, hometown, and contact information. Profiles may be private or accessible to the general public.
9. <u>Chat Rooms</u> – An online gathering where users can communicate with each other and exchange information via instant messaging and the information is visible to all people in the chat room. Chat Rooms may be private or accessible to the general public.

**<u>PROCEDURE</u>:**

1. **Fire Rescue-Sanctioned Use**:
   a. Fire Rescue reserves the right to not publish any posting and can remove unsuitable content from authorized social networking websites at any time without notice (CW-R-113).
   b. Fire Rescue's Public Information Officer shall have final discretion as to the removal of any posting under question.
   c. Fire Rescue's Public Information Officer and staff assigned by the Deputy Chief of Operations shall help promote authorized social media accounts.
   d. Misuse of social media may lead to disciplinary action under applicable provisions of the Palm Beach County Merit Rules or the Collective Bargaining Agreement (Article 15 Disciplinary Action and Discharge).
   e. Employees representing Fire Rescue via social media shall:
      i. Conduct themselves at all times as representatives of Fire Rescue and, accordingly, adhere to all Fire Rescue standards of conduct and observe conventionally accepted protocols and proper decorum.
      ii. Identify themselves as a member of Fire Rescue.
      iii. Observe and abide by all copyright, trademark, and service mark restrictions.
      iv. Obtain authorization prior to accessing social media from Fire Rescue computers.
      v. Obtain express written permission to use personally owned devices to manage those Fire Rescue's social media activities or conduct official duties.
   f. Employees representing Fire Rescue via social media shall <u>not</u> conduct political activities or private business.

2. **Personal Use**:
   a. Fire Rescue recognizes the employee's right to participate in social networking/social media sites or maintain personal web pages, blogs or other types of online platforms while off-duty. However, it is strongly recommended employees use caution in their usage of social networking/social media sites especially when displaying personal profiles so as not to discredit themselves or the agency.

b. Development of an individual departmental social networking/social media site representing Fire Rescue, or any Battalion, Division, Fire Station, Unit or other Fire Rescue affiliation, is prohibited unless prior approval is obtained by the Fire Rescue Administrator or designee. No postings shall be permitted without the final approval of the Public Information Officer or designee.

c. Employees shall not use social networking/social media sites in violation of PBC Merit Rules, the Collective Bargaining Agreement (Article 15 Disciplinary Action and Discharge), State law, Federal law or the PBCFR HIPAA Policies and Procedure Manual (FR-A-401 Attachment A).

d. While **on-duty or off-duty** employees are prohibited from disseminating content that is inconsistent with the duties, conduct, and responsibilities of a Fire Rescue employee, including content that could be reasonably interpreted as having an adverse effect upon Fire Rescue morale, discipline, operations, the safety of staff, or perception of the public.

    i. For example, unprofessional, unbecoming, illegal, unethical, sexual, violent, harassing, racist, sexist, or ethnically derogatory comments, pictures, artwork, videos, material or other such references all tend to undermine the public trust and confidence required by employees of Fire Rescue.

e. Unless authorized by the Fire Rescue Administrator or designee, employees are prohibited from posting any confidential, sensitive, or copyrighted information, data, text, photographs, audio, video, or any other multimedia file related to any on-going criminal or administrative investigation of this agency. This includes but is not limited to: photographing or video-taping of fire scenes, crime scenes, traffic crashes, medical/trauma patients, arrestees, evidence, restricted areas of governmental facilities, vehicles, other employees, and statements or comments related to any pending prosecutions or investigations.

f. Employees shall exercise good judgment in displaying logos, badges, seals, uniforms, vehicles, equipment, or any item or symbol that is associated with Fire Rescue.

g. Employees who choose to maintain or participate in social networking/social media sites while **on-duty or off-duty** shall conduct themselves with professionalism and in such a manner that shall not reflect negatively upon this agency or its mission.

h. While using social media off duty or in an unofficial capacity, employees are prohibited from speaking or writing in an official capacity, or from representing that they are acting on behalf of Fire Rescue or the PBC Board of County Commissioners. Employees are cautioned that speech **on-duty or off-duty**, made pursuant to their official duties, generally is not protected speech under the First Amendment and may be subject to disciplinary action if in violation of this policy.

i. Employees should be aware that the content of social media/social networking sites may be subpoenaed and used to undermine or impeach employee's testimony in a civil or criminal trial or other official proceeding.

j. Failure to comply with this policy may result in discipline up to and including termination. Authorized exceptions to this policy may be permitted by the Fire Rescue Administrator or designee for the operational needs of Fire Rescue. Employees are strongly encouraged to use caution and seek the guidance of their supervisors regarding any posting that may adversely reflect upon Fire Rescue or the professionalism and integrity of the employee.

k. Employees shall not post, transmit, or otherwise disseminate any information (data, text, photographs, audio, video, or any other multimedia file) to which they have

access as a result of their employment without written permission from the Fire Rescue Administrator or designee.

l.  Employees are cautioned against posting personal photographs or providing similar means of personal recognition that may cause them to be identified as a firefighter, fire officer or employee of Fire Rescue.


_Michael C. Mackey_
**MICHAEL C. MACKEY**
**FIRE RESCUE ADMINISTRATOR**

**Supersession History**
1. PPM#FR I-71, issued 12/21/1991
2. PPM#FR I-71, issued 03/24/2011
3. PPM#FR I-71, issued 06/10/2016
4. PPM#FR A-404, clerical 03/01/2018
5. PPM#FR A-404, 01/10/2019
6. PPM#FR A-404, 02/28/2019
7. PPM#FR A-404, 3/14/2019

USCA11 Case: 20-14676 Document: 26 Date Filed: 04/12/2021 Page: 331 of 457

# Vote AJ O'Laughlin

### For Union President

**EXHIBIT 7**

# AJ O'Laughlin for Union President The Vision for Our Future Local 2928.

Presidential Candidate AJ O'Laughlin - More Than Just a Good Contr...



# About Me

## Captain AJ O'Laughlin



I have been with Palm Beach County Fire Rescue since 1992 and hold the rank of Captain. I have been involved in Union work as a volunteer and elected Officer for most of that time, most recently as 1st Legislative Vice President.

During this time I have been an effective advocate at the State, Local and Department level using your power as a group to influence the important issues facing us. Politics is everything in protecting our futures and I understand the system and have been effective in it with your help.





I have been fortunate to have the support of my family throughout my career with the fire department and my past union endeavors. My wife of 21 years Denise and our beautiful daughters, Brooke 20, and Lindsay 17 are a solid foundation and continue to support my run for Union President.

## A message from Captain AJ O'Laughlin, Candidate for Union President.

Presidential Candidate AJ O'Laughlin - Local 2928



November 9, 2017... The darkest day of my life.



## Vision

Unions began around 70 years ago when employees were not represented fairly, and work conditions were poor. My ultimate vision is to have a strong leadership of union officials which in turn will give us great contracts, working conditions, and labor relations.

"Fair representation"

"Be the strongest local in the country"

"Obtain COLA for new employees"

"Better pensions for dispatch and facilities"

"Protect and support firefighters with PTSD"

"County –wide mergers with all departments"

"Transparency"

"Have lawyers represent us on work compensation issues"

"Office efficiency"

# Accomplishments

| | | |
|---|---|---|
| Advocated for a fire boat | Passed firefighter sales tax | PTSD bill |
| Halted privatization in cities | Held county leadership accountable | Stopped Boca Raton Fire annexation |
| Advocated against AMR and privatization of fire services | Supported candidates on a nonpartisan basis | Helped with Lake Worth merger and Palm Springs merger |
| Advocated for Riviera Beaches contract for an average of 12-12-12 (36%) over 3 years | Supported and held accountable the leadership running the trauma hawk | State wide bill passed regarding line of duty death and child college financial support |

# Endorsements and Encouragement

"Capt. AJ OLaughlin is a man who has done some great things over the years, on behalf of the local in Tallahassee. Beyond that, I respect how he owned up to a mistake that he made, which couldn't have been easy! He's a tough bulldog with lots of experience, basing his race on transparency....who doesn't want that? Some say he shouldn't run, I say why not bring all qualified candidates and let the members choose! Im positive that the local will vote the best man in... Good luck to all"

- FIREFIGHTER/PARAMEDIC VINCE BELL

"AJ,
I wanted to reach out to you and let you know that I support your run for Union President. I'm proud of the fact that you own your mistakes and are moving forward. I believe that everyone should have the opportunity for a second chance as long as they take ownership for that mistake, learn from it and make the needed adjustments in their life. I believe you've done that. I feel you have the education and the ability to be our next Union President. Good Luck. "

- CAPTAIN JASON MARTINO

"Let me start by saying he who hath not sinned let them cast the first stone. I have known you AJ for 26 years and you have never backed down from a fight. No matter how powerful your opponent is, you will take a beating for us. You have called the most powerful people out when they are pulling shady shit. For this you have made some very powerful enemies. You still don't quit. No one is free from a bad day. Yours led to public humiliation and you still don't quit. You are still trying to make things better after all that you have been through. You deserve the right to quit, but you still don't. You truly are the William Wallace of local 2928. We need integrity and honesty and you have both. You will never profit at our expense. Some will call you horrible names. I call you brother because I know you will never quit on us! For this you have my endorsement!"

- CAPTAIN EDDIE O'BERRY

"AJ, You've been on the bench long enough. Get back in the game, support the firefighter family and hit some home runs. We need the runs and we need the wins. Always remember the mistakes and the good things that went right. Don't look backwards, look forward and focus on making a positive difference."

- CHIEF GRIBBLE

# Questions I am most frequently asked.

## How did the politicians feel after my arrest?

The relevant politicians that called and spoke to me offered their help and support. They also totally understood that this was a mistake that I would recover from. They are proud that I owned it, that I am coming back and they are supporting my run for President.

## What do you bring to the table vs. your opponent (an appointed President)?

7/2/2019

Case 9:19-cv-80701-WPD   Document 50-7   Entered on FLSD Docket 08/20/2020   Page 8 of 9
USCA11 Case: 20-14676   Document: 26   Date Filed: 04/12/2021   Page: 338 of 457

I bring a vision. I bring transparency. I bring accountability and I bring a succession plan for the local to survive successfully into the future. I can align our politics with our goals as a Local so we no longer have confusion between the FPF, our current President, our political Officers and even past Officers out lobbying on their own. We all need to agree on our goals and use our political power to achieve them.

## Why would we vote for you when your opponent successfully ratified our contract?

With the economy booming, we should be making our gains and solving problems faster. Staffing was on the table three contracts ago. We had the votes but the article was pulled last minute without the knowledge of the full negotiations committee. Vacation accrual, sick rules, work comp, promotions etc. all have been watered down or not addressed in exchange for steady raises in pay. We have the ability to fix these articles without sacrificing wages if we apply our politics effectively as a team.

## What do you see as the future for the union under your leadership?

I will be addressing all staffing to be sure that all are held accountable and to the highest standards. I will be addressing workman's comp issues to protect firefighter's rights, aka an attorney in the office. In addition, I will be actively pursuing mergers while stopping annexation in order to protect the employment of our firefighters rather than pricing ourselves out of our jobs.

## How will you improve the efforts to support those who suffer from PTSD?

I commit to re-vamp and revise the process and protocol to help protect firefighters with the utmost confidence while maintaining their identity and character. This is currently not being done.

## How do you plan on improving the training department?

The training division like everything the department does is the Administration's business to operate properly. The union's job is to make sure our members are treated fairly, trained effectively and safely and we do want the department to be successful in that job. Our membership has embraced training and understands its value. Our facility is top notch and well funded. The problem has been consistent effective management of the Division. The Union should address our concerns in the contract (promotions article to describe proper qualifications) and through Labor relations meetings. It's the departments job to fix any problems there. It's the local's job to make sure the fixes are safe, effective and fairly implemented for our members.

# "A BULLDOG in your backyard"

## Vote AJ O'Laughlin

**Brothers and Sisters,**

I have created a quick list of the differences between us as candidates, to represent you in this election. I believe that applying our politics in a unified, planned approach can gain us better safety, wages and benefits quicker than our current path. Your Union Reps work for you, not the office. Ask your reps if the only vote they ever took was to raise their own wage and what motions he or she has made on your behalf. The office is "upside down" with the Officers believing you work for them and they can tell you how things will be, and not the other way around. I believe the office should work for you and you should know who earns what. As well as, what they are doing and how they decided to pursue the paths they did take on important issues. The members run the local and I will work on your behalf in a more effective and transparent manner, if you will please give me that chance.

Fraternally,

AJ

www.voteolaughlin.com

| AJ O'Laughlin | Scott Bielecky |
|---|---|
| Still on the **TRUCK** and skin in the game | **RETIRED** since **2015**, no skin in the game |
| Holds county leadership accountable | Appears fearful of County Leaders |
| I have taken full responsibility of my actions and mistakes | Blames others for actions and mistakes |
| Importance of stopping annexations | Allows annexations unopposed |
| Involved with **5** city mergers | Involved with **NO** mergers |
| I will give 100% full and fair representation | Will pick and choose who to represent just to stay elected |
| Conservative on spending | Allowed the e-board a 30% raise, cost was over $110,000 dollars per year |
| Never took a pay raise in 9 years on the board | Gave himself and principal officers a 20% raise cost of $36,000 dollars per year |
| Used UTP as needed for Union Events | Grants UTP for people to use for personal time and gain |
| Office efficiency | Hired **5** extra people with the same or less work accomplished |
| Get out of the FPF cost saving of $180,000 dollars per year | Doesn't want to leave the FPF, they pick only democrats |
| Transparency | Not telling the complete truth |
| Stopped trauma hawk interfacility | Sat on his hands |
| Making big moves forward for **VISION** and **GOALS** | Unable to make decisions |
| Met with county leadership for more staffing in ARFF | Sat on his hands |
| Still paying high premiums for insurance | Doesn't pay for insurance cost |
| I will fight to restore our pension | He has a pension with all benefits |
| Not afraid to pull the trigger for the right thing | Unable to speak up for the right thing |
| Advocating **AGAINST** privatizing the shop "rights", replace current leadership | Scott's classic line, "management rights" |
| Able to organize **LABOR** | **UNABLE** to organize labor |
| A **BULLDOG** in your backyard | A **CAT** on the couch |

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 19-80701-CIV-DIMITROULEAS/MATTHEWMAN

AJ O'LAUGHLIN and CRYSTAL
LITTLE,

     Plaintiffs,

vs.

PALM BEACH COUNTY, a political
subdivision of the State of Florida,

     Defendant.

_____/

**Plaintiff/Crystal Little's Responses to**
**Defendant's Interrogatories**

Plaintiff/AJ O'Laughlin , hereby responds to Defendant's  Interrogatories
as follows:

**Certificate of Service**

I HEREBY certify that on June 12, 2020, the above and foregoing was
served by email to:   Anaili Cure, Assistant County Attorney, 300 North Dixie
Highway, Third Floor, West Palm Beach, Florida 33401, at acure@pbcgov.org:
and to secondary emails:  dfishel@pbcgov.org ;  swebber@pbcgov.org.

**The Amlong Firm** ● 500 Northeast Fourth Street ● Fort Lauderdale, FL  33301 ● 954.462.1983

# EXHIBIT 8

_/s/ William R. Amlong_
WILLIAM R. AMLONG
Florida Bar No.: 470228
WRAmlong@TheAmlongFirm.com
KAREN COOLMAN AMLONG
Florida Bar No.: 275565
KamIong@TheAmlongFirm.com
AMLONG & AMLONG, P.A.
500 Northeast Fourth Street
Fort Lauderdale, Florida 33301-1154
(954) 462-1983
(954) 523-3192 (fax)

**_Attorneys for Plaintiffs,_**
**_AJ O'Laughlin and Crystal Little_**

## PLAINTIFF'S RESPONSES TO DEFENDANT'S
## FIRST INTERROGATORIES TO AJ O'LAUGHLIN

**OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS:**   Plaintiff

objects to the "Definitions" and "Instructions" to the extent they purport to

expand the scope of discovery provided by the Florida Rules of Civil

Procedure ("the Rules") or impose obligations on plaintiff that are

inconsistent with or in addition to those that exist under existing Rules.

**Interrogatory No. 1.** Please state the name and address of all

persons answering, and assisting in answering, these interrogatories, and, if

applicable, the person's official position or relationship with the party to

whom the interrogatories are directed?

**ANSWER:**    Plaintiff objects on the ground that the interrogatory is

not designed to lead to the discovery of admissible information regarding

Plaintiff's counsel's office personnel, and seeks to invade the attorney client

confidential communication privilege as to any communications between

Plaintiff's counsel and Plaintiff.  Subject to this objection, Chris Hoch, former

Division Chief and present friend, phone number is 561-504-8815; and

Capt. Crystal Little, Plaintiff herein and friend.

**Interrogatory No. 2.** Please state whether You have ever been

convicted of a crime, other than any juvenile adjudication, which under the

law under which you were convicted was punishable by death or

imprisonment in excess of one (1) year, or that involved dishonesty or a

false statement, regardless of the punishment? If so, state as to each
conviction, the specific crime, the date and the place of conviction.

**ANSWER:**   Plaintiff has no criminal record admissible under FRE
609.

**Interrogatory No. 3.** Please state for how long You have been a
member of the Union and the positions You have held in the Union,
including the time periods in which those positions were held.

**ANSWER:**   Member since 1992 to present; Second Legislative Vice
President (March 1, 2009 to February 28, 2014); First Legislative Vice
President (March 1, 2015 to February 28, 2018).

**Interrogatory No. 4.** Please state the number of times You have ran
and/or participated in a Union election campaign including dates, position(s)
running for, names of opponent(s), and whether you won the election.

**ANSWER:**   February 2009 Second Legislative Vice President (Won)
opponents Dave Fulmer, Lawerence Williams and John Flaherty held
position until 2011; February 2011 Second Legislative Vice President (Won)
unopposed, held the position until 2014; February 2014 Executive Vice
Present (Lost) opponent Chuck Lupo; February 2015 First Legislative Vice
President (Won) opponent Marvin Hupert held the position until 2018;
February 2019 President (Lost) opponent Scott Bielecky

**Interrogatory No. 5.** Please state the date in which the Facebook
Page was created, identify who created the Facebook Page, and identify all
members/participants/invitees to the Facebook Page.

**ANSWER:**   Plaintiff  created the page and Steve Eller was the co-adminstrator.  There was approximately 350 members to the group, which will be produced.  Face Book page started Jan 19, 2019**.**

**Interrogatory No.** 6. Please identify every individual that posted on the Facebook Page and identify their post on the Facebook Page.

**ANSWER:**    There was approximately 350 members to the group, which will be produced.

**Interrogatory No. 7.** Please state if you have ever been a party, either Plaintiff or Defendant, in a lawsuit or other legal proceeding, other than the present matter (including but not limited to dissolution of marriage, bankruptcy, criminal defendant or victim of a crime, worker's compensation, unemployment compensation, disability, immigration, personal injury, wrongful death, breach of contract) and, if so, state whether the nature of your involvement in the lawsuit or legal proceeding, the nature of the lawsuit or legal proceeding, the date, and court or forum in which such lawsuit or legal proceeding took place.

**ANSWER:**   Plaintiff has no criminal record admissible under FRE 609, and has not been a named party in any legal proceeding save the instant case.

**Interrogatory No.** 8. Please state how You received a copy of the Telestaff picture included in the Facebook Posts and referenced in Paragraph 12 of the Amended Complaint.

**ANSWER:**   Picture was from Chris Hoch via text message.

**Interrogatory No. 9.** Please specify whether You have ever supported the campaign(s)/election(s) of a Union member running for a Union position and identify the campaign(s)/election(s), how You supported their campaign(s)/election(s) (e.g. posting on Facebook on their behalf; speaking on their behalf, etc.), and the date You supported their campaign(s)/elections.

**ANSWER:** Plaintiff objects to this interrogatory on the ground that it invades his privilege under the First Amendment of the Constitution of the United State to the security of his voting record. Excluding the sanctity of the poll, Jeff Rudd for DVP3 word of mout; Ed Morejon for LVP2 made a poster and word of mouth; Joe Palandro for DVP10 made a poster and word of mouth; Angelo Diariano for Treasure made a poster and word of mouth; Ed O'Berry for trustee and LVP2 made a poster and word of mouth; Scott Bielecky for treasure and EVP1 made a poster and word of mouth; Jeff Newsome for DVP2 and word of mouth; Ken Fisher for trustee and word of mout; Mark Anderson for trustee and word of mouth; Jeff Teems for trustee and DVP4 and word of mouth; Jose Gonzalez for DVP9 special ops word of mouth; Bob Bench for trustee and word of mouth; Rich Lownsbury for Batt Chiefs and word of mouth; Rich Swan for DVP palm beach gardens.

**VERIFICATION**

AJ O'Laughlin, being duly sworn, deposes and says:

    1. I am the Plaintiff in the above-referenced matter. I am fully familiar with the facts set forth herein.

    2. I have reviewed the above answers to interrogatories, and verify upon penalty of perjury that they are true and correct as related to me, to the best of my knowledge.


_____

AJ O'Laughlin

USCA11 Case: 20-14676   Document: 26   Date Filed: 04/12/2021   Page: 347 of 457



£ Like          Q Comment

**AJ O'Laughlin** ▶ **Make our Union Strong again**
1 min · E

This was send to me can someone explain this to me. I'm confused. Second copy coming!!!



👍 Like          💬 Comment

     

**EXHIBIT 9**

Page: 348 of 457    Date Filed: 04/12/2021    Document: 26    USCA11 Case: 20-14676

8:26 

 **AJ O'Laughlin** ▷ **Make our Union Strong again**    ···
⊘ Admin · 32 mins · 🖼️

Be the first to like this

 **AJ O'Laughlin** ⚙

This person is a theft just thinking about putting this into Telestaff. This is your Union leadership. Wtf. When elected this will stop and who is Saying this is OK.

26m   Like   Reply          1

**AJ O'Laughlin** ⚙

Jeff you should be ashamed of yourself. Thinking that union business is done on holidays. I will make sure I keep my locker closed when I'm working with you.

18m   Like   Reply

Write a reply...

 **Robert Valentine**

I don't understand???

17m   Like   Reply

      

 Write a comment...           

     

USCA11 Case: 20-14676   Document: 26   Date Filed: 04/12/2021   Page: 349 of 457

8:31 

 **AJ O'Laughlin** ▶ **Make our Union Strong again**    •••
🛡 Admin · 35 mins · 



👍 **Like**          💬 **Comment**

❤️ 1

 **Robert Valentine**
Looks like he canceled his UTP???

21m    Like    Reply

 **Crystal Little**
Nice to know the current retired president thinks it's ok to use UTP for holidays!! Thanks AJ for keeping them accountable. And on that note our fucking stellar staffing officer just blindly approves it? Wtf!

10m    Like    Reply                    👍 1

      

 Write a comment…     

     

USCA11 Case: 20-14676    Document: 26    Date Filed: 04/12/2021    Page: 350 of 457



Page: 351 of 457   Date Filed: 04/12/2021   Document: 26   USCA11 Case: 20-14676

< **AJ's Post** •••

 **Robert Valentine**
I don't understand???

11h   Like   Reply

 **AJ O'Laughlin**
**Robert Valentine** EVP1 took UTP for thanksgiving and also XMas. It was approved by the Union and by Admin. Who does Union stuff on these days. This is how Armand Nault got unelected.  You got to be kidding me. Transparency is my campaign. Soon you will see the truth.

11h   Like   Reply

 **Robert Valentine**
**AJ O'Laughlin** I don't see a date on there for Thanksgiving or Christmas.

11h   Like   Reply

 **AJ O'Laughlin**
Can't be erased.

11h   Like   Reply

 **Robert Valentine**
**AJ O'Laughlin** so where is it then?? The dates that is.

11h   Like   Reply

 Write a comment...    

     

February 7, 2019

Chief Cooper,

Please accept this letter as my official internal complaint in reference to the conduct of Cpt. AJ O'Laughlin. I am accusing Cpt. O'Laughlin of C-6 Conduct Unbecoming, and F-1 Violation of Policy FR-A-404.

Cpt. O'Laughlin is the creator and moderator of a hidden Facebook page called "Make our Union Strong again". On February 6th, 2019, Cpt. O'Laughlin posted a screen shot of my Telestaff calendar to his Facebook page (twice). He then advised that I was misusing Union Time Pool, that I committed theft, and encouraged people contact the Office of the Inspector General to make a complaint. This post, then was replied to by Cpt. C. Little, who commented about "our fucking stellar staffing officer".

By making this post, Cpt. O'Laughlin violated several provisions of Policy FR-A-404. Section 2 (d) states: Employees are prohibited from disseminating content that is inconsistent with the duties, conduct, and responsibilities of a Fire Rescue employee <u>including content that could be reasonably interpreted as having an adverse effect upon Fire Rescue morale, discipline, operations, the safety of staff, or perception of the public.</u> Section 2 (g) states Employees who chose to maintain or participate in social media or social networking platforms <u>while off-duty shall conduct themselves with professionalism and in such a manner that shall not reflect negatively upon this agency or its mission.</u> Section 2 (j) states Fire Rescue personnel shall not post, transmit, or otherwise disseminate any information (photographic or text) to which they <u>have access as a result of their employment</u> without written permission from the Fire Rescue Administrator.

Cpt. O'Laughlin's posts have disparaged the reputation of Fire Rescue, the Fire Rescue Staffing Officer, "Admin", and me personally. His behavior could erode the faith the public has in Palm Beach County Fire Rescue. His behavior is unprofessional, and certainly does not display the conduct that PBCFR and the

**EXHIBIT 10**

public expect of a firefighter. By having a profile picture in his PBCFR Class A uniform, he cannot make the argument that his profession is not tied to his posts.

I have attached a copy of his Facebook page posts for your review. By looking at the pictures, the security permissions used are clearly that of someone higher than a Captain. I am requesting that PBCFR investigate who has accessed my Telestaff calendar. This misuse of official power must be addressed.

Thank you for your assistance in this matter.

Fraternally,

Jeffrey L. Newsome

7:54 ◁                                           .ıll LTE 🔋

👍 Like                         💬 Comment

 **AJ O'Laughlin** ▸ **Make our Union Strong again**          •••
1 min · 👥

This was send to me can someone explain this to me. I'm confused. Second copy coming!!!



 👍 Like                   💬 Comment

                

8:26 ⬆

<  **AJ O'Laughlin** ▶ **Make our Union Strong again**  ⬤ Admin · 32 mins · 📇    •••

Be the first to like this

 **AJ O'Laughlin** 🛡

This person is a theft just thinking about putting this into Telestaff. This is your Union leadership. Wtf. When elected this will stop and who is Saying this is OK.

26m   Like   Reply                  1

 **AJ O'Laughlin** 🛡

Jeff you should be ashamed of yourself. Thinking that union business is done on holidays. I will make sure I keep my locker closed when I'm working with you.

18m   Like   Reply

Write a reply...

 **Robert Valentine**

I don't understand???

17m   Like   Reply

      

   Write a comment...                   

    

8:31

 **AJ O'Laughlin** ► **Make our Union Strong again**
Admin · 35 mins ·



👍 **Like**          💬 **Comment**

❤️ 1

 **Robert Valentine**
Looks like he canceled his UTP???
21m   Like   Reply

 **Crystal Little**
Nice to know the current retired president thinks it's ok to use UTP for holidays!! Thanks AJ for keeping them accountable. And on that note our fucking stellar staffing officer just blindly approves it? Wtf!
10m   Like   Reply                    👍 1

😂   🤔   😳   😬   👀   🙄   ✕

📷   Write a comment...          GIF   ☺



‹    Q   Search in Make our Union Stro...    ⓘ

**Discussion**   Chats   Photos   Events   Files

## From Notifications

 **AJ O'Laughlin**
🛡 Admin · Just now · 👥

Is this unethical Wtf. Make sure u call the IG about this. Transparency is everything.

 **Robert Valentine**
I don't understand???

11h   Like   Reply

 **AJ O'Laughlin** ✪
**Robert Valentine** EVP1 took UTP for thanksgiving and also XMas. It was approved by the Union and by Admin. Who does Union stuff on these days. This is how Armand Nault got unelected.  You got to be kidding me. Transparency is my campaign. Soon you will see the truth.

11h   Like   Reply

 **Robert Valentine**
**AJ O'Laughlin** I don't see a date on there for Thanksgiving or Christmas.

11h   Like   Reply

 **AJ O'Laughlin** ✪
Can't be erased.

11h   Like   Reply

 **Robert Valentine**
**AJ O'Laughlin** so where is it then?? The dates that is.

11h   Like   Reply

 Write a comment...                 

               

TO:                **ALL PALM BEACH COUNTY FIRE RESCUE PERSONNEL**

FROM:          **MICHAEL C. MACKEY**
                        **FIRE RESCUE ADMINISTRATOR**

PREPARED BY:   **FIRE RESCUE PPM COMMITTEE**

SUBJECT:      **USE OF SOCIAL MEDIA**

PPM #:         **FR-A-404**

| **ISSUE DATE** | **EFFECTIVE DATE** |
|---|---|
| April 17, 2016 | June 10, 2016 |

**PURPOSE:**   The purpose of this policy is to provide guidelines on the procedure and use of social media and social networking.

**UPDATES:**   Future updates to this PPM are the responsibility of the Deputy Chief of Administration, in conjunction with the PPM Committee, under the authority of the Fire Rescue Administrator.

**AUTHORITY:**
- Fire Rescue Administrator
- Florida Statues, Chapter 11
- CW-R-008: Internet Use Policy
- CW-R-113: Social Networking Policy
- PBCFR HIPAA Policies and Procedures Manual (PPM FR-A-401), as may be amended.

**SCOPE:**     This policy applies to all Palm Beach County Fire Rescue personnel and reservists.

**POLICY:**     This policy applies to the procedure and use of social media and social networking.

**DEFINITIONS:**

1. <u>Social Media</u> – A variety of online sources that allow people to communicate, share information, photos, videos, audio or exchange text and other multimedia files with others via online or cellular network platform. This includes but is not limited to social networking sites, micro-blogging sites, personal blogs/personal websites, and news sites.
2. <u>Social Networking</u> – Online platforms where users can network, socialize, communicate and exchange information with other users via text, live conferencing/chat rooms, photographs and/or video-tapes. Mobile Social Networking refers to social networking using a mobile phone or cellular based device.
3. <u>Blogs</u> – A personal online journal or commentary that allows visitors to post opinions, responses, reactions, or comments to a particular topic and may allow the use of graphics or video. Blogs may be private or accessible to the general public.

**FR-A-404/Page 1 of 4**

USCA11 Case: 20-14676     Document: 26     Date Filed: 04/12/2021     Page: 360 of 457

4. <u>Website/Webpage</u> – A webpage is any page a person sees when accessing the internet. A website is a collection of one or more web pages.
5. <u>Posting</u> – Typing a message, uploading graphics/videos or any electronic media to an online forum or newsgroup which may be accessible to specific viewers or the general public.
6. <u>Personal Website</u> – An online site created by an individual that may include personal information, commentary, photographs, videos and/or graphics for social, entertainment or business purposes. Personal websites may be private or accessible to general public.
7. <u>Profile</u> – A self-defined description of a person which can be displayed on a webpage or a social networking site, and may display any or all of the following biographical information: age, race, sex, employment, education, religion, political viewpoints, the user's likes and dislikes, current location, hometown, and contact information. Profiles may be private or accessible to the general public.
8. <u>Chat Rooms</u> – An online gathering where users can communicate with each other and exchange information via instant messaging and the information is visible to all people in the chat room. Chat Rooms may be private or accessible to the general public.

**<u>PROCEDURE</u>:**

1. **<u>Department-Sanctioned Use</u>:**
   a. Fire Rescue reserves the right to not publish any posting and can remove unsuitable content from authorized social networking websites at any time without notice (CW-R-113). The Fire Rescue's Public Information Officer shall have final discretion as to the removal of any posting under question. The Fire Rescue's Public Information Officer and staff assigned by the Deputy Chief of Operations shall help promote authorized social media accounts.
   b. Misuse of social media websites may lead to disciplinary action under applicable provisions of the Palm Beach County Merit Rules or the Collective Bargaining Agreement (Disciplinary - Article 15).
   c. Fire Rescue personnel representing the Fire Rescue via social media outlets shall do the following:
      i. The use of Fire Rescue computers by Fire Rescue personnel to access social media is prohibited without authorization.
      ii. Conduct themselves at all times as representatives of the Fire Rescue and, accordingly, shall adhere to all Fire Rescue standards of conduct and observe conventionally accepted protocols and proper decorum.
      iii. Identify themselves as a member of the Fire Rescue.
      iv. Post, transmit, or otherwise disseminate confidential information, including photographs or videos, related to Fire Rescue training, activities, or work-related assignments without express written permission.
      v. Do not conduct political activities or private business.
      vi. Fire Rescue personnel use of personally owned devices to manage the Fire Rescue's social media activities or in the course of official duties is prohibited without express written permission.
      vii. Employees shall observe and abide by all copyright, trademark, and service mark restrictions in posting materials to electronic media.
      viii. Any postings to a Social Media site shall be assumed to be an official opinion/comment of Fire Rescue.

**FR-A-404/Page 2 of 4**

2. <u>**Personal Use**</u>:

   a. Fire Rescue recognizes the employee's right to participate in social networking/social media sites or maintain personal web pages, blogs or other types of online platforms while off-duty. However, it is strongly recommended employees use caution in their usage of social media/social networking platforms especially when displaying personal profiles so as not to discredit themselves or the agency.

   b. Development of an individual departmental networking site representing FIRE RESCUE or any Battalion/Division/Fire Station/Unit etc., is prohibited unless approved by the Fire Rescue Administrator or designee. No postings shall be permitted without the final approval of the Public Information Office or designee.

   c. Employees shall not use social media/social networking platforms in violation of PBC Merit Rules, the Collective Bargaining Agreement, (Disciplinary Article 15), either State or Federal law and the HIPAA Policies and Procedure Manual.

   d. Employees are prohibited from disseminating content that is inconsistent with the duties, conduct, and responsibilities of a Fire Rescue employee including content that could be reasonably interpreted as having an adverse effect upon Fire Rescue morale, discipline, operations, the safety of staff, or perception of the public. For example, unprofessional, unbecoming, illegal, unethical, sexual, violent, harassing, racist, sexist, or ethnically derogatory comments, pictures, artwork, videos, material or other such references all tend to undermine the public trust and confidence required by employees of the Fire Rescue.

   e. Unless authorized by the Fire Administrator or designee, employees are prohibited from posting any confidential, sensitive, or copyrighted information, data, text, photographs, audio, video, or any other multimedia file related to any on-going criminal or administrative investigation of this agency. This includes but is not limited to: photographing or video-taping of fire scenes, crime scenes, traffic crashes, medical/trauma patients, arrestees, evidence, restricted areas of Governmental facilities, vehicles, other employees, and statements or comments related to any pending prosecutions or investigations.

   f. Employees shall exercise good judgment in displaying logos, badges, seals, uniforms, vehicles, equipment, or any item or symbol that is associated with this agency.

   g. Employees who choose to maintain or participate in social media or social networking platforms while off-duty shall conduct themselve with professionalism and in such a manner that shall not reflect negatively upon this agency or its mission. While using social media off duty or in an unofficial capacity, employees are prohibited from speaking or writing in an official capacity, or from representing that they are acting on behalf of Fire Rescue or the PBC Board of County Commissioners. Employees are cautioned that speech on-or-off duty, made pursuant to their official duties, generally is not protected speech under the First Amendment and may be subject to disciplinary action if in violation of this policy.

   h. Employees should be aware that the content of social networking sites may be subpoenaed and used to undermine or impeach employee's testimony in a civil or criminal trial or other official proceeding.

   i. Failure to comply with the above guidelines may result in discipline up to and including termination. Authorized exceptions to the above guidelines may be permitted by the Fire Administrator or designee for the operational needs of the Fire Rescue. Employees are strongly encouraged to use caution and seek the guidance of

their supervisors regarding any posting that may adversely reflect upon either the agency or upon the professionalism and integrity of the employee.

j. Fire Rescue personnel shall not post, transmit, or otherwise disseminate any information (photographic or text) to which they have access as a result of their employment without written permission from the Fire Rescue Administrator or designee.

k. Fire Rescue personnel are cautioned against posting personal photographs or provide similar means of personal recognition that may cause you to be identified as a firefighter, fire officer or employee of this Fire Rescue.

*Michael C. Mackey*

**MICHAEL C. MACKEY**
**FIRE RESCUE ADMINISTRATOR**

<u>Supersession History</u>
1. PPM#FR I-71, issued 12/21/1991
2. PPM#FR I-71, issued 03/24/2011
3. PPM#FR I-71, issued 06/10/2016
4. PPM#FR A-404, clerical 03/01/2018

USCA11 Case: 20-14676    Document: 26    Date Filed: 04/12/2021    Page: 362 of 457

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### CASE NO. 19-80701-CIV-DIMITROULEAS/MATTHEWMAN

AJ O'LAUGHLIN and CRYSTAL LITTLE,
    Plaintiffs,

v.

PALM BEACH COUNTY, a political
Subdivision of the State of Florida,
    Defendant.

_____/

### <u>AFFIDAVIT OF TIM MCCABE</u>

BEFORE ME, the undersigned authority, personally appeared TIM MCCABE, who being first duly sworn, on oath, deposes and says:

1.      My name is Tim McCabe. I am over the age of 18 and have personal knowledge of the facts testified to herein.

2.      I have served the Palm Beach County Fire Rescue Department ("PBCFR") since 1990.

3.      I currently hold the position of District Chief.  This is the same position I held at the time of the incident.

4.      I was the supervisor that signed the "Notification and Acknowledgment of Violation of Rules and Regulations Palm Beach County Fire Rescue" as to AJ O'Laughlin's F-2 violation resulting in a written warning (the "written warning"). A true and correct copy of the written warning issued to AJ O'Laughlin on February 25, 2019, is attached hereto as Exhibit "A."

5.      In deciding to sign the written warning, I reviewed PBCFR's Social Media Policy and AJ O'Laughlin's Facebook postings.  The Facebook posts I reviewed are attached hereto as Exhibit "B."

6.      I recall carefully reviewing the Social Media Policy and highlighting the sections I

# EXHIBIT 11

believed AJ O'Laughlin violated as a result of his Facebook posts. To the best of my recollection, AJ O'Laughlin violated Sections 2(d) and 2(j) of the Social Media Policy. The Social Media Policy in effect at the time of the violations is attached hereto as Exhibit "C."

7.      O'Laughlin clearly posted a picture on social media of internal information (the telestaff picture) that he received only as a result of his employment with PBCFR. That is a direct violation of Section 2(j) of the Social Media Policy.

8.      Further, O'Laughlin referred to a PBCFR Captain as a thief without verifying the facts surrounding that very serious allegation. O'Laughlin's posts had or could have had an adverse effect on Fire Rescue morale, operations, and the perception of the department by the public. Firefighters became doubtful as to whether Union Time Pool ("UTP") hours were being properly used. Time had to be spent conducting an internal investigation into the veracity of those statements.

9.      Further, anyone that saw those posts would think that a PBCFR Captain is a thief and that their lockers and homes should be locked around that person. This eroded the trust firefighters under Captain Newsome had in him. These comments also eroded the public trust in the PBCFR department that is essential to our department.

10.     The discipline issued to AJ O'Laughlin was a direct result of our finding that he violated the Social Media Policy through his Facebook posts.

11.     At no point in time was AJ O'Laughlin's association with the union or union campaign mentioned or considered when determining whether discipline was proper.

12.     To the best of my knowledge, apart from Crystal Little and AJ O'Laughlin, no other discipline was issued to other union members or supporters of AJ O'Laughlin's campaign. This is because union membership and/or union campaign has no bearing on the department's

determination of whether to issue discipline in any given case.

FURTHER AFFIANT SAYETH NAUGHT.

TIM MCCABE

The foregoing affidavit was sworn to and subscribed before me by means of [X] physical presence OR [ ] online notarization, this 21 day of May 2020, by Tim McCabe who is [X] Personally known to me OR [ ] Produced Identification: _____

(type of identification)

{seal}

TAMMY SMITH
NOTARY PUBLIC
STATE OF FLORIDA
Comm# GG979139
Expires 5/18/2024

Notary Public, State of Florida

NOTIFICATION AND ACKNOWLEDGMENT OF VIOLATION OF RULES

AND REGULATIONS PALM BEACH COUNTY FIRE RESCUE

(The following employee is hereby notified of a Violation of Rules and Regulations)

EMPLOYEE: A. J. O' Laughlin          JOB TITLE: Captain

DEPARTMENT: Fire Rescue          DATE: 2/25/2019

DIVISION: Operations          STATUS: ✓ PERMANENT ☐ PROBATIONARY

OFFENSE OF CONDUCT: F-2-Violation of rules, regulations, or policies specified in disciplinary guidelines

Description of incident or offense (include date of offense):
On 2/6/2019 posted on social media an employees telestaff calendar which violates policy FR-A-404

ACTION TAKEN: ✓ Written Warning: _____

☐ Written Reprimand: _____

☐ Suspension: _____

From: Date/Time: NA          To: Date/Time: NA

CORRECTIVE ACTION RECOMMENDED:
Follow and adhere to the policy regarding social media FR-A-404

Signed: _Terroll McLahn_ 2/25/19
                    Supervisor          Date

Signed: _____
                    Division Head          Date

Signed: _____
                    Department Head          Date

I acknowledge that I have been provided with a copy of this disciplinary action and that I have been advised of my grievance rights.

Signed: _A. J. O'Laughlin_ 2/25/19
                    Employee          Date

**Employee Comments:**

FR-A-101/ Attachment B Page 1 of 2

Exhibit "A"

NOTIFICATION AND ACKNOWLEDGMENT OF VIOLATION OF RULES AND REGULATIONS

PALM BEACH COUNTY FIRE RESCUE

(The following employee is hereby notified of a violation of rules and regulations)

EMPLOYEE: A. J. O'Laughlin                                    DATE: 2/25/2019

SUPPLEMENTAL:
NA

Signed: _Timothy Nichter_ 2/25/19
Supervisor                Date

I acknowledge that I have been provided with a copy of this disciplinary action and that I have been advised of my grievance rights.

Signed: _A. J. O'Laughlin_ 2/25/19
Employee                Date

EMPLOYEE COMMENTS:

**Supersession History**
1. PPM#FR d-02 Form, revised 06/20/2017
2. PPM#FR A-101 Attachment B, clerical 04/01/2018
3. PPM#FR A-101 Attachment B, clerical 7/23/2018

**FR-A-101/ Attachment B Page 2 of 2**

Page: 367 of 457   Date Filed: 04/12/2021   Document: 26   USCA11 Case: 20-14676

Page: 368 of 457     Date Filed: 04/12/2021     Document: 26     USCA11 Case: 20-14676












**Exhibit "B"**

Page: 369 of 457     Date Filed: 04/12/2021     Document: 26     USCA11 Case: 20-14676

8:26

 **AJ O'Laughlin** ▶ **Make our Union Strong again**
Admin · 32 mins

Be the first to like this

 **AJ O'Laughlin**
This person is a theft just thinking about putting this into Telestaff. This is your Union leadership. Wtf. When elected this will stop and who is Saying this is OK.

26m   Like   Reply                     1

 **AJ O'Laughlin**
Jeff you should be ashamed of yourself. Thinking that union business is done on holidays. I will make sure I keep my locker closed when I'm working with you.

18m   Like   Reply

Write a reply...

 **Robert Valentine**
I don't understand???

17m   Like   Reply

      

 Write a comment...           

     

USCA11 Case: 20-14676     Document: 26     Date Filed: 04/12/2021     Page: 370 of 457

8:31 

 **AJ O'Laughlin** ▸ **Make our Union Strong again**   •••
🛡 Admin · 35 mins · 👥



👍 Like          💬 Comment

❤️ 1

 **Robert Valentine**
Looks like he canceled his UTP???

21m   Like   Reply

 **Crystal Little**
Nice to know the current retired president thinks it's ok to use UTP for holidays!! Thanks AJ for keeping them accountable. And on that note our fucking stellar staffing officer just blindly approves it? Wtf!

10m   Like   Reply          👍 1

      

 Write a comment…    

     

USCA11 Case: 20-14676    Document: 26    Date Filed: 04/12/2021    Page: 371 of 457



Discussion   Chats   Photos   Events   Files

## From Notifications

**AJ O'Laughlin**
🛡 Admin · Just now · 👥

Is this unethical Wtf. Make sure u call the IG about this. Transparency is everything.



AJ's Post

 **Robert Valentine**
I don't understand???

11h   Like   Reply

 **AJ O'Laughlin** ✪
**Robert Valentine** EVP1 took UTP for thanksgiving and also XMas. It was approved by the Union and by Admin. Who does Union stuff on these days. This is how Armand Nault got unelected.  You got to be kidding me. Transparency is my campaign. Soon you will see the truth.

11h   Like   Reply

 **Robert Valentine**
**AJ O'Laughlin** I don't see a date on there for Thanksgiving or Christmas.

11h   Like   Reply

 **AJ O'Laughlin** ✪
Can't be erased.

11h   Like   Reply

 **Robert Valentine**
**AJ O'Laughlin** so where is it then?? The dates that is.

11h   Like   Reply

 Write a comment...    

     

Page: 372 of 457    Date Filed: 04/12/2021    Document: 26    USCA11 Case: 20-14676

| | |
|---|---|
| **TO:** | **ALL PALM BEACH COUNTY FIRE RESCUE PERSONNEL** |
| **FROM:** | **MICHAEL C. MACKEY**<br>**FIRE RESCUE ADMINISTRATOR** |
| **PREPARED BY:** | **FIRE RESCUE PPM COMMITTEE** |
| **SUBJECT:** | **USE OF SOCIAL MEDIA** |
| **PPM #:** | **FR-A-404** |

| | |
|---|---|
| **ISSUE DATE** | **EFFECTIVE DATE** |
| April 17, 2016 | January 10, 2019 |

**PURPOSE**:   The purpose of this policy is to provide guidelines on the procedure and use of social media and social networking.

**UPDATES**:   Future updates to this PPM are the responsibility of the Deputy Chief of Administration, in conjunction with the PPM Committee, under the authority of the Fire Rescue Administrator.

**AUTHORITY**:
- Fire Rescue Administrator
- Florida Statues, Chapter 11
- CW-R-008: Internet Use Policy
- CW-R-113: Social Networking Policy
- PBCFR HIPAA Policies and Procedures Manual (PPM FR-A-401), as may be amended.

**SCOPE**:   This policy applies to all Palm Beach County Fire Rescue personnel and reservists.

**POLICY**:   This policy applies to the procedure and use of social media and social networking.

**DEFINITIONS**:

1. Social Media – A variety of online sources that allow people to communicate, share information, photos, videos, audio or exchange text and other multimedia files with others via online or cellular network platform. This includes but is not limited to social networking sites, micro-blogging sites, personal blogs/personal websites, and news sites.
2. Social Networking – Online platforms where users can network, socialize, communicate and exchange information with other users via text, live conferencing/chat rooms, photographs and/or video-tapes. Mobile Social Networking refers to social networking using a mobile phone or cellular based device.
3. Blogs – A personal online journal or commentary that allows visitors to post opinions, responses, reactions, or comments to a particular topic and may allow the use of graphics or video. Blogs may be private or accessible to the general public.

<div align="center">

**Exhibit "C"**

</div>

4. <u>Website/Webpage</u> – A webpage is any page a person sees when accessing the internet. A website is a collection of one or more web pages.
5. <u>Posting</u> – Typing a message, uploading graphics/videos or any electronic media to an online forum or newsgroup which may be accessible to specific viewers or the general public.
6. <u>Personal Website</u> – An online site created by an individual that may include personal information, commentary, photographs, videos and/or graphics for social, entertainment or business purposes. Personal websites may be private or accessible to general public.
7. <u>Profile</u> – A self-defined description of a person which can be displayed on a webpage or a social networking site, and may display any or all of the following biographical information: age, race, sex, employment, education, religion, political viewpoints, the user's likes and dislikes, current location, hometown, and contact information. Profiles may be private or accessible to the general public.
8. <u>Chat Rooms</u> – An online gathering where users can communicate with each other and exchange information via instant messaging and the information is visible to all people in the chat room. Chat Rooms may be private or accessible to the general public.

**<u>PROCEDURE</u>**:

1. **<u>Department-Sanctioned Use</u>**:
   a. Fire Rescue reserves the right to not publish any posting and can remove unsuitable content from authorized social networking websites at any time without notice (CW-R-113). The Fire Rescue's Public Information Officer shall have final discretion as to the removal of any posting under question. The Fire Rescue's Public Information Officer and staff assigned by the Deputy Chief of Operations shall help promote authorized social media accounts.
   b. Misuse of social media websites may lead to disciplinary action under applicable provisions of the Palm Beach County Merit Rules or the Collective Bargaining Agreement (Disciplinary - Article 15).
   c. Fire Rescue personnel representing the Fire Rescue via social media outlets shall do the following:
      i. The use of Fire Rescue computers by Fire Rescue personnel to access social media is prohibited without authorization.
      ii. Conduct themselves at all times as representatives of the Fire Rescue and, accordingly, shall adhere to all Fire Rescue standards of conduct and observe conventionally accepted protocols and proper decorum.
      iii. Identify themselves as a member of the Fire Rescue.
      iv. Post, transmit, or otherwise disseminate confidential information, including photographs or videos, related to Fire Rescue training, activities, or work-related assignments without express written permission.
      v. Do not conduct political activities or private business.
      vi. Fire Rescue personnel use of personally owned devices to manage the Fire Rescue's social media activities or in the course of official duties is prohibited without express written permission.
      vii. Employees shall observe and abide by all copyright, trademark, and service mark restrictions in posting materials to electronic media.
      viii. Any postings to a Social Media site shall be assumed to be an official opinion/comment of Fire Rescue.

2. **Personal Use**:
   a. Fire Rescue recognizes the employee's right to participate in social networking/social media sites or maintain personal web pages, blogs or other types of online platforms while off-duty. However, it is strongly recommended employees use caution in their usage of social media/social networking platforms especially when displaying personal profiles so as not to discredit themselves or the agency.
   b. Development of an individual departmental networking site representing FIRE RESCUE or any Battalion/Division/Fire Station/Unit etc., is prohibited unless approved by the Fire Rescue Administrator or designee. No postings shall be permitted without the final approval of the Public Information Office or designee.
   c. Employees shall not use social media/social networking platforms in violation of PBC Merit Rules, the Collective Bargaining Agreement, (Disciplinary Article 15), either State or Federal law and the HIPAA Policies and Procedure Manual.
   d. While on duty or off duty Employees are prohibited from disseminating content that is inconsistent with the duties, conduct, and responsibilities of a Fire Rescue employee including content that could be reasonably interpreted as having an adverse effect upon Fire Rescue morale, discipline, operations, the safety of staff, or perception of the public. For example, unprofessional, unbecoming, illegal, unethical, sexual, violent, harassing, racist, sexist, or ethnically derogatory comments, pictures, artwork, videos, material or other such references all tend to undermine the public trust and confidence required by employees of the Fire Rescue.
   e. Unless authorized by the Fire Administrator or designee, employees are prohibited from posting any confidential, sensitive, or copyrighted information, data, text, photographs, audio, video, or any other multimedia file related to any on-going criminal or administrative investigation of this agency. This includes but is not limited to: photographing or video-taping of fire scenes, crime scenes, traffic crashes, medical/trauma patients, arrestees, evidence, restricted areas of Governmental facilities, vehicles, other employees, and statements or comments related to any pending prosecutions or investigations.
   f. Employees shall exercise good judgment in displaying logos, badges, seals, uniforms, vehicles, equipment, or any item or symbol that is associated with this agency.
   g. Employees who choose to maintain or participate in social media or social networking platforms while off-duty shall conduct themselves with professionalism and in such a manner that shall not reflect negatively upon this agency or its mission. While using social media off duty or in an unofficial capacity, employees are prohibited from speaking or writing in an official capacity, or from representing that they are acting on behalf of Fire Rescue or the PBC Board of County Commissioners. Employees are cautioned that speech on-or-off duty, made pursuant to their official duties, generally is not protected speech under the First Amendment and may be subject to disciplinary action if in violation of this policy.
   h. Employees should be aware that the content of social networking sites may be subpoenaed and used to undermine or impeach employee's testimony in a civil or criminal trial or other official proceeding.
   i. Failure to comply with the above guidelines may result in discipline up to and including termination. Authorized exceptions to the above guidelines may be permitted by the Fire Administrator or designee for the operational needs of the Fire Rescue. Employees are strongly encouraged to use caution and seek the guidance of

their supervisors regarding any posting that may adversely reflect upon either the agency or upon the professionalism and integrity of the employee.

j.   Fire Rescue personnel shall not post, transmit, or otherwise disseminate any information (photographic or text) to which they have access as a result of their employment without written permission from the Fire Rescue Administrator or designee.

k.   Fire Rescue personnel are cautioned against posting personal photographs or provide similar means of personal recognition that may cause you to be identified as a firefighter, fire officer or employee of this Fire Rescue.

_Michael C. Mackey_

**MICHAEL C. MACKEY**
**FIRE RESCUE ADMINISTRATOR**

**Supersession History**
1. PPM#FR I-71, issued 12/21/1991
2. PPM#FR I-71, issued 03/24/2011
3. PPM#FR I-71, issued 06/10/2016
4. PPM#FR A-404, clerical 03/01/2018
5. PPM#FR A-404, clerical 1/10/2019

## NOTIFICATION AND ACKNOWLEDGMENT OF VIOLATION OF RULES

## AND REGULATIONS PALM BEACH COUNTY FIRE RESCUE

(The following employee is hereby notified of a Violation of Rules and Regulations)

EMPLOYEE: A. J. O' Laughlin                JOB TITLE: Captain

DEPARTMENT: Fire Rescue                DATE: 2/25/2019

DIVISION: Operations                STATUS: ✓ PERMANENT ☐ PROBATIONARY

OFFENSE OF CONDUCT: F-2-Violation of rules, regulations, or policies specified in disciplinary guidelines

Description of incident or offense (include date of offense):
On 2/6/2019 posted on social media an employees telestaff calendar which violates policy FR-A-404

ACTION TAKEN: ✓ Written Warning: _____

☐ Written Reprimand: _____

☐ Suspension: _____

From: Date/Time: NA                To: Date/Time: NA

CORRECTIVE ACTION RECOMMENDED:
Follow and adhere to the policy regarding social media FR-A-404

Signed: _____ 2/25/19
              Supervisor                Date

Signed: _____
              Division Head                Date

Signed: _____
              Department Head                Date

I acknowledge that I have been provided with a copy of this disciplinary action and that I have been advised of my grievance rights.

Signed: _____ 2/25/19
              Employee                Date

**Employee Comments:**

EXHIBIT 12          FR-A-101/ Attachment B Page 1 of 2

## NOTIFICATION AND ACKNOWLEDGMENT OF VIOLATION OF RULES AND REGULATIONS

### PALM BEACH COUNTY FIRE RESCUE

(The following employee is hereby notified of a violation of rules and regulations)

EMPLOYEE: A. J. O'Laughlin                                     DATE: 2/25/2019

SUPPLEMENTAL:
NA

Signed: _Timothy Nichter_ 2/25/19
          Supervisor          Date

I acknowledge that I have been provided with a copy of this disciplinary action and that I have been advised of my grievance rights.

Signed: _A. J. O'Laughlin_ 2/25/19
          Employee          Date

EMPLOYEE COMMENTS:

**Supersession History**
1. PPM#FR d-02 Form, revised 06/20/2017
2. PPM#FR A-101 Attachment B, clerical 04/01/2018
3. PPM#FR A-101 Attachment B, clerical 7/23/2018

Page: 378 of 457   Date Filed: 04/12/2021   Document: 26   USCA11 Case: 20-14676

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 19-80701-CIV-DIMITROULEAS/MATTHEWMAN

AJ O'LAUGHLIN and CRYSTAL
LITTLE,

     Plaintiffs,

vs.

PALM BEACH COUNTY, a political
subdivision of the State of Florida,

     Defendant.

_____/

**Plaintiff/Crystal Little's Responses to
Defendant's Interrogatories**

Plaintiff/Crystal Little , hereby responds to Defendant's Interrogatories

as follows:

**Certificate of Service**

I HEREBY certify that on June 12, 2020, the above and foregoing was

served by email to:   Anaili Cure, Assistant County Attorney, 300 North Dixie

Highway, Third Floor, West Palm Beach, Florida 33401, at acure@pbcgov.org;

and to secondary emails:  dfishel@pbcgov.org ;  swebber@pbcgov.org.

**The Amlong Firm** • 500 Northeast Fourth Street • Fort Lauderdale, FL  33301 • 954.462.1983

## EXHIBIT 13

DocuSign Envelope ID: F0FF08BA-B6AB-473E-A4D2-00F2E84459E8

/s/ William R. Amlong
WILLIAM R. AMLONG
Florida Bar No.: 470228
WRAmlong@TheAmlongFirm.com
KAREN COOLMAN AMLONG
Florida Bar No.: 275565
Kamlong@TheAmlongFirm.com
AMLONG & AMLONG, P.A.
500 Northeast Fourth Street
Fort Lauderdale, Florida 33301-1154
(954) 462-1983
(954) 523-3192 (fax)

**Attorneys for Plaintiffs,**
**AJ O'Laughlin and Crystal Little**

DocuSign Envelope ID: F0FF08DA-B6AB-473E-A4B2-00F2E84459E8

## RESPONSES TO DEFENDANT'S INTERROGATORIES
## TO PLAINTIFF CRYSTAL LITTLE

**OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS:** Plaintiff objects to the "Definitions" and "Instructions" to the extent they presume to expand the scope of discovery provided by the Florida Rules of Civil Procedure ("the Rules") or impose obligations on plaintiff that are inconsistent with or in addition to those that exist under existing Rules.

**Interrogatory No. 1.** Please state the name and address of all persons answering, and assisting in answering, these interrogatories, and, if applicable, the person's official position or relationship with the party to whom the interrogatories are directed?

**Answer**: Plaintiff objects on the ground that the interrogatory is not designed to lead to the discovery of admissible information regarding Plaintiff's counsel's office personnel, and seeks to invade the attorney client confidential communication privilege as to any communications between Plaintiff's counsel and Plaintiff. Otherwise, Plaintiff was assisted by Chris Hoch, 22112 Woodset Way, Boca Raton, FL, former Division Chief of Operations, Palm Beach County Fire & Rescue.

**Interrogatory No. 2**. Please state whether you have ever been convicted of a crime, other than any juvenile adjudication, which under the law under which you were convicted was punishable by death or imprisonment in excess of one (1) year, or that involved dishonesty or a

false statement, regardless of the punishment? If so, state as to each

conviction, the specific crime, the date and the place of conviction.

**Answer**:    No.

**Interrogatory No. 3.** Please state for how long You have been a

member of the Union and the positions You have held in the Union,

including the time periods in which those positions were held.

**Answer**: 15 years; never held a union position.

**Interrogatory No. 4.** Please state the number of times you have ran

and/or participated in a Union election campaign including dates, position(s)

running for, names of opponent(s), and whether you won the election.

**Answer**: Never.

**Interrogatory No. 5.** Please state the date in which you joined the

Facebook Page, identify who created the Facebook Page and the date it was

created, and identify all members/participants/invitees to the Facebook

Page.

**Answer**: AJ O'Laughlin created it.  I joined January 15, 2019.

**Interrogatory No. 6.** Please state if you have ever been a party,

either Plaintiff or Defendant, in a lawsuit or other legal proceeding, other

than the present matter (including but not limited to dissolution of

marriage, bankruptcy, criminal defendant or victim of a crime, worker's

compensation, unemployment compensation, disability, immigration,

personal injury, wrongful death, breach of contract) and, if so, state

whether the nature of your involvement in the lawsuit or legal proceeding,

DocuSign Envelope ID: F0FF08BA-B6AB-473E-A4D2-00F2E84459E8

the nature of the lawsuit or legal proceeding, the date, and court or forum in which such lawsuit or legal proceeding took place.

**Answer**:    I have not been a party to a lawsuit.

**Interrogatory No. 7.** Please specify whether you have ever supported the campaign(s)/election(s) of a Union member running for a Union position and identify the campaign(s)/election(s), how you supported their campaign(s)/election(s) (e.g. posting on Facebook on their behalf; speaking on their behalf, etc.), and the date you supported their campaign(s)/elections.

**Answer**: Plaintiff objects to this interrogatory on the ground that it invades her privilege under the First Amendment of the Constitution of the United States to privately participate in free association as a member of the Union.

## VERIFICATION

CRYSTAL LITTLE, being duly sworn, deposes and says:

1. I am the Plaintiff in the above-referenced matter. I am fully familiar with the facts set forth herein.

2. I have reviewed the above answers to interrogatories, and verify upon penalty of perjury that they are true and correct as related to me, to the best of my knowledge.

DocuSigned by:

2316F1CA4CC0420...

CRYSTAL LITTLE, Plaintiff

FR-A-101

NOTIFICATION AND ACKNOWLEDGMENT OF VIOLATION OF RULES

AND REGULATIONS PALM BEACH COUNTY FIRE RESCUE

(The following employee is hereby notified of a Violation of Rules and Regulations)

EMPLOYEE: Crystal Little _____ JOB TITLE: Captain _____

DEPARTMENT: Fire Rescue _____ DATE: 02/26/19 _____

DIVISION: Operations _____ STATUS: ✓ PERMANENT ☐ PROBATIONARY

OFFENSE OF CONDUCT: F-2 Violation of rules, regulations or policies specified in disciplinary guidelines _____

Description of incident or offense (include date of offense):
On 02/07/19 Palm Beach Fire Rescue was notified that a comment was made on a social media post which violates policy FR-A-404

ACTION TAKEN: ✓ Written Warning: _____

☐ Written Reprimand: _____

☐ Suspension: _____

From: Date/Time: NA _____ To: Date/Time: NA _____

CORRECTIVE ACTION RECOMMENDED:
Follow and adhere to the policy regarding social media FR-A-404

Signed: _____
Supervisor          Date

Signed: _____ 2/27/19
Division Head       Date

Signed: _____
Department Head     Date

I acknowledge that I have been provided with a copy of this disciplinary action and that I have been advised of my grievance rights.

Signed: _____ 1230   2/26/19
Employee            Date

**Employee Comments:**

_____

**EXHIBIT 14**   FR-A-101/ Attachment B Page 1 of 2

NOTIFICATION AND ACKNOWLEDGMENT OF VIOLATION OF RULES AND REGULATIONS

PALM BEACH COUNTY FIRE RESCUE

(The following employee is hereby notified of a violation of rules and regulations)

EMPLOYEE: Crystal Little _____ DATE: 02/26/19 _____

SUPPLEMENTAL:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Signed:_____
                    Supervisor          Date

_____

I acknowledge that I have been provided with a copy of this disciplinary action and that I have been advised of my grievance rights.

Signed:_____
                    Employee          Date

EMPLOYEE COMMENTS:

_____
_____
_____
_____

*TA*

**Supersession History**
1. PPM#FR d-02 Form, revised 06/20/2017
2. PPM#FR A-101 Attachment B, clerical 04/01/2018
3. PPM#FR A-101 Attachment B, clerical 7/23/2018

**FR-A-101/ Attachment B Page 2 of 2**

**Certificate of Service**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was filed and served electronically to Helene C. Hvizd and Anaili Cure, Attorneys for Appellee, hhvizd@pbcgov.org; acure@pbcgov.org; ldennis@pbcgov.org; webber@pbcgov.org; Palm Beach County Attorney's Office, 301 N. Olive Avenue, Suite 601, West Palm Beach, Florida 33401.

Respectfully Submitted,

*/s/ Karen Coolman Amlong*
KAREN COOLMAN AMLONG
Florida Bar Number 275565
KAmlong@TheAmlongFirm.com
THE AMLONG FIRM
500 NE Fourth St., Second Floor
Fort Lauderdale, FL 33301
Telephone (954) 462-1983
Facsimile (954) 523-3192
***Attorneys for the Appellants***,
        ***AJ O'Laughlin and Crystal Little***

\\amlong3\cpshare\CPWin\HISTORY\210325_0001\1829.40

IN THE UNITED STATES COURT OF APPEALS
ELEVENTH CIRCUIT

11th Cir. No. 20-14676-HH

AJ O'LAUGHLIN and
CRYSTAL LITTLE,

      Appellants,

vs.

PALM BEACH COUNTY, a political
subdivision of the State of Florida,

      Appellee.

_____/

**Appendix to Appellants' Initial Brief**

(Volume 3)

KAREN COOLMAN AMLONG
Florida Bar Number 275565
KAmlong@TheAmlongFirm.com
THE AMLONG FIRM
500 NE Fourth St., Second Floor
Fort Lauderdale, FL  33301
Telephone (954) 462-1983
Facsimile (954) 523-3192
***Attorneys for the Appellants***,
    ***AJ O'Laughlin and Crystal Little***

## Index to Appendix

**Description**                                                              **DE  No.**

Index  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I

**[Volume 1]**

Docket Sheet  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Docket

Notice of  Removal   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Defendant's Motion to Dismiss the Complaint  . . . . . . . . . . . . . . . . . . . . . . . . 11

Plaintiffs' Response to Defendant's Motion to Dismiss the Complaint  . . . . . . . 14

Defendant's Reply in Support of Its Motion to Dismiss  . . . . . . . . . . . . . . . . . . 30

Order Granting Motion to Dismiss  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

First Amended Complaint  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Defendant's Motion to Dismiss the Amended Complaint  . . . . . . . . . . . . . . . . . 35

Plaintiff's Response to Defendant's Motion to Dismiss the Amended

    Complaint  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Defendant's Reply in Support of its Motion to Dismiss Plaintiffs' Amended

    Complaint  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Order Granting Motion to Dismiss  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

**[Volume 2]**

Palm Beach County's Answer and Affirmative Defenses  . . . . . . . . . . . . . . . . . 46

Plaintiffs' Motion for Summary Judgment  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Plaintiffs' Local 51.6(a) Statement of Material Facts . . . . . . . . . . . . . . . . . . . . 48

Defendant's Motion for Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Defendant's Statement of Material Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

**[Volume 3]**

Defendants' Response in Opposition to Plaintiffs' Motion

for Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Defendant's Response Plaintiffs' Local 51.6(a) Statement of Material Facts . . . . 52

Plaintiffs' Local Rule 51.6(a)(2) Response to Defendant's Statement of Undisputed

Material Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Plaintiffs' Response to Defendant's Motion for Summary Judgment . . . . . . . . . 54

Defendant's Reply in Support of its Motion for Summary Judgment . . . . . . . . 55

Defendant's Reply to Plaintiffs' Local Rule 51.6(a)(2) Response to Defendant's

Statement of Undisputed Material Facts . . . . . . . . . . . . . . . . . . . . . . . 56

Plaintiffs' Reply to Defendant's Response to Plaintiff's Motion for Summary

Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Order Granting Defendant's Motion for Summary Judgment . . . . . . . . . . . . . 76

Final Judgment and Order Closing Case . . . . . . . . . . . . . . . . . . . . . . . 77

**DE 51**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 19-80701-CIV-DIMITROULEAS/MATTHEWMAN

AJ O'LAUGHLIN and CRYSTAL LITTLE,
     Plaintiffs,

v.

PALM BEACH COUNTY, a political
Subdivision of the State of Florida,
     Defendant.

                                   /

## DEFENDANT'S RESPONSE IN OPPOSITION TO
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

     Defendant, Palm Beach County (the "County"), by and through its undersigned counsel, hereby files its Response in Opposition to "Plaintiffs' Motion for Summary Judgment on Facial Unconstitutionality of Palm Beach County Fire Recue Department's Social Media Policy and Incorporated Memorandum of Law" ("Plaintiffs' Motion for Summary Judgment") [DE 47] and states as follows:

**I.**     **INTRODUCTION**

     This Court should dismiss Plaintiffs' Motion for Summary Judgment because Plaintiffs failed to meet their burden in advancing an argument of facial unconstitutionality as to Palm Beach County Fire Rescue Department's[1] Social Media Policy (the "Social Media Policy"). Plaintiffs' failed to support their motion with either evidence or logical argument. Moreover, summary judgment must also be denied because the Social Media Policy is constitutional on its face. The Social Media Policy is not overbroad because it does not reach a substantial amount of protected speech when viewed in the public employment context. Even if it did reach a substantial amount of protected speech, the Social Media Policy passes constitutional scrutiny because it meets the

_____

[1] Hereinafter referred to as "Fire Rescue."

test articulated in *United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 465, 115 S.Ct.

1003, 130 L.Ed.2d 964 (1995) ("*NTEU*").   Fire Rescue's interest in operating its department

efficiently and effectively outweighs employees' First Amendment rights.   Likewise, the Social

Media Policy is not void for vagueness because it is clear what the policy prohibits.[2]

## II.   **LEGAL ANALYSIS**

###   A.   **Plaintiffs' Motion For Summary Judgment Should Be Denied Because It Is Not Properly Supported.**

Plaintiffs' Motion for Summary Judgment attempts to argue that the Social Media Policy

[DE 50-6] is facially unconstitutional.   In so doing, Plaintiffs rely solely on their Amended

Complaint and the Social Media Policy language.   That is not enough.

"When a question involving a facial constitutional validity of a [governmental policy] is

reached on a motion for summary judgment, if the party asserting the invalidity of the [policy]

fails to offer evidence of a substantial character, or at least an argument based upon compelling

logic, which rebuts the presumption of constitutionality of the [policy], or to excuse that failure in

accordance with provision of rule relating to unavailability of affidavits," then their summary

judgment motion should be denied.   *JBK, Inc. v. City of Kansas City*, Mo., 641 F.Supp. 893, 904

(W.D.Mo.1986).  Plaintiffs have failed to offer any evidence, not even affidavits signed by them,

supporting their allegations that "[w]hat PBCFR management wants – and, unless this Court finds

it unconstitutional, what it would continue to have – is a social media policy patterned along the

lines of what the Fourth Circuit panel in *Liverman*[3] characterized as 'a policy . . . and the

disciplinary actions taken pursuant to it that would, if upheld, lead to an utter lack of transparency

---

[2] The County incorporates its Motion for Summary Judgment [DE 49] into this Response, as the County's Motion for Summary Judgment analyzes why the Social Media Policy is neither overbroad nor vague.
[3] *Liverman v. City of Petersburg*, 844 F.3d 400 (4th Cir. 2016).

in [PBCFR] operations that the First Amendment cannot countenance." Notably, Plaintiffs have not, and cannot, provide one example in which the Social Media Policy was used to "lead to an utter lack of transparency."[4]

Nor do Plaintiffs provide an argument based upon compelling logic. While Plaintiffs' allege in a conclusory fashion that, "the Social Media Policy here is similar to the one in *Liverman*," they fail to conduct an in-depth analysis comparing the Social Media Policy here with the one in *Livermani*. In fact, Plaintiffs fail to refer to the entirety of the Social Media Policy at issue in this case even once. Instead, Plaintiffs cherry pick provisions and quote them out of context. Plaintiffs also fail to instruct the Court that in *Sabatini,* a social media policy, almost identical to the one here, was found to be constitutional. *Sabatini v. Las Vegas Metro. Police Dep't*, 369 F. Supp. 3d 1066 (D. Nev. 2019), reconsideration denied, 217CV01012JADNJK, 2019 WL 3307040 (D. Nev. July 23, 2019). Additionally, in *Hernandez*, the court denied a motion for a preliminary injunction against a social media policy similar to the one at issue here and stated that it would "not issue an injunction in favor of [plaintiff] on its facial challenge to the policy and its potential chilling effect on speech because Plaintiffs have failed to show serious questions going to the merits or a likelihood of success on the merits." *Hernandez v. City of Phoenix*, 432 F. Supp. 3d 1049, 1068 (D. Ariz. 2020). Plaintiffs also fail to discuss, or even mention, *Hernandez*.

Notably, "assertions made by movant seeking summary judgment are meaningless unless supported as provided by the rule." *Jacobson v. Maryland Cas. Co*., 336 F.2d 72, 75 (8th Cir. 1964). As previously stated, Plaintiff have failed to meet their burden. Consequently, Plaintiffs' Motion for Summary Judgment should be denied and the County's Motion for Summary Judgement, which is supported by affidavits and a compelling logical and legal argument, should

---

[4] Plaintiffs' lack of support is even more noticeable given the fact that Plaintiffs, as Captains, were charged with enforcing the Social Media Policy for years. [DE 50, ¶¶ 22, 34].

be granted.

    **B.**    **The Social Media Policy Survives AN *NTEU* Analysis.**

Without analysis, Plaintiffs state: "PBCFR's social media policy cannot survive the standards set forth by the Supreme Court in *NTEU*." Plaintiffs' conclusory assertion is incorrect.

Under the *NTEU* test, courts first determine "whether the restriction reaches speech on a matter of public concern." *Sabatini*, 369 F. Supp. 3d at 1095. If the regulation covers speech that involves a matter of public concern, "[c]ourts then look to the public employer's justification for the policy." *Id*. It is the government's burden to show "that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's necessary impact on the actual operation of the Government." *See NTEU*, 513 U.S. at 468. Whether an employee's interest in speaking outweighs the government's interest is a question of law for the court. *Rankin v. McPherson,* 483 U.S. 378, 388 (1987).

The threshold question for the Court is to determine whether Fire Rescue's Social Media Policy realistically reaches a substantial amount of speech on matters of public concern. Because the overbreadth must be substantial, "the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Members of the City Council of Los Angeles v Taxpayers for Vincent*, 466 U.S. 789, 800 (1984). Therefore, this Court is forced to look only to the language of the provision itself. *See Ruff v. City of Leavenworth*, Kan., 858 F.Supp. 1546, 1556 (D. Kan. 1994). A look at the provision in its entirety shows that it is limited in its reach as exemplified by Section (2)(d) of the Social Media Policy.

As illustrated in Plaintiffs' case, the majority of the speech that is subject to the Social Media Policy is not afforded First Amendment protection. Speech made in the employee's personal interest pertaining to internal grievances, race, gender, sexual orientation, and political 8affiliation is not automatically rendered "a matter of public concern" because it simply involves those topics.

Further, assuming the Social Media Policy reaches a substantial amount of speech on matters of public concern, it is nevertheless constitutional because Fire Rescue's interest outweigh its employee's First Amendment interests. When balancing both sides' interests, it is important to note that the Eleventh Circuit has repeatedly recognized that "[i]n the 'quasi-military' context', which includes both fire departments and police stations, [courts] have afforded public employers greater latitude to burden an employee's rights, particularly when the exercise of that right impacts discipline, morale, harmony, uniformity, and trust in the ranks." *Starling v. Bd. Of County Com'rs*, 602 F.3d 1257, 1261 (11th Cir. 2010). This is the case because the government's interest in avoiding disruption is magnified when the employee serves in a public contact role. *Pool v. VanRheen*, 297 F.3d 899, 908 (9th Cir. 2002). Notably, several Courts have already ruled that the interests of a paramilitary institution, such as Fire Rescue, outweigh an individual employee's freedom of speech.

For example, In *Anderson v. Burke County, Ga*, cited by Plaintiffs in their Summary Judgment Motion, the court recognized that "the government, acting as employer, is afforded broad discretion for its acts." *Anderson v. Burke County, Ga*., 239 F.3d 1216, 1221–22 (11th Cir. 2001). In *Anderson*, the defendant provided fire rescue services and argued that it "had a legitimate interest in ensuring that Plaintiff "maintains public confidence in the ability of [the Burke County fire and rescue services] to carry out its public safety mission." *Id*. The court found that the

defendant's interest was "a compelling and legitimate government interest." The court in *Anderson*

went on to further state:

> In addition, a paramilitary organization, such as a fire department
> has a 'need to secure discipline, mutual respect, trust and particular
> efficiency among the ranks due to its status as a quasi-military entity
> different from other public employers.' *Hansen v. Soldenwagner*, 19
> F.3d 573, 577 (11th Cir.1994) (citations omitted); *see also Busby v.
> City of Orlando*, 931 F.2d 764, 774 (11th Cir.1991) (noting special
> disciplinary concerns of quasi-military organizations); *Thorne v.
> City of El Segundo*, 726 F.2d 459, 470 n. 10 (9th Cir.1983) (state's
> interest in regulating speech is greatest when paramilitary
> organizations are involved).
>
> Because we conclude that Defendants' interest, as an employer, in
> promoting the efficiency of the public services it performs through
> its employees, outweighs whatever interest Plaintiff—a ranking
> officer in the agency—may have in commenting upon these matters
> as he did, Plaintiff cannot sustain a claim for retaliation under 42
> U.S.C. § 1983.

*Id*. (some internal citations omitted).

    Recently, the Fourth Circuit also concluded that, a fire department's interest in efficiency

and preventing disruption outweighed an employee's interest in speaking in the manner he did

regarding gun control and the department's social media policy.  *See Grutzmacher v. Howard*

*County*, 851 F.3d 332, 345 (4th Cir. 2017).  In *Grutzmacher*, the plaintiff made and approved

several political and racially charged Facebook posts.  *Id*. at 338-339.  The court ultimately found

in favor of the department for several reasons.  Id. at 345-348.  Amongst those reasons was the

court's reasoning that the plaintiff's actions led to concerns regarding plaintiff's fitness as a

supervisor and role model.  *Id*.  Notably, the court ruled that plaintiff's speech frustrated the

department's public safety mission and threatened community trust in. the department, which is

essential to its function.  *Id*.  The court went on to state that the potential for plaintiffs statement to

diminish the department's standing with the public further weighed in favor of the department.  *Id.*

at 347.  In support of its conclusion, the court reasoned that part of a firefighter's job is to

"safeguard the public's opinion of them, particularly with regard to a community's view of the respect that firefighters accord the members of that community."  *Id*. at 346.

The analysis in *Anderson, Grutzmacher, Sabatini,* and *Hernandez* apply in this instance with similar force.  Fire Rescue, as a paramilitary organization responsible for the health and safety of the community, must work closely with the community and public to achieve its public safety mission.  Fire Rescue has articulated significant and sufficient reasons for implementing and maintaining the Social Media Policy.  Chief amongst these reasons are:

(1) establishing a policy concerning personal web pages or internet sites when referencing Fire Rescue to ensure employees use appropriate discretion so as to not impede Fire Rescue's ability to serve the community and maintain the community's trust and respect;

(2) clearly identifying prohibited activities by Fire Rescue employees on social networking and other web sites;

(3) providing guidelines for Fire Rescue employees in applying rules of conduct to their online content;

(4) protecting Fire Rescue and its employees from harm as a result of inappropriate postings or inadvertent harmful postings;

(5) and maintaining order and discipline within Fire Rescue to promote efficient operations, trust and camaraderie among our firefighters internally, and the safety of staff.

[DE 50-2, ¶ 17].

The interests articulated by Fire Rescue are legitimate interests that satisfy the higher burden articulated in *NTEU*.  Therefore, Plaintiffs' Motion for Summary Judgment should be denied.

III.   **CONCLUSION**

Based on the foregoing, and on the arguments articulated in the County's Motion for Summary Judgment, the County respectfully requests the Court deny Plaintiffs' Motion for Summary Judgment and grant Defendant's Motion for Summary Judgment.

Respectfully submitted on September 3, 2020, by:

*/s/Anaili M. Cure*
Anaili M. Cure, Esquire
Assistant County Attorney
Florida Bar No. 119558

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on September 3, 2020, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send an electronic notice to the authorized CM/ECF filers.

*/s/Anaili M. Cure*
Anaili M. Cure, Esquire
Assistant County Attorney
Florida Bar No. 119558
300 North Dixie Highway, Third Floor
West Palm Beach, Florida 33401
Tel.: (561) 355-6337 / Fax: (561) 355-4234
Primary Email: acure@pbcgov.org
Secondary Email: dfishel@pbcgov.org,
                          swebber@pbcgov.org

# DE 52

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 19-80701-CIV-DIMITROULEAS/MATTHEWMAN**

AJ O'LAUGHLIN and CRYSTAL LITTLE,
     Plaintiffs,

v.

PALM BEACH COUNTY, a political
Subdivision of the State of Florida,
     Defendant.

_____/

**<u>DEFENDANT, PALM BEACH COUNTY'S, RESPONSE TO PLAINTIFFS' LOCAL
RULE 51.6(a) STATEMENT OF MATERIAL FACTS IN SUPPORT OF PLAINTIFFS'
SUMMARY JUDGMENT</u>**

     Defendant, Palm Beach County ("County"), by and through its undersigned counsel, files

this Response to Plaintiffs' Local Rule 51.6(a) Statement of Material Facts In Support of Plaintiffs'

Summary Judgment [DE 48] and states as follows:

     1.     Undisputed.

     2.     Undisputed.

     3.     Undisputed.

**<u>Additional Facts</u>**

     4.     There are no additional facts necessary beyond the facts included in the County's

Statement of Material Facts in Support of Defendant's Motion for Summary Judgment [DE 50].

     Respectfully submitted on September 3, 2020, by:

     */s/Anaili Cure*_____
     Anaili Cure, Esquire
     Assistant County Attorney
     Florida Bar No. 119558

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 3, 2020, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send an electronic notice to the authorized CM/ECF filers.

*/s/Anaili M. Cure*
Anaili M. Cure, Esquire
Assistant County Attorney
Florida Bar No. 119558
300 North Dixie Highway, Third Floor
West Palm Beach, Florida 33401
Tel.: (561) 355-6337 / Fax: (561) 355-4234
Primary Email: acure@pbcgov.org
Secondary Email: dfishel@pbcgov.org,
swebber@pbcgov.org

**DE 53**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 19-80701-CIV-DIMITROULEAS

AJ O'LAUGHLIN and CRYSTAL LITTLE,

     Plaintiffs,

vs.

PALM BEACH COUNTY, a political
subdivision of the State of Florida,

     Defendant.

_____/

**Plaintiffs' Local Rule 51.6(a)(2) Response to Defendant's Statement
Of Material Facts In Supports of Summary Judgment**

     Plaintiffs submit the following responses to defendant's statement of

material facts in support of is motion for summary judgment (DE 50):

     1.     Not disputed, but relevant only to establish that the Palm Beach

County Fire Rescue Department is a governmental entity to which the First

Amendment, as extended to the states by the Fourteenth Amendment,

applies and is amenable to suit under 42 U.S.C. § 1983.

     2.     Neither disputed nor relevant to the sole issue before the Court.

     3.     Neither disputed nor relevant to the sole issue before the Court.

     4.     Neither disputed nor relevant to the sole issue before the Court.

     5.     Neither disputed nor relevant to the sole issue before the Court.

6.      Neither disputed nor relevant to the sole issue before the Court.

7.      Neither disputed nor relevant to the sole issue before the Court.

8.      Neither disputed nor relevant to the sole issue before the Court.

9.      Neither disputed nor relevant to the sole issue before the Court.

10.     Neither disputed nor relevant to the sole issue before the Court.

11.     Neither disputed nor relevant to the sole issue before the Court.

12.     Neither disputed nor relevant to the sole issue before the Court.

13.     Neither disputed nor relevant to the any issue before the Court

other than that ¶¶ 2(d) and 2(j) of that policy provided:

>       ***Employees are prohibited from disseminating content that*** is inconsistent with the duties, conduct, and responsibilities of a Fire Rescue employee including content ***that could be reasonably interpreted as having an adverse effect upon*** Fire Rescue morale, discipline, operations, the safety of staff or perception of the public. For example, unprofessional, unbecoming, illegal, unethical, sexual, violent, harassing, racist, sexist, or ethnically derogatory comments, pictures, artwork, videos, material or other such references all tend to undermine ***the public trust and confidence required by employees of the Fire Rescue***.

¶ 2(d) (emphasis supplied);

>       Failure to comply with this policy may result in discipline up to and including termination. . . .  Employees are strongly encouraged to use caution and seek the guidance of their supervisors regarding any posting that may adversely reflect upon Fire Rescue. . . .

14.     Not disputed.

15.     Neither disputed nor relevant to the any issue before the Court

other than that ¶ 2(d) of the amended policy is virtually identical, in

pertinent part, to ¶ 2(d) and 2(i) of the 2016 policy:

While **on-duty or off-duty** *employees are prohibited from disseminating content that* is inconsistent with the duties, conduct, and responsibilities of a Fire Rescue employee, including content that *could be reasonably interpreted as having an adverse effect on* Fire Rescue morale, discipline, operations, the safety of the staff, or *the perception of the public.*

¶ 2(d)  (emphasis supplied), and

Failure to comply with the above guidelines may result in discipline up to and including termination. . . .  *Employees are strongly encouraged to use caution* and seek the guidance of their supervisors *regarding any posting that may adversely reflect upon . . . the agency*. . . .

¶ 2(i)   (emphasis supplied.

16.   Neither disputed nor relevant for any issue other than to set

forth the texts of ¶ 2(d) and 2(i).

17.   Neither disputed nor relevant to the sole issue before the Court.

18.   Neither disputed nor relevant to the sole issue before the Court.

19.   Neither disputed nor relevant to the sole issue before the Court.

20.   Not disputed.

21.   Not disputed.

22.   Not disputed.

23.   Not disputed.

24.   Not disputed.

25.   Not disputed.

26.   Not disputed.

27.   Disputed:  *One*, DE 45, at 6, is the certificate of service for

defendant's answer and affirmative defenses; Exhibit 2 to the McGlynn

Affidavit, DE 50-2, at 11 is the February 24, 2011 version of the Social Media

Policy; ¶ 25 of the McGlynn Affidavit is summary of the conclusions of an

investigation, of which no best-evidence copy is provided.  ***Two***, plaintiffs

did not "allege[]" that Captain Newswome "used UTP on holidays," but

merely that he had been caught trying to do so.  <u>See</u> First Amended

Complaint, DE 32, at 5-6, ¶¶ 10-12.

     28.    Neither disputed nor relevant to the sole issue before the Court.

     29.    Neither disputed nor relevant to the sole issue before the Court.

     30.    Not disputed that plaintiffs posted the quoted items; disputed

that Captain Newsome was innocent.  <u>See</u> ¶ 27, <u>supra</u>.

     31.    Neither disputed nor relevant to the sole issue before the Court.

     32.    Neither disputed nor relevant to the sole issue before the Court.

     33.    Neither disputed nor relevant to the sole issue before the Court.

     34.    Neither disputed nor relevant to the sole issue before the Court.

     35.    Neither disputed nor relevant to the sole issue before the Court.

     36.    Neither disputed nor relevant to the sole issue before the Court.

     37.    Neither disputed nor relevant to the sole issue before the Court.

     38.    Neither disputed nor relevant to the sole issue before the Court.

     39.    Neither disputed nor relevant to the sole issue before the Court.

     40.    Neither disputed nor relevant to the sole issue before the Court.

     41.    Neither disputed nor relevant to the sole issue before the Court.

42.     Neither disputed nor relevant to the sole issue before the Court.

43.     Neither disputed nor relevant to the sole issue before the Court.

44.     Neither disputed nor relevant to the sole issue before the Court.

45.     Neither disputed nor relevant to the sole issue before the Court.

46.     Neither disputed nor relevant to the sole issue before the Court.

Respectfully Submitted,

*/s/   William R. Amlong*
WILLIAM R. AMLONG
Florida Bar No.: 470228
WRAmlong@TheAmlongFirm.com
KAREN COOLMAN AMLONG
Florida Bar No.: 275565
KAmlong@TheAmlongFirm.com

AMLONG & AMLONG, P.A.
500 Northeast Fourth Street
Fort Lauderdale, Florida 33301-1154
(954) 462-1983
(954) 523-3192 (fax)

**Certificate of Service**

I HEREBY certify that the above and foregoing was electronically filed through the Southern District of Florida ECF system and thereby delivered to all counsel of record.

*/s/   William R. Amlong*
WILLIAM R. AMLONG

**DE 54**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 19-80701-CIV-DIMITROULEAS

AJ O'LAUGHLIN and CRYSTAL LITTLE,

　　　Plaintiffs,

vs.

PALM BEACH COUNTY, a political
subdivision of the State of Florida,

　　　Defendant.

_____

/

**Plaintiffs' Response to Defendant (sic) Motion for Summary
Judgment and Incorporated Memorandum of Law**

　　　Plaintiffs, AJ O'laughlin and Crystal Little move, respond to defendant,

Palm Beach County's motion for summary judgment, DE 49, as follows:

**Introduction and Summary**

　　　Palm Beach County's Fire Rescue Department's social media policy

provides, in pertinent part, that

　　　　　While **on-duty or off-duty** *employees are prohibited from
　　　　　disseminating content that* is inconsistent with the duties, conduct,
　　　　　and responsibilities of a Fire Rescue employee, including content that
　　　　　*could be reasonably interpreted as having an adverse effect on*
　　　　　Fire Rescue morale, discipline, operations, the safety of the staff, or
　　　　　*the perception of the public[.]*

¶ 2(d), PBCFR 2019 Social Media Policy, and cautions shortly afterwards

**The Amlong Firm** • 500 Northeast Fourth Street • Fort Lauderdale, FL  33301 • 954.462.1983

that

> Failure to comply with the above guidelines may result in discipline up to and including termination. . . . ***Employees are strongly encouraged to use caution*** and seek the guidance of their supervisors ***regarding any posting that may adversely reflect upon . . . the agency***. . . .

Id. at ¶ 2(i).

The sole issue in this summary judgment duel is whether that language satisfies the criteria set by the Supreme Court in  United States v. National Treasury Employees Union, 513 U.S. 454, 468 (1995) for regulating speech that has yet to be spoken.

Comparing the operative language of the PDCFR policy to the language in policies that have been held to be facially unconstitutional, PBCFR's language is similar.  Comparing the PBCFR language to the language in the cases cited by the County as not being facially unconstitutional, the language is different.

The conclusion:  PBCFR's social media policy is facially unconstitutional and the discipline imposed on AJ O'Laughlin and Crystal Little, the plaintiffs, must be voided.

### Statement of the Facts

PBCFR had on or about February 6, 2019, re-issued a policy addressed to "Use of Social Media," which policy was appended (as it was amended

February 28) to the First Amended Complaint as Attachment 2.[1]  In its

regulations on "personal use," the policy:

**One**, warns against "discredit[ing] … the agency,"[2] Procedure 1(a),[3]

and

**Two**, cautions against "[w]hile . . . off-duty . . .disseminating content

that is inconsistent with the duties, conduct, and responsibilities of a Fire

Rescue employee, including content that could reasonably be interpreted as

having an adverse effect upon . . . [the] perception of the public. . . ."[4]

Procedure 2(d), which lists as "examples,"

•       material that might "tend to undermine the public trust and

confidence required by employees of Fire Rescue," Procedure 2(d)(i),[5] and

•       "any posting that may adversely reflect on Fire Rescue…."

Procedure 2(j).[6]

As part of plaintiff Mr. O'Laughlin's 2018 campaign for to become

---

[1]DE 32, at 4, ¶ 5, and DE 32-2.

[2]The context in which the verb "discredit" is used in the PBCFR Social Media Policy is to discredit the agency or any of its personnel by making allegations against them.  The context of the use of the word in the three cases cited by defendant in footnote 2 on page 9 of the motion is to engage in conduct that would bring discredit upon the employer.

[3]DE 32, at 4, ¶ 6(a), and DE 32-2, at 2.

[4]DE 32, at 4, ¶ 6(b), and DE 32-2, at 3.

[5]DE 32, at 4, ¶ 6(c), and DE 32-2, at 3.

[6]DE 32, at 4, ¶ 6(d), and DE 32-2, at 4-5.

president of the fire fighters' union, he and Ms. Little on February 6, 2018 posted comments on a private, election-connected Facebook Page accusing Captain Jeff Newsome of attempting to improperly use his position as First Executive Vice President of the union to ensure he would be off work Thanksgiving and Christmas 2018. See Defendant's Statement of Material Facts in Support of its Motion for Summary Judgment ("DS") at 6-8, ¶¶ 23-26, 36-37; Plaintiffs' Local Rule 51.6(a)(2) Response to Defendant's Statement Of Material Facts In Supports of Summary Judgment ("PS"), at 34, ¶¶ 23-26, 36-37.  Captain Newsome complained to PBCFR that Captains O'Laughlin and Little's criticism of him violated the Social Media Policy. DS, at 7, ¶ 29; PS at ¶ 29.  PBCFR issued written warnings to both Captain O'Laughlin and Captain Little.  DS at 8, ¶ 32.

Captains O'Laughlin and Little's First Amended Complaint, DE 32, seeks to declare the PBCFR Social Media Policy facially unconstitutional and to void the disciplined issued to them.

### Applicable Legal Standards

• **For granting summary judgment when no facts are disputed**

"When, as here, there are no disputed facts and the only issue is the application of law to the undisputed facts, a court may decide at the Rule 56 stage that one side or the other is entitled to judgment." Harris v. Liberty Cmty. Mgmt., Inc., 702 F.3d 1298, 1303 (11th Cir 2012), citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

- **For making a facial challenge based on overbreadth**

Plaintiffs are not arguing that PBCFR's Social Media Policy could never be applied constitutionally, but are rather basing their facial challenge on the fact that the policy is so overbroad that there is "a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." City Council v. Taxpayers for Vincent, 466 US 789, 801 (1984).

The overbreadth doctrine "is designed to protect 'the public from the chilling effect such a statute has on protected speech; the court will strike down the statute even though the governmental entity enforced the statute against those engaged in unprotected activities.'" Weaver v. Bonner, 309 F3d 1312, 1318-19 (11th Cir 2002).

- **For determining whether social media policies are facially unconstitutional**

"A facial challenge to a public-employer's policy that creates a prospective restriction on speech is similar to a retaliation claim, but it assesses the policy's impact on all prohibited employee speech rather than merely the plaintiff's interest in the specific speech that resulted in his discipline." Sabatini v. Las Vegas Metro. Police Dep't, 369 F.Supp 3d 1066, 1095 (D. Nev. 2019).

When it comes to a government agency policing what its employees

may say — but have not yet said — the First Amendment demands a

stricter scrutiny because "unlike an adverse action taken in response to

actual speech, this [sort of] ban chills potential speech before it happens."

United States v. National Treasury Employees Union, 513 U.S. 454, 468

(1995) ("NTEU") (striking as unconstitutionally overbroad a provision in the

Ethics Reform Act of 1989 that forbade rank-and-file federal employees to

accept "any honorarium while that individual is [an] employee" for any

appearance, writing or presentation).

> [T]he Government's burden is greater with respect to this statutory
> restriction on expression than with respect to an isolated disciplinary
> action. The Government must show that the interests of both
> potential audiences and a vast group of present and future employees
> in a broad range of present and future expression are outweighed by
> that expression's "necessary impact on the actual operation" of the
> Government.

Id., quoting Pickering v. Board of Education, 391 U.S. 563, 571 (1968).

The closest match to the case at bar is Liverman v. City of Petersburg,

844 F.3d 400 (4th Cir. 2016).  The Liverman court, addressing through the

prism of NTEU a police department's social-networking policy similar to the

one that PBCFR has in place,[7] opened its opinion by stating "[w]hile we are

---

[7]Two paragraphs from the Liverman social-media policy read as
follows:

> The central provision of the policy, which we will refer to as the
> Negative Comments Provision, states:
>
> > Negative comments on the internal operations of the Bureau, or
> > (continued...)

sensitive to the Department's need for discipline throughout the chain of command, the policy here and the disciplinary actions taken pursuant to it would, if upheld, lead to an utter lack of transparency in law enforcement operations that the First Amendment cannot countenance."  The <u>Liverman</u> court held that "the Department's social networking policy was unconstitutional and that the disciplinary measures taken against plaintiffs pursuant to that policy were likewise impermissible," 844 F.3d at 414.

A district court in Michigan, declaring unconstitutional an ordinance forbidding fire fighters to speak to the press, quoted the <u>NTEU</u> passage cited above and characterized the <u>NTEU</u> standard as "particularly onerous to the government employer...."  <u>Inter. Ass'n of Firefighters v. Frenchtown Charter</u>, 246 F. Supp. 2d 734, 740 (E.D. Mich. 2003).

---

[7](...continued)
> specific conduct of supervisors or peers that impacts the public's perception of the department is not protected by the First Amendment free speech clause, in accordance with established case law.

J.A. 162. Another provision, which we label the Public Concern Provision, specifies:

> Officers may comment on issues of general or public concern (as opposed to personal grievances) so long as the comments do not disrupt the workforce, interfere with important working relationships or efficient work flow, or undermine public confidence in the officer. The instances must be judged on a case-by-case basis.

844 F.3d at 404.

In contrast to the anti-transparency rule struck down by the Liverman court, the rules at issue in Sabatini were more closely drawn and applied to egregious behavior that was precisely what the rules were designed to prevent.  The court described the plaintiff's and their online escapades thus:

> Plaintiffs John Sabatini and Charles Moser are Metro officers who were disciplined for posting material on Facebook that violated the department's social-media policy. Sabatini, a now-retired corrections officer, made over two dozen posts on his public Facebook profile that demonstrated disdain for inmates and racial bias against African Americans. Moser, who served as a SWAT team sniper at the time, commented on a Facebook post that discussed other Metro officers capturing a suspect in an officer-involved shooting, stating that it was "a shame" the suspect "didn't have a few holes in him."

Sabatini, 369 F.Supp 3d at 1071.

After discussing the philosophy behind the social media policy, the Sabatini court set out three relevant "prohibitions" contained in the policy:

> 3. Department members are prohibited from speech that ridicules, maligns, disparages, or otherwise promotes discrimination against race, ethnicity, religion, sex, national origin, sexual orientation, age, disability, political affiliation, gender identity and expression[,] or other explicit class of individuals;

> 4. Department members are prohibited from speech or other expression that suggests the person is engaged in behavior reasonably considered to be unlawful or reckless toward public safety;

> 5. Engaging in prohibited speech as stated in this policy, may negatively affect the department member's credibility and impair the member's ability to perform the essential job functions. A department member's speech is a reflection of character and values. Speech that fundamentally conflicts with the department's ICARE[8] values

---

[8]ICARE isan acronym for "Integrity, Courage, Accountability, Respect
(continued...)

negatively affects both the member's ability and the department's ability to serve the community. Violations of this policy or related policies (values, conduct, etc.) in the use of social media <u>that bring the member or the department into discredit or would tend to bring the member or the department into discredit</u> will result in the department taking appropriate action up to and including termination.

<u>Sabatini</u>, 369 F.Supp.3d at 1072-73 (Emphasis supplied by court).

Those "prohibitions" are similar to parts of the PBCFR Social Media Polity that plaintiffs are **not** challenging.

- **For measuring overbreadth**

"To overcome a vagueness challenge, statutes must 'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly,' and 'must provide explicit standards for those who apply them.'" <u>Leib v. Hillsborough County Public Transportation Commission</u>, 558 F.3d 1301, 1310 (11th Cir. 2009), quoting <u>Grayned v. City of Rockford</u>, 408 U.S. 104, 108 (1972).

"A statute is facially overbroad if it prohibits a substantial amount of protected speech 'relative to the statute's plainly legitimate sweep.'" <u>United States v. Williams</u>, 553 U.S. 285, 282 (2008).

As the Court of Appeals for the Eleventh Circuit stated in <u>Weaver v. Bonner</u>, 309 F.3d 1312, 1318-19 (11th Cir 2002):

> The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech. . . ." U.S. Const. amend. I. This

---

(…continued)
for People, and Excellence"

prohibition on laws abridging the freedom of speech has been incorporated into the Fourteenth Amendment so that it also applies to state governments. An overbreadth challenge is based on a statute's "possible direct and indirect burdens on speech." United States v. Acheson, 195 F.3d 645, 650 (11th Cir. 1999) (quoting Am. Booksellers v. Webb, 919 F.2d 1493, 1499-1500 (11th Cir. 1990)). The overbreadth doctrine "permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when `judged in relation to the statute's plainly legitimate sweep.'" City of Chicago v. Morales, 527 U.S. 41, 52 (1999) (quoting Broadrick v. Oklahoma, 413 U.S. 601, 612-15 (1973)).

(parallel citations omitted).

- **For determining what constitutes a matter of public concern in the context of fire fighters**

The Eleventh Circuit historically has shown deference to such paramilitary units as police and fire departments when it comes to restrictions on employee's off-duty behavior. See, e.g., Starling v Board of County Com'rs, 602 F.3d 1257, 1261 (11th Cir 2010) ("In the 'quasi-military' context, which includes both fire departments and police stations, . . . we have afforded public employers greater latitude to burden an employee's rights, particularly when the exercise of that right impacts discipline, morale, harmony, uniformity, and trust in the ranks" (citations omitted)).

That has not necessarily held true, however, when the topics of the off-duty speech include matters of public concern — such as fire safety. See, e.g., Anderson v. Burke County, 239 F.3d 1216 (11th Cir. 2001) (although questionnaire sent to political candidates by union president

addressed a number of issues that were routine job-related issues rather than public concerns, the questionnaire constituted protected speech because it also "address[ed] concerns about alleged understaffing in the 911 system and of engine companies, physical fitness standards required for certain employees, and public tax consequences of high employee turnovers"); Beckwith v. City of Daytona Beach Shores, 58 F.3d 1554 (11th Cir. 1995) (remanding for entry of a judgment as a matter of law in favor of a fire chief who was terminated because he

> publicly opposed budget-cutting proposals advanced by Mayor Large at a city council meeting[; . . . expressed particular concern about a proposal to discontinue the City's paramedic program[, which h]e considered . . . dangerous to the City's citizens, visitors, and his own employees[; . . .] began mobilizing public opinion by discussing the proposed paramedic cut with citizens, most notably the ex-mayor[, and . . .] urged the people with whom he spoke to attend the next city council meeting in order to oppose or support the proposed cuts."

Id. at 1556-57).

As the Beckwith court observed,

> Few subjects are of more public concern to the average citizen than the provision of basic fire and rescue services. It is hard to imagine any combination of government interests sufficient to outweigh Appellant's strong interest in informing the public about policies he believed were dangerous to the City's citizens.

58 F.3d at 1564.


### Applying the Law to the Facts in the Case at Bar

Fire fighters using social media can be expected to talk about fire

fighting, both in private conversations and those open to a broader audience. Discussions about such matters as those that union president in <u>Anderson</u> was including in a survey, i.e., "understaffing in the 911 system and of engine companies, physical fitness standards required for certain employees, and public tax consequences of high employee turnovers," would be matters about which the public can legitimately be expected to be both curious and anxious.  So would such cost-cutting measures as the "proposal to discontinue the City's paramedic program[, which the fire chief in <u>Beckwith</u> ] considered . . . dangerous to the City's citizens, visitors, and his own employees. . ."; the chief opposed the proposal both before the city counsel and to anyone else, including a former mayor, who would listen.

Such discussions clearly could be interpreted by PBCFR management as "discredit[ing] . . . the agency," "disseminating content . . . that could reasonably be interpreted as having an adverse effect upon . . . [the] perception of the public...," posting material that might "tend to undermine the public trust and confidence required by employees of Fire Rescue," and having a possibility to "adversely reflect on Fire Rescue...."  Such online conversations, however, feed the considerable hunger of what the <u>Beckwith</u> court characterized as "the average citizen" about "the provision of basic fire and rescue services."  58 F.3d at 1564.

What PBCFR management wants — and, unless this Court finds it unconstitutional, what it would continue to have — is a social media policy

patterned along the lines of what the Fourth Circuit panel in <u>Liverman</u>

characterized as "[a] policy . . . and the disciplinary actions taken pursuant

to it [that] would, if upheld, lead to an utter lack of transparency in [PBCFR]

operations that the First Amendment cannot countenance." 844 F.3d at 404.

PBCFR's social media policy cannot survive the standards set forth by

the Supreme Court in <u>NTEU</u> since is proscribes speech without having

"show[n] that the interests of both potential audiences and a vast group of

present and future employees in a broad range of present and future

expression are outweighed by that expression's 'necessary impact on the

actual operation' of the Government."  513 U.S. at 468.[9]

The social media policy additionally:

•	fails to "give the person of ordinary intelligence a reasonable

opportunity to know what is prohibited, so that he may act accordingly" to

"provide explicit standards for those who apply them," <u>Leib</u>, quoting

<u>Grayned</u>, and

•	is capable of being understood to "prohibit[] a substantial

amount of protected speech 'relative to the statute's plainly legitimate

sweep.'" <u>Williams</u>.

_____

[9]Defendant's assertion that all that is needed to meet <u>NTEU</u>'s criteria
is  all that is needed, Motion, at 10, citing <u>McCullars v. Maloy</u>, 369 F.Supp
3d 1230, 1240 (MD Fla 2019), ignores the fact that <u>NTEU</u> addresses
behavior that has not yet occurred, while the plaintiff in <u>McCullars</u> had
already misbehaved.

Notwithstanding that this Court has found that neither Captain AJ O'Laughlin nor Captain Chrystal Little engaged in behavior that this COurt has found was protected by the First Amendment, the social-media regulation used to punish them for what they posted on Captain O'Lauglin's union-campaign presidential page is unconstitutionally overbroad. Therefore, under <u>Weaver</u>, they are protected.

## Conclusion

Based on the facts alleged, the authorities cited and the arguments presented, plaintiffs, Captains AJ O'Laughlin and Crystal Little, respectfully request this Court to:

***One***, deny the County's motion for summary judgment;

***Two***, enter final judgment in favor of them, declaring the PBCFR social-media policy facially unconstitutional and ordering their discipline voided;

***Three***, reserve jurisdiction to resolve plaintiff's motions for attorneys fees and litigation expenses, and

***Four***, grant such other and further relief as is just.

Respectfully Submitted,

*/s/   William R. Amlong*
WILLIAM R. AMLONG
Florida Bar No.: 470228
WRAmlong@TheAmlongFirm.com
KAREN COOLMAN AMLONG
Florida Bar No.: 275565
KAmlong@TheAmlongFirm.com

AMLONG & AMLONG, P.A.
500 Northeast Fourth Street
Fort Lauderdale, Florida 33301-1154
(954) 462-1983
(954) 523-3192 (fax)

## Certificate of Service

I HEREBY certify that the above and foregoing was electronically filed through the Southern District of Florida ECF system and thereby delivered to all counsel of record.

*/s/   William R. Amlong*
WILLIAM R. AMLONG

# DE 55

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 9:19-cv-80701 Dimitrouleas/Matthewman

AJ O'LAUGHLIN and
CRYSTAL LITTLE,
     Plaintiffs,

vs.

PALM BEACH COUNTY, a political
Subdivision of the State of Florida,
     Defendant.

_____/

## <u>DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW</u>

Defendant, PALM BEACH COUNTY BOARD OF COUNTY COMMISSIONERS (the "County"), by and through undersigned counsel, files this Reply in Support of its Motion for Summary Judgment and Incorporated Memorandum of Law [DE 49] ("Reply") and states as follows:

**I.**      <u>**INTRODUCTION**</u>

Plaintiffs' Response in Opposition to the Motion for Summary Judgment (the "Response") [DE 54] regurgitates, without adding any value, the unsupported assertions and conclusions in Plaintiffs' Motion for Summary Judgment [DE 47]. In fact, large portions of the "Response" are verbatim copy and paste from Plaintiffs' Motion for Summary Judgment. The County files this Reply to clarify specific portions of Plaintiffs' Response and incorporates herein, without repeating, the County's Response to Plaintiffs' Motion for Summary Judgment [DE 51]. A consideration of the law and the dueling Motions for Summary Judgment, along with the Responses and Replies, leads to only one conclusion: Palm Beach County Fire Rescue's Social Media Policy (the "Social Media Policy") is constitutional and should be upheld by this Court.

The relevant social media policy for the Court's consideration is the policy currently in effect: the 2019 Social Media Policy [DE 50-6]. Plaintiffs, however, appear to cherry pick portions of the 2016 Social Media Policy to cite to in their Response.[1]

## II.   REPLYING TO THE "STATEMENT OF THE FACTS" MISPLACED IN PLAINTIFFS' RESPONSE

Plaintiffs should have quoted the relevant sections of the Social Media Policy in their entirety for the Court's consideration. *Sabatini v. Las Vegas Metro. Police Dep't,* 369 F. Supp. 3d 1066, 1097 (D. Nev. 2019)*, reconsideration denied,* 217CV01012JADNJK, 2019 WL 3307040 (D. Nev. July 23, 2019) (courts must construe a challenged provision in the context of the broader social-media policy and 'consider whether the policy is readily susceptible to a limiting construction that would render it constitutional'") (internal citations omitted). Plaintiffs, however, failed to do so. Instead, they cherry-picked and parsed out the Social Media Policy to change its meaning.

Without providing any support whatsoever, Plaintiffs state

> [t]he context in which the verb "discredit" is used in the PBCFR Social Media Policy is to discredit the agency *or any of its personnel by making allegations against them*. The context of the use of the word in the three cases cited by defendant [*sic*] in footnote 2 on page 9 of the motion is to engage in conduct that would bring discredit upon the employer.

*See* [DE 54, fn 2] *emphasis added*. In making this argument Plaintiffs add words and meanings into the Social Media Policy that are not there. In fact, nowhere in the Social Media Policy, unlike the policy at issue in *Liverman*[2], does it say that an employee cannot discredit the agency "or any of its personnel by making allegations against them." That language was unilaterally inserted by

---

[1] For example, Plaintiffs' mis-cite section 2(i) of the Social Media Policy, apparently citing to the 2016 version of the policy.
[2] *Liverman v. City of Petersburg*, 844 F.3d 400, 404 (4th Cir. 2016).

Plaintiffs without support.  The Social Media Policy here, like the ones in footnote 2 of the County's Motion for Summary Judgment, refers to conduct that would bring discredit to Fire Rescue, the employer.

### III.  REPLYING TO "FOR MAKING A FACIAL CHALLENGE BASED ON OVERBREADTH" AND "FOR MEASURING OVERBREADTH"

The cases cited by Plaintiffs in these sections:

1.   *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789 (1984);

2.   *Weaver v. Bonner*, 309 F.3d 1312 (11th Cir. 2002);

3.   *Leib v. Hillsborough County Pub. Transp. Com'n*, 558 F.3d 1301, 1304 (11th Cir. 2009); and

4.   *United States v. Williams*, 553 U.S. 285 (2008)

are not cases involving the employer/employee context at issue here.  It is undisputed that "government employers can lawfully regulate their employees' speech to a significant degree" and a social media policy that does so is not overbroad solely because one can conjure a scenario in which protected speech may be implemented by the policy. *Hallandale Prof'l Fire Fighters Local 2238 v. City of Hallandale*, 922 F.2d 756, 762, f.n. 5, (11th Cir. 1991).

Moreover, the United States Supreme Court has upheld a similar statutory provision concerning a public agency's ability to discipline an employee for "such cause as will promote the efficiency of the service."  *See Arnett v. Kennedy*, 416 U.S. 134, 158 (1974).   *In Arnett*, the Court was asked to determine the constitutionality of a provision of the Lloyd-La Follette Act, and specifically U.S.C. § 750l(a), which allowed the government to discharge a federal employee with cause so as to promote the efficiency of the service.  *Id*.   On appeal the appellee argued that " employees faced with the standard of 'such cause as will promote the efficiency of the service' can only guess as to what utterances may cos them their jobs." *Id*.   The appellee further argued that

there could be little question that they would be deterred from exercising their First Amendment rights to the fullest extent. *Id*.

The Court determined that the standard at issue was intended to authorize dismissal for speech, as well as other conduct. *Id*. at 160. In making this determination, the Court relied on an analysis by Judge Leventhal regarding the impracticability of great specificity in such a standard:

> [I[t is not feasible or necessary for the Government to spell out in detail all that conduct which will result in retaliation. The most conscientious of codes that define prohibited conduct of employees includes 'catch-all' clauses prohibiting employee 'misconduct,' 'immorality,' or 'conduct unbecoming.' We think it is inherent in the employment relationship as a matter of common sense if not (of) common law that (a Government) employee ... cannot reasonably assert a right to keep his job while at the same time he inveighs against his superiors in public with intemperate and defamatory (cartoons)....(Dismissal in such circumstances neither) comes as an unfair surprise (nor) is so unexpected ... as to chill ... freedom to engage in appropriate speech.

*Id*. at 161-162 (citing *Meehan v. Macy*, 392 F.2d 822, 835 (U.S.App.D.C. 1968). The Court in *Arnett* appropriately determined the provision did not intend to authorize discharge for speech which is constitutionally protected, and instead, only proscribes that public speech which improperly damages and impairs the reputation and efficiency of the employing agency is punishable.

When the Social Media Policy is reviewed as a whole, it is evident that Fire Rescue does not intend to discipline employees for speech that is constitutionally protected. That becomes even clearer when the Court considers that Fire Rescue has had a social media policy for over twenty years and has not once used it to discipline employees for constitutionally protected speech.

IV.   **REPLYING TO "FOR DETERMINING WHETHER SOCIAL MEDIA POLICIES ARE FACIALLY CONSTITUTIONAL**"

The County thoroughly analyzed the Social Media Policy in question here to the policies in both *Liverman* and *Sabatini* in its Motion for Summary Judgment [DE 49] and incorporates that comparison and analysis herein.  Comparing the Social Media Policy here to the two social media policies in those cases leads to the conclusion that the Social Media Policy here resembles the policy upheld in *Sabatini* and not the policy struck down in *Liverman*.

The case of *Int'l Ass'n of Firefighters Local 3233 v. Frenchtown Charter Tp*., 246 F. Supp. 2d 734, 735 (E.D. Mich. 2003) does not inform the Court's analysis.  In *Frenchtown Charter*, the Ordinance at issue prevented all members of the fire department, except for the fire chief, from having any communications with the media.  Further, that case dealt with whistleblower allegations.  The facts in *Frenchtown Charter*, are vastly different from the facts present in this case.

Here, Plaintiffs face no prohibition of speaking to the press or of using social media, they are just asked to do so in a way that does not interfere with their ability to perform their job functions and with Fire Rescue's ability to meet its mission of serving community members.

V.   **CONCLUSION**

Based on the arguments made in the Motion for Summary Judgment [DE 45], the Response to Plaintiffs' Motion for Summary Judgment [DE 51] and the arguments made above, the County respectfully requests that this Court grant the County's Motion for Summary Judgment in its entirety and find that, as a matter of law, the Social Media Policy is not constitutionally infirm.

Dated:  September 10, 2020.

Respectfully submitted,

*/s/ Anaili Medina Cure                    /*
Anaili M. Cure, Esquire
Assistant County Attorney
Florida Bar No. 119558
300 North Dixie Highway, Third Floor
West Palm Beach, Florida 33401
Tel.: (561) 355-6021; Fax: (561) 233-2720
Primary Email: acure@pbcgov.org
Secondary Email: dfishel@pbcgov.org
swebber@pbcgov.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 10, 2020, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send an electronic notice to the authorized CM/ECF filers.

*/s/ Anaili Medina Cure                    /*
Anaili M. Cure, Esquire
Assistant County Attorney
Florida Bar No. 119558
300 North Dixie Highway, Third Floor
West Palm Beach, Florida 33401
Tel.: (561) 355-6021; Fax: (561) 233-2720
Primary Email: acure@pbcgov.org
Secondary Email: dfishel@pbcgov.org
swebber@pbcgov.org

# DE 56

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 19-80701-CIV-DIMITROULEAS/MATTHEWMAN**

AJ O'LAUGHLIN and CRYSTAL LITTLE,
      Plaintiffs,

v.

PALM BEACH COUNTY, a political
Subdivision of the State of Florida,
      Defendant.

_____/

**DEFENDANT, PALM BEACH COUNTY'S, REPLY TO PLAINTIFFS' LOCAL RULE
51.6(a)(2) RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL FACTS IN
SUPPORT OF SUMMARY JUDGMENT**

Defendant, Palm Beach County ("County"), by and through its undersigned counsel and pursuant to Local Rule 51.6(a)(3), files this Reply to Plaintiffs' Local Rule 51.6(a)(2) Response to Defendant's Statement of Material Facts In Support of Summary Judgment [DE 53] (the "Response") and states as follows:

1.      Plaintiffs' assertions that Paragraphs 1-13; 15-19; and 28-46 of the County's Statements of Material Fact [DE 50] are not relevant are not a proper response. The County's Statements of Material Fact [DE 50] are relevant to show how the County's interests in maintaining a Social Media Policy outweigh the interests of Fire Rescue employees in speaking in a way that violates the Social Media Policy. Notably, Plaintiffs do not dispute the facts asserted within those paragraphs.

2.      The appropriate Social Media Policy before the Court for purposes of a facial constitutional challenge is the policy currently in place, which is the March 14, 2019 policy [DE 50-6], and not the 2016 version cited to by Plaintiffs in their Response.

3.      As to Plaintiff's response to Paragraph 27 of the County's Statement of Material Facts, DE-45, pg. 6 is this Courts Order Granting Motion to Dismiss dated July 6, 2020, and it is

not "the certificate of service for defendant's answer and affirmative defenses"; Exhibit 2 referred to the McGlynn Affidavit itself, and specifically Paragraph 25 of the McGlynn Affidavit [DE 50-2, ¶ 25].  Chief McGlynn has personal knowledge as to the internal review conducted into Captain Newsome's use of Union Time Pool ("UTP").  Further, Plaintiffs did allege that Captain Newsome used UTP on holidays in the Facebook Posts; specifically, O'Laughlin wrote, "EVP1 took UTP for thanksgiving and also XMAS. It was approved by the Union and by Admin. Who does Union stuff on these days…."  *See* [DE 50-9].

Respectfully submitted on September 10, 2020, by:

*/s/Anaili M. Cure*
Anaili M. Cure, Esquire
Assistant County Attorney
Florida Bar No. 119558

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 10, 2020, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send an electronic notice to the authorized CM/ECF filers.

*/s/Anaili M. Cure*
Anaili M. Cure, Esquire
Assistant County Attorney
Florida Bar No. 119558
300 North Dixie Highway, Third Floor
West Palm Beach, Florida 33401
Tel.: (561) 355-6337 / Fax: (561) 355-4234
Primary Email: acure@pbcgov.org
Secondary Email: dfishel@pbcgov.org,
swebber@pbcgov.org

**DE 60**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 19-80701-CIV-DIMITROULEAS

AJ O'LAUGHLIN and CRYSTAL LITTLE,

      Plaintiffs,

vs.

PALM BEACH COUNTY, a political
subdivision of the State of Florida,

      Defendant.

_____/

**Plaintiffs' Reply to Defendant's Response to
Plaintiff's Motion for Summary Judgment**

Plaintiffs, AJ O'laughlin and Crystal Little, reply to Defendant's

Response to Plaintiff's Motion for Summary Judgment (DE 51):[1]

**Introduction and Summary**

Palm Beach County opens its response by asserting that plaintiffs have

presented "[n]either evidence [n]or logical argument" in support of their

motion for summary judgment concerning the facial unconstitutionality of

the Palm Beach County Fire Rescue ("PBCFR") Department's social media

policy.

_____

[1]As does Palm Beach County, see Response, at 2, n. 1, plaintiffs adopt
as if fully set forth in this reply their response to the County's summary
judgment motion (DE 54).

**The Amlong Firm** • 500 Northeast Fourth Street • Fort Lauderdale, FL 33301 • 954.462.1983

However, the evidence is the policy itself, which provides, in pertinent part, that

> While **on-duty or off-duty** *employees are prohibited from disseminating content that* is inconsistent with the duties, conduct, and responsibilities of a Fire Rescue employee, including content that *could be reasonably interpreted as having an adverse effect on* Fire Rescue morale, discipline, operations, the safety of the staff, or *the perception of the public[.]*

¶ 2(d), PBCFR 2019 Social Media Policy, and cautions shortly afterwards that

> Failure to comply with the above guidelines may result in discipline up to and including termination. . . .  *Employees are strongly encouraged to use caution* and seek the guidance of their supervisors *regarding any posting that may adversely reflect upon . . . the agency*. . . .

Id. at ¶ 2(I).

The logical argument is that the quoted portions of PBCFR's policy, like that part of a police department's social media policy found to be "unconstitutionally overbroad" in Liverman v. City of Petersburg, 844 F.3d 400, 407 (4th Cir. 2016),[2] would "if upheld, lead to an utter lack of

---

[2]Two relevant paragraphs from the Liverman social-media policy read as follows:

The central provision of the policy, which we will refer to as the Negative Comments Provision, states:

> Negative comments on the internal operations of the Bureau, or specific conduct of supervisors or peers that impacts the public's perception of the department is (sic) not protected by the First Amendment free speech clause, in accordance with established case law.

(continued...)

transparency in law enforcement operations that the First Amendment cannot countenance." Id., 844 F.3d at 400.  The Liverman court applied the criteria set forth in United States v. National Treasury Employees Union, 513 U.S. 454, 468 (1995), which modified Pickering v. Board of Education, 391 U.S. 563, 568 (1968) for regulating speech that had yet to be spoken.

## Reply

**Point 1:**     Palm Beach County relies on JBK, Inc. v. City of Kansas City, 641 F. Supp 893, 904 (W.D. Mo. 1986), citing Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 15 (other citations omitted), an out-of-circuit massage-parlor case.  JBK involved "a straightforward presumption of constitutional validity" that attaches to legislative acts, which, although rebuttable "is entitled to as much force and effect under summary judgment procedures as elsewhere." Id.  "Accordingly, when a question involving the facial constitutional validity of such legislation is reached on a motion for summary judgment, if the party asserting the invalidity of the legislation

---

[2](…continued)
[internal citation omitted].  Another provision, which we label the Public Concern Provision, specifies:

> Officers may comment on issues of general or public concern (as opposed to personal grievances) so long as the comments do not disrupt the workforce, interfere with important working relationships or efficient work flow, or undermine public confidence in the officer. The instances must be judged on a case-by-case basis.

844 F.3d at 404.

fails to offer evidence of a substantial character (or at least an argument

based upon compelling logic) which rebuts the presumption, or to excuse

that failure in accordance with Rule 56(f), the motion should be granted.")

The County's reliance on JBK, however, ignores the teaching of Reno

v. American Civil Liberties Union, 521 U.S. 844, 885 (1997) (affirming a

district court's finding of two sections of the Computer Decency Act of 1997

to be unconstitutional) that

> As a matter of constitutional tradition, in the absence of evidence to
> the contrary, we presume that governmental regulation of the content
> of speech is more likely to interfere with the free exchange of ideas
> than to encourage it. The interest in encouraging freedom of
> expression in a democratic society outweighs any theoretical but
> unproven benefit of censorship.

Id. at 844.

Because here, where the only relevant evidence is the policy itself, the

County's reliance on Jacobson v. Maryland Casualty Co., 336 F.2d 72, 75

(8th Cir. 1964) is likewise misplaced.  The plain language of the policy is

clearly before this Court.

**Point 2**:     Plaintiffs do not "allege in a conclusory fashion that 'the

Social Media Policy here is similar to the on in Liverman.'"  Rather plaintiffs

set out the operative portions of the PBCFR policy and the two paragraphs of

the policy that the Liverman court found "unconstitutionally overbroad."  See

supra, at 2, n. 2; DE 47, at 2-3, 7, notes 3-7 and 9.

Additionally, plaintiffs distinguished the more closely drawn regulations

in <u>Sabatini v. Las Vegas Metro. Police Dep't</u>, 369 F.Supp 3d 1066, 1071-1073 (D. Nev. 2019).  DE 47, at 8-9.[3]

Comparing the operative language of the PBCFR policy to the language in a policy that has been held to be facially unconstitutional, PBCFR's language is similar.  Comparing the PBCFR language to the language in the case cited by the County as not being facially unconstitutional, the language is different.

The conclusion:  PBCFR's social media policy is facially unconstitutional and the discipline imposed on AJ O'Laughlin and Crystal Little, the plaintiffs, must be voided.

**Point 3**:    Plaintiffs do not attack PBCFR's social media policy based on their having "conceive[d] of some impermissible applications of [the policy]," County's Response, at 4, quoting <u>Members of the City Council of Los Angeles v Taxpayers for Vincent</u>, 466 U.S. 789, 800 (1984), but rather on the plain language of the policy.  By prohibiting employees from "dissemina-ting content that . . .could be reasonably interpreted as having

---

[3]<u>Hernandez v. City of Phoenix</u>, 432 F.Supp. 1049 (D. Ariz. 2020), is an out-of-circuit case involving a police sergeant seeking the "extraordinary remedy" of a preliminary injunction to avoid discipline for four anti-Islamic internet postings in which action the court held that he lacked a likelihood of success on the merits.  Equally inapposite is <u>Grutzmacher v. Howard County</u>, 851 F.3d 332 (4th Cir. 2017), which involved internet messaging smacking of discrimination against public employees' engaging in discussions promoting racial or religious discrimination.  Plaintiffs in the action at bar engaged in no such behavior and express no opinion as to the protected status of such statements.

an adverse effect on. . . the perception of the public," the PBCFR policy prohibits the precise type of criticism of the department's operations that the Court of Appeals has held in <u>Anderson v. Burke County</u>, 239 F.3d 1216 (11th Cir. 2001) and <u>Beckwith v. City of Daytona Beach Shores</u>, 58 F.3d 1554 (11th Cir. 1995) was protected speech in the context of paramilitary fire services.  So much for the County's Argument ("this Court is forced to look only to the language of the provision itself"), based on <u>Ruff v. City of Leavenworth</u>, 858 F.Supp. 1546, 1556 (D. Kan. 1994).  County's Response, at 4.

Respectfully Submitted,

/s/   William R. Amlong
WILLIAM R. AMLONG
Florida Bar No.: 470228
WRAmlong@TheAmlongFirm.com
KAREN COOLMAN AMLONG
Florida Bar No.: 275565
KAmlong@TheAmlongFirm.com

AMLONG & AMLONG, P.A.
500 Northeast Fourth Street
Fort Lauderdale, Florida 33301-1154
(954) 462-1983
(954) 523-3192 (fax)

**Certificate of Service**

I HEREBY certify that the above and foregoing was electronically filed through the Southern District of Florida ECF system and thereby delivered to all counsel of record.

/s/   William R. Amlong
WILLIAM R. AMLONG

**DE 76**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-80701-CIV-DIMITROULEAS

AJ O'LAUGHLIN and CRYSTAL
LITTLE,

      Plaintiffs,

v.

PALM BEACH COUNTY, a political
Subdivision of the State of Florida,

      Defendant.

_____/

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT

THIS MATTER comes before the Court on Plaintiffs' Motion for Summary Judgment on Facial Unconstitutionality of Palm Beach County Fire Rescue Department's Social Media Policy [DE 47] ("Plaintiffs'") and Defendant's Motion for Summary Judgment [DE 49] (Defendant's). The Court has carefully considered the Motions, Statements of Material Facts [DE 48, 50], Responses [DE 51, 52, 53, 54], and Reply [DE 55, 56, 60] and is otherwise fully advised in the premises.

## I.    PROCEDURAL BACKGROUND

On January 3, 2020, the Court granted Defendant Palm Beach County's ("Defendant" or "the County") Motion to Dismiss. [DE 31]. Plaintiffs AJ O'Laughlin ("O'Lauglin") and Crystal Little ("Little") (collectively "Plaintiffs") then filed an Amended Complaint on January 23, 2020. Am. Compl. [DE 32]. In their Amended Complaint Plaintiffs seek injunctive relief under 42 U.S.C §1983, the First Amendment to the United States Constitution, and the Florida Constitution. Am. Compl. ¶ 1. Plaintiffs' Amended Complaint states a single general count which attempts to present both a facial challenge and an as-applied challenge to the Social Media

Policy at issue. Am. Compl. ¶ 23. Plaintiffs allege that the Social Media Policy as-applied to them served as an unconstitutional restriction on their freedom of speech and freedom of association. *Id.* In addition, the Amended Complaint characterizes the Social Media Policy as a prior restraint on speech. Am. Compl. ¶ 24.

On July 6, 2020, the Court granted in part Defendant's Motion to Dismiss the Amended Complaint. [DE 45]. In that Order the Court dismissed Plaintiffs' as-applied challenges to the Social Media Policy and ruled that the Social Media Policy was not a prior restraint on speech. [DE 45].

The only remaining issue in the present case is Plaintiffs' facial challenge to the Social Media Policy. Both Plaintiffs and Defendant have filed motions for summary judgement on this remaining issue.

## II.   <u>FACTUAL BACKGROUND</u>

On February 6, 2019, Plaintiff O'Laughlin made Facebook posts in an invite-only Facebook page he maintained while campaigning for the presidency of Local 2928 of the International Association of Fire Fighters. Am. Compl. ¶ 4, 8, 10. The posts concerned alleged, attempted misuse of a Union Time Pool in November and December of 2018 by the union's First Executive Vice President, Captain Jeffrey L. Newsome ("Newsome"). Am. Compl. ¶ 10, 13, 15. UTP is a pool of paid-time-off hours donated by union members for union officers to use to take time off to perform union duties. Am. Compl. ¶ 9.

Plaintiff O'Laughlin's Facebook posts alleged that Newsome was coordinating with the Palm Beach County Fire and Rescue Department ("Fire Department") management to ensure he had Thanksgiving and Christmas Day off with pay by using Union Pool Time ("UTP") on those holidays. Am. Compl. ¶ 13, 14. The UTP allows officers to get paid their regular salaries for

doing union business on days that they would otherwise be scheduled to work. Compl. ¶ 9.

Plaintiff Little, a supporter of Plaintiff O'Laughlin's candidacy, commented on O'Laughlin's

post in support of its content. Compl. ¶ 14.

Plaintiffs were disciplined per the department's Social Media Policy for the content of

these posts and comment. Am. Compl. ¶ 22.

Plaintiffs seek a judgment from the Court declaring that the Social Media Policy is an

unconstitutional prior restraint and unconstitutionally vague and overbroad. Am. Compl. 11.

Plaintiffs take issue with a number of provisions of the Defendant's Social Media Policy,

attached to the Amended Complaint as Exhibit 2, which provide guidelines for Fire Department

employee's personal use of social media. For instance, Plaintiffs points to §2(d) of the Social

Media Policy which prohibits employees from disseminating "content that could reasonably be

interpreted as having an adverse effect upon Fire Rescue morale, discipline, operations, the

safety of staff, or the perception of the public." Am. Compl. Ex. 2 § 2(d); Am. Compl. ¶ 6. The

policy also prohibits the posting of any information individuals have access to as a result of their

employment. Am. Compl. Ex. 2 § 2(k). Am. Compl. ¶ 7. The social media policy also dictates

that when making social media posts, employees "shall conduct themselves with professionalism

and in such a manner that shall not reflect negatively upon [the] agency or its mission." Am.

Compl. Ex. 2 § 2(g).

The most recent version of the Social Media Policy was updated on February 28, 2019

and became effective on March 14, 2019. DSMF [DE 50] ¶ 15;[1] Am. Compl. Ex. 2 [DE 32-2].

The Social Media Policy states, in pertinent part:

---

[1] The Parties include various citations to portions of the record. Defendants' statement of facts [DE 50] is cited as "DSMF", Plaintiff's Response to Defendants Statement of Material Facts [DE 53] is cited as "PRSMF". Any citations herein to the statement of facts, response, and reply thereto should be construed as incorporating those citations to the record.

PURPOSE: The purpose of this policy is to provide guidelines on the procedure and use of social media and social networking.

…

2. Personal Use:

a. Fire Rescue recognizes the employee's right to participate in social networking/social media sites or maintain personal web pages, blogs or other types of online platforms while off-duty. However, it is strongly recommended employees use caution in their usage of social networking/ social media sites especially when displaying personal profiles so as not to discredit themselves or the agency.

b....

c....

d. While on-duty or off-duty employees are prohibited from disseminating content that is inconsistent with the duties, conduct, and responsibilities of a Fire Rescue employee, including content that could be reasonably interpreted as having an adverse effect on Fire Rescue morale, discipline, operations, the safety of the staff, or the perception of the public.

> i. For example, unprofessional, unbecoming, illegal, unethical, sexual, violent, harassing, racist, sexist, or ethnically derogatory comments, pictures, artwork, videos, material or other such references all tend to undermine the public trust and confidence required by employees of Fire Rescue.

e.. . .

f.. . .

g. Employees who choose to maintain or participate in social networking/social media sites while on-duty or off-duty shall conduct themselves with professionalism and in such a manner that shall not reflect negatively upon this agency or its mission.

h.. . .

i.. . .

j. Failure to comply with this policy may result in discipline up to and including termination. Authorized exceptions to this policy may be permitted by the Fire Rescue Administrator or designee for the operational needs of Fire Rescue. Employees are strongly encouraged to use caution and seek guidance of their supervisors regarding any posting that may adversely reflect upon Fire Rescue or the professionalism and integrity of the employee.

k. Employees shall not post, transmit, or otherwise disseminate any information (data, text, photographs, audio, video, or any other multimedia file) to which they have access to as a result of their employment without written permission from the Fire Rescue Administrator or designee.

*See* DSMF ¶ 16; Am. Compl. Ex. 2.

### III.    <u>STANDARD OF LAW</u>

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  To satisfy this burden, the movant must show the court that "there is an absence of evidence to support the nonmoving party's case."  Id. at 325.

After the movant has met its burden under Rule 56(a), the burden of production shifts, and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  As Rule 56 explains, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may . . . grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3).  Therefore, the nonmoving party "may not rest upon the mere allegations or denials in its pleadings" but instead must present "specific facts showing that there is a genuine issue for trial."  *Walker v. Darby*, 911 F.2d 1573, 1576–77 (11th Cir. 1990).  "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016) (internal quotations omitted).

In deciding a summary-judgment motion, the Court must view the facts in the light most favorable to the nonmoving party.  *Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006).  The Court also must resolve all ambiguities and draw all justifiable inferences in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

IV.   **DISCUSSION**

Plaintiffs argue that the Social Media Policy is unconstitutional due to both its

overbreadth and its vagueness. The Court will address each challenge in turn.

A.   **Plaintiffs' Contention that the Social Media Policy is an Overbroad Restriction**

"A facial challenge to a public-employer's policy that creates a prospective restriction on

speech is similar to a retaliation claim, but it assesses the policy's impact on all prohibited

employee speech rather than merely the plaintiff's interest in the specific speech that resulted in

his discipline." *Sabatini v. Las Vegas Metro. Police Dep't*, 369 F. Supp. 3d 1066, 1095 (D. Nev.

2019), *reconsideration denied*, No. 217CV01012JADNJK, 2019 WL 3307040 (D. Nev. July 23,

2019). In addressing a facial challenge to such a policy Courts routinely apply a modified version

of the *Pickering* framework used in cases where a public employee has been disciplined for

speech post-hoc. *Id.*; *See Liverman v. City of Petersburg*, 844 F.3d 400, 407 (4th Cir. 2016). The

first question addressed in this modified-*Pickering* analysis is whether the public-employer's

policy regulates employees' rights to speak on matters of public concern. *See Liverman*, 844

F.3d at 407. If the regulation covers speech that involves a matter of public concern, the

government bears the burden of showing "that the interests of both potential audiences and a vast

group of present and future employees in a broad range of present and future expression are

outweighed by that expression's 'necessary impact on the actual operation' of the Government."

*See Liverman*, 844 F.3d at 407 (citing *United States v. Nat'l Treasury Employees Union*, 513

U.S. 454, 466 (1995)).

Here, the Court finds that the Social Media Policy does cover speech that could involve

matters of public concern. Information that could affect the public's perception of the Fire

Department or information that Fire Department come in contact within the course of their

employment could certainly include matters of public concern when considered a broad range of future expression.

When balancing the interest of potential audiences and present and future government employees with the interest of the government, the Court notes the important public interest in the efficient and effective functioning of government offices. *See Grutzmacher v. Howard Cty.,* 851 F.3d 332, 342 (4th Cir. 2017). Further, in the "quasi-military" context, such as a fire department, the Eleventh Circuit has "afforded public employers greater latitude to burden an employee's rights, particularly when the exercise of that right impacts discipline, morale, harmony, uniformity, and trust in the ranks."[2] *Starling v. Bd. Of Cty. Comm'rs*, 602 F.3d 1257, 1261 (11th Cir. 2010).

The Fire Department's purposes in implementing the current version of the Social Media Policy include: (1) establishing a policy concerning personal web pages or internet sites when referencing Fire Rescue to ensure employees use appropriate discretion so as to not impede Fire Rescue's ability to serve the community and maintain the community's trust and respect; (2) clearly identifying prohibited activities by Fire Rescue employees on social networking and other web sites; (3) providing guidelines for Fire Rescue employees in applying rules of conduct to their online content; (4) protecting Fire Rescue and its employees from harm as a result of inappropriate postings or inadvertent harmful postings; (5) and maintaining order and discipline within Fire Rescue to promote efficient operations, trust and camaraderie among our firefighters internally, and the safety of staff." DSMF ¶ 17; PRSMF ¶ 17.

Reading the relevant provisions of the Social Media Policy in context of the overall policy, the Court finds the Fire Department's interests outweigh potential employee and audience

---

[2] The Parties also agree that due to the nature of the mission and work carried out by the Fire Department, the Fire Department operates as a paramilitary organization and follows a chain of command. *See* DSMF ¶ 5; PRSMF ¶ 5.

interests in the speech the Social Media Policy proscribes. In prohibiting content that "could be reasonably interpreted as having an adverse effect on Fire Rescue morale, discipline, operations, the safety of the staff, or the perception of the public", Am. Compl. Ex. 2 § 2(d), the Social Media Policy provides an illustrative example which explains,

> "For example, unprofessional, unbecoming, illegal, unethical, sexual, violent, harassing, racist, sexist, or ethnically derogatory comments, pictures, artwork, videos, material or other such references all tend to undermine the public trust and confidence required by employees of Fire Rescue."

Sections 2(g) and 2(k) of the Social Media Policy further reiterate that the target of the policy's provisions is any speech which reflects negatively upon the Fire Department, but rather speech that unprofessional speech that undermines the public trust in employees of the Fire Department. Section 2(g) states that Fire Department employees "shall conduct themselves with professionalism and in such a manner that shall not reflect negatively upon this agency or its mission." Am. Compl. Ex. 2 § 2(g). Section 2(k) strongly encourages Fire Department employees to "use caution and seek guidance of their supervisors regarding any posting that may adversely reflect upon Fire Rescue or the professionalism and integrity of the employee."

The sweep of the Social Media Policy appears to be narrower than the policy struck down by the Fourth Circuit in *Liverman v. City of Petersburg* which prohibited the the dissemination of any information "that would tend to discredit or reflect unfavorably upon the [Department] or any other City of Petersburg Department or its employees" and further states that "[n]egative comments on the internal operations of the Bureau, or specific conduct of supervisors or peers that impacts the public's perception of the department is not protected by the First Amendment free speech clause." *Liverman v. City of Petersburg*, 844 F.3d 400, 404 (4th Cir. 2016). The Policy further "strongly discourage[d] employees from posting information regarding off-duty

activities." *Id.* While the policy in *Liverman* did specify that officers were permitted to comment

on issues of public concern "so long as the comments do not disrupt the workforce, interfere with

important working relationships or efficient work flow, or undermine public confidence in the

officer," the Fourth Circuit found that the potentially permissible provision did not salvage "the

unacceptable overbreadth of the social networking policy taken as a whole." *Id.* at 409.

Rather, the Social Media Policy at issue in the present case seems to be more analogous

to the policy upheld in *Sabatini v. Las Vegas Metropolitan Police Department*. *See* 369 F. Supp.

3d 1066, 1097 (D. Nev. 2019), *reconsideration denied*, No. 217CV01012JADNJK, 2019 WL

3307040 (D. Nev. July 23, 2019). The policy in *Sabatini* similarly prohibited speech that would

> a. Impair working relationships of the department for which loyalty and
> confidentiality are important; b. *Impede the performance of duties*; c. Impair
> discipline and harmony among co-workers; or d. *Negatively impact or tend to
> negatively impact the department's ability to serve the public.*

> that *ridicules, maligns, disparages, or otherwise promotes discrimination against* race,
> ethnicity, religion, sex, national origin, sexual orientation, age, disability, political
> affiliation, gender identity and expression[,] or other explicit class of individuals;

> that suggests the person is engaged in behavior reasonably considered to be unlawful or
> reckless toward public safety;

*See Sabatini v. Las Vegas Metro. Police Dep't*, 369 F. Supp. 3d 1066, 1072–73 (D. Nev. 2019),

*reconsideration denied,* No. 217CV01012JADNJK, 2019 WL 3307040 (D. Nev. July 23, 2019).

The Policy in *Sabatini* also stated

> Department members will not post, transmit, or otherwise disseminate any
> information, documents, photos or videos, *to which members have access as a
> result of employment*, without written permission from the Sheriff, or designee;

*See id.* Ultimately the Court finds here as the Court in *Sabatini* did that the impact of the

proscriptions in the Social Media Policy is outweighed by the Fire Department's interest in

functioning and orderly department capable of effectively serving the public.

**B.  Plaintiffs' Contention the Social Media Policy is Unconstitutionally Vague**

In the context of public employment, the unconstitutional vagueness doctrine is intended to ensure that public employees have fair notice that certain conduct puts persons at risk of discharge. *See San Filippo v. Bongiovanni*, 961 F.2d 1125, 1136 (3d Cir. 1992). Policies of public employers "are not void for vagueness as long as ordinary persons using ordinary common sense would be notified that certain conduct will put them at risk of discharge." *Id.* (citing *Arnett v. Kennedy*, 94 S. Ct. 1633, 1647 (1974)). Here, the Court finds that the policy is sufficiently clear that a reasonable person could foresee the conduct which would put him at risk of discharge or other discipline. As the Court noted about section 2(d) of the policy provides an explanatory list of the types of speech or conduct which would fall under the policy and would serve to undermine public trust and confidence in Fire Department Employees.

Further, a "plaintiff whose speech is clearly proscribed cannot raise a successful vagueness claim ...." *Doe v. Valencia Coll.*, 903 F.3d 1220, 1233 (11th Cir. 2018) (quoting *Holder v. Humanitarian Law Project*, 130 S.Ct. 2705, 2719 (2010). In the present case Plaintiffs' speech, in posting a picture of an internal calendar, was proscribed by the Social Media Policies prohibition on disseminating "disseminate any information (data, text, photographs, audio, video, or any other multimedia file) to which they have access to as a result of their employment without written permission from the Fire Rescue Administrator or designee." *See* Am. Compl. Ex 2 § 2(k). Plaintiffs statements that a fellow captain was a "thief" and that a staffing officer was "fucking stellar" who "blindly approves" what is before him, *see* [DE 50-2] ¶¶ 24–26, could be "reasonably interpreted as having an adverse effect on Fire Rescue morale," and as "unprofessional… comments" that tend to undermine the public trust and confidence required by

employees." *See* Am. Compl. Ex 2 § 2(d). As such, it is not clear the plaintiff may even raise a successful facial vagueness claim.

V.   **CONCLUSION**

Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1.   Plaintiff's Motion [DE 47] is **DENIED**.

2.   Defendant's Motion [DE 49] is **GRANTED.**

3.   Judgment shall be entered separately pursuant to Federal Rule of Civil Procedure 58.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida this 12th  day of November, 2020.

WILLIAM P. DIMITROULEAS
United States District Judge

Copies furnished to:

All counsel of record

# DE 77

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-80701-CIV-DIMITROULEAS

AJ O'LAUGHLIN and CRYSTAL
LITTLE,

       Plaintiffs,

v.

PALM BEACH COUNTY, a political
Subdivision of the State of Florida,

       Defendant.

_____/

## FINAL JUDGMENT AND ORDER CLOSING CASE

THIS CAUSE is before the Court upon the Court's Order Granting Defendant's Motion

for Summary Judgment, entered separately today.

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Judgment is hereby entered in favor of Defendant and against Plaintiffs;

2. Plaintiffs shall take nothing from Defendant through this action; and

3. The Clerk is hereby directed to **CLOSE** this case and **DENY** any pending motions as

    moot.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida,

this 12th day of November, 2020.

WILLIAM P. DIMITROULEAS
United States District Judge

Copies furnished to:
Counsel of record

**Certificate of Service**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was

filed and served electronically to Helene C. Hvizd and Anaili Cure, Attorneys for

Appellee,  hhvizd@pbcgov.org;  acure@pbcgov.org; ldennis@pbcgov.org;

webber@pbcgov.org; Palm Beach County Attorney's Office, 301 N. Olive Avenue,

Suite 601, West Palm Beach, Florida 33401.

Respectfully Submitted,

*/s/ Karen Coolman Amlong*
KAREN COOLMAN AMLONG
Florida Bar Number 275565
KAmlong@TheAmlongFirm.com
THE AMLONG FIRM
500 NE Fourth St., Second Floor
Fort Lauderdale, FL  33301
Telephone (954) 462-1983
Facsimile (954) 523-3192
*Attorneys for the Appellants*,
      *AJ O'Laughlin and Crystal Little*

\\amlong3\cpshare\CPWin\HISTORY\210325_0001\1829.40